# EXHIBIT C

Steven J. Nataupsky (CA SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (CA SBN 156511)
lynda.zadrasymes@knobbe.com
Matthew Bellinger (CA SBN 222228)
matt.bellinger@knobbe.com
Marko R. Zoretic (CA SBN 233,952)
marko.zoretic@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BEASTUP LLC, a California limited liability company,<br><br>Defendant. | Case No. 2:17-CV-01605-KJM-EFB<br><br>**DECLARATION OF MARKO R. ZORETIC IN SUPPORT OF MONSTER ENERGY COMPANY'S PORTION OF JOINT STATEMENT REGARDING DISCOVERY DISAGREEMENT**<br><br>Date:          May 16, 2018<br>Time:          10:00 a.m.<br>Location:      Ctrm 8, 13th Floor<br>Magistrate Edmund F. Brennan |

I, Marko R. Zoretic, declare as follows:

1.      I am a partner with the law firm of Knobbe, Martens, Olson & Bear, LLP, and one of the attorneys representing Plaintiff Monster Energy Company ("MEC").  I have personal knowledge of the matters set forth herein and if called upon to testify, I could and would competently testify as follows:

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Monster Energy Company's First Set of Interrogatories (Nos. 1–12), that was served on December 1, 2017.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of Monster Energy Company's First Set of Requests for Production (Nos. 1–46), that was served on December 1, 2017.

4.      On December 1, 2017, Monster Energy Company served its First Set of Requests for Admission (Nos. 1–5).

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a January 12, 2018 email that I received from Eve Brown, counsel for BeastUp (including previous email chain contents; email chain contents prior to the January 2, 2018 email omitted).

6.      Attached hereto as **Exhibit 4** is a true and correct copy of a BeastUp's untimely January 9, 2018 Responses to Monster Energy Company's First Set of Interrogatories (1–12).

7.      Attached hereto as **Exhibit 5** is a true and correct copy of BeastUp's untimely January 9, 2018 Response to Monster Energy Company's First Set of Requests for Production (1–46).

8.      Attached hereto as **Exhibit 6** is a true and correct copy of a January 19, 2018 letter from Julianna Simon, counsel for Monster, to Eve Brown, counsel for BeastUp.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Monster Energy Company's Second Set of Interrogatories (Nos. 13–16), that was served on December 20, 2017.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of Monster Energy Company's Second Set of Requests for Production (No. 47), that was served on December 20, 2017.

Zoretic Decl re Motion to Compel
Case No. 2:17-CV-01605-KJM-EFB

11.     Attached hereto as **Exhibit 9** is a true and correct copy of BeastUp's February 5, 2018 Supplemental Responses to Monster's First Set of Interrogatories and untimely Responses to Monster's Second Set of Interrogatories.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of BeastUp's February 2, 2018 Supplemental Responses to Monster's First Set of Requests for Production and untimely Responses to Monster's Second Set of Requests for Production.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of a January 24, 2018 email from me to Eve Brown, counsel for BeastUp (including previous email chain contents).

14.     Attached hereto as **Exhibit 12** is a true and correct copy of excerpts of the January 25, 2018 Rule 30(b)(6) deposition of Defendant (Mr. Robert Waelty designated witness.)

15.     Attached hereto as **Exhibit 13** is a true and correct copy of a March 12, 2018 letter from me to Eve Brown, counsel for BeastUp, requesting a meet and confer concerning BeastUp's deficient discovery responses

16.     Attached hereto as **Exhibit 14** is a true and correct copy of a February 2, 2018 email from Eve Brown, counsel for BeastUp, to me, stating for the first time that documents were available for inspection. (Highlighting added.)

17.     On March 20, 2018, I conducted a meet and confer with Eve Brown, counsel for BeastUp concerning issues raised in my March 12, 2018 letter (attached hereto as Exhibit 13.)

18.     Attached hereto as **Exhibit 15** is a true and correct copy of an April 2, 2018 email from Eve Brown, counsel for BeastUp, to me (including previous email chain contents).

19.     Attached hereto as **Exhibit 16** is a true and correct copy of my April 4, 2018 letter to Eve Brown, counsel for BeastUp.

20.     Attached hereto as **Exhibit 17** is a true and correct copy of a document bearing production numbers FD000019–21 that was produced in this case by Foothill Distributing Co., Inc. in response to a subpoena.

21.     Attached hereto as **Exhibit 18** is a true and correct copy of an April 11, 2018 email from Eve Brown, counsel for BeastUp, to me.

Zoretic Decl re Motion to Compel
Case No. 2:17-CV-01605-KJM-EFB

22.     Attached hereto as **Exhibit 19** is a true and correct copy of an April 16, 2018 email from Eve Brown, counsel for BeastUp, to me.

23.     I have reviewed Defendant's document production in this case (BEASTUP PROD0001–2228).    Defendant has produced some emails from the email account sniperwaelty@yahoo.com, but I did not locate any emails produced by Defendant from the following     email     accounts:     beastupenergy@gmail.com,     info@beastup.com, beastupgear@gmail.com, and robertwaelty@beastup.com.   I also did not locate in Defendant's production any communications between Robert Waelty, Jessee Waelty, John Waelty, Colter Hedden, and/or Tony Thompson.   Further, Defendant has produced invoices for sales of the BeastUp energy drink, but it is not clear whether all sales invoices have been produced.  It is also not clear whether all documents reflecting the amount of products that have been given away have been produced.   The only documents that appear to have been filed with the Board of Equalization that were included in Defendant's document production are for 2017.  I also did not locate in Defendant's production the following documents:

- the form that Defendant uses to track product provided to stores and all sales documents from Foothill Distributing;
- the list of athletes Defendant has sponsored;
- the sheet showing the investments made into Defendant's business;
- the final, executed version of Deposition Exhibit 12 (BEASTUP PROD 0010–21);
- communications that occurred before Aug. 7, 2017 between Mr. Waelty and Mr. Norberg; and
- communications with Tim Crew.

/ / /

1         I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct.

3         Executed on this day, April 23, 2018 at Irvine, California.

4

5

6                            */s/ Marko R. Zoretic*
                             Marko R. Zoretic

7

8

9 28060934

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Zoretic Decl re Motion to Compel
Case No. 2:17-CV-01605-KJM-EFB

# EXHIBIT 1

1  Steven J. Nataupsky (CA SBN 155913)
   steven.nataupsky@knobbe.com
2  Lynda J. Zadra-Symes (CA SBN 156511)
   lynda.zadrasymes@knobbe.com
3  Matthew Bellinger (CA SBN 222228)
   matt.bellinger@knobbe.com
4  Marko R. Zoretic (CA SBN 233952)
   marko.zoretic@knobbe.com
5  KNOBBE, MARTENS, OLSON & BEAR, LLP
   2040 Main Street, Fourteenth Floor
6  Irvine, CA  92614
   Telephone: (949) 760-0404
7  Facsimile: (949) 760-9502

8  Attorneys for Plaintiff
   MONSTER ENERGY COMPANY

9

10                    **IN THE UNITED STATES DISTRICT COURT**

11                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation, | Case No. 2:17-CV-01605-KJM-EFB |
| Plaintiff, | **MONSTER ENERGY COMPANY'S FIRST SET OF INTERROGATORIES (NOS. 1–12)** |
| v. | |
| BEASTUP LLC, a California limited liability company, | |
| Defendant. | |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Monster Energy Company ("MEC") hereby requests that Defendant BeastUp LLC ("BeastUp") answer the following Interrogatories separately and fully, in writing, and serve a copy of such answer upon counsel for MEC within thirty (30) days of service hereof.

## DEFINITIONS

1.     The terms "You", "Your," "Defendant," and "BeastUp" shall mean BeastUp LLC and any present or former officer, director, member, employee, servant, subcontractor, agent, attorney, or other representative acting on their behalf, and shall include any parent, wholly-owned or partially-owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

2.     The term "MEC" shall mean Monster Energy Company and any present or former officer, director, member, employee, servant, subcontractor, agent, attorney, or other representative acting on its behalf, and shall include any parent, wholly-owned or partially-owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

3.     The term "MEC'S BEAST-Inclusive Marks" shall mean MEC's UNLEASH THE BEAST!®, REHAB THE BEAST! WWW.MONSTERENERGY.COM®, REHAB THE BEAST!®, UNLEASH THE ULTRA BEAST!®, PUMP UP THE BEAST!®, and UNLEASH THE NITRO BEAST!® trademarks.

4.     The term "Claw Icon" shall mean MEC's ⧣® mark and other marks incorporating that mark, including the marks identified in Paragraph 13 of MEC's Complaint.

5.     The term "MEC's Products" shall mean any product sold and/or distributed by MEC under the Claw Icon and/or any of MEC's BEAST-Inclusive Marks, including the products identified in Paragraphs 8, 9, and 10 of MEC's Complaint.

6.     The term "Defendant's Claw Logos" shall mean the claw designs shown on BeastUp's energy drinks and/or on BeastUp's promotional materials, including the claw logo designs shown in Paragraphs 40 and 41 of MEC's Complaint.

7.     The term "BeastUp Products" shall mean any product offered for sale, sold, distributed, marketed, advertised, or promoted under Defendant's Claw Logos and/or the

BEASTUP mark, including the energy drinks identified in Paragraphs 40 and 41 of MEC's Complaint.

8.     The term "document" shall mean all writings, recordings, photographs, or other documents within the scope of Rule 1001 of the Federal Rules of Evidence or Rule 34 of the Federal Rules of Civil Procedure, including without limitation written, printed, typed, electronically stored, magnetically stored, optically stored, and visually or aurally reproduced material of any kind.  The term "document" shall include both the original of a document and all distinct copies thereof, including, without limitation, copies that are distinct due to the presence of notes made on or attached to the document.

9.     The term "thing" shall mean all tangible objects of any type, composition, construction or nature.

10.     The terms "relating to" or "relate to" shall encompass all express and implied references to the specified person, subject, event or thing and means evidencing, comprising, constituting, reflecting, respecting, concerning, referring, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing, evaluating, supporting, or tending to negate.

11.     The term "person" or "persons" shall include both natural persons and corporate or other businesses entities, whether or not in your employ, and the acts and knowledge of that person are defined to include the acts and knowledge of that person's officers, directors, members, employees, representatives, servants, agents, and attorneys.

12.     The term "concerning" shall mean relating to, referring to, describing, evidencing or constituting.

13.     The plural of any term shall be construed as the singular, and vice versa, as necessary and in order to bring within the scope of these interrogatories any information, documents, or things that might otherwise be construed to be outside their scope.

14.     The terms "and" and "or" shall be construed both conjunctively and disjunctively, and the plural shall be construed as the singular and vice versa, as necessary to bring within the scope of these interrogatories all information, documents and things that

1   otherwise could be deemed outside their scope.

2                          **INSTRUCTIONS**

3        1.       All requests to identify a person in the following Interrogatories are to be

4   answered by providing sufficient information to enable the undersigned to contact the person by

5   telephone and mail, and to serve legal documents on such person.  If such person is a natural

6   person, state his or her:

7                a.       full name;

8                b.       present or last known employer, occupation, and position;

9                c.       present or last known job title;

10               d.       a brief description of the responsibilities of such person with the pertinent

11                        organization; and

12               e.       any relationship between any such person and You, and the dates any

13                        such relationship existed.

14       2.       If the request is to identify a person in the following Interrogatories and such

15   person is other than a natural person, state:

16               a.       its full name or designation;

17               b.       the legal classification of the entity (e.g., corporation, partnership, etc.)

18                        giving the state of incorporation where appropriate;

19               c.       the principal place of business;

20               d.       the present or last known address and telephone number of the entity;

21               e.       any other information reasonably necessary to permit efficient contact with

22                        the entity; and

23               f.       any relationship between the entity and You, and the dates any such

24                        relationship existed.

25       3.       All requests to identify a written document or statement in the following

26   Interrogatories, should state:

27               a.       the type of document or writing;

28               b.       the name of the author or creator;

1              c.      the title of the document and/or any preexisting identifying mark or code;

2              d.      the date it bears, or if undated, the date it was created;

3              e.      the name of the addressee or recipient; and

4              f.      all production numbers marked on the document.

5     4.      All requests to identify an event in the following Interrogatories, should state:

6              a.      the name of the event;

7              b.      the nature of the event;

8              c.      the date of the event;

9              d.      the persons in attendance;

10            e.      the subject matter; and

11            f.      the location.

12     5.      If You claim that any information, document, or thing requested is protected by the attorney-client privilege, work product immunity, or any other privilege or immunity, provide all information falling within the scope of the interrogatory which is not subject to the claim of privilege or immunity, and identify with sufficient particularity for purposes of a motion under Federal Rule of Civil Procedure Rule 37 to compel the information, document, or thing with respect to which You claim a privilege or immunity, and separately state:

18            a.      the basis on which the privilege or immunity is claimed;

19            b.      the nature of the information, document, or thing;

20            c.      the author, creator or sender of the information, document or thing;

21            d.      each individual or other person to whom the information, document, copy
22                    thereof, or thing was sent or otherwise disclosed;

23            e.      the date of the information, document, or thing or if the date is not
24                    known, the date the information, document, or thing was created or sent;
25                    and

26            f.      a summary of the subject matter of such information, document, or thing
27                    in sufficient detail to permit the Court to reach a determination in the
28                    event of a motion under Federal Rule of Civil Procedure Rule 37.

6.      Your obligation to respond to these Interrogatories is continuing and the responses to the following Interrogatories are to be promptly supplemented to include subsequently acquired information in accordance with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify and describe each of the BeastUp Products.

**INTERROGATORY NO. 2:**

For each product identified in response to Interrogatory No. 1, identify the date the product was first sold and its average wholesale and retail price.

**INTERROGATORY NO. 3:**

Identify each person involved with the development, selection, or approval of the BEASTUP mark and Defendant's Claw Logos, and for each person so identified, describe in detail, with reference to any supporting documents, information, and materials, their role in such development, selection, or approval.

**INTERROGATORY NO. 4:**

Describe in detail, with reference to any supporting documents, information, and materials, when and how You first became aware of MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, and any of MEC's Products and describe all circumstances surrounding such knowledge.

**INTERROGATORY NO. 5:**

Describe in detail, with reference to any supporting documents, information, and materials, how and in what way any of MEC's BEAST-Inclusive Marks were considered or referenced during the selection, development, or approval of the BEASTUP mark, including, but not limited to, whether a clearance search was conducted by You or on Your behalf before the BEASTUP mark was approved for use in the marketplace.

/ / /

/ / /

**INTERROGATORY NO. 6:**

Describe in detail, with reference to any supporting documents, information, and materials, how and in what way the Claw Icon was considered or referenced during the selection, development, or approval of Defendant's Claw Logos, including, but not limited to, whether a clearance search was conducted by You or on Your behalf before Defendant's Claw Logos were approved for use in the marketplace.

**INTERROGATORY NO. 7:**

Describe any research (including, but not limited to, surveys, polls, market research, investigations, analyses, studies, or searches) regarding the BEASTUP mark or Defendant's Claw Logos, including, but not limited to, stating the person(s) who authorized the research, when the research was conducted, the person(s) who conducted the research, the reason the research was conducted, the results of the research, and identifying all documents relating to the research.

**INTERROGATORY NO. 8:**

State Your net and gross sales (in units and dollars) and net and gross profits, on a monthly basis, for each of the BeastUp Products since the date of first sale of each product.

**INTERROGATORY NO. 9:**

Describe the trade channels, including identifying by name all retail stores and other outlets, through which the BeastUp Products have been sold, are currently being sold, or will be sold.

**INTERROGATORY NO. 10:**

Identify the customers who purchase or have purchased the BeastUp Products, including, but not limited to, the demographic characteristics associated with these consumers (*e.g.* age, sex, and education level).

**INTERROGATORY NO. 11:**

Describe in detail, with reference to any supporting documents, information, and materials, the manner in which You have advertised, marketed, and/or promoted the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products, including identifying the

publications, radio stations, television stations, websites, advertising programs, social media, or other media channels through which You have promoted the marks and the products.

**INTERROGATORY NO. 12:**

Identify and describe in detail each and every instance in which someone has confused, questioned, or inquired about a relationship between (1) You, the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products and (2) MEC, any of MEC's Products, the Claw Icon, or any of MEC's BEAST-Inclusive Marks, including, but not limited to, identifying all persons having knowledge thereof and all documents relating thereto.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 1, 2017          By:  /s/  Marko R. Zoretic
                                         Steven J. Nataupsky
                                         Lynda J. Zadra-Symes
                                         Matthew S. Bellinger
                                         Marko R. Zoretic

                                         Attorneys for Plaintiff
                                         MONSTER ENERGY COMPANY

<div align="center">

**<u>CERTIFICATE OF SERVICE</u>**

</div>

I am a citizen of the United States of America and I am employed in Irvine, California. I am over the age of 18 and not a party to the within action. My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

On December 1, 2017, I **MONSTER ENERGY COMPANY'S FIRST SET OF INTERROGATORIES (NOS. 1–12)** on counsel for BeastUp LLC as shown below **VIA E-MAIL:**

Eve J. Brown
BRICOLAGE LAW, LLC
1080 Beacon Street, Suite 4D
Brookline, MA  02446
(508) 734-3404
ejbrown@bricolagelaw.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on December 1, 2017, at Irvine, California.

_____
Linda P. Dunn

26726870

# EXHIBIT 2

1   Steven J. Nataupsky (CA SBN 155913)
    steven.nataupsky@knobbe.com
2   Lynda J. Zadra-Symes (CA SBN 156511)
    lynda.zadrasymes@knobbe.com
3   Matthew Bellinger (CA SBN 222228)
    matt.bellinger@knobbe.com
4   Marko R. Zoretic (CA SBN 233952)
    marko.zoretic@knobbe.com
5   KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
6   Irvine, CA  92614
    Telephone: (949) 760-0404
7   Facsimile: (949) 760-9502

8   Attorneys for Plaintiff
    MONSTER ENERGY COMPANY

9

10                  **IN THE UNITED STATES DISTRICT COURT**

11                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12   MONSTER ENERGY COMPANY,          )   Case No. 2:17-CV-01605-KJM-EFB
     a Delaware corporation,           )
13                                     )
                                       )
14              Plaintiff,             )   **MONSTER ENERGY COMPANY'S**
                                       )   **FIRST SET OF REQUESTS FOR**
15          v.                         )   **PRODUCTION (NOS. 1–46)**
                                       )
16   BEASTUP LLC, a California limited liability )
     company,                         )
17                                     )
                Defendant.             )
18                                     )
                                       )
19                                     )

20

21

22

23

24

25

26

27

28

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff, Monster Energy Company ("MEC") hereby requests that Defendant BeastUp LLC ("BeastUp") respond to the following requests for production of documents and things, separately and fully, in writing, and produce the documents and things identified below for inspection and copying at the offices of counsel for MEC within thirty (30) days of service hereof. These requests are deemed continuing in nature, requiring amendment and supplemental answers as appropriate

## DEFINITIONS

1.      The terms "You", "Your," "Defendant," and "BeastUp" shall mean BeastUp LLC and any present or former officer, director, member, employee, servant, subcontractor, agent, attorney, or other representative acting on their behalf,  and shall include any parent, wholly-owned or partially-owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

2.      The term "MEC" shall mean Monster Energy Company and any present or former officer, director, member, employee, servant, subcontractor, agent, attorney, or other representative acting on its behalf, and shall include any parent, wholly-owned or partially-owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

3.      The term "MEC's BEAST-Inclusive Marks" shall mean MEC's UNLEASH THE BEAST!®, REHAB THE BEAST! WWW.MONSTERENERGY.COM®, REHAB THE BEAST!®, UNLEASH THE ULTRA BEAST!®, PUMP UP THE BEAST!®, and UNLEASH THE NITRO BEAST!® trademarks.

4.      The term "Claw Icon" shall mean MEC's $\text{M}^®$ mark, including the marks identified in Paragraph 13 of MEC's Complaint.

5.      The term "MEC's Products" shall mean any products sold and/or distributed by MEC under the Claw Icon and/or any of MEC's BEAST-Inclusive Marks, including the products identified in Paragraphs 8, 9, and 10 of MEC's Complaint.

6.      The term "Defendant's Claw Logos" shall mean the claw design shown on BeastUp's energy drinks and/or on BeastUp's promotional materials, including the claw designs shown in Paragraphs 40 and 41 of MEC's Complaint.

7.     The term "BeastUp Products" shall mean any product offered for sale, sold, distributed, marketed, advertised, or promoted under Defendant's Claw Logos and/or the BEASTUP mark, including the energy drinks identified in Paragraphs 40 and 41 of MEC's Complaint.

8.     The term "document" shall mean all writings, recordings, photographs, or other documents within the scope of Rule 1001 of the Federal Rules of Evidence or Rule 34 of the Federal Rules of Civil Procedure, including without limitation written, printed, typed, electronically stored, magnetically stored, optically stored, and visually or aurally reproduced material of any kind.  The term "document" shall include both the original of a document and all distinct copies thereof, including, without limitation, copies that are distinct due to the presence of notes made on or attached to the document.

9.     The term "thing" shall mean all tangible objects of any type, composition, construction or nature.

10.     The terms "relating to" or "relate to" shall encompass all express and implied references to the specified person, subject, event or thing and means evidencing, comprising, constituting, reflecting, respecting, concerning, referring, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing, evaluating, supporting, or tending to negate.

11.     The term "person" or "persons" shall include both natural persons and corporate or other businesses entities, whether or not in your employ, and the acts and knowledge of that person are defined to include the acts and knowledge of that person's officers, directors, members, employees, representatives, servants, agents, and attorneys.

12.     The term "concerning" shall mean relating to, referring to, describing, evidencing or constituting.

13.     The terms "and" and "or" shall be construed both conjunctively and disjunctively, and the plural shall be construed as the singular and vice versa, as necessary to bring within the scope of these requests all information, documents and things that otherwise could be deemed outside their scope.

14.     The plural of any term shall be construed as the singular, and vice versa, as necessary and in order to bring within the scope of these requests any information, documents, or things that might otherwise be construed to be outside their scope.

## **GENERAL INSTRUCTIONS**

1.      If you claim that any requested document or thing is protected by the attorney-client privilege, work product immunity, or any other privilege or immunity, or otherwise excludable from discovery, produce all documents and things falling within the scope of the request which are not subject to the claim of privilege or immunity, and with respect to each responsive document or thing withheld or redacted, state:

a.      the basis on which the privilege or immunity is claimed;

b.      the nature of the document or thing;

c.      the identity of the person(s) who authored, created, sent, or received the original or a copy of the document or thing, including the names appearing on any circulation list associated with such document;

d.      the manner of its transmission to each recipient;

e.      the date of the document or thing, or, if the date is not known, the date the document or thing was created or sent; and

f.      a summary of the subject matter of such document or thing in sufficient detail to permit the Court to reach a determination in the event of a motion under Federal Rule of Civil Procedure 37.

2.      With regard to any physical item or other item of which a meaningful copy cannot be made, and which you elect to make available for inspection in lieu of producing the original, mark that item with a unique production number and state in your response that the item is available for inspection.

3.      All documents and things shall be produced in the order and form in which they are kept, including any organizational grouping.

4.      Your obligation to respond to these requests for production is continuing and the responses to the following requests for production are to be promptly supplemented to include

1   subsequently acquired information, or responsive documents and things that are discovered after

2   your initial response to these requests, in accordance with the requirements of Rule 26(e) of the

3   Federal Rules of Civil Procedure.

4   **REQUESTS FOR PRODUCTION**

5   **REQUEST FOR PRODUCTION NO. 1:**

6       All documents and things relating to the development, origin, conception, derivation,

7   selection, adoption, and/or approval of the BEASTUP mark and Defendant's Claw Logos.

8   **REQUEST FOR PRODUCTION NO. 2:**

9       Documents sufficient to show the reasons for which the BEASTUP mark and

10   Defendant's Claw Logos were selected.

11   **REQUEST FOR PRODUCTION NO. 3:**

12       Documents sufficient to show the person or persons who assisted with or otherwise

13   developed and/or created the BEASTUP mark and Defendant's Claw Logos.

14   **REQUEST FOR PRODUCTION NO. 4:**

15       All documents and things relating to any consideration of or reference to MEC, any of

16   MEC's BEAST-Inclusive Marks, or any of MEC's Products in connection with the

17   development, selection or approval of the BEASTUP mark and/or Defendant's Claw Logos.

18   **REQUEST FOR PRODUCTION NO. 5:**

19       Documents and things sufficient to identify all variations and versions of the BEASTUP

20   mark and Defendant's Claw Logos, whether final or not and whether used or not, which were

21   considered or developed for use in connection with the BeastUp Products.

22   **REQUEST FOR PRODUCTION NO. 6:**

23       Documents sufficient to show each of the BeastUp Products.

24   **REQUEST FOR PRODUCTION NO. 7**

25       All documents and things relating to MEC, the Claw Icon, any of MEC's BEAST-

26   Inclusive Marks, or MEC's Products.

27   **REQUEST FOR PRODUCTION NO. 8:**

28       All communications relating to MEC, the Claw Icon, any of MEC's BEAST-Inclusive

Marks, or MEC's products.

**REQUEST FOR PRODUCTION NO. 9:**

All documents and things relating to communications between You and any distributors, retailers, and/or consumers that refer to or mention MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and things relating to any decision to seek or not seek trademark protection for the BEASTUP mark and/or Defendant's Claw Logos.

**REQUEST FOR PRODUCTION NO. 11:**

All documents evidencing the first use in commerce of the BEASTUP mark and Defendant's Claw Logos, including samples, advertisements, marketing plans, and invoices.

**REQUEST FOR PRODUCTION NO. 12:**

Documents sufficient to show the geographic regions where the BeastUp Products have been sold.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show, on a monthly basis, Your total net and gross sales (both in units and dollars) and total net and gross profits for the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show the prices charged for the BeastUp Products, including, but not limited to, price lists for the products.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things relating to the circumstances surrounding Your first awareness of MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things relating to any opinions, written or oral, conducted by You or on Your behalf relating to MEC, MEC's Products, the Claw Icon, and/or any of MEC's BEAST-Inclusive Marks.

/ / /

**REQUEST FOR PRODUCTION NO. 17:**

All documents and things relating to any opinions, written or oral, relating to the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and things relating to searches (including trademark searches), surveys, investigations, analyses, polls, research (including market research) or studies by You or on Your behalf relating to the BEASTUP mark and/or Defendant's Claw Logos.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and things relating to searches (including trademark searches), surveys, investigations, analyses, polls, research (including market research) or studies by You or on Your behalf relating to MEC, MEC's Products, the Claw Icon, and/or any of MEC's BEAST-Inclusive Marks.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and things relating to surveys, investigations, analyses, polls, research (including market research) or studies by You or on Your behalf relating to comparisons between (1)You, the BEASTUP mark, and/or Defendant's Claw Logos and (2) MEC, any of MEC's BEAST-Inclusive Marks, and/or the Claw Icon.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and things relating to any instances of actual or possible confusion or association, or any reports of such confusion or association, known to You, between the BeastUp Products on the one hand, and MEC or any of MEC's Products on the other, including, but not limited to, any inquiries or comments regarding whether the BeastUp Products originate from the same source as, or are affiliated with, MEC or any of MEC's Products.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things relating to any communications, comments, or inquiries You have received from third-parties about MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products.

/ / /

Monster 1st Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

**REQUEST FOR PRODUCTION NO. 23:**

All documents and things relating to the advertisement, promotion, or marketing of the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify each manner in which the BeastUp Products are marketed, advertised, and/or promoted, including documents sufficient to identify the magazines, publications, Internet web pages, trade shows and other events, through which the products are advertised or promoted, and copies of each advertisement and/or marketing material that features or promotes the products.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to identify each manner in which the BEASTUP mark and Defendant's Claw Logos are marketed, advertised, and/or promoted, including documents sufficient to identify the magazines, publications, Internet web pages, trade shows and other events, through which the marks are advertised or promoted, and copies of each advertisement and/or marketing material that features or promotes the marks.

**REQUEST FOR PRODUCTION NO. 26:**

All documents relating to Your costs and expenditures in connection with promoting and advertising the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show the person or persons involved in how the BeastUp Products are and/or will be advertised, marketed, and/or promoted.

**REQUEST FOR PRODUCTION NO. 28:**

All documents and things relating to the target or intended market for the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 29:**

All documents referring to the degree of care exercised by purchasers who buy the BeastUp Products.

/ / /

Monster 1st Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

**REQUEST FOR PRODUCTION NO. 30:**

All documents and things relating to the consumers who purchase or have purchased the BeastUp Products, including, but not limited to, the demographic characteristics associated with these consumers (*e.g.* age, sex, and education level).

**REQUEST FOR PRODUCTION NO. 31:**

All documents and things relating to the consumers to whom you target or have targeted any marketing, advertising, or promotions for the BeastUp Products, including, but not limited to, the demographic characteristics associated with these potential consumers (*e.g.* age, sex, and education level).

**REQUEST FOR PRODUCTION NO. 32:**

All marketing and business plans relating to the BEASTUP mark, Defendant's Claw Logos, and/or the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 33:**

Documents sufficient to identify the distributors and retailers of any the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 34:**

All documents and things relating to the channels of distribution or the intended channels of distribution for the BeastUp Products.

**REQUEST FOR PRODUCTION NO. 35:**

Documents sufficient to ascertain and describe Your corporate structure, including, but not limited to, all companies related to You, each of Your members, and each related company.

**REQUEST FOR PRODUCTION NO. 36:**

Printed copies of the current and previous versions of all websites maintained by You, including, but not limited to, www.beastup.com.

**REQUEST FOR PRODUCTION NO. 37:**

Printed copies of the current and previous versions of all social media accounts maintained by You, including, but not limited to, https://www.facebook.com/BeastUpBrand/ and https://www.instagram.com/beastupbrand/.

Monster 1st Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

**REQUEST FOR PRODUCTION NO. 38:**

All documents relating to any communications between You and any third-parties relating to this lawsuit.

**REQUEST FOR PRODUCTION NO. 39:**

Documents sufficient to show Your document retention policies for the past three (3) years.

**REQUEST FOR PRODUCTION NO. 40:**

All documents and things relied upon or consulted in connection with Your responses to MEC's interrogatories served in this case.

**REQUEST FOR PRODUCTION NO. 41:**

All documents and things supporting or refuting the Affirmative Defenses in Your Answer filed September 8, 2017.

**REQUEST FOR PRODUCTION NO. 42:**

All documents and things relating to Your contention, as stated in Paragraph 101 of Your Answer filed September 8, 2017, that "Defendant's marks have been in open, continuous, and extensive use by Defendant for more than eight (8) years for 'hats and shirts,' and for more than three (3) years for 'sports drinks, namely, energy drinks' prior to the filing of this action."

**REQUEST FOR PRODUCTION NO. 43:**

All documents and things relating to Your contention, as stated in Paragraph 101 of Your Answer filed September 8, 2017, that MEC was aware of Your use of the BEASTUP mark and/or Defendant's Claw Logos.

**REQUEST FOR PRODUCTION NO. 44:**

All documents and things showing or relating to any alleged continuous use by You of the BEASTUP mark since You first began using the mark.

**REQUEST FOR PRODUCTION NO. 45:**

All documents and things showing or relating to any alleged continuous use by You of Defendant's Claw Logos since You first began using the marks.

/ / /

Monster 1st Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

**REQUEST FOR PRODUCTION NO. 46:**

All documents and things relating to any efforts or other consideration by You to change or redesign the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 1, 2017          By:  */s/ Marko R. Zoretic*
                                        Steven J. Nataupsky
                                        Lynda J. Zadra-Symes
                                        Matthew S. Bellinger
                                        Marko R. Zoretic

                                        Attorneys for Plaintiff
                                        MONSTER ENERGY COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I am a citizen of the United States of America and I am employed in Irvine, California. I am over the age of 18 and not a party to the within action. My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

On December 1, 2017, I served **MONSTER ENERGY COMPANY'S FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 1–46)** on counsel for BeastUp LLC as shown below **VIA E-MAIL:**

Eve J. Brown
BRICOLAGE LAW, LLC
1080 Beacon Street, Suite 4D
Brookline, MA  02446
(508) 734-3404
ejbrown@bricolagelaw.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on December 1, 2017, at Irvine, California.


_Linda Dunn_
Linda P. Dunn

26726900

Monster 1st Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

# EXHIBIT 3

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Friday, January 12, 2018 11:37 AM
**To:** Marko.Zoretic
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Matt.Bellinger
**Subject:** Re: BeastUp

Here is the link, Marko:

https://files.acrobat.com/a/preview/3262b9d5-2d7b-4d45-a0bb-2f261891d9b1

Please note that several documents have been designated Confidential. If you still have difficulty accessing the files, let me know and I will do my best to "immediately" remedy the issue.

Have a great weekend,

Eve

---

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Friday, January 12, 2018 6:11:47 PM
**To:** Eve Brown
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Matt.Bellinger
**Subject:** Re: BeastUp

Eve,

I'm following up yet again. We still haven't received the promised documents. Will they be produced immediately or not?

Regards,
Marko

On Jan 11, 2018, at 12:12 PM, Marko.Zoretic <Marko.Zoretic@knobbe.com> wrote:

Eve,

I've checked and I have not received it.  And I'm not sure what you mean when you said you sent a link via Adobe.  Please explain and please resend immediately.  How many pages of production is it? Can't you just attach it to an email? It seems like a very basic task that doesn't require IT assistance and yet further delay.

Regards,
Marko

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Thursday, January 11, 2018 11:52 AM
**To:** Marko.Zoretic
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Matt.Bellinger
**Subject:** Re: BeastUp

I just received this message, Marko. The link to the document production was sent to you yesterday via Adobe. I will have my IT person look into why it wasn't received on your end. Because the link comes directly from the program, it may not look like I was the sender. Please check your junk inbox just in case.

If not, I will resend and let you know when it is transmitted so that we confirm that you receive it. I am in a meeting from 3-5pm EST this afternoon, and then have my son's Winter Concert, so if I hear from you that you cannot find the link, I will remedy the issue tomorrow.

---

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Thursday, January 11, 2018 12:34:56 PM
**To:** Eve Brown
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Matt.Bellinger
**Subject:** RE: BeastUp

Eve,

We still haven't received Defendant's documents (1) despite your representation on January 3 that you received Defendant's document production and that you would serve them "ASAP"; (2) despite your representation on January 5 that Defendant's discovery responses will be sent "via separate email"; and (3) despite your representation on January 9 that "a link to the documents themselves" would be produced on January 10, which was yesterday.   If the documents will not be produced today, please let us know your availability for a meet and confer at 4:00 pm Eastern (1:00 pm Pacific).   In view of the upcoming Rule 30(b)(6) deposition, we need to receive Defendant's document production immediately.

Regards,
Marko

**Marko Zoretic**
Partner
949-721-7695 **Direct**
**Knobbe Martens**

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Tuesday, January 9, 2018 1:05 PM
**To:** Marko.Zoretic
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Matt.Bellinger
**Subject:** RE: BeastUp

Attached please find BeastUp's responses to MEC's First Set of Requests for Production. I will send a link to the documents themselves tomorrow.

**From:** Eve Brown
**Sent:** Tuesday, January 9, 2018 1:57 PM
**To:** 'Marko.Zoretic' <Marko.Zoretic@knobbe.com>
**Cc:** Vanessa.Lantin <Vanessa.Lantin@knobbe.com>; Lynda.Zadra-Symes
<Lynda.ZadraSymes@knobbe.com>; Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: BeastUp

Marko,

Attached are BeastUp's Responses to MEC's First Sets of Interrogatories and RfAs. Responses to MEC's doc requests will be sent under separate email.

**From:** Marko.Zoretic [mailto:Marko.Zoretic@knobbe.com]
**Sent:** Monday, January 8, 2018 6:27 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Vanessa.Lantin <Vanessa.Lantin@knobbe.com>; Lynda.Zadra-Symes
<Lynda.ZadraSymes@knobbe.com>; Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: BeastUp

Eve,

As you know, the due date for Defendant to respond to Monster's discovery requests has passed. Accordingly, any objections to the discovery requests have been waived, and the unanswered requests for admission are deemed admitted.  We're available tomorrow afternoon, so let's plan on 1:00 pm Eastern to discuss Defendant's failure to produce the requested documents and interrogatory responses.  If Defendant provides its documents and interrogatory responses before that time, then we can cancel the call.  But given that we still have not received Defendant's documents or discovery responses, despite your representations that they were forthcoming, it makes sense to schedule the call.

Regards,
Marko

**Marko Zoretic**
Partner

949-721-7695 **Direct**
**Knobbe Martens**

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Monday, January 08, 2018 12:01 PM
**To:** Marko.Zoretic
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Matt.Bellinger
**Subject:** RE: BeastUp

Marko,

I am working on them as we speak. As you know, while I was planning to send these to you on Friday, I became unexpectedly and regrettably tied up all day fighting with you about other matters. As much as I would love to have 8 hands and multiple brains, it's only me over here.

I am also, as Matt may have told you, stuck in Maine still trying to get back to MA after the blizzard.

Doing my best, my friend. If I can't finish these tonight, then we can schedule a call for tomorrow afternoon. Hopefully that will not be necessary.

**From:** Marko.Zoretic [mailto:Marko.Zoretic@knobbe.com]
**Sent:** Monday, January 8, 2018 2:55 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Vanessa.Lantin <Vanessa.Lantin@knobbe.com>; Lynda.Zadra-Symes
<Lynda.ZadraSymes@knobbe.com>; Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: BeastUp

Eve,

We still have not received Defendant's responses to Monster's December 1, 2017 First Set of Interrogatories (Nos. 1-12), First Set of Requests for Production (Nos. 1-46), and First Set of Requests for Admission (Nos. 1-5).  This is despite your representation on Wednesday, January 3rd, that you received Defendant's document production and discovery responses, and that you would serve them "ASAP"; and your representation on Friday, January 5, that Defendant's discovery responses will be sent "via separate email."  Accordingly, please let us know if you're available today at 3:00 pm Pacific (6:00 pm Eastern), tomorrow at 10:00 am Pacific (1:00 pm Eastern), or tomorrow at 1:30 pm Pacific (4:30 pm Eastern) for a meet and confer to discuss Defendant's failure to respond to Monster's discovery requests.

Regards,
Marko

**Marko Zoretic**
Partner

949-721-7695 **Direct**

**Knobbe Martens**

**From:** Matt.Bellinger
**Sent:** Wednesday, January 03, 2018 2:22 PM
**To:** Eve Brown
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Marko.Zoretic
**Subject:** RE: BeastUp

Eve –

While you state that Defendant will serve its document production and discovery responses "ASAP," that fails to provide any specific date by which defendant will be serving the responses and documents.

Given that the responses simply need to be formatted and you already have your client's documents per your email below, please confirm that the responses and documents will be served by this Friday, January 5.  Otherwise, let us know your availability on Friday for a meet and confer on Defendant's failure to serve the responses and documents.

Regarding the date for the Rule 30(b)(6) deposition of Defendant, if January 25 does not work, we are also available on January 24 or 26.  So that the necessary arrangements can be made, please confirm by this Friday which date is acceptable.  While we have noticed the deposition for Red Bluff, we are also amenable to conducting the deposition in Sacramento.

Regards,
Matt

**Matthew Bellinger**
Partner
Matthew.Bellinger@knobbe.com

949-721-2972 **Direct**

**Knobbe Martens**
2040 Main St., 14th Fl.
Irvine, CA 92614
www.knobbe.com/matthew-bellinger


**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Tuesday, January 02, 2018 7:38 PM
**To:** Matt.Bellinger
**Cc:** Vanessa.Lantin; Lynda.Zadra-Symes; Marko.Zoretic
**Subject:** RE: BeastUp

Hi Matt,

I will take a look and respond shortly.

In the meantime, I just received my client's document production and interrogatory responses. I will get those formatted, certified, and sent to you ASAP. I am stuck in Maine at the moment with a frozen car, so please forgive my intermittent Internet until I can make it back home safely.

I also shared your deposition notice with Mr. Waelty. He is scheduled to work for the Fire Dept. that day, but has requested time off for the depo. He should be able to confirm within the week. If he cannot get off work that day, are there alternate dates that work for you?

# EXHIBIT 4

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

Attorneys for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MONSTER ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:17-CV-01605-KJM-EFB |
| | ) | |
| v. | ) | BEASTUP'S RESPONSES TO MONSTER |
| | ) | ENERGY COMPANY'S FIRST SET OF |
| BEASTUP LLC, | ) | INTERROGATORIES (1-12) |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure ("FRCP"), Defendant BeastUp

LLC ("Defendant") hereby responds to Plaintiff Monster Energy Company ("Plaintiff")'s First Set

of Interrogatories. These responses are based upon information and records presently available to

Defendant. As discovery is ongoing, Defendant reserves its right to supplement his responses as

necessary.

### GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response

set forth below and are not waived with respect to any response.

1.     Defendant objects to Plaintiff's "Definitions" to the extent they exceed the

requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.     Defendant objects to the extent that any Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or other limitation on discovery.

3.     Defendant objects to the extent that any Interrogatory seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.     Defendant objects to the extent that any Interrogatory seeks information not in Defendant's possession, custody, or control.

5.     Defendant objects to the extent that any Interrogatory is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.     Defendant objects to the extent that any Interrogatory contains discrete subparts contrary to FRCP 33(a).

## INTERROGATORIES AND RESPONSES

**INTERROGATORY NO. 1:**

Identify and describe each of the BeastUp Products.

**RESPONSE:**

Defendant sells the following products under the BeastUp marks: (1) clothing items, including sweatshirts, t-shirts, tank tops, workout shirts (long and short-sleeved), hats, lanyards, wristbands, beanies, coffee cups and stickers/decals; and (2) performance beverages in 12 oz. aluminum cans, formulated to increase mental clarity, memory, and focus.

**INTERROGATORY NO. 2:**

For each product identified in response to Interrogatory No. 1, identify the date the product was first sold and its average wholesale and retail price.

**RESPONSE:**

Defendant's first products were clothing items in April 2009. On average, clothing items are purchased wholesale at between $8.00 and $20.00, and sold to the public at between $12.00 and $30.00, depending on the specific item. Defendant launched its beverage in May 2014. Defendant's cost to produce each beverage, not including overhead and R&D, is approximately $.083/can. Defendant sells cans to distributors and retail stores for $1.05-$1.45 per can, depending on the overall volume of cans purchased and whether the purchase is subject to a promotion. Defendant believes that retail stores sell cans to the public for an average $2.50 each.

**INTERROGATORY NO. 3:**

Identify each person involved with the development, selection, or approval of the BEASTUP mark and Defendant's Claw Logos, and for each person so identified, describe in detail, with reference to any supporting documents, information, and materials, their role in such development, selection, or approval.

**RESPONSE:**

1. Name: Robert Waelty

   Role: Robert Waelty is the CEO of BeastUp LLC, and was the primary individual responsible for the conception, development, selection, and approval of Defendant's mark and all packaging and presentation thereof.

2. Name: Jessee Waelty

   Role:   Jessee Waelty is Robert Waelty's son, and the Vice President of BeastUp LLC. Jessee Waelty manages Defendant's marketing and events and creates artwork for Defendant's clothing.

3. Name: Power Brands Consulting, LLC

Role: Power Brands is an independent beverage consulting company that was hired by
Defendant in 2011 to support the development of BeastUp-branded beverages, pursuant to
a Product Development Agreement that is being produced to Plaintiff together with these
responses. Power Brands was solely involved in beverage-related branding; Defendant's
BeastUp mark and logos were already in use on clothing prior to Defendant's expansion
into beverages.

**INTERROGATORY NO. 4:**

Describe in detail, with reference to any supporting documents, information, and
materials, when and how You first became aware of MEC, the Claw Icon, any of MEC's
BEAST-Inclusive Marks, and any of MEC's Products and describe all circumstances
surrounding such knowledge.

**RESPONSE:**

Defendant first became aware of Monster Energy Company in approximately 2004-2005, in the
context of motocross racing. Jessee Waelty, a professional motocross racer, was exposed to
various brands, including Monster Energy, RockStar, and Red Bull, as energy drink companies
began to aggressively advertise and sponsor bikes and related extreme sports events.

**INTERROGATORY NO. 5:**

Describe in detail, with reference to any supporting documents, information, and
materials, how and in what way any of MEC's BEAST-Inclusive Marks were considered or
referenced during the selection, development, or approval of the BEASTUP mark, including,
but not limited to, whether a clearance search was conducted by You or on Your behalf before
the BEASTUP mark was approved for use in the marketplace.

**RESPONSE:**

Plaintiff's "BEAST-Inclusive Marks" were not referenced during the selection, development, or approval of the BEASTUP mark. Defendant conceived of BEASTUP in 2008, as an action sports clothing brand with a mission to "Beast Up" the lives of young athletes by providing them with the support and equipment needed to train and compete at the top levels in pursuing their goals of becoming professional athletes. The name BEASTUP was chosen while Robert Waelty was supervising an inmate crew for Cal Fire during the 2008 fire season. Mr. Waelty used the call "Beast Up!" as a motivational tool for the men when times were difficult. The phrase was inspired by a Sega Genesis Joe Madden football game, in which Mr. Waelty heard linebackers yell what sounded to him like "BEAST UP!" when they approached the line. After seeing the power the phrase had to motivate people while they worked on challenging tasks, Mr. Waelty decided to build a brand around it. Plaintiff did not factor into the naming or selection process.

**INTERROGATORY NO. 6:**

Describe in detail, with reference to any supporting documents, information, and materials, how and in what way the Claw Icon was considered or referenced during the selection, development, or approval of Defendant's Claw Logos, including, but not limited to, whether a clearance search was conducted by You or on Your behalf before Defendant's Claw Logos were approved for use in the marketplace.

**RESPONSE:**

Defendant objects to this Interrogatory in that it refers to "Defendant's Claw Logos," which do not exist. Defendant does not own or use any claw-inclusive logos or trademarks. Without waiving this objection, Plaintiff's Claw Icon had no influence on, nor was it considered or referenced, during Defendant's design process.

**INTERROGATORY NO. 7:**

Describe any research (including, but not limited to, surveys, polls, market research, investigations, analyses, studies, or searches) regarding the BEASTUP mark or Defendant's Claw Logos, including, but not limited to, stating the person(s) who authorized the research, when the research was conducted, the person(s) who conducted the research, the reason the research was conducted, the results of the research, and identifying all documents relating to the research.

**RESPONSE:**

Robert Waelty performed a search of the USPTO's TESS database in or around September 2008 for the mark BEASTUP. He identified one potential competitor, "The Beast," which was a brand from Austria. Plaintiff did not appear in Defendant's search results, nor did Plaintiff appear in the USPTO's search results. All general marketing research and surveys are being produced to Plaintiff contemporaneously with these responses.

**INTERROGATORY NO. 8:**

State Your net and gross sales (in units and dollars) and net and gross profits, on a monthly basis, for each of the BeastUp Products since the date of first sale of each product.

**RESPONSE:**

Defendant is producing its profit and loss tax statements to Plaintiff with these responses.

**INTERROGATORY NO. 9:**

Describe the trade channels, including identifying by name all retail stores and other outlets, through which the BeastUp Products have been sold, are currently being sold, or will be sold.

**RESPONSE:**

Defendant has sold products online through its website, www.beastup.com, as well as through various retail stores throughout Siskiyou, Shasta, Tehama, Plumas, Trinity, and Butte counties in Northern California. For a full list of retail stores that have sold or distributed Defendant's products, see documents titled "BeastUp Buying Report," produced to Plaintiff with these responses.

**INTERROGATORY NO. 10:**

Identify the customers who purchase or have purchased the BeastUp Products, including, but not limited to, the demographic characteristics associated with these consumers (*e.g.* age, sex, and education level).

**RESPONSE:**

The primary customers of Defendant's Products are young (16-34) amateur and pre-professional athletes, both male and female.

**INTERROGATORY NO. 11:**

Describe in detail, with reference to any supporting documents, information, and materials, the manner in which You have advertised, marketed, and/or promoted the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products, including identifying the publications, radio stations, television stations, websites, advertising programs, social media, or other media channels through which You have promoted the marks and the products.

**RESPONSE:**

Defendant has advertised, marketed, and promoted BEASTUP through social media (Facebook, Twitter, Instagram), sponsorship of events and competition teams such as the Chico State University wake board team, publications such as local newspapers and magazines, and

Defendant's website, www.beastup.com. All supporting and illustrative documentation in Defendant's possession is being produced to Plaintiff.

**INTERROGATORY NO. 12:**

Identify and describe in detail each and every instance in which someone has confused, questioned, or inquired about a relationship between (1) You, the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products and (2) MEC, any of MEC's Products, the Claw Icon, or any of MEC's BEAST-Inclusive Marks, including, but not limited to, identifying all persons having knowledge thereof and all documents relating thereto.

**RESPONSE:**

Defendant is not aware of any such instance.

<div align="center">

**VERIFICATION**

</div>

The foregoing Responses are based on a diligent and reasonable effort by me to obtain information currently available.  I reserve the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  Subject to these limitations, these Responses are true to the best of my present knowledge, information, and belief.

Subscribed and sworn to under the pains and penalties of perjury this 9th day of January, 2018.


*/s/ Robert Waelty*_____
Robert Waelty, on behalf of BEASTUP LLC
Defendant

As to objections:                     */s/ Eve J. Brown*_____
Eve J. Brown

BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

E-mail: ejbrown@bricolagelaw.com

Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses to Plaintiff's First Set of

Interrogatories (nos. 1-12) has been served upon the attorneys for Plaintiff, Marko Zoretic, Lynda

Zadra-Symes, and Matthew Bellinger of Knobbe Martens Olson & Bear LLP, 2040 Main Street, 14th

Floor, Irvine, CA 92614, by e-mail to Marko.Zoretic@knobbe.com,

Lynda.ZadraSymes@knobbe.com, and Matt.Bellinger@knobbe.com, this 9th day of January, 2018.

<div style="margin-left: 40%;">

*/s/ Eve J. Brown*　　　　　　　　　
Eve J. Brown

</div>

# EXHIBIT 5

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

Attorneys for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MONSTER ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:17-CV-01605-KJM-EFB |
| | ) | |
| v. | ) | BEASTUP'S RESPONSES TO MONSTER |
| | ) | ENERGY COMPANY'S FIRST SET OF |
| BEASTUP LLC, | ) | REQUESTS FOR PRODUCTION (1-46) |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant BeastUp LLC ("Defendant") hereby responds to Plaintiff Monster Energy Company ("Plaintiff")'s First Set of Requests for Production. These responses are based upon information and records presently available to Defendant. As discovery is ongoing, Defendant reserves the right to supplement its responses as necessary.

## GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.      Defendant objects to Plaintiff's definitions to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.      Defendant objects to the extent that any Request seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Request seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Request seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Request is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.      Defendant objects to all mentions and requests for information regarding Defendant's "Claw Logos." Defendant does not own or use claw logos. To the extent that Defendant's former can designs included ornamental claw marks, Defendant will produce information related to those decorative elements.

## REQUESTS FOR PRODUCTION AND RESPONSES

**REQUEST FOR PRODUCTION NO. 1:**

All documents and things relating to the development, origin, conception, derivation,

selection, adoption, and/or approval of the BEASTUP mark and Defendant's Claw Logos.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 2:**

Documents sufficient to show the reasons for which the BEASTUP mark and Defendant's Claw Logos were selected.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 3:**

Documents sufficient to show the person or persons who assisted with or otherwise developed and/or created the BEASTUP mark and Defendant's Claw Logos.

**RESPONSE:**

Please see Defendant's Responses to Plaintiff's First Set of Interrogatories, served on January 9, 2018. Defendant will produce any additional non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 4:**

All documents and things relating to any consideration of or reference to MEC, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products in connection with the development, selection, or approval of the BEASTUP mark and/or Defendant's Claw Logos.

**RESPONSE:**

Defendant did not consider or reference MEC, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products in connection with the development, selection, or approval of Defendant's mark, and therefore has no responsive documents to produce.

**REQUEST FOR PRODUCTION NO. 5:**

Documents and things sufficient to identify all variations and versions of the BEASTUP mark and Defendant's Claw Logos, whether final or not and whether used or not, which were considered or developed for use in connection with the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 6:**

Documents sufficient to show each of the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 7:**

All documents and things relating to MEC, the Claw Icon, any of MEC's BEAST-inclusive

Marks, or MEC's Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 8:**

All communications relating to MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or

MEC's products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 9:**

All documents and things relating to communications between You and any distributors, retailers,

and/or consumers that refer to or mention MEC, the Claw Icon, any of MEC's BEAST-Inclusive

Marks, or any of MEC's Products.

**RESPONSE:**

Defendant has identified no responsive, non-privileged documents in its possession, custody, or control after a reasonable search.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and things relating to any decision to seek or not seek trademark protection for the BEASTUP mark and/or Defendant's Claw Logos.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 11:**

All documents evidencing the first use in commerce of the BEASTUP mark and Defendant's Claw Logos, including samples, advertisements, marketing plans, and invoices.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 12:**

Documents sufficient to show the geographic regions where the BeastUp Products have been sold.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show, on a monthly basis, Your total net and gross sales (both in units and

dollars) and total net and gross profits for the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show the prices charged for the BeastUp Products, including, but not limited to, price lists for the products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things relating to the circumstances surrounding Your first awareness

of MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products.

**RESPONSE:**

Defendant has identified no responsive, non-privileged documents in its possession, custody, or control after a reasonable search.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and things relating to any opinions, written or oral, conducted by You or on Your behalf relating to MEC, MEC's Products, the Claw Icon, and/or any of MEC's BEAST-Inclusive Marks.

**RESPONSE:**

Defendant has identified no responsive, non-privileged documents in its possession, custody, or control after a reasonable search.

**REQUEST FOR PRODUCTION NO. 17:**

All documents and things relating to any opinions, written or oral, relating to the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and things relating to searches (including trademark searches), surveys, investigations, analyses, polls, research (including market research) or studies by You or on Your behalf relating to the BEASTUP mark and/or Defendant's Claw Logos.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and things relating to searches (including trademark searches), surveys, investigations, analyses, polls, research (including market research) or studies by You or on Your behalf relating to MEC, MEC's Products, the Claw Icon, and/or any of MEC's BEAST-Inclusive Marks.

**RESPONSE:**

Defendant has identified no responsive, non-privileged documents in its possession, custody, or control after a reasonable search.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and things relating to surveys, investigations, analyses, polls, research (including

market research) or studies by You or on Your behalf relating to comparisons between (1) You, the BEASTUP mark, and/or Defendant's Claw Logos and (2) MEC, any of MEC's BEAST-Inclusive Marks, and/or the Claw Icon.

**RESPONSE:**

Defendant has identified no responsive, non-privileged documents in its possession, custody, or control after a reasonable search.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and things relating to any instances of actual or possible confusion or association, or any reports of such confusion or association, known to You, between the BeastUp Products on the one hand, and MEC or any of MEC's Products on the other, including, but not limited to, any inquiries or comments regarding whether the BeastUp Products originate from the same source as, or are affiliated with, MEC or any of MEC's Products.

**RESPONSE:**

To the best of Defendant's knowledge, no instances of actual or possible confusion have occurred, and therefore, no responsive documents exist.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and things relating to any communications, comments, or inquiries You have received from third-parties about MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products.

**RESPONSE:**

Defendant's has not received any communications, comments, or inquiries from third-parties about MEC, the Claw Icon, or any of MEC's Marks, and therefore, no responsive documents exist.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and things relating to the advertisement, promotion, or marketing of the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify each manner in which the BeastUp Products are marketed, advertised, and/or promoted, including documents sufficient to identify the magazines, publications, Internet web pages, trade shows and other events, through which the products are advertised or promoted, and copies of each advertisement and/or marketing material that features or promotes the products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to identify each manner in which the BEASTUP mark and Defendant's Claw Logos are marketed, advertised, and/or promoted, including documents sufficient to identify the magazines, publications, Internet web pages, trade shows and other events, through which the marks are advertised or promoted, and copies of each advertisement and/or marketing material that features or promotes the marks.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 26:**

All documents relating to Your costs and expenditures in connection with promoting and advertising the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show the person or persons involved in how the BeastUp Products are and/or will be advertised, marketed, and/or promoted.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 28:**

All documents and things relating to the target or intended market for the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 29:**

All documents referring to the degree of care exercised by purchasers who buy the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 30:**

All documents and things relating to the consumers who purchase or have purchased the BeastUp Products, including, but not limited to, the demographic characteristics associated with these consumers (e.g. age, sex, and education level).

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 31:**

All documents and things relating to the consumers to whom you target or have targeted any marketing, advertising, or promotions for the BeastUp Products, including, but not limited to, the demographic characteristics associated with these potential consumers (e.g. age, sex, and education level).

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 32:**

All marketing and business plans relating to the BEASTUP mark, Defendant's Claw Logos, and/or the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 33:**

Documents sufficient to identify the distributors and retailers of any the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 34:**

All documents and things relating to the channels of distribution or the intended channels of distribution for the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 35:**

Documents sufficient to ascertain and describe Your corporate structure, including, but not limited to, all companies related to You, each of Your members, and each related company.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 36**:

Printed copies of the current and previous versions of all websites maintained by You, including, but not limited to, www.beastup.com.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 37:**

Printed copies of the current and previous versions of all social media accounts maintained by You, including, but not limited to, https://www.facebook.com/BeastUpBrand/ and https://www.instagram.com/beastupbrand/.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 38:**

All documents relating to any communications between You and any third-parties relating to this lawsuit.

**RESPONSE:**

Defendant objects to the extent that this Request asks for documents not relevant to Plaintiff's claims. Without waiving this objection, Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 39:**

Documents sufficient to show Your document retention policies for the past three (3) years.

**RESPONSE:**

Defendant has no written document retention policy, and therefore no responsive documents exist.

**REQUEST FOR PRODUCTION NO. 40:**

All documents and things relied upon or consulted in connection with Your responses to MEC's interrogatories served in this case.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 41:**

All documents and things supporting or refuting the Affirmative Defenses in Your Answer filed

September 8, 2017.

**RESPONSE:**

Defendant will produce all documents and things supporting or refuting the Affirmative Defenses

in its Amended Answer filed January 8, 2018.

**REQUEST FOR PRODUCTION NO. 42:**

All documents and things relating to Your contention, as stated in Paragraph 101 of Your Answer

filed September 8, 2017, that "Defendant's marks have been in open, continuous, and extensive use

by Defendant for more than eight (8) years for 'hats and shirts,' and for more than three (3) years

for 'sports drinks, namely, energy drinks' prior to the filing of this action."

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 43:**

All documents and things relating to Your contention, as stated in Paragraph 101 of Your Answer

filed September 8, 2017, that MEC was aware of Your use of the BEASTUP mark and/or

Defendant's Claw Logos.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its

possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 44:**

All documents and things showing or relating to any alleged continuous use by You of the BEASTUP mark since You first began using the mark.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 45:**

All documents and things showing or relating to any alleged continuous use by You of Defendant's Claw Logos since You first began using the marks.

**RESPONSE:**

Defendant has no "claw logos," but will produce all documents showing any depiction of claws on Defendant's former can designs.

**REQUEST FOR PRODUCTION NO. 46:**

All documents and things relating to any efforts or other consideration by You to change or redesign the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**RESPONSE:**

Defendant will produce all non-privileged documents responsive to this Request that are within its possession, custody, or control and are located after a reasonable search.

Dated: January 9, 2018                                     /s/ Eve J. Brown

                                                            Eve J. Brown

                                                            Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses to Plaintiff's First Set of

Requests for Production (nos. 1-46) has been served upon the attorneys for Plaintiff, Marko Zoretic,

Lynda Zadra-Symes, and Matthew Bellinger of Knobbe Martens Olson & Bear LLP, 2040 Main

Street, 14th Floor, Irvine, CA 92614, by e-mail to Marko.Zoretic@knobbe.com,

Lynda.ZadraSymes@knobbe.com, and Matt.Bellinger@knobbe.com, this 9th day of January, 2018.

*/s/ Eve J. Brown*
Eve J. Brown

EXHIBIT 6

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Julianna M Simon
Julianna.Simon@knobbe.com

January 19, 2018

## VIA ELECTRONIC MAIL

Eve Brown
Bricolage Law, LLC
128 School Street
Walpole, MA 02081

Re:   <u>Monster Energy Company v.  BeastUp, LLC.</u>
Case No. 2:17-CV-01605-KJM-EFB
Our Ref.:  HANBEVL.6127L

Dear Eve:

I write regarding deficiencies in Defendant BeastUp, LLC's ("Defendant") belated served written responses to Plaintiff Monster Energy Company's ("MEC") First Set of Interrogatories Nos. 1-12, First Set of Requests for Production Nos. 1-46, and First Set of Requests for Admission Nos. 1-5 (collectively, "MEC's Discovery Requests").[1]   Although this letter addresses the major deficiencies in Defendant's responses to MEC's Discovery Requests, MEC's review and evaluation of Defendant's responses is ongoing.   Therefore, this letter is not intended to identify every deficiency in Defendant's responses, and MEC reserves the right to raise additional deficiencies at a later date, if necessary.

## Defendant's Deficient Responses to MEC's Interrogatories

### Interrogatory No. 1

In response to Interrogatory No. 1, which seeks the identity and description of each of the BeastUp Products, Defendant listed various goods, including clothing items, lanyards, coffee cups, stickers/decals, and "performance beverages." Defendant's response is deficient because it fails to identify with specificity the "performance beverages" sold by Defendant.  Please supplement Defendant's response to identify the specific beverages that have been sold by Defendant.

### Interrogatory No. 2

Interrogatory No. 2 seeks information regarding the date the products identified in response to Interrogatory No. 1 were first sold and the average wholesale and retail price of each item.  Defendant's response to Interrogatory No. 1 identifies "performance beverages," but the response to Interrogatory No. 2 states that Defendant "launched its beverage in May 2014."  To the extent Defendant has sold more than one beverage, as the response to Interrogatory No. 1 indicates, Defendant should supplement its response to Interrogatory No. 2 to provide the requested information for each beverage sold by Defendant.  Please also confirm that the cost to produce Defendant's beverage identified in Defendant's response ($.083) is accurate.  Otherwise, Defendant should supplement the response to provide accurate cost information.

---

[1] MEC incorporates by reference the definitions set forth in MEC's Discovery Requests.

**Knobbe Martens**

**Interrogatory No. 3**

Interrogatory No. 3 seeks the identity of each person involved with the development, selection, or approval of the BEASTUP mark and Defendant's Claw Logos and a description of each identified person's role, including information regarding any supporting documents, information, and materials. Defendant's response is deficient. Defendant's response fails to provide any information regarding the development, selection, or approval of Defendant's Claw Logos. Defendant's response also fails to identify Jessee Waelty's and Power Brands Consulting's role in the development, selection, or approval of the BEASTUP mark. Further, Defendant's response fails to identify which individuals at Power Brands Consulting were involved in the development of the BEASTUP mark with regard to beverages. Moreover, Defendant's response fails to identify any supporting documents or materials that relate to Robert Waelty's and Jessee Waelty's involvement in the development, selection, or approval of the BEASTUP mark. Please supplement Defendant's response to (1) identify each person involved in the development, selection, or approval of Defendant's Claw Logos and a description of each identified person's role; (2) identify Jessee Waelty's and Power Brands Consulting's role in the development, selection, or approval of the BEASTUP mark; (3) identify which individuals at Power Brands Consulting were involved in the development of the BEASTUP beverages; and (4) identify any supporting documents or materials that relate to Robert Waelty's and Jessee Waelty's involvement in the development, selection, or approval of the BEASTUP mark or Defendant's Claw Logos.

**Interrogatory No. 4**

Interrogatory No. 4 seeks information regarding when and how Defendant first became aware of MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, and any of MEC's Products. Defendant's response, "Defendant first became aware of Monster Energy Company in approximately 2004-2005, in the context of motocross racing. Jessee Waelty, a professional motocross racer, was exposed to various brands, including Monster Energy, RockStar, and Red Bull, as energy drink companies began to aggressively advertise and sponsor bikes and related extreme sports events" is deficient. Defendant's response fails to identify when and how Defendant first became aware of the Claw Icon, any of MEC's BEAST-Inclusive Marks, and any of MEC's Products. Please supplement Defendant's answer to provide this information.

**Interrogatory No. 7**

Interrogatory No. 7 seeks information regarding any research regarding the BEASTUP mark and Defendant's Claw Logos. Defendant's response is deficient. Defendant's response fails to identify whether any research was conducted regarding Defendant's Claw Logos. Further, it is unclear from Defendant's response what search terms and parameters (e.g. International Class) Defendant used to conduct its search on the USPTO's TESS database for the BEASTUP mark. It is also unclear from Defendant's response whether any marks or entities were identified in Defendant's search results that Defendant does or did not deem to be competitors. Further, it is unclear from Defendant's response whether Defendant has any documents showing the results of its search on the USPTO's TESS database because Defendant only agreed to produce "general marketing research and surveys." In addition, Defendant's response fails to identify why the search was conducted. Moreover, Defendant's use of the phrase "USPTO's search results" is vague and ambiguous, and MEC is unable to ascertain what Defendant is referring to. Likewise, Defendant's statement that "[a]ll general marketing research and surveys are being produced to Plaintiff contemporaneously with these responses" is insufficient and non-responsive, as Defendant has not provided the information requested by the interrogatory for that "marketing research and surveys."

**Knobbe Martens**

Please supplement Defendant's response to (a) identify whether any research was conducted regarding Defendant's Claw Logos, and if a search was conducted, please identify the parameters of the research, when the research was conducted, the person(s) who conducted the research, the reason the research was conducted, the results of the research, and identify all documents relating to the research; (b) describe in detail the complete results of Defendant's search for the BEASTUP mark on the USPTO's TESS database, including, but not limited to, whether any marks or entities were identified in Defendant's search on the USPTO's TESS database that Defendant does not deem to be competitors; (c) identify all documents showing the results of its search on the USPTO's TESS database; (d) identify the reason Defendant conducted a search for the BEASTUP mark on the USPTO's TESS database; and (f) provide the information requested by the interrogatory for the "marketing research and surveys" identified by Defendant in its response.

**Interrogatory No. 8**

Interrogatory No. 8 seeks information regarding Defendant's net and gross sales and net and gross profits for each of the BeastUp Products since the date of first sale of each product. Defendant's response, "Defendant is producing its profit and loss tax statements to Plaintiff with these responses" is evasive and deficient. Defendant's profit and loss tax statements do not show the number of units Defendant sold of the BeastUp Products or which products were sold. These statements also fail to show Defendant's sales and profits on a monthly basis. Further, Defendant failed to produce a profit and loss tax statement for 2017. Please immediately supplement Defendant's response to identify Defendant's net and gross sales (in units and dollars) and net and gross profits, on a monthly basis, for each of the BeastUp Products since the date of first sale of each product.

**Interrogatory No. 11**

Interrogatory No. 11 seeks information regarding the manner in which Defendant has advertised, marketed, and/or promoted the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products. Defendant's response is deficient. Defendant failed to identify which events and the types of events Defendant sponsors and/or has sponsored. Further, the term "competition teams" is vague and ambiguous. While Defendant provides one example of what it considers a "competition team", it is unclear from Defendant's response and document production whether Defendant sponsors any other team. Further, while Defendant claims it has advertised, marketed, and promoted BEASTUP through publications such as local newspapers and magazines, it is unclear from Defendant's response and document production through which local newspapers and magazines Defendant promotes its products or mark. Please immediately supplement Defendant's response to identify which events and teams Defendant sponsors or has sponsored and the local newspapers and magazines in which Defendant promotes its products or mark.

<div align="center">

**Defendant's Deficient Document Production**

</div>

As an initial matter, Defendant has not produced a single e-mail in response to any of MEC's Discovery Requests. Please confirm that Defendant will conduct a search of e-mail and other electronically stored documents for documents responsive to MEC's Discovery Requests.

**Knobbe Martens**

#### Request for Production Nos. 1-2

Request for Production Nos. 1 and 2 seek documents relating to the development, origin, conception, derivation, selection, adoption, and/or approval of the BEASTUP mark and Defendant's Claw Logos and documents sufficient to show why the mark and logos were selected, respectively.  Defendant agreed to produce all non-privileged documents.  Defendant, however, failed to produce any documents showing why the BEASTUP mark and Defendant's Claw Logos were selected or the origin, conception, derivation, selection, adoption, and/or approval of the BEASTUP mark.  Defendant only produced layouts for the cans bearing the BEASTUP mark and Defendant's Claw Logos.  These documents do not show how or why the mark and logos were selected.  Moreover, it appears that Defendant has not produced the "art specification form" referenced on BEASTUP PROD0123.  If that document has been produced, please identify it by production number.  Please confirm Defendant will immediately supplement its production to include all documents relating to the development, origin, conception, derivation, selection, adoption, and/or approval of the BEASTUP mark and Defendant's Claw Logos, including, but not limited to, documents relating to the development of the BEASTUP mark and Defendant's Claw Logos for use in connection with clothing and the art specification form submitted to Power Brands Consulting.

#### Request for Production No. 3

Request for Production No. 3 seeks documents sufficient to show the person(s) who assisted with or otherwise developed and/or created the BEASTUP mark and Defendant's Claw Logos.  Defendant agreed to produce all non-privileged documents.  In response to MEC's Interrogatory No. 3, Defendant responded that Robert Waelty, Jessee Waelty, and Power Brands Consulting, LLC were involved in the development, selection, or approval of the BEASTUP mark and the artwork for Defendant's products.  Defendant, however, failed to produce any documents showing Jessee Waelty's role in the development and creation of the BEASTUP mark and artwork.  Please immediately supplement Defendant's production and produce documents showing Jessee Waelty's role in the development and creation of mark and artwork.  Further, Defendant's production identifies the following individuals at Power Brand Consulting, being involved with the development of the BEASTUP beverage: Darin Ezra, Alina Guerrero, and Kris (last name was not identified).  Please confirm that no other employees at Power Brands Consulting were involved in the development of the BEASTUP beverage.  Alternatively, please produce all documents showing the other employees at Power Brands Consulting involved in the development of the BEASTUP beverage.

#### Request for Production Nos. 7-8

Request for Production Nos. 7 and 8 seek documents and communications, respectively, relating to MEC, the Claw Icon, any of MEC's BEAST Marks, or MEC's Products.   Defendants agreed to produce all non-privileged documents.  Defendant's, however, failed to produce any responsive communications and only produced one document referencing MEC and MEC's Products (BEASTUP PROD0129-142).   Please confirm Defendant has produced all responsive documents and communications and has conducted a search for such documents (including an e-mail search).  Alternatively, please immediately supplement Defendant's production and produce all documents and communications relating to MEC, the Claw Icon, any of MEC's BEAST Marks, or MEC's Products.

knobbe.com

**Request for Production No. 10**

Request for Production No. 10 seeks documents relating to any decision to seek or not seek trademark protection for the BEASTUP mark and/or Defendant's Claw Logos. Defendant agreed to produce all non-privileged documents. Defendant produced documents relating to the prosecution of the applications for BEASTUP mark, but failed to produce any documents showing the reason Defendant sought protection for the BEASTUP mark and did not seek protection for Defendant's Claw Logos. Please confirm Defendant has produced all responsive documents, or immediately produce all documents responsive to this request.

**Request for Production No. 11 and 13**

Request for Production Nos. 11 and 13 seek documents evidencing the first use in commerce of the BEASTUP mark and Defendant's Claw Logos and documents sufficient to show Defendant's total net and gross sales (both in units and dollars) and total net and gross profits for the BeastUp Products. Despite agreeing to produce all non-privileged documents, it appears that Defendant has not produced documents evidencing the first use of the marks or logos. If Defendant believes it has produced such documents, please identify them. In addition, Defendant has failed to produce complete sales documents for the BeastUp products. While Defendant produced portions of income tax returns from 2010-2016, these documents do not show the number of units of the BeastUp Products Defendant sold nor which products were sold. And while Defendant has produced some buying reports from Foothill Distributing, those documents only cover the periods from May 1, 2014 to July 23, 2014 and January 1, 2014 to August 28, 2014. Please immediately supplement Defendant's production and produce all documents responsive to this request.

**Request for Production Nos. 17-18**

Request for Production Nos. 17 and 18 seek documents relating to any opinions and any searches, surveys, investigations, analyses, polls, research or studies regarding the BEASTUP mark and/or Defendant's Claw Logos. Defendant agreed to produce all non-privileged documents. Defendant, however, only produced one consumer survey (BEASTUP PROD0154) and failed to produce the results of this survey. Please immediately produce the results of the survey identified in Defendant's production. Please also produce the results of Defendant's search identified in response to MEC's Interrogatory No. 7 and any other documents responsive to this request.

**Request for Production Nos. 23-25**

Request for Production Nos. 23, 24, and 25 seek documents relating to the advertisement, promotion, or marketing of the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products. Defendant agreed to produce all non-privileged documents. In response to MEC's Interrogatory No. 11, Defendant responded that "Defendant has advertised, marketed, and promoted BEASTUP through social media (Facebook, Twitter, Instagram), sponsorship of events and competition teams such as the Chico State University wake board team, publications such as local newspapers and magazines, and Defendant's website, www.beastup.com." Defendant failed to produce any documents showing Defendant's promotion of the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products on any of Defendant's social media pages or Defendant's website. Defendant also failed to produce any documents showing it sponsored competition teams other than the Chico State University wake board team. Please immediately supplement Defendant's production and produce all documents responsive to these requests, including, but not limited to,

knobbe.com

**Knobbe Martens**

documents showing Defendant's promotion of the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products on each of Defendant's social media pages or Defendant's website.

<u>Request for Production No. 26</u>

Request for Production No. 26 seeks documents relating to Defendant's costs and expenditures in connection with promoting and advertising the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products. Defendant agreed to produce all non-privileged documents. The only documents in Defendant's production that show Defendant's promotional costs are portions of income tax returns from 2010-2016. Please immediately supplement Defendant's production and produce all documents responsive to this request, including documents showing the costs Defendant incurred to sponsor any events or teams.

<u>Request for Production Nos. 28 & 30</u>

Request for Production Nos. 28 and 30 seek documents relating to the target or intended market for the BeastUp Products and consumers who purchase or have purchased the BeastUp Products, respectively. Defendant agreed to produce all non-privileged documents, but appears to have only produced one document responsive to both requests (BEASTUP PROD0129-142). Please confirm Defendant has produced all responsive documents, or immediately produce all documents responsive to this request.

<u>Request for Production Nos. 29</u>

Request for Production No. 29 seeks documents relating to the degree of care exercised by purchasers who buy the BeastUp Products. Despite agreeing to produce all non-privileged documents, Defendant's failed to produce any documents responsive to this request. Please immediately produce all documents responsive to this request. Alternatively, please supplement Defendant's response to this request and confirm that Defendant does not have any responsive documents.

<u>Request for Production Nos. 32</u>

Request for Production No. 32 seeks all marketing and business plans relating to the BEASTUP mark, Defendant's Claw Logos, and/or the BeastUp Products. Defendant agreed to produce all non-privileged documents, but only produced two documents that appear to be responsive to this request (BEASTUP PROD0121-122 and BEASTUP PROD0129-142). Please immediately produce all documents responsive to this request, or confirm that Defendant does not have any other responsive documents.

<u>Request for Production Nos. 34</u>

Request for Production No. 34 seeks documents relating to the channels of distribution or the intended channels of distribution for the BeastUp Products. Defendant agreed to produce all non-privileged documents. In response to MEC's Interrogatory No. 9, Defendant responded that it has sold products online through its website, www.beastup.com, as well as through various retail stores. Defendant, however, failed to produce any documents showing the sale of the BeastUp Products on Defendant's website. Please immediately produce all documents responsive to this request, including, but not limited to, documents showing the sale of the BeastUp Products on Defendant's website and documents showing the sales of the BeastUp products in retail stores.

**Knobbe Martens**

**Request for Production Nos. 35**

Request for Production No. 35 seeks documents sufficient to ascertain and describe Defendant's corporate structure, including all companies related to Defendant, each of Defendant's members, and each related company. Defendant agreed to produce all non-privileged documents, but failed to produce any documents identifying each of Defendant's members or documents showing any companies related to Defendant. Please immediately produce all documents responsive to this request or confirm Defendant does not have any other responsive documents.

**Request for Production Nos. 36 and 37**

Request for Production No. 36 and 37 seek copies of the current and previous versions of all websites and social media accounts maintained by Defendant. Defendant agreed to produce all non-privileged documents, but failed to produce any responsive documents. Please immediately supplement Defendant's production and produce all documents responsive to these requests.

**Request for Production Nos. 38**

Request for Production No. 38 seeks documents relating to communications between Defendant and any third parties relating to this lawsuit. Defendant agreed to produce all non-privileged documents, but failed to produce any responsive documents. Please immediately supplement Defendant's production and produce all documents responsive to this request.

**Request for Production Nos. 43**

Request for Production No. 43 seeks documents relating to Defendant's contention that MEC was aware of Defendant's use of the BEASTUP mark and/or Defendant's Claw Logos. Defendant agreed to produce all non-privileged documents, but failed to produce any responsive documents. Please immediately produce all documents responsive to this request. Alternatively, please supplement Defendant's response to this request to confirm that Defendant does not have any responsive documents.

**Request for Production Nos. 46**

Request for Production No. 46 seeks documents relating to efforts or other consideration by Defendant to change or redesign the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products. Defendant agreed to produce all non-privileged documents. However, it does not appear that Defendant has produced documents responsive to this request. Please confirm that Defendant has produced all documents responsive to this request.

### Defendant's Responses to MEC's Requests for Admissions

MEC served Defendant with its Requests for Admissions on December 1, 2017. Defendant did not serve its responses to these Requests until January 9, 2018. Defendant's responses are untimely and MEC's Requests are deemed admitted pursuant to F.R.C.P. 36(a)(3).

# Knobbe Martens

**Timing of Supplemental Responses and Document Production and Defendant's Deposition**

Defendant's Rule 30(b)(6) deposition is scheduled for Thursday, January 25.   Accordingly, please supplement Defendant's document production and Defendant's responses to MEC's Discovery Requests by close of business on Monday, January 22 so we have sufficient time to review the responses and production prior to the deposition.  MEC reserves the right to leave the deposition open and complete it at a later date in view of any discovery responses or documents that are produced after the deposition or provided insufficiently in advance of the deposition.

We also note that Defendant's responses to MEC's second set of interrogatories and document requests are due on Monday, January 22.  MEC expects that Defendant will timely serve its responses to those requests and produce responsive document requests by close of business on Monday.

With regards to Defendant's Rule 30(b)(6) deposition, we note that you informed Mr. Zoretic that you will be appearing via telephone.  We do not know what the telephone setup will be in the conference room of the hotel.  Please contact the hotel directly and make the necessary arrangements for you to appear via telephone.

**Request for Conference of Counsel**

I am available for a meet and confer with Defendant on all of the issues raised in this letter any time between 9:00 a.m. and 4:00 p.m. (Pacific Time) on January 22-23.  Please let me know what dates and times you are available.

Sincerely,

Julianna M.  Simon

27374077

knobbe.com

# EXHIBIT 7

Steven J. Nataupsky (CA SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (CA SBN 156511)
lynda.zadrasymes@knobbe.com
Matthew Bellinger (CA SBN 222228)
matt.bellinger@knobbe.com
Marko R. Zoretic (CA SBN 233,952)
marko.zoretic@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BEASTUP LLC, a California limited liability company,<br><br>Defendant. | Case No. 2:17-CV-01605-KJM-EFB<br><br>**MONSTER ENERGY COMPANY'S SECOND SET OF INTERROGATORIES (NOS. 13–16)** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure,  Plaintiff Monster Energy Company ("MEC") hereby requests that Defendant BeastUp LLC ("BeastUp") answer the following Interrogatories separately and fully, in writing, and serve a copy of such answer upon counsel for MEC within thirty (30) days of service hereof.

## DEFINITIONS

1.    The terms "You", "Your," "Defendant," and "BeastUp" shall mean BeastUp LLC and any present or former officer, director, member, employee, servant, subcontractor, agent, attorney, or other representative acting on their behalf,  and shall include any parent, wholly-owned  or partially-owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

2.    The term "MEC" shall mean Monster Energy Company and any present or former officer, director, member, employee, servant, subcontractor, agent, attorney, or other representative acting on its behalf, and shall include any parent, wholly-owned or partially-owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

3.    The term "MEC'S BEAST-Inclusive Marks" shall mean MEC's UNLEASH THE BEAST!®, REHAB THE BEAST! WWW.MONSTERENERGY.COM®, REHAB THE BEAST!®, UNLEASH THE ULTRA BEAST!®, PUMP UP THE BEAST!®, and UNLEASH THE NITRO BEAST!® trademarks.

4.    The term "Claw Icon" shall mean MEC's $\text{M}$® mark and other marks incorporating that mark, including the marks identified in Paragraph 13 of MEC's Complaint.

5.    The term "MEC's Products" shall mean any product sold and/or distributed by MEC under the Claw Icon and/or any of MEC's BEAST-Inclusive Marks, including the products identified in Paragraphs 8, 9, and 10 of MEC's Complaint.

6.    The term "Defendant's Claw Logos" shall mean the claw designs shown on BeastUp's energy drinks and/or on BeastUp's promotional materials, including the claw logo designs shown in Paragraphs 40 and 41 of MEC's Complaint.

7.    The term "BeastUp Products" shall mean any product offered for sale, sold, distributed, marketed, advertised, or promoted under Defendant's Claw Logos and/or the

1  BEASTUP mark, including the energy drinks identified in Paragraphs 40 and 41 of MEC's

2  Complaint.

3    8.    The term "document" shall mean all writings, recordings, photographs, or other

4  documents within the scope of Rule 1001 of the Federal Rules of Evidence or Rule 34 of the

5  Federal Rules of Civil Procedure, including without limitation written, printed, typed,

6  electronically stored, magnetically stored, optically stored, and visually or aurally reproduced

7  material of any kind.  The term "document" shall include both the original of a document and all

8  distinct copies thereof, including, without limitation, copies that are distinct due to the presence

9  of notes made on or attached to the document.

10    9.    The term "thing" shall mean all tangible objects of any type, composition,

11  construction or nature.

12    10.    The terms "relating to" or "relate to" shall encompass all express and implied

13  references to the specified person, subject, event or thing and means evidencing, comprising,

14  constituting, reflecting, respecting, concerning, referring, stating, describing, recording, noting,

15  embodying, containing, mentioning, studying, analyzing, discussing, evaluating, supporting, or

16  tending to negate.

17    11.    The term "person" or "persons" shall include both natural persons and corporate

18  or other businesses entities, whether or not in your employ, and the acts and knowledge of that

19  person are defined to include the acts and knowledge of that person's officers, directors,

20  members, employees, representatives, servants, agents, and attorneys.

21    12.    The term "concerning" shall mean relating to, referring to, describing, evidencing

22  or constituting.

23    13.    The plural of any term shall be construed as the singular, and vice versa, as

24  necessary and in order to bring within the scope of these interrogatories any information,

25  documents, or things that might otherwise be construed to be outside their scope.

26    14.    The terms "and" and "or" shall be construed both conjunctively and

27  disjunctively, and the plural shall be construed as the singular and vice versa, as necessary to

28  bring within the scope of these interrogatories all information, documents and things that

- 2 -

Monster 2nd Set of Interrogatories
Case No. 2:17-CV-01605-KJM-EFB

1   otherwise could be deemed outside their scope.

2   **<u>INSTRUCTIONS</u>**

3   1.      All requests to identify a person in the following Interrogatories are to be

4   answered by providing sufficient information to enable the undersigned to contact the person by

5   telephone and mail, and to serve legal documents on such person.  If such person is a natural

6   person, state his or her:

7           a.      full name;

8           b.      present or last known employer, occupation, and position;

9           c.      present or last known job title;

10          d.      a brief description of the responsibilities of such person with the pertinent

11                  organization; and

12          e.      any relationship between any such person and You, and the dates any

13                  such relationship existed.

14  2.      If the request is to identify a person in the following Interrogatories and such

15  person is other than a natural person, state:

16          a.      its full name or designation;

17          b.      the legal classification of the entity (e.g., corporation, partnership, etc.)

18                  giving the state of incorporation where appropriate;

19          c.      the principal place of business;

20          d.      the present or last known address and telephone number of the entity;

21          e.      any other information reasonably necessary to permit efficient contact with

22                  the entity; and

23          f.      any relationship between the entity and You, and the dates any such

24                  relationship existed.

25  3.      All requests to identify a written document or statement in the following

26  Interrogatories, should state:

27          a.      the type of document or writing;

28          b.      the name of the author or creator;

1               c.      the title of the document and/or any preexisting identifying mark or code;

2               d.      the date it bears, or if undated, the date it was created;

3               e.      the name of the addressee or recipient; and

4               f.      all production numbers marked on the document.

5        4.      All requests to identify an event in the following Interrogatories, should state:

6               a.      the name of the event;

7               b.      the nature of the event;

8               c.      the date of the event;

9               d.      the persons in attendance;

10              e.      the subject matter; and

11              f.      the location.

12       5.      If You claim that any information, document, or thing requested is protected by

13   the attorney-client privilege, work product immunity, or any other privilege or immunity,

14   provide all information falling within the scope of the interrogatory which is not subject to the

15   claim of privilege or immunity, and identify with sufficient particularity for purposes of a

16   motion under Federal Rule of Civil Procedure Rule 37 to compel the information, document, or

17   thing with respect to which You claim a privilege or immunity, and separately state:

18              a.      the basis on which the privilege or immunity is claimed;

19              b.      the nature of the information, document, or thing;

20              c.      the author, creator or sender of the information, document or thing;

21              d.      each individual or other person to whom the information, document, copy

22                       thereof, or thing was sent or otherwise disclosed;

23              e.      the date of the information, document, or thing or if the date is not

24                       known, the date the information, document, or thing was created or sent;

25                       and

26              f.      a summary of the subject matter of such information, document, or thing

27                       in sufficient detail to permit the Court to reach a determination in the

28                       event of a motion under Federal Rule of Civil Procedure Rule 37.

      Monster 2nd Set of Interrogatories
Case No. 2:17-CV-01605-KJM-EFB

6.      Your obligation to respond to these Interrogatories is continuing and the responses to the following Interrogatories are to be promptly supplemented to include subsequently acquired information in accordance with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure.

## INTERROGATORIES

### INTERROGATORY NO. 13:

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Laches, Waiver and/or Acquiescence."

### INTERROGATORY NO. 14:

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Unclean Hands."

### INTERROGATORY NO. 15:

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Priority."

### INTERROGATORY NO. 16:

Identify, by name and position, each of Your current and former employees and contractors, including the dates of employment and/or contract for each person You identify, and provide a description of each person's role and responsibilities.

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:   December 20, 2017          By: _/s/  Marko R. Zoretic_____
                                        Steven J. Nataupsky
                                        Lynda J. Zadra-Symes
                                        Matthew S. Bellinger
                                        Marko R. Zoretic

                                   Attorneys for Plaintiff
                                   MONSTER ENERGY COMPANY

**<u>CERTIFICATE OF SERVICE</u>**

I am a citizen of the United States of America and I am employed in Irvine, California. I am over the age of 18 and not a party to the within action. My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

On December 20, 2017, I served **MONSTER ENERGY COMPANY'S SECOND SET OF INTERROGATORIES (NOS. 13–16)** on counsel for BeastUp LLC as shown below **VIA E-MAIL:**

Eve J. Brown
BRICOLAGE LAW, LLC
1080 Beacon Street, Suite 4D
Brookline, MA  02446
(508) 734-3404
ejbrown@bricolagelaw.com


I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on December 20, 2017, at Irvine, California.


_Linda Dunn_
Linda P. Dunn

27222251

Monster 2nd Set of Interrogatories
Case No. 2:17-CV-01605-KJM-EFB

# EXHIBIT 8

1   Steven J. Nataupsky (CA SBN 155913)
    steven.nataupsky@knobbe.com
2   Lynda J. Zadra-Symes (CA SBN 156511)
    lynda.zadrasymes@knobbe.com
3   Matthew Bellinger (CA SBN 222228)
    matt.bellinger@knobbe.com
4   Marko R. Zoretic (CA SBN 233952)
    marko.zoretic@knobbe.com
5   KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
6   Irvine, CA  92614
    Telephone: (949) 760-0404
7   Facsimile: (949) 760-9502

8   Attorneys for Plaintiff
    MONSTER ENERGY COMPANY

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12  MONSTER ENERGY COMPANY,          )   Case No. 2:17-CV-01605-KJM-EFB
    a Delaware corporation,          )
13                                   )
                                     )
14              Plaintiff,           )   **MONSTER ENERGY COMPANY'S**
                                     )   **SECOND SET OF REQUESTS FOR**
15         v.                        )   **PRODUCTION (NO. 47)**
                                     )
16  BEASTUP LLC, a California limited liability )
    company,                         )
17                                   )
                Defendant.           )
18                                   )
                                     )
19                                   )

1         Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff, Monster

2   Energy Company ("MEC") hereby requests that Defendant BeastUp LLC ("BeastUp") respond

3   to the following requests for production of documents and things, separately and fully, in

4   writing, and produce the documents and things identified below for inspection and copying at

5   the offices of counsel for MEC within thirty (30) days of service hereof. These requests are

6   deemed continuing in nature, requiring amendment and supplemental answers as appropriate

### DEFINITIONS

8        1.    The terms "You", "Your," "Defendant," and "BeastUp" shall mean BeastUp

9   LLC and any present or former officer, director, member, employee, servant, subcontractor,

10   agent, attorney, or other representative acting on their behalf,  and shall include any parent,

11   wholly-owned or partially-owned subsidiary, division, predecessor, successor-controlled or

12   affiliate companies.

13        2.    The term "MEC" shall mean Monster Energy Company and any present or

14   former officer, director, member, employee, servant, subcontractor, agent, attorney, or other

15   representative acting on its behalf, and shall include any parent, wholly-owned or partially-

16   owned subsidiary, division, predecessor, successor-controlled or affiliate companies.

17        3.    The term "MEC's BEAST-Inclusive Marks" shall mean MEC's UNLEASH THE

18   BEAST!®, REHAB THE BEAST! WWW.MONSTERENERGY.COM®, REHAB THE

19   BEAST!®, UNLEASH THE ULTRA BEAST!®, PUMP UP THE BEAST!®, and UNLEASH

20   THE NITRO BEAST!® trademarks.

21        4.    The term "Claw Icon" shall mean MEC's 𝕄® mark, including the marks

22   identified in Paragraph 13 of MEC's Complaint.

23        5.    The term "MEC's Products" shall mean any products sold and/or distributed by

24   MEC under the Claw Icon and/or any of MEC's BEAST-Inclusive Marks, including the

25   products identified in Paragraphs 8, 9, and 10 of MEC's Complaint.

26        6.    The term "Defendant's Claw Logos" shall mean the claw design shown on

27   BeastUp's energy drinks and/or on BeastUp's promotional materials, including the claw designs

28   shown in Paragraphs 40 and 41 of MEC's Complaint.

- 1 -      Monster 2ND Set Req. for Production
                         Case No. 2:17-CV-01605-KJM-EFB

7.      The term "BeastUp Products" shall mean any product offered for sale, sold, distributed, marketed, advertised, or promoted under Defendant's Claw Logos and/or the BEASTUP mark, including the energy drinks identified in Paragraphs 40 and 41 of MEC's Complaint.

8.      The term "document" shall mean all writings, recordings, photographs, or other documents within the scope of Rule 1001 of the Federal Rules of Evidence or Rule 34 of the Federal Rules of Civil Procedure, including without limitation written, printed, typed, electronically stored, magnetically stored, optically stored, and visually or aurally reproduced material of any kind.  The term "document" shall include both the original of a document and all distinct copies thereof, including, without limitation, copies that are distinct due to the presence of notes made on or attached to the document.

9.      The term "thing" shall mean all tangible objects of any type, composition, construction or nature.

10.     The terms "relating to" or "relate to" shall encompass all express and implied references to the specified person, subject, event or thing and means evidencing, comprising, constituting, reflecting, respecting, concerning, referring, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing, evaluating, supporting, or tending to negate.

11.     The term "person" or "persons" shall include both natural persons and corporate or other businesses entities, whether or not in your employ, and the acts and knowledge of that person are defined to include the acts and knowledge of that person's officers, directors, members, employees, representatives, servants, agents, and attorneys.

12.     The term "concerning" shall mean relating to, referring to, describing, evidencing or constituting.

13.     The terms "and" and "or" shall be construed both conjunctively and disjunctively, and the plural shall be construed as the singular and vice versa, as necessary to bring within the scope of these requests all information, documents and things that otherwise could be deemed outside their scope.

Monster 2ND Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

14.     The plural of any term shall be construed as the singular, and vice versa, as necessary and in order to bring within the scope of these requests any information, documents, or things that might otherwise be construed to be outside their scope.

## **GENERAL INSTRUCTIONS**

1.     If you claim that any requested document or thing is protected by the attorney-client privilege, work product immunity, or any other privilege or immunity, or otherwise excludable from discovery, produce all documents and things falling within the scope of the request which are not subject to the claim of privilege or immunity, and with respect to each responsive document or thing withheld or redacted, state:

a.     the basis on which the privilege or immunity is claimed;

b.     the nature of the document or thing;

c.     the identity of the person(s) who authored, created, sent, or received the original or a copy of the document or thing, including the names appearing on any circulation list associated with such document;

d.     the manner of its transmission to each recipient;

e.     the date of the document or thing, or, if the date is not known, the date the document or thing was created or sent; and

f.     a summary of the subject matter of such document or thing in sufficient detail to permit the Court to reach a determination in the event of a motion under Federal Rule of Civil Procedure 37.

2.     With regard to any physical item or other item of which a meaningful copy cannot be made, and which you elect to make available for inspection in lieu of producing the original, mark that item with a unique production number and state in your response that the item is available for inspection.

3.     All documents and things shall be produced in the order and form in which they are kept, including any organizational grouping.

4.     Your obligation to respond to these requests for production is continuing and the responses to the following requests for production are to be promptly supplemented to include

Monster 2ND Set Req. for Production
Case No. 2:17-CV-01605-KJM-EFB

subsequently acquired information, or responsive documents and things that are discovered after your initial response to these requests, in accordance with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 47:**

All communications between any of the following individuals that refer to or mention MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products: Robert Waelty, Jessee Waelty, John Waelty, Colter Hedden, and/or Tony Thompson.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 20, 2017          By:  */s/ Marko R. Zoretic*
                                        Steven J. Nataupsky
                                        Lynda J. Zadra-Symes
                                        Matthew S. Bellinger
                                        Marko R. Zoretic

                                        Attorneys for Plaintiff
                                        MONSTER ENERGY COMPANY

**<u>CERTIFICATE OF SERVICE</u>**

I am a citizen of the United States of America and I am employed in Irvine, California. I am over the age of 18 and not a party to the within action. My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

On December 20, 2017, I served **MONSTER ENERGY COMPANY'S FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 47)** on counsel for BeastUp LLC as shown below **VIA E-MAIL:**

Eve J. Brown
BRICOLAGE LAW, LLC
1080 Beacon Street, Suite 4D
Brookline, MA  02446
(508) 734-3404
ejbrown@bricolagelaw.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on December 20, 2017, at Irvine, California.

_Linda Dunn_
Linda P. Dunn

27232417

- 5 -                     Monster 2ND Set Req. for Production
                          Case No. 2:17-CV-01605-KJM-EFB

# EXHIBIT 9

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

Attorneys for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY | Case No. 2:17-CV-01605-KJM-EFB |
| v. | |
| BEASTUP LLC | BEASTUP'S SUPPLEMENTAL RESPONSES TO MONSTER ENERGY COMPANY'S FIRST SET OF INTERROGATORIES (1-12) AND RESPONSES TO MONSTER ENERGY COMPANY'S SECOND SET OF INTERROGATORIES (NOS. 13–16) |

Defendant BeastUp LLC hereby provides supplemental responds to Plaintiff Monster Energy Company's First Set of Interrogatories and responses to Monster Energy Company's Second Set of Interrogatories.

## GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.      Defendant objects to Plaintiff's "Definitions" to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.      Defendant objects to the extent that any Interrogatory seeks information protected

from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Interrogatory seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Interrogatory seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Interrogatory is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.      Defendant objects to the extent that any Interrogatory contains discrete subparts contrary to FRCP 33(a).

<div align="center">

**INTERROGATORIES AND RESPONSES**

</div>

**INTERROGATORY NO. 1:**

Identify and describe each of the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant sells the following products under the BeastUp marks: (1) clothing items, including sweatshirts, t-shirts, tank tops, workout shirts (long and short-sleeved), hats, lanyards, wristbands, beanies, coffee cups and stickers/decals; and (2) two performance beverage formulations, one designed to increase mental clarity and focus that is currently sold in 12 oz. aluminum can, and one designed for refueling after strenuous physical activity that is ready for production and will be sold in a 16 oz. plastic bottle. Images, ingredient lists, prices, SKU and UPC codes, and descriptions of each product have been produced to Plaintiff, to the extent Defendant has such information in its possession, custody, or control and was able to locate them after a reasonable search.

**INTERROGATORY NO. 2:**

For each product identified in response to Interrogatory No. 1, identify the date the product was

first sold and its average wholesale and retail price.

**SUPPLEMENTAL RESPONSE:**

Defendant's first products were clothing items in April 2009. On average, clothing items are

purchased wholesale at between $8.00 and $20.00 and sold to the public at between $15.00 and

$35.00, depending on factors such as whether a sale applied, where and when the item was sold,

and the volume of items sold. Defendant launched its beverage in May 2014. Defendant's cost to

produce each beverage, not including overhead and R&D, is approximately $.83/can. Defendant

sells cans to distributors and retail stores for $1.05-$1.45 per can, depending on the overall

volume of cans purchased and whether the purchase is subject to a promotion. Defendant believes

that retail stores sell cans to the public for an average $2.50 each. Average retail prices for specific

items are as follows:

- Tank tops: $15.00
- T-shirts: $20.00
- Workout Long Sleeve Shirts: $25
- Workout Short Sleeve Shirts: $22
- Hats: $20
- Beverage cans: $2.50

Price lists, cost estimates, and wholesale quotes have been produced to Plaintiff.

**INTERROGATORY NO. 3:**

Identify each person involved with the development, selection, or approval of the

BEASTUP mark and Defendant's Claw Logos, and for each person so identified, describe in

detail, with reference to any supporting documents, information, and materials, their role in such

development, selection, or approval.

**SUPPLEMENTAL RESPONSE:**

1.      Name: Robert Waelty

        Role: Robert Waelty is the CEO of BeastUp LLC, and was the primary individual

        responsible for the conception, development, selection, and approval of Defendant's mark

        and all packaging and presentation thereof.

2.      Name: Jessee Waelty

        Role:   Jessee Waelty is Robert Waelty's son, and is a professional Motocross racer. Jessee

        Waelty was consulted and provided opinions and advice with respect to the creation and

        adoption of Defendant's mark and all packaging and presentation thereof.

3.      Name: Power Brands Consulting, LLC

        Role: Power Brands is an independent beverage consulting company that was hired by

        Defendant in 2011 to support the development of BeastUp-branded beverages, pursuant to

        a Product Development Agreement that is being produced to Plaintiff together with these

        responses. Power Brands was solely involved in beverage-related branding; Defendant's

        BeastUp mark and logos were already in use on clothing prior to Defendant's expansion

        into beverages. The individuals at Power Brands who were involved in Defendant's

        beverage-related branding were: Kris Guiao (Creative Director); Ashlliegh Brookham

        (Executive Assistant/Project Manager); and Alina Guerrero (Senior Beverage Scientist).

**INTERROGATORY NO. 4:**

Describe in detail, with reference to any supporting documents, information, and

materials, when and how You first became aware of MEC, the Claw Icon, any of MEC's

BEAST-Inclusive Marks, and any of MEC's Products and describe all circumstances

surrounding such knowledge.

**SUPPLEMENTAL RESPONSE:**

Defendant first became aware of Monster Energy Company in approximately 2004-2005, in the context of motocross racing. Jessee Waelty, a professional motocross racer, was exposed to various brands, including Monster Energy, RockStar, and Red Bull, as energy drink companies began to aggressively advertise and sponsor bikes and related extreme sports events. Defendant does not recall the specific date when it first learned of MEC's Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's specific Products. Defendant's recollection applies only to a general awareness of MEC as a company in connection with exposure to broad-level advertising.

**INTERROGATORY NO. 7:**

Describe any research (including, but not limited to, surveys, polls, market research, investigations, analyses, studies, or searches) regarding the BEASTUP mark or Defendant's Claw Logos, including, but not limited to, stating the person(s) who authorized the research, when the research was conducted, the person(s) who conducted the research, the reason the research was conducted, the results of the research, and identifying all documents relating to the research.

**SUPPLEMENTAL RESPONSE:**

Robert Waelty performed an amateur search of the USPTO's public TESS database in or around September 2008 for the mark BEASTUP. He does not recall specific search terms and does not have documents relating to that search in his possession. He recalls identifying a single potential competitor, "The Beast," which was a brand from Austria. Defendant later retained LegalZoom to perform an additional search for marks including the word BEAST in connection with apparel in

Class 25. LegalZoom's search results have been produced to Plaintiff. All other responsive

documents located after a reasonable search have been produced to Plaintiff.

**INTERROGATORY NO. 8:**

State Your net and gross sales (in units and dollars) and net and gross profits, on a

monthly basis, for each of the BeastUp Products since the date of first sale of each product.

**SUPPLEMENTAL RESPONSE:**

Defendant objects to this Interrogatory to the extent that it is unduly burdensome, and that such

information is not kept in Defendant's ordinary course of business. Defendant has produced

available financial and sales documents to Plaintiff. Additional documents are kept in hard copy

form and will be made available to Plaintiff for inspection and copying at Defendant's principal

place of business, at Plaintiff's expense.

**INTERROGATORY NO. 11:**

Describe in detail, with reference to any supporting documents, information, and

materials, the manner in which You have advertised, marketed, and/or promoted the BEASTUP

mark, Defendant's Claw Logos, and the BeastUp Products, including identifying the

publications, radio stations, television stations, websites, advertising programs, social media, or

other media channels through which You have promoted the marks and the products.

**SUPPLEMENTAL RESPONSE:**

Defendant has advertised, marketed, and promoted BEASTUP through social media (Facebook,

Twitter, Instagram), Defendant's website, sponsorship of the Chico State University wake board

team, sponsorship of the AMA Motocross West, sponsorship of CalROCS Rock Crawling Series,

sponsorship of the Finger Lakes Iron Man Race, sponsorship of the Red Bluff Roundup Rodeo,

sponsorship West Coast Monster Truck Show, sponsorship of Tehama's Fittest Beast, sponsorship

Corning Skate Comp, sponsorship of Wake fest Chico Park, sponsorship of Big Bike Weekend, sponsorship of Corning Zombie Run, sponsorship American Cancer Society Color Run, enjoy Magazine, promotional artwork on company vans, and the sale of stickers designed to decorate race vehicles. All supporting and illustrative documentation in Defendant's possession has been produced to Plaintiff.

**INTERROGATORY NO. 13:**

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Laches, Waiver and/or Acquiescence."

**RESPONSE:**

Defendant objects to this Interrogatory to the extent it asks for a legal conclusion. Notwithstanding this objection, Defendant has been openly using its BEASTUP mark in commerce since 2009 without objection or comment from Plaintiff.

**INTERROGATORY NO. 14:**

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Unclean Hands."

**RESPONSE:**

Defendant objects to this Interrogatory to the extent it asks for a legal conclusion. Notwithstanding this objection, upon information and belief, Plaintiff is publicly known as a "trademark bully," notorious for misusing the courts to vexatiously harass and intimidate other businesses beyond what the law reasonably allows. Numerous third-party articles, scholarly journals, websites, and news stories have documented Plaintiff's bad faith pattern of behavior.

Such documents are not in Defendant's possession, custody, or control, but are equally available to Plaintiff through a public Internet search.

**INTERROGATORY NO. 15:**

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Priority."

**RESPONSE:**

Defendant has been using its mark in commerce since April 2009. The following marks cited by Plaintiff in its Complaint appear to have originated after April 2009, thereby giving Defendant, and not Plaintiff, seniority with respect to those marks.

| Registration No. |
|---|
| 3,908,600 |
| 3,908,601 |
| 3,914,828 |
| 3,923,683 |
| 3,963,668 |
| 3,963,669 |
| 4,011,301 |
| 4,051,650 |
| 4,332,062 |

**INTERROGATORY NO. 16:**

Identify, by name and position, each of Your current and former employees and contractors, including the dates of employment and/or contract for each person You identify,

and provide a description of each person's role and responsibilities.

**RESPONSE:**

Robert Waelty is Defendant's founder, owner, and sole employee.

<div align="center">

**VERIFICATION**

</div>

The foregoing Responses are based on a diligent and reasonable effort by me to obtain

information currently available.  I reserve the right to make changes in or additions to any of these

answers if it appears at any time that errors or omissions have been made or if more accurate or

complete information becomes available.  Subject to these limitations, these Responses are true to

the best of my present knowledge, information, and belief.

Subscribed and sworn to under the pains and penalties of perjury this 5th of February, 2018.


*/s/ Robert Waelty*
Robert Waelty, on behalf of BEASTUP LLC
Defendant

As to objections:          */s/ Eve J. Brown*
Eve J. Brown

BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404
E-mail: ejbrown@bricolagelaw.com

Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses has been served upon the

attorneys for Plaintiff, Marko Zoretic, Lynda Zadra-Symes, and Matthew Bellinger of Knobbe

Martens Olson & Bear LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614, by e-mail to

Marko.Zoretic@knobbe.com, Lynda.ZadraSymes@knobbe.com, and Matt.Bellinger@knobbe.com,

this 5th day of February, 2018.

*/s/ Eve J. Brown*
Eve J. Brown

# EXHIBIT 10

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

Attorneys for Defendant
BEASTUP LLC


## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY | Case No. 2:17-CV-01605-KJM-EFB |
| v. | BEASTUP'S SUPPLEMENTAL RESPONSES TO MONSTER ENERGY COMPANY'S FIRST SET OF REQUESTS FOR PRODUCTION (1-46) AND RESPONSES TO MONSTER ENERGY COMPANY'S SECOND REQUESTS FOR PRODUCTION (47) |
| BEASTUP LLC | |

Pursuant to the Federal Rules of Civil Procedure, Defendant BeastUp LLC hereby supplements its responses to Plaintiff Monster Energy Company's First Set of Requests for the Production of Documents Nos. 1-46 and provides its response to Request No. 47, as follows.

## GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.      Defendant objects to Plaintiff's definitions to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

- 1 -

2.      Defendant objects to the extent that any Request seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Request seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Request seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Request is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.      Defendant objects to all mentions and requests for information regarding Defendant's "Claw Logos." Defendant does not own or use claw logos. To the extent that Defendant's former can designs included ornamental scratch marks, Defendant will produce information related to those decorative elements.

### REQUESTS FOR PRODUCTION AND SUPPLEMENTAL RESPONSES

**REQUEST FOR PRODUCTION NO. 1:**

All documents and things relating to the development, origin, conception, derivation, selection, adoption, and/or approval of the BEASTUP mark and Defendant's Claw Logos.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to include additional documents relating to the development, origin, conception, derivation, selection, adoption, and/or approval of the BEASTUP mark and all related designs, including the art specification form submitted to Power Brands Consulting.

**REQUEST FOR PRODUCTION NO. 2:**

Documents sufficient to show the reasons for which the BEASTUP mark and Defendant's Claw Logos were selected.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 3:**

Documents sufficient to show the person or persons who assisted with or otherwise developed and/or created the BEASTUP mark and Defendant's Claw Logos.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 7:**

All documents and things relating to MEC, the Claw Icon, any of MEC's BEAST-inclusive Marks, or MEC's Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 8:**

All communications relating to MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or

MEC's products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and things relating to any decision to seek or not seek trademark protection for the BEASTUP mark and/or Defendant's Claw Logos.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 11:**

All documents evidencing the first use in commerce of the BEASTUP mark and Defendant's Claw Logos, including samples, advertisements, marketing plans, and invoices.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show, on a monthly basis, Your total net and gross sales (both in units and dollars) and total net and gross profits for the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. Defendant maintains voluminous additional documents exclusively in hard copy format. Such documents are overly burdensome for Defendant to scan or mail to Plaintiff. Defendant will make such documents available to Plaintiff for inspection and copying, at Plaintiff's expense, at Defendant's place of business, during regular business hours and upon reasonable advance notice.

**REQUEST FOR PRODUCTION NO. 17:**

All documents and things relating to any opinions, written or oral, relating to the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and things relating to searches (including trademark searches), surveys, investigations, analyses, polls, research (including market research) or studies by You or on Your behalf relating to the BEASTUP mark and/or Defendant's Claw Logos.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and things relating to the advertisement, promotion, or marketing of the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify each manner in which the BeastUp Products are marketed, advertised, and/or promoted, including documents sufficient to identify the magazines, publications, Internet web pages, trade shows and other events, through which the products are advertised or promoted, and copies of each advertisement and/or marketing material that features or promotes the products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to identify each manner in which the BEASTUP mark and Defendant's Claw Logos are marketed, advertised, and/or promoted, including documents sufficient to identify the magazines, publications, Internet web pages, trade shows and other events, through which the marks are advertised or promoted, and copies of each advertisement and/or marketing material that features or promotes the marks.

- 6 -

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 26:**

All documents relating to Your costs and expenditures in connection with promoting and advertising the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. Defendant maintains voluminous additional documents exclusively in hard copy format. Such documents are overly burdensome for Defendant to scan or mail to Plaintiff. Defendant will make such documents available to Plaintiff for inspection and copying, at Plaintiff's expense, at Defendant's place of business, during regular business hours and upon reasonable advance notice.

**REQUEST FOR PRODUCTION NO. 28:**

All documents and things relating to the target or intended market for the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 29:**

All documents referring to the degree of care exercised by purchasers who buy the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant has already produced all documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 30:**

All documents and things relating to the consumers who purchase or have purchased the BeastUp Products, including, but not limited to, the demographic characteristics associated with these consumers (e.g. age, sex, and education level).

**SUPPLEMENTAL RESPONSE:**

Defendant has already produced all documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 32:**

All marketing and business plans relating to the BEASTUP mark, Defendant's Claw Logos, and/or the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant has already produced all responsive documents located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 34:**

All documents and things relating to the channels of distribution or the intended channels of distribution for the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 35:**

Documents sufficient to ascertain and describe Your corporate structure, including, but not limited to, all companies related to You, each of Your members, and each related company.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 36**:

Printed copies of the current and previous versions of all websites maintained by You, including, but not limited to, www.beastup.com.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 37:**

Printed copies of the current and previous versions of all social media accounts maintained by You, including, but not limited to, https://www.facebook.com/BeastUpBrand/ and https://www.instagram.com/beastupbrand/.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this

Request.

**REQUEST FOR PRODUCTION NO. 38:**

All documents relating to any communications between You and any third-parties relating to this lawsuit.

**SUPPLEMENTAL RESPONSE:**

Defendant objects to the extent that this Request is duplicative of prior requests. Nonetheless, Defendant hereby supplements its production to provide additional documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 43:**

All documents and things relating to Your contention, as stated in Paragraph 101 of Your Answer filed September 8, 2017, that MEC was aware of Your use of the BEASTUP mark and/or Defendant's Claw Logos.

**SUPPLEMENTAL RESPONSE:**

Defendant has no responsive documents in its possession, custody, or control. However, Defendant has not yet conducted its own discovery in this case, and therefore has not yet had the opportunity to ascertain facts relevant to its claims and defenses, including those set forth in Paragraph 101 of its Answer.

**REQUEST FOR PRODUCTION NO. 46:**

All documents and things relating to any efforts or other consideration by You to change or redesign the BEASTUP mark, Defendant's Claw Logos, or the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant hereby supplements its production to provide additional documents responsive to this

Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production.

**REQUEST FOR PRODUCTION NO. 47:**

All communications between any of the following individuals that refer to or mention MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products: Robert Waelty, Jessee Waelty, John Waelty, Colter Hedden, and/or Tony Thompson.

**RESPONSE:**

Defendant hereby produces all responsive documents located after a reasonable search. To the extent additional documents are later uncovered, Defendant will supplement its production.


Dated: February 2, 2018                          /s/ Eve J. Brown
                                                 _____

                                                 Eve J. Brown

                                                 Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses has been served upon the

attorneys for Plaintiff, Marko Zoretic, Lynda Zadra-Symes, and Matthew Bellinger of Knobbe

Martens Olson & Bear LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614, by e-mail to

Marko.Zoretic@knobbe.com, Lynda.ZadraSymes@knobbe.com, and Matt.Bellinger@knobbe.com,

this 2nd day of February, 2018.

<div align="right">

*/s/ Eve J. Brown*

Eve J. Brown

</div>

# EXHIBIT 11

**From:** Marko.Zoretic
**Sent:** Wednesday, January 24, 2018 10:23 AM
**To:** Eve Brown
**Cc:** Matt.Bellinger; Julianna.Simon
**Subject:** RE: BeastUp Deposition 1/25

Eve,

Defendant <u>still</u> has not responded to Monster's second set of interrogatories and document requests. The objections have therefore been waived, as is also the case with Defendant's untimely responses to Monster's first set of discovery requests, despite your assertions to the contrary.  Your email provides no legitimate excuse for Defendant's failure to timely respond as required by the Federal Rules of Civil Procedure.  Indeed, Defendant's position that it will not respond to our second set discovery until it "understand[s] [our] objections" to defendant's belatedly served responses to Monster's first set of discovery requests is untenable and frivolous.  We are confident that the Court will not countenance such gamesmanship.  Moreover, the meet and confer letter sent to you last Friday detailed the deficiencies in Defendant's discovery responses.

Moreover, your refusal to timely respond to Monster's second set of interrogatories and document requests, and refusal to meet and confer before the Rule 30(b)(6) deposition of Defendant regarding the deficiencies in defendant's previous discovery responses, prejudices our ability to prepare for and conduct the Rule 30(b)(6) deposition of Defendant.  Accordingly, as we previously stated to you, please be advised that tomorrow we will not close the Rule 30(b)(6) deposition, and reserve the right to continue the deposition at a later date after we receive complete discovery responses and documents from Defendant.

We are available on Monday at 9am Pacific for a meet and confer.   Please reach me at 949-721-7695.

Regards,
Marko

**Marko Zoretic**
Partner
949-721-7695 **Direct**
**Knobbe Martens**

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Wednesday, January 24, 2018 8:39 AM
**To:** Marko.Zoretic
**Cc:** Matt.Bellinger; Julianna.Simon
**Subject:** RE: BeastUp Deposition 1/25

Dear Marko,

No objections have been waived.

I assure you that Defendant does not have a cavalier attitude towards this litigation, which is very seriously threatening to destroy his business, his home, and his retirement savings, all while his wife is going through chemotherapy.

To the extent that I am attempting to lessen the financial and administrative burdens on my client and the court by discussing your concerns in good faith prior to creating additional fodder for disputes, I trust you will not be prejudiced by the minor delay. Discovery remains open until June, and you are of course welcome to send follow-up requests or ask Mr. Waelty clarifying questions at his deposition tomorrow. We will also, to the best of our ability, provide you with all of the answers you request, as soon as we understand your objections.

We want to provide you with all the information we have. We know we are in the right, and genuinely hope that, the more facts you have, the more reasonable your client will be in dropping this meritless suit or coming to a mutually agreeable resolution. No one is hiding anything from you. We simply want to make sure that the time we spend is productive and not wasted by engaging in avoidable spats among counsel.

For example, one of your repeated objections to my client's first set of responses was that he did not provide documents supporting how he selected, adopted, advertises, etc. his "Claw Logos." I have been very clear with you, both on the phone and in the written responses themselves, that <u>BeastUp has no claw logos.</u>

If we are not aligned in our basic understandings of the marks and definitions at issue, then our exchange of information will be unnecessarily messy and prolonged. You will not be satisfied with the responses you receive, and my client will be frustrated by truthfully and comprehensively responding to your inquiries, only to be told his answers are insufficient. We are talking past each other, which benefits no one.

I am not available to meet and confer today, as I will be preparing my client for tomorrow's deposition. I am available on Friday between 11am and 3pm EST. I am also available on Monday between 9am and 2pm EST.

Regarding the transcript for tomorrow, under FRCP 30(e), a copy of the deposition transcript must be provided to the witness for review if the witness requests the opportunity to do so. I am not asking for a free certified copy; merely stating that my client does not waive this right of review. I believe he should have 30 days from the date the transcript is received to review the document and make any corrections. If he does not order a transcript, then he will return the review copy to the court reporter, or to you. I will repeat our non-waiver on the record tomorrow before the deposition ends.

Robert Waelty will be appearing tomorrow on behalf of BeastUp. He will meet you in the Board Room.

Best,
Eve

Eve J. Brown, Esq.
*Owner, Principal*
**Bricolage Law, LLC**
128 School Street
Walpole, Massachusetts 02081
(508) 734-3404
bricolagelaw.com

**From:** Marko.Zoretic [mailto:Marko.Zoretic@knobbe.com]
**Sent:** Tuesday, January 23, 2018 6:21 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>; Julianna.Simon <Julianna.Simon@knobbe.com>
**Subject:** RE: BeastUp Deposition 1/25

Dear Eve,

 We understand that the deposition will take place in the "Board room" and the room will have a speaker phone.  You can attempt to call the following conference call number: 1-877-678-4585; room # 784045316.  We expect you to make other arrangements that will allow you to appear via telephone if for some reason the conference call number we provided does not work.  Please have Defendant's Rule 30(b)(6) witness meet us in the Board room.

Further, the due date for Defendant to respond to Monster's second set of interrogatories and document requests has passed and Defendant has yet again delayed in serving its responses.  Accordingly, any objections to the discovery requests have been waived (as is the case with Defendant's untimely responses to Monster's first set of discovery requests).  We are very concerned with Defendant's repeated cavalier disregard of due dates in this case.  Defendant belatedly served its initial disclosures.  Defendant also unilaterally extended the deadline for Defendant's responses to Monster's first set of discovery requests and only served Defendant's responses after we repeatedly emailed you about not receiving Defendant's responses.  Defendant's disregard of due dates is disrupting the course of this litigation.  Indeed, as you know, the Rule 30(b)(6) deposition of Defendant is set for two days from now.  Please provide Defendant's responses to Monster's second set of interrogatories and document requests by the end of the day.  Your assertion that the parties need to meet and confer regarding Defendant's responses to Monster's first set of discovery requests before Defendant serves its responses to Monster's second set of interrogatories and document requests is frivolous and nonsensical.

 We are available to meet and confer regarding the issues raised in our January 19, 2018 letter, and Defendant's failure to timely respond to Monster's second set of interrogatories and document requests, any time between 8:30am and 5:00pm (Pacific Time) tomorrow, January 24.  Please let us know what times you are available.

Also, Defendant may order a copy of the deposition transcript from the court report pursuant to F.R.C.P. 30(f)(3).

Regards,
Marko

**Marko Zoretic**
Partner
Marko.Zoretic@knobbe.com
949-721-7695 **Direct**
**Knobbe Martens**
2040 Main St., 14th Fl.
Irvine, CA 92614
www.knobbe.com/marko-zoretic

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Tuesday, January 23, 2018 10:03 AM
**To:** Marko.Zoretic
**Subject:** BeastUp Deposition 1/25

 Marko,

Please provide me with a call-in number and any specific instructions for where my client should meet you on Thursday for his deposition.

Thanks,
Eve

Eve J. Brown, Esq.
*Owner, Principal*
**Bricolage Law, LLC**
128 School Street
Walpole, Massachusetts 02081
(508) 734-3404
bricolagelaw.com

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT 12

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF CALIFORNIA
 3
 4
 5
 6   MONSTER ENERGY COMPANY,      )
     a Delaware corporation,      )
 7                                )
                  Plaintiff,  )
 8                                )
            vs.                   )   No. 2:17-CV-01605
 9                                )      -KJM-EFB
     BEASTUP LLC, a California    )
10   limited liability company,  )
                                  )
11                Defendant.  )
     _____)
12
13
14              VIDEOTAPED DEPOSITION OF
15                   ROBERT WAELTY
16               RED BLUFF, CALIFORNIA
17              THURSDAY, JANUARY 25, 2018
18
19
20
21
22
23
     Reported by:
24   SHARON L. DUNBAR
     LICENSE NO. 4051
25   NO. 18-60437
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   For Plaintiff:        KNOBBE - MARTENS
                           Attorneys at Law
 4                         2040 Main Street
                           Fourteenth Floor
 5                         Irvine, CA  92614
                           949-760-0404
 6                         matt.bellinger@knobbe.com
 7                         BY:  MATTHEW BELLINGER, Esq.
 8   For Defendants:       BRICOLAGE LAW
                           Attorneys at Law
 9                         1089 Beacon Street
                           Suite 4D
10                         Brookline, MA  02446
                           508-734-3404
11                         ejbrown@bricolagelaw.com
12                         BY:  EVE J. BROWN, Esq.
13
     Videographer:         Terry Fox
14                         REDDING VIDEO PRODUCTIONS
                           reddingvideoproductions.com
15                         530-222-5281
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  INDEX OF EXAMINATION
 2
 3                                            PAGE
 4      Examination by MR. BELLINGER................ 7
 5
 6
 7
 8
 9                     --oo0oo--
10
11
12
13        DEPOSITION OF ROBERT WAELTY, taken on
14   behalf of the Plaintiffs herein, at the Hampton Inn
15   Conference Room, 520 Adobe Road, Red Bluff, California,
16   on Thursday, the 25th day of January, 2018, commencing
17   at the hour of 9:08 a.m., before SHARON L. DUNBAR,
18   a Certified Shorthand Reporter of the State of
19   California.
20
21
22
23                     --oo0oo--
24
25
```

**Page 4**

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition of BeastUp, LLC - 10 pages | 9 |
| 2 | Color Graphic, BEASTUP PROD 0177 - 1 page | 50 |
| 3 | Color Graphic, BEASTUP PROD 0209 - 1 page | 56 |
| 4 | Color photograph of 12-ounce BeastUp Energy Drink can | 59 |
| 5 | Schedule C tax forms for 2010-2016, BEASTUP PROD 0088 through 0101 - 14 pages | 69 |
| 6 | BeastUp Events, 2014-2017 - 2 pages | 75 |
| 7 | Color Graphic Artwork - BEASTUP PROD 0043 through 0045, 0053, 0067, 0075, 0076 and 0085 - 8 pages | 99 |
| 8 | Distribution Spreadsheet, BEASTUP PROD 0059 AND 0069 - 2 pages | 128 |
| 9 | BeastUp Drink Locations - 3 pages | 132 |
| 10 | Color Facebook photo and comments - 1 page | 134 |
| 11 | Color Facebook photo and comment - 1 page | 136 |

Deposition of
ROBERT WAELTY

MONSTER ENERGY V. BEASTUP.
January 25, 2018

Page 5

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 12 | BeastUp Distribution Agreement, BEASTUP PROD 0010 through 0021 - 12 pages | 144 |
| 13 | Foothill Distributing Spreadsheet, BEASTUP PROD 0110 through 0116 - 7 pages | 148 |
| 14 | 2016 Annual Plan Meeting, BEASTUP PROD 0121 - 1 page | 149 |
| 15 | "Take Our Survey" Color Graphic - 1 page | 157 |
| 16 | Market Plan, BEASTUP PROD 0129 through 0142 - 14 pages | 159 |
| 17 | Color Graphics and Posters, BEASTUP PROD 0158, 0173 through 0175, 0210, 0214 and 0217 - 7 pages | 172 |
| 18 | Color Posters, BEASTUP PROD 0046, 0047, 0159, 0178 through 0184, 0208, 0218, 0225, 0237 and 0243 - 15 pages | 179 |
| 19 | Color Posters, BEASTUP PROD 0178, 0199, 0200 and 0210 - 4 pages | 184 |
| 20 | 2009 Schedule C tax form for 2009 - 2 pages | 203 |

--oo0oo--

Page 6

1  RED BLUFF, CALIFORNIA, THURSDAY, JANUARY 25, 2018
2          9:08 a.m.
3
4      THE VIDEOGRAPHER:  Ladies and gentlemen, we
5  are on video record with the deposition of Robert
6  Waelty.  The date is January 25th, 2018.  The time is
7  9:08 a.m.
8      I am Terry Fox, the Video Specialist from the
9  firm of Redding Video Productions on behalf of the
10  Sullivan Group of Court Reporters, Incorporated.
11      This is the beginning of DVD No. 1 regarding
12  Case No. 2:17-CV-01605-KJM-EFB, Monster Energy Drink
13  Company, a Delaware Corporation vs. BeastUp, LLC, a
14  California Limited Liability Company, in the United
15  States District Court of the Eastern District of
16  California.
17      This deposition is being taken at the Hampton
18  Inn at 520 Adobe Road in Red Bluff, California.
19      The Court Reporter is Sharon Dunbar, CSR
20  No. 4051, on behalf of the Sullivan Group of Court
21  Reporters, Incorporated.
22      Counsel will now please introduce themselves,
23  state who you represent, and the witness will then be
24  sworn in by the Court Reporter.
25      MR. BELLINGER:  Matt Bellinger of Knobbe

Page 7

1  Martens for Plaintiff, Monster Energy Company.
2      MS. BROWN (telephonically):  This is Eve
3  Brown, Bricolage Law, representing Defendant BeastUp.
4      MR. BELLINGER:  And for the record Ms. Brown
5  is appearing by telephone.
6
7          ROBERT WAELTY,
8  having been duly sworn, was examined
9  and testified as follows:
10
11          EXAMINATION
12  BY MR. BELLINGER:
13  Q.  Morning.
14  A.  Morning.
15  Q.  Can you please state your name and address
16  for the record?
17  A.  Robert Waelty, spelling of W-a-e-l-t-y,
18  20790 Live Oak Road, Red Bluff, California.
19  Q.  Have you ever been deposed before?
20  A.  No.
21  Q.  Just since this is your first time through
22  through the process let me explain things for you.
23      The Court Reporter is writing down everything
24  that we say.  And for that reason it's important that
25  we only speak one at a time, because the Court Reporter

Page 8

1  can't write things down if we are speaking over each
2  other.  So if you will let me finish my question before
3  you begin your answer, and I will let you finish your
4  answer before I begin my next question.
5      Does that sound fair?
6  A.  Sounds fair.
7  Q.  And because the Court Reporter is writing down
8  everything that you say it is important that you give
9  verbal answers to my questions as opposed to nodding
10  your head "yes" or shaking your head "no."
11      Do you understand that?
12  A.  Yes, sir.
13  Q.  All right.  And if at any time you need a
14  break, just let me know, and I will try to accommodate
15  you.  The only thing I ask is if there is a question
16  pending, we would take care of answering the question
17  before we take a break.
18      Okay?
19  A.  Yes.
20  Q.  All right.  Do you understand this is a
21  Rule 30(b)(6) deposition of BeastUp?
22  A.  Yes.
23  Q.  And when I say "BeastUp" I will be referring
24  to BeastUp, LLC, the Defendant in this case.
25      Do you understand that?

Page 9

1  A.  Yes.
2  Q.  All right.  And the Plaintiff in this case
3  is Monster Energy Company.  And I'll probably just
4  refer to them as "Monster."
5      Do you understand that?
6  A.  Yes.
7      MR. BELLINGER:  Let me introduce for you
8  Exhibit 1, which is the 30(b)(6) Deposition Notice.
9      (At this time a 10-page Notice of Deposition
10  was marked Exhibit 1.)
11  Q.  BY MR. BELLINGER:  If you could look at
12  Exhibit 1, please?
13  A.  Okay.
14  Q.  Have you seen this document before?
15  A.  Yes.
16  Q.  All right.  And do you understand that you
17  have been designated on behalf of BeastUp to testify
18  regarding the topics in this Notice?
19  A.  Yes.
20  Q.  Did you do anything to prepare for your
21  deposition today?
22  A.  Yes.
23  Q.  And what did you do?
24  A.  I backtracked through some of the -- I just
25  wanted to refresh myself and the process I have been

Page 10

1  through through building this company.  So I kind of
2  just went back through some e-mails, you know, when I
3  first started till now.  And then basically spoke with
4  my attorney and just clarified some stuff and what I
5  was going to be expected.  I reached out to some of
6  -- another company that was under the same -- going
7  through the same process I'm going through.  So I
8  just kind of got some input what to expect.  And
9  that's about it.
10  Q.  So you mentioned you reviewed some e-mails
11  from the time you first started the company until
12  now.
13  A.  Yes.
14  Q.  Whose e-mails were those?
15  A.  Those are my e-mails.
16  Q.  And from what time period did those cover?
17  A.  From 2008.  When I first started back in
18  September of 2008 till now.
19  Q.  And was that a personal e-mail account or
20  business e-mail account?
21  A.  At that time, yeah, it was a personal e-mail
22  account.
23  Q.  And from what period of time was it your
24  personal account that you were reviewing?
25      Probably till 2016.  I usually ran a lot of

Page 11

1  personal -- or a lot of stuff through my personal
2  account.  But I did have an e-mail on my website that
3  people would e-mail me, and I would answer through it.
4  And that was an info@beastup.com.
5      I ended up -- When the website was created I
6  ended up changing providers and going to another host
7  and transferred all of that over.  So I ended up
8  having another separate e-mail, which was
9  beastupenergy@gmail.com.
10  Q.  And so for the personal e-mail you used, what
11  type of account was that?  Like Outlook or Hotmail?
12  A.  Yahoo.
13  Q.  Yahoo.
14  A.  Yeah.
15  Q.  And then at what point did the
16  info@beastup.com e-mail account come into existence?
17  A.  Probably when I started the website.
18      Is it okay if I reference some of my notes?
19  Q.  Sure.
20  A.  Okay.  And that probably would have started
21  in 2009 when I started the website with GoDaddy.  It
22  allowed you to create a, you know, an e-mail account
23  with the website or the hosting.
24  Q.  And were you able to find e-mails in the
25  info@beastup.com e-mail account that went all the way

Page 12

1  back to 2009?
2  A.  Yes.  Then I was able to forward those to my
3  Yahoo account, because I just haven't had -- yeah, I
4  could still go back and look at those accounts.  But I
5  forwarded most of those so I can transfer them to the
6  beastupenergy and kind of reference stuff through
7  there.
8  Q.  And at what point was the
9  beastupenergy@gmail.com account created?
10  A.  I would say in 2016 by my son.  He's the one
11  that created that.
12  Q.  And in preparing for your deposition what
13  particular e-mails did you review?
14  A.  The ones when I first started trademarking
15  the process through LegalZoom.  That was the company
16  I went through to get my trademark.  So reviewed some
17  of those e-mails and then the process I went through,
18  just that.  And then some GoDaddy confirming, you know,
19  the website stuff.
20      And then, yeah, just the process from how
21  the company was established, getting my LLC e-mails,
22  confirming those, and then, yeah, lawyer stuff, when I
23  first had to get an attorney for the opposition that
24  was filed against me.
25  Q.  Was that the opposition by USA Neutraceuticals

Page 13

1  or Beast Sports?
2      A.  Yes.
3      Q.  USA Neutraceuticals known as Beast Sports.
4          And then the ones through Power Brands, the
5  company that I used -- they are called Power Brands
6  -- that I used to develop my first drinks, the first
7  company and that process, just kind of reading back
8  through some of those e-mails and the things we agreed
9  on and just started to develop, the plan, all the way
10  to moving to another company, Production Services
11  International, for the development of my company.
12  E-mails to dozens of others businesses for like
13  product and promotional stuff, like my tents and
14  clothing and stuff like that.  Yeah, just the overall
15  progress and progression of my business.
16      Q.  Do you recall reviewing any e-mails with any
17  distributors?
18      A.  Say it again?
19      Q.  Do you recall reviewing e-mails with any
20  distributors?
21      A.  Yes.
22      Q.  And what did you review?
23      A.  Just the agreements that we -- the first
24  agreement that we had established with Foothill
25  Distributing back in 2014.  Some e-mails about just

Page 14

1  some things that we needed to go over to help build
2  the business and things like that.
3          They would e-mail me if they got some coolers
4  or some stuff for us to use, and just things.  And
5  we would go back and forth about how to promote my
6  business.  And I ended up having a meeting with them,
7  I think, to kind of motivate them a little bit.  So
8  we ended up having some e-mails about that, trying
9  to get a meeting, have a meeting, so...
10          And then the final e-mails with them, or me
11  e-mailing them.  And we kind of separated our ways in
12  2016.  And there is reasons behind that.
13      Q.  Okay.  We will get into more of that later.
14      A.  Yeah.
15      Q.  Do you recall reviewing e-mails with any
16  current or former customers?
17      A.  No, not in this last couple weeks that I have
18  been doing some research.  But, yeah, I would imagine
19  we do have some e-mails on my BeastUp account through
20  stores that are looking for us to get it into their
21  store or, you know, some of them might e-mail us saying
22  "We are getting short on some product.  You know, can
23  you guys deliver some?"
24          And those are kind of like our private
25  accounts that we had, besides Foothill.  Because

Page 15

1  Foothill covered six counties.  And in their territory,
2  when we signed the agreement, we couldn't sell to any
3  of their stores in those six counties that they sold
4  to.  So we basically had our hands tied -- weren't
5  able to go into those stores.
6          But we can go to like gyms or small delis or
7  somewhere that they didn't have their products, which
8  leads me to why we pulled away from them later in
9  2016.
10      Q.  Any other e-mails that you recall reviewing
11  to prepare for your deposition today beyond what you
12  have told me?
13      A.  That's about all I can remember.
14      Q.  You mention that you also reached out to
15  another company in preparing for your deposition
16  today?
17      A.  Yes.
18      Q.  Who is that?
19      A.  Thunder Beast.
20      Q.  And who did you communicate with there?
21      A.  His name is Stephen.
22      Q.  Do you know the last name?
23      A.  I think it is Norberg or something like that.
24  I'd have to look in my notes.
25      Q.  Okay.  And what did you discuss with that

Page 16

1  individual?
2      A.  I just asked him just some questions of what
3  he is going through, the process he is going through.
4          Because through my other attorney, Morris
5  Turek, he had told me about Thunder Beast, that I
6  should look into Thunder Beast, because they're being
7  sued for the same reason.  So that's when I reached
8  out to Thunder Beast, and just asked him, you know,
9  told him I was kind of going through the same thing.
10  And then he sent me an e-mail back, just kind of what
11  to expect, what he is going through.  And then, yeah,
12  just went back a couple times.
13      Q.  So were those e-mail exchanges?
14      A.  Yes.
15      Q.  Did you have any phone calls?
16      A.  No.
17      Q.  And when were those e-mails sent roughly?
18      A.  I would say around August 2017 till just
19  recently, a couple days ago.
20      Q.  How many exchanges do you think you have had
21  with Thunder Beast?
22      A.  Four.
23      Q.  Did you speak to anyone else in preparing for
24  your deposition today?
25      A.  Not for any legal advice or anything like

Page 29

1    Q.  Does BeastUp have any employees?
2    A.  No.
3    Q.  Has it ever had any employees?
4    A.  No.
5    Q.  Do you know who Colter Hedden is?
6    A.  Yes.
7    Q.  And who is that?
8    A.  He is my son's best -- well, I don't know
9  if they are best friends now.  But he is one of my
10  son's best friends.  They grew up together.  I know
11  his dad.  His dad just passed away from cancer around
12  three, maybe three years ago, four years ago.  So he's
13  just been -- he's kind of like a second kid in our
14  family that I have kind of overseen.
15    Q.  Has he had any involvement in BeastUp?
16    A.  He was a main -- He is one of our little main
17  media players back in the day when we first started.
18  He was kind of the social media kid.  He was always
19  posting things for us.  And he has always been there
20  with us, going to events and being a part of the
21  whole BeastUp movement.
22      I never -- You know, he wasn't an employee or
23  anything like that.  He just wanted to be part of it.
24  He is my son's best friend.  So he helped us get going.
25    Q.  Is he still active in assisting the

Page 30

1  business?
2    A.  No.  He is a Chico State Wakeboard coach,
3  and I sponsor the Chico State Wakeboard Team.  So I go
4  through him, because I give him product to give to the
5  Chico State Wakeboard Team.  So we associate that way
6  through the sponsorship of them.  And then, yeah, he
7  comes over once in a while, buys a bunch of drinks,
8  and I give him some product.  He's my second kid, so...
9    Q.  So approximately what time period was he more
10  actively involved in the business?
11    A.  He was pretty involved from 2014 when we got
12  the drinks probably till the end of 2015.  And then,
13  yeah, then we kind of, he trained -- I think he had a
14  job doing ranch work with his grandpa, so he kind of
15  was committed a lot of the times doing some stuff for
16  his grandpa, so we weren't able to pull him away to go
17  to some of our events, so...
18    Q.  Do you know Tony Thompson?
19    A.  Yes.  He was a convict on my hand crew back
20  in 2008.  Yeah, he was an inmate that was on the fire
21  crews back in 2008, and amongst, you know, 13 or so
22  that I ran.
23      Yeah, he was an inmate that after he got out
24  in 2011 decided that he was going to try to start a
25  company called BeastUp.  So I ended up having to deal

Page 31

1  with him.  I think we filed a cease and desist or
2  something on him.  I used Morris Turek.
3      Because he had started a website and was
4  copying my images and putting them on his website and
5  doing some things.  And I was just like, "Whoa, who is
6  this guy?"
7      So I actually met with him.  And it was like
8  there only can be one BeastUp, you know?  You couldn't
9  have two BeastUp companies.  So he wanted to do his
10  own thing.  So I think he ended up trademarking it,
11  and it went through for music and CDs and labels and
12  stuff.  And I'm not sure what he's -- I haven't heard
13  from him since 2011.  So I don't know if he's even did
14  anything with the trademark.  But he did get it passed
15  or sent through the system.
16    Q.  And why did you think there could only be one
17  BeastUp?
18    A.  Because there is only one Monster Energy.
19  I want to establish a company; that you can't have
20  multiple companies with the same name.  I just wanted
21  to establish, you know -- I didn't want any confusion
22  to my mark, that people think it's, you know, a music
23  label business or something.
24      I was pushing towards the extreme sports, you
25  know.  That's my industry, was to get into the extreme

Page 32

1  sports, and try to get 1 percent of that business or
2  that industry so I can buy me a vacation home.
3    Q.  Do you know Ryan Kinyon, K-i-n-y-o-n?
4    A.  Yes.
5    Q.  Who is that?
6    A.  He is currently a fire captain.  And he was
7  one of my buddies from Fire Service, from CAL FIRE.
8      He's the one that kind of helped me establish
9  my website and get me started back in the day in two
10  thousand -- probably when I just first started.  I
11  know he helped me build the website on GoDaddy, and
12  that would have been probably 2009 is when he came on
13  board.
14      So he kind of helped me out, helped me
15  develop some stuff.  He -- We went back and forth on
16  some ideas for shirts and logos and drawing, and --
17  yeah, he was just that guy that kind of helped me
18  get going.
19      And then the same thing.  Well, he ended up
20  getting a permanent job in the Fire Service, and then
21  so things just kind of -- He ended up doing his thing,
22  and wasn't able to give me the time or help me build
23  my company.  He was too busy doing some stuff, so I
24  had to move on.
25      So I still keep in contact with him if I

Page 41

1  that's another scammer there.
2       I ended up -- I knew I was kind of tapped out
3  on my cards and everything, and they advised I can get
4  some funding to help grow my business, because that's
5  what I needed was just more money.
6       So I ended up having to pay somebody $2,500, I
7  believe, to get into this special funding program, and
8  just for them to tell me that, "No, you can't get any
9  more money." I ended up -- it was basically I couldn't
10  go any further. I gave them money for them to tell
11  me that I couldn't get no more money. So it ended up
12  being a dead-end there.
13     Q. So then other than the $20,000 in funding to
14  start the business and the 10,000 funding for the
15  premix stage, has the company received any other
16  funding or investment over time?
17     A. No.
18     Q. Did the company receive any funding investment
19  or loans around December of last year?
20     A. December. I don't recall. Shouldn't have.
21  No, I mean there was no reason to -- no, no, not that
22  I recall. I don't remember getting any money for --
23  I mean, if I was looking to get money, it would have
24  been to go forward with the new drink. And that
25  didn't happen. So, no, I did not get no money. Yeah.

Page 42

1       But we were looking into getting money with --
2  We had a guy come on. So where he was an individual
3  that was going to try to help us find -- get some
4  money. And I think that was in the end of 2016 to
5  basically the middle of 2017, the summer or so,
6  whenever all this came about.
7       We had an individual that was looking to help
8  us out. And he was going to look for investors for us
9  and everything like that. And then he ended up backing
10  out when all of this kind of came about, so...
11     Q. And who is that?
12     A. His name is Tim Crew.
13     Q. How did the company come into contact with
14  Mr. Crew?
15     A. We actually went down into a gym that was
16  down in -- I can't think of the city, but it is down
17  southwest of the Sacramento area. There's a town. I
18  can't remember the town.
19       But we actually -- My son's friend worked at
20  a gym there. He invited us down. So we displayed,
21  put all of our clothes there and were selling our
22  drinks. And we were going to sponsor the guy that
23  owned the gym. He's an MMA fighter.
24       So the -- Tim Crew actually owned that gym;
25  was selling it to the MMA fighter. So Tim Crew had

Page 43

1  saw our product, and wanted to meet with us, because
2  he's always looking for opportunities for business.
3       So when we came down there, he asked us to
4  meet him at a restaurant. And we met and we talked.
5  And he said that he had enough business experience
6  that he could help us get to the next level, and he
7  had a lot of contacts and things like that. So he
8  just basically invited himself to help us out. So
9  from there we just kind of e-mailed each other back
10  and forth, and he would give us advice.
11       He actually set up an appointment. And we all
12  went to it at Stapletons in Gridley. It's a bottling
13  company, where we were going to talk to them about our
14  new product and see if they could fill the bottles,
15  you know, what we wanted, and just kind of let them
16  know that we were going to go through them, stay
17  local up here for our next product.
18     Q. And where are they located?
19     A. Gridley, California. It's a bottling
20  company.
21     Q. But as part of the relationship with Mr. Crew,
22  no additional financing --
23     A. No.
24     Q. -- or money was obtained?
25     A. No. He didn't give us any money or anything

Page 44

1  like that. But he was going to try to find us some.
2  He was the man.
3     Q. And when did that relationship end?
4     A. We are still friends and everything. I still
5  talk to him. But he had other -- Since this was kind
6  of going on, he wants to wait to see how this all
7  comes about. But he's doing some other stuff. But
8  that was, yeah, we kind of just -- early, or I mean
9  in the middle of 2017.
10     Q. Has BeastUp ever been -- Other than this
11  lawsuit has BeastUp ever been a party to a lawsuit?
12     A. No.
13     Q. What goods has BeastUp sold under the BeastUp
14  mark over the years?
15     A. Just the one beverage that we have, and hats,
16  sweatshirts, T-shirts, lanyards, wristbands, beanie
17  hats. Did I say T-shirts? Yeah.
18     Q. And has it sold the clothing continuously
19  since 2009?
20     A. Yes.
21     Q. And has it continuously sold beverages since
22  around 2014?
23     A. Yes.
24     Q. And has it only sold the one 12-ounce can
25  beverage product?

Deposition of
ROBERT WAELTY

MONSTER ENERGY V. BEASTUP
January 25, 2018

Page 57

1    A.  It shows the BeastUp Extreme design.
2         Yeah.  This is when -- Well, the BeastUp
3  Refuel was the sports bottle.  The BeastUp new 16-ounce
4  pineapple orange, the one we have now in the 16-ounce,
5  and then when we do the 16-ounce -- or we did the
6  BeastUp Extreme, because it was going to be more of
7  an energy drink, we were going to go to this.  So that
8  was the BeastUp Extreme.
9    Q.  So if I understand --
10   A.  Sorry about that.  I think I messed that one
11  up.
12   Q.  Yeah.  So if --
13   A.  This was going to be BeastUp Extreme, and all
14  the other looks.  Because this is our wild berry, yeah
15  (indicating).
16   Q.  So if we refer back to Exhibit 2, the bottle
17  that is shown on the top of the page --
18   A.  Yeah.
19   Q.  -- is the plan to launch that product under
20  the name BeastUp Extreme, but in a packaging that
21  looks like Exhibit 3?
22   A.  Yes.
23   Q.  Okay.  And then you mentioned, referring back
24  to Exhibit 2, the 12-ounce can shown at the bottom of
25  the page.  You had mentioned there were some plans to

Page 58

1  redesign the look of the can?
2    A.  Yes.
3    Q.  Is the plan to redesign the look of the can
4  on the bottom of Exhibit 2 such that it would look
5  like the can shown on Exhibit 3?
6    A.  Yes.
7    Q.  So both potentially new products would have
8  the same or similar can design?
9    A.  Yeah.  It would be a black can.
10   Q.  And what steps, if any, has BeastUp taken
11  with respect to redesigning the can image of the
12  current product?
13   A.  I had sent out an e-mail to the artist that
14  does all of the -- that did the first original
15  converting so they can -- he does the artwork so he
16  can send it to Ball, and then Ball makes the plates.
17  I e-mailed him about helping us out with the new
18  artwork on that, and -- yeah, we -- yeah, that's
19  about it.  I mean, I --
20   Q.  Who is the artist?
21   A.  The artist is, it's -- his name is Tom
22  J-a-h-n-k-e.  He owns Advertising Art Studios out of
23  Brookfield, Wisconsin.
24   Q.  And when did you e-mail him about potentially
25  changing the can art?

Page 59

1    A.  I don't have it on here.  But it would have
2  been 2016.  I just wrote "new drink" on my notes here.
3  That is our new drink.  So I would imagine that was
4  2016.  I e-mailed him to see if he could help us out
5  with the new design.  But I couldn't really -- I mean
6  we couldn't  go forward.  I just wanted to find out if
7  he would help us.
8    Q.  So other than that e-mail exchange in 2016 has
9  BeastUp done, taken any other steps with respect to
10  potential redesign of its can, current can?
11   A.  No.
12       MR. BELLINGER:  We can take and mark this can
13  as Exhibit 4.  Just put the label on the bottom.
14       (At this time a 12-ounce BeastUp Energy Drink
15   can was marked Exhibit 4, after which a photograph was
16   taken for inclusion in the deposition transcript.)
17   Q.  BY MR. BELLINGER:  So let me show you what has
18  been marked as Exhibit 4.  If you can hold that up for
19  the camera so it is in the shot?
20   A.  (Complies.)
21   Q.  Thank you.  Is this BeastUp's current can
22  design?
23   A.  Yes.
24   Q.  And that's been the same can design since
25  2014?

Page 60

1    A.  Yes.
2    Q.  With respect to the what you have called
3  scratch marks that are located on the can, have those
4  scratch marks been used on any other products?
5    A.  No.
6    Q.  BeastUp has never sold clothing with those
7  scratch marks on them?
8    A.  No.
9    Q.  What terms, if any, have you heard people use
10  to refer to the scratch marks?
11   A.  I haven't heard anybody refer to the scratch
12  marks.  If anything I have gotten -- they said that I
13  should have made the word a little brighter because
14  sometimes they just can't read it until they get
15  closer.  That's the only thing I've gotten.  And that
16  it's a 12-ounce can is the only negativity that I've
17  gotten on the can design.
18   Q.  When you say make the word brighter, you are
19  referring to the "BeastUp" name on the can?
20   A.  Yes.
21   Q.  And does BeastUp use the scratch marks in
22  advertising materials for the beverage product?
23   A.  If it does, it's usually with the -- If
24  this image or the image of the can design is on there,
25  maybe it will have some scratch marks.  But other than

Page 101

1   I sent him, to the ones he sent me back.  And then we
2   chose a font and -- or I got to choose the font that
3   I liked.  And we went from there, and he did the final
4   one.
5       Q.  So looking at the -- So if you wanted to get
6   those documents, you could?
7       A.  Yes.
8           MR. BELLINGER:  Eve, just for the record, it's
9   becoming apparent in this deposition there are a number
10  of responsive documents that haven't been produced.
11  And I will request that all --
12          MS. BROWN (telephonically):  I'm sorry.
13  What?
14          MR. BELLINGER:  It's becoming apparent during
15  this deposition there are a number of documents
16  responsive to our request that have not been produced.
17  And we request that all of these documents be produced.
18  I know there is a meet and confer scheduled,
19  so we can discuss it more in more detail.
20          MS. BROWN (telephonically):  Yes, we have a
21  meet and confer on Monday.
22          Also to the extent that things were found
23  while preparing for this deposition, we will certainly
24  produce everything that we have in our possession.
25      Q.  BY MR. BELLINGER:  So with respect to the

Page 102

1   first page of Exhibit 7, on the left-hand side there
2   is a Power Brands box.
3           Do you see that?
4       A.  Uh-huh.
5       Q.  And there is a -- At the bottom of that box
6   it says Round 1, Round 2, Round 3.
7           Do you see that?
8       A.  Yeah.
9       Q.  And Round 2 is checked?
10      A.  Uh-huh.
11      Q.  So did this label come as part of the Round 2
12  iteration?
13      A.  Yeah.  Because the Round 1 never existed.
14  Because like he sent me like the sniper stuff.  So we
15  didn't consider -- so I think -- I would have to go
16  back and look at the e-mails.  But, yeah, I think this
17  would be considered the Round 2.  We are getting down
18  to the final with this image.
19      Q.  So this was the Round 2 images the first time
20  the scratch marks appear?
21      A.  No.  Well, Round 1 didn't count.  But the
22  Round 2, which was actually Round 1, he had the scratch
23  marks on the sports bottle, but not on the can.  This
24  is the can right here, this image (indicating).
25      Q.  Right.  Do you see anything in Exhibit 7 that

Page 103

1   would reflect what you believe is part of Round 1?
2       A.  No.
3       Q.  Do all of these labels in Exhibit 7 appear to
4   reflect Round 2 or Round 3?
5       A.  This one, this one (indicating) --
6       Q.  When you say "this one" and "this one" can you
7   refer to which page of the exhibit?
8       A.  Page 1, Page 2, Page 4, Page 5 and I believe
9   are all Power Brands, the process through Power Brands.
10          These, Page 3, is when I went through PSI,
11  Product Services International, and had to redo all of
12  the artwork over again.  Because basically we needed
13  to change the label.  They wanted to go from a
14  supplemental label to a nutritional label.  So this
15  was one of the first ones that PSI or Advertising Arts
16  maybe had done, or maybe I submitted to him.  And
17  then we --
18      Q.  Just if we can stay on Page --
19      A.  Oh, okay.  I'm sorry.
20      Q.  That's okay.  Page 3 of Exhibit -- I don't
21  think there is a page number that was put on here, so
22  I can't refer to it.  Or if there is -- oh, I see.
23  It's kind of obscured.  Maybe BeastUp 45.  But it's
24  Page 3 of the exhibit.
25          So when was this label created?

Page 104

1       A.  This label, this one might -- This one looks
2   like it is Power Brands.  It still has the supplemental
3   label on it.  This would have been the final probably
4   artwork that I got from the Power Brands.
5       Q.  And this would have been for the bottle --
6       A.  Bottle.
7       Q.  -- product which was never made?
8       A.  Correct.  Yes.
9       Q.  So this was done around the same --
10      A.  Yeah.
11      Q.  -- same time?
12      A.  Yes.  I'm sorry, are we looking at the same?
13      Q.  Yes.
14      A.  I just flipped real quick.
15      Q.  Right.  Page 3.  So Page 3 was also created
16  by Power Brands, but for the bottle design; correct?
17      A.  Correct.  Yeah, because it still has the
18  glucosamine and everything in it, so yeah.
19      Q.  And if we go to the fourth page of the
20  exhibit, which has Production No. BeastUp 53, what is
21  this?
22      A.  That is basically the same page as Page 1.
23  It's just a lay-flat format, that in how it's kind of
24  stretched out, I believe that's how it gets printed
25  out.  But when it gets put on a can it looks normal.

Page 105

1 So I think this is the lay-flat approval or the end
2 of the concept form.
3    Q.   So this is for a 12-ounce can; correct?
4    A.   Yes.
5    Q.   And at the top of this can there are four
6 scratch marks; correct?
7    A.   Correct.
8    Q.   But on the final can design there were only
9 three; right?
10    A.   Correct.
11    Q.   And so why was --
12    A.   This is for the sleek tall. Power Brands
13 did all of their artwork for the sleek tall can.
14          When I went to Production Services
15 International, they are the ones that changed it to
16 the smaller, and we had to redo the artwork, which
17 brings us to the other pages, which you will see that
18 it -- we actually took the romance copy off, and did
19 the double "BeastUp" on both sides.
20    Q.   But with respect to Page 4, this is still a
21 Power Brands design; correct?
22    A.   Yes. Correct.
23    Q.   So the next page of the exhibit, the fifth
24 page has Production No. BeastUp 67.
25          What is shown in this page?

Page 106

1    A.   This would be the energy drink from Power
2 Brands design. It's the same artwork, same everything.
3 It's just -- It's just a better image.
4    Q.   And is this still within the Round 2 of the
5 design process?
6    A.   This would be -- This could be Round 2 or
7 Round 3. This looks like the final concept with
8 Power Brands to me.
9    Q.   And then on there, there is some text on the
10 left-hand side. It says, "BeastUp, not just a word.
11 It's that inner beast that waits to be released on
12 your competition or enemy," and then it continues on.
13          Do you see that?
14    A.   Yes.
15    Q.   Who came up with that?
16    A.   I think I did. Yeah, I did. They wanted me
17 to write a romance copy for -- or wanted me to write
18 something, or either I told them I wanted to write
19 something. So, yeah, that would have came from me.
20    Q.   And what was your inspiration for that text?
21    A.   Just what I witnessed with the power -- with
22 the word when, you know, just things are tough, they
23 are going to release their inner beast just by saying
24 the word "BeastUp." That's kind of -- yeah, you're
25 just going to, yeah, release the beast or release that

Page 107

1 inner beast. I'm sorry.
2    Q.   And were you inspired by Monster's use of
3 "Unleash the Beast!" when you wrote that?
4    A.   No.
5    Q.   But you might have known about use of
6 "Unleash the Beast!" when you wrote that; right?
7    A.   There's a good chance I probably did if they
8 were out on the market with that term on their can.
9    Q.   And has BeastUp used this text or verbiage in
10 its promotional activities?
11    A.   No, this never made it to -- on the can or
12 anywhere. It stopped right here actually. This
13 design never got used for my product because we had
14 to change the artwork and everything, so...
15    Q.   And so why did this text get left off the
16 final can design?
17    A.   It was an idea from Production Services
18 International that if we put the design on both sides
19 of the can, depending on the way, if the can was turned
20 inside on the rack, you would still see the brand name.
21 You would have -- It would be more effective for
22 people to see the brand name rather than just on one
23 side. So we decided to go with -- did it on both
24 sides.
25    Q.   Did anyone at Production Services

Page 108

1 International ever communicate with you regarding
2 Monster's products or marks?
3    A.   No. I mean the day we did production on 2014
4 they told me that Monster Energy was producing that
5 -- or they were in production that day. So we got
6 to see on the board that "Monster Energy," "BeastUp."
7 I thought that was kind of cool.
8          But we -- that's the only time. They just
9 said, "You guys will be doing your drink after.
10 Monster is running a production run before you guys"
11 that day. Basically that's it.
12    Q.   Do you recall any discussions, communications
13 with PSI as to whether the BeastUp name was similar to
14 any Monster marks, or the scratch marks on the can
15 were similar to Monster's marks?
16    A.   No. No.
17          MR. BELLINGER: Okay. Eve, do you still need
18 to take your break?
19          MS. BROWN (telephonically): If we can. If
20 now is a good time, that would be great. Thank you.
21          MR. BELLINGER: Sure. We will go off the
22 record.
23          THE VIDEOGRAPHER: We are off the record, and
24 the time is 11:48.
25          (Recess taken.)

Page 109

1    THE VIDEOGRAPHER:  We are back on the record,
2  and the time is 12:32.
3    Q.  BY MR. BELLINGER:  All right.  If we can
4  return to Exhibit 7.
5    A.  Okay.
6    Q.  And turn to the sixth page of the exhibit,
7  which has Production No. BeastUp 0075.
8    A.  Yes.
9    Q.  And what is shown on this page of the
10  exhibit?
11    A.  This is the final concept through PSI,
12  Production Service International.  This was done by
13  Advertising Arts.  This is the final design that was
14  going to be sent to Ball for Ball to print.  So this
15  would have been the final concept.
16    Q.  So were there other iterations of the label
17  design that BeastUp went through with PSI?
18    A.  Just taking it from the stuff that I had
19  from Power Brands, and converting it into this to a
20  12-ounce can and changing the supplemental label.
21  That was it.  Yeah, this is the design, yeah, that I
22  went and got through them.
23    Q.  And when did the relationship with Power
24  Brands end?
25    A.  End?  I will have to look through my last --

Page 110

1  it hasn't really end.  I could still go through them
2  because I still have my second SKU that I paid for,
3  that $2500, if I needed to.  Because they still hold
4  my premixes.  They have all of that for me.
5    So when I need to order my next batch for a
6  production run, then I just go through them for my
7  premixes, which they I believe own a -- they have a
8  Head Source is one of their companies that they kind
9  of run, I think which is their premix department.
10    Q.  How about for the 12-ounce can that was
11  ultimately sold?  Approximately when did you stop the
12  design work with Power Brands for that label?
13    A.  That would have been prior to the production
14  run.  So it would have been 2013, '14.  So...
15    Q.  So once you had gotten to the final iteration
16  with Power Brands did you then take that label artwork
17  to PSI?
18    A.  No, the artwork went through PSI.  So I gave
19  them all my stuff that I got from Power Brands.  And
20  then they got ahold of this Advertising Art studio, and
21  he redid all of my artwork.  He's the one that shrunk
22  the artwork down and did all of that for the production
23  run to get -- be on that 12-ounce small can.
24    And I have down here the February 2014 was
25  when I was corresponding with Tom, Advertising Art

Page 111

1  Studio, and when I paid nearly, you know, $4,500 or
2  so for that.
3    Q.  So you took the artwork that Power Brands had
4  developed, and transferred it over to PSI --
5    A.  Yeah.
6    Q.  -- and they finalized it --
7    A.  And they --
8    Q.  -- on the --
9    A.  -- have their --
10    Q.  Sorry, if you could let me --
11    A.  Oh, sorry.
12    Q.  I have to let you answer --
13    A.  Yeah.
14    Q.  -- or the Court Reporter is going to get
15  upset at us.
16    So you took the artwork that Power Brands,
17  to the extent, however far they got, and they
18  transferred it over to PSI, and then they finalized
19  it to have printed on the can; is that right?
20    A.  Yes.
21    Q.  And approximately how long did PSI work on
22  the labeling in connection with this other artist,
23  graphic artist?
24    A.  So February 2013 is when I started an
25  agreement with PSI.

Page 112

1    July of 2013 I have down here that the can
2  was being changed.  That's when they started doing the
3  artwork and changing it was July 2013.  So that's --
4  I'm assuming that is when Tom came on board, the
5  artist, and started doing all the artwork for me was
6  July of 2013.
7    Q.  And then returning to this page, Production
8  No. 0075, towards the center of the can there's a black
9  and red logo.
10    Do you see that?
11    A.  Yes.
12    Q.  What is that intended to represent?
13    A.  That's our logo that we use on all of our
14  products.  It's a B and a U for BeastUp.
15    Q.  And who designed that logo?
16    A.  His name is A.J. Collins.  He's one of my
17  sister's friends -- or boyfriends back in the day.
18  And he is the one that finalized the artwork, like
19  took it to, you know, cement -- created it.  Not
20  really created the whole artwork, but just finalized
21  everything for me so I can actually use it and scan
22  it, PDF it, and do whatever I needed to, you know,
23  send it to the silkscreen machine guys.
24    Q.  So when was that logo created?
25    A.  I have September 2009, but I have a question

Page 113

1  mark.  I put September 2009, A.J. Collins.
2      Q.   And do you have any documentation regarding
3  the design of what you call the BU logo?
4      A.   Yeah.  I have like the original thing that he
5  drew up for me that's all in pencil and stuff that we
6  were able to like scan and then create on like a photo
7  illustrator program, and then started cleaning up
8  everything and highlighting that.  So I have that.
9      Q.   And when was the -- Around what time period
10  was that logo finalized?
11      A.   I guess it would be when we first started
12  putting it on the shirts, because -- Let me see if I
13  have it here.
14          I'm guessing right then, September 2009 or
15  so is when we started.  But we never put the logo on
16  the shirt.  I believe, I would have to look at some of
17  my past photos and stuff, but I think the first time
18  we put it on the shirt was when we went through
19  storenvy, and we had the big logo put on the side.
20  Yeah.
21      Q.   Do you know where Mr. Collins resides now?
22      A.   No.
23      Q.   When was the last time you had communications
24  with him?
25      A.   Oh, he does live in Red Bluff here, but I

Page 114

1  don't see him very often.  I run a pretty busy life.
2  But he's around here in Red Bluff.
3      Q.   Do you know where he works?
4      A.   No.
5      Q.   Do you recall any communications with
6  Mr. Collins in designing this what you call the BU
7  logo as to whether it looks like Monster's M claw icon
8  mark?
9      A.   No.
10      Q.   So did you supply this what you call the BU
11  logo to Power Brands for inclusion on the label?
12      A.   Yes.
13      Q.   Did you give them any other information beyond
14  the listing of motorsport events in this logo?
15      A.   As in what we were trying to target?
16      Q.   Yeah, let me ask the question.
17          When you approached Power Brands and were
18  going to have them work on designing the label, what,
19  if anything, did you give to them as a starting point?
20      A.   Basically I just gave them, the what I was
21  saying, the racers' schedule.  I gave them the logo
22  that we had created.  And that was about it.
23      Q.   Who came up with the -- on the can, the word
24  "BeastUp" that is in the stylized font?  Who came up
25  with that?

Page 115

1      A.   That Kris from Power Brands.  It's called a
2  Shogun font, or S-h-o, Shogun or something like that.
3  But it doesn't have a "w" in it.
4      Q.   So BeastUp had not used that font before?
5      A.   No.  On the rounds he had sent me multiple
6  images with different fonts, and that was the font
7  that I thought was the coolest.  So that's why we stuck
8  with that font.
9      Q.   Turn to the next page of Exhibit 7.
10      A.   (Complies.)
11      Q.   That's BeastUp Production No. 0076.
12          Can you tell me what is shown on this page?
13      A.   This looks like just something that might
14  have been sent from Ball Company showing me where the
15  labels -- yeah.  I think this is just a label print
16  from Ball, that probably sent to PSI, who sends it
17  to me.
18          It's just a lay-flat design.  Like I believe
19  the stitching line there might be where the can is
20  going to fold or roll back.  So it's kind of just an
21  image of the design.
22      Q.   And has BeastUp had any direct communications
23  with Ball?
24      A.   Yes.  Just e-mails.  I've e-mailed and talked
25  about the final concept.  Like they sent me a red piece

Page 116

1  of metal asking me if that was the type of -- that
2  color, if I liked that color, to approve it.
3          So -- and I think this is something like --
4  This would be something that they sent me for me to
5  approve, "yeah, it looks good," before they print.
6  It would be kind of like an approval form.
7      Q.   Do you recall any communications with Ball
8  regarding Monster, its products or its marks?
9      A.   No.
10      Q.   The entire design process of the label for the
11  BeastUp can, do you recall any communications regarding
12  Monster, its products or its marks?
13      A.   No.
14      Q.   If you'd turn to the next page of the exhibit,
15  which is the last page of Exhibit 7.
16          What's shown on this page?
17      A.   It looks like the exact same one that was
18  shown on the third page.  I think it's the exact same
19  thing.  Yeah, it looks like a -- one of the artworks
20  from -- I'm not sure.  It would be the same thing we
21  went over with this one (indicating), either created
22  -- the one created by PSI or Power Brands.
23          This isn't like anything that's going to go
24  on a can or nothing.  This would be something like the
25  guy that I sent to somebody like PSI to have them get

Page 117

1  to, you know, something like this (indicating).
2      Q.  But for the last page, do you recall whether
3  this label was created by Power Brands or PSI?
4      A.  This looks like it probably would be the
5  Power Brands since it still has the glucosamine on
6  it and -- yeah.
7      Q.  All right.  Other than yourself and the
8  individuals that you have mentioned at Power Brands
9  and PSI, did anyone else have involvement in creating
10  the label for the BeastUp beverage?
11      A.  No.
12      Q.  Did Jessee have any involvement in the can
13  design?
14      A.  Yeah, I guess you could say so.
15      Q.  What was his involvement?
16      A.  The cool factor, I guess, he -- yeah, he --
17  Actually he shot me down a lot of stuff when we
18  designed clothes and stuff.  But yeah, he would
19  have probably -- he probably did have a pretty good
20  impact on what we shot for on that.
21      Q.  And are there any aspects of the can design
22  that you can recall him contributing to?
23      A.  It would be the color.  I think we talked
24  about the color being white, and the font, and location
25  of the logo and stuff.

Page 118

1      Because when they first sent us our Round 1's
2  and 2's and stuff, they had the logo real small and
3  different places.  And we talked about making it big
4  and visible.  And, yeah, he had some say-so in the
5  design.  Pretty much has a say-so in most all of the
6  designs.
7      Q.  Did he have any communications with Power
8  Brands?
9      A.  No.
10      Q.  Did all of that go through you?
11      A.  Yes.
12      Q.  How about PSI?
13      A.  Well, Jessee did -- Power Brands, did go
14  with me to the very first meeting that we had when
15  we actually signed up with them.  We flew down to
16  Van Nuys, California, and met with the -- with them
17  to go over what we were going to do.  And he was
18  there for that.  That was like basically his only
19  contact with Power Brands.
20      And maybe he went back with me at the final
21  meeting where we -- they actually gave us like our
22  copies of stuff, CDs, and a piece of paper telling
23  you, "Good luck.  Here is who you need to call."  He
24  might have been -- Those are the only times he might
25  have been involved with Power Brands.

Page 119

1      Production Services International, he was
2  involved.  He, I think, shared some e-mails or he had
3  to phone call them because he was going to be part --
4  he was going to meet -- he was going to be there for
5  the production runs.  So I think he corresponded with
6  Ben at PSI.  Last name, let me look here.  I just
7  wrote all the names down.
8      (Brief pause.)
9      THE WITNESS:  His name is Ben.  Let's just go
10  with that.
11      Here we go.  Last spelling of E-b-e-l-i-n-g.
12  He was kind of my contact guy through PSI that helped
13  me get in production.
14      Q.  BY MR. BELLINGER:  And so when -- You
15  mentioned there was an in-person meeting at Power
16  Brands at the start of the process.
17      Who from Power Brands attended that?
18      A.  There was actually those three people, which
19  I never basically didn't talk to afterwards, maybe a
20  couple times through e-mail.  But I don't think I
21  mentioned them through the process of the whole
22  development.
23      But it was Evan Silver; Marty Molina,
24  M-o-l-i-n-a; and then a Darin E-z-r-a.  Those are
25  the three that I was supposed to meet at the meeting.

Page 120

1  But I think I only met Evan and Darin that day.
2      And then from there I maybe shared a couple
3  e-mails with Evan and Marty.  But my main contacts were
4  the lab lady and Alina and the design guy Kris and
5  Patty.  But...
6      Q.  During the design process do you recall any
7  communications with Power Brands about avoiding making
8  the BeastUp product look like any other existing
9  product on the market?
10      A.  No.
11      Q.  At that initial meeting with Power Brands
12  was there any discussion of the product, energy drink
13  products that were already on the market?
14      A.  No.  Well, the guy that actually -- I think
15  his name is Darin -- he was talking how he is the one
16  that -- I think GoGirl.  He was the one that developed
17  GoGirl, so he was talking to us about that, and how he
18  started it or something, and he couldn't afford $200
19  brakes, but now he drives a $200,000 car.
20      Q.  What is GoGirl?
21      A.  It's an energy drink.  Yeah, so I remember
22  him talking about that.  But other than that, we didn't
23  talk about any other energy drinks.
24      Q.  Has BeastUp used any other "beast" containing
25  marks other than BeastUp?

Page 121

1    A.  No.
2    Q.  Are you aware of if BeastUp has used in its
3  advertising or marketing materials other "beast"
4  marks other than BeastUp together?
5    A.  I know we shouldn't.  If we are doing any
6  kind of marketing or anything we always use the word
7  BeastUp together, usually one word.  We never separate
8  it, yeah.
9    Q.  Do you know if BeastUp has ever used
10  "Unleash the Beast!" in connection with its products?
11    A.  No.
12    Q.  Has BeastUp ever used any variations of what
13  you called the scratch marks that appear on the cans
14  in connection with its product?
15    A.  No.
16    Q.  Has BeastUp ever used a green and black color
17  scheme in connection with its products?
18    A.  No.  I did see that Complaint that was sent
19  with the art logo and trademark name BeastUp on a
20  green and black graphics, which was a Kawasaki dirt
21  bike, which those are green and black.  And my son was
22  racing Pro Motocross, so he was on a Kawasaki.  That
23  is what he raced.  So we had a couple of Kawasakis that
24  were green and black.  So that's the only reason why
25  our graphics would have been on the green and black

Page 122

1  was because of the Kawasaki.  That's their colors.
2    Q.  And what sort of racing has your son done?
3    A.  Pro, just Motocross, Supercross.  He's
4  actually has raced in the Monster Energy Supercross
5  series.
6        And going back on the green thing, also, is
7  we had a -- it was also inside the Complaint, was a
8  green, I don't know what they call it, being off-road
9  racing type vehicle.  It's green and black.
10        But he also, we sponsored him, and he had our
11  logo on the side and on the roof.  And that was in one
12  of our images that the Complaint stated that we, you
13  know, tried to submit or show that Monster was on
14  there, too.  But it was actually our guy was actually
15  in the lead, so that's why the picture was on there.
16  But that was one of our sponsored riders -- drivers.
17        Those are the only two incidents that I can
18  think of that green and black is involved.
19    Q.  Does your son still race?
20    A.  No, not competitively.  He still rides, and
21  we do some races here in Red Bluff.  They are like what
22  they call marathon type races.  And he enters those.
23    Q.  So with respect to the BeastUp beverage
24  products, through which channels have those products
25  been sold or in what ways?

Page 123

1    A.  Just through our distributor, through, you
2  know, retail stores and stuff like that, through
3  sponsored events, friends and family, firefighters,
4  guys that I know, you know.  I've sold stuff to them,
5  yeah.
6    Q.  Does BeastUp sell its products or has it on
7  its website?
8    A.  We tried.  But every time someone would click
9  on to try to order, I guess the weight would deter them
10  from buying it, because they would have to pay for the
11  shipping.  So we never sold a case through like the
12  website.  But I did get e-mails from individuals that
13  wanted the product.  And then I would just get their
14  address, and I would ship it down to them.  There was
15  a guy down in LA that was buying some.
16    Q.  So beyond Los Angeles, any other locations
17  outside of Northern California that you can recall
18  the product being sold to?
19    A.  Not at this time.  Yeah, I can't.  I know
20  I've shipped it to a couple different people, but I'm
21  just not sure where they live right now.
22    Q.  Is the intent to expand distribution of the
23  product throughout the state?
24    A.  Yes.
25    Q.  Is the intent to expand distribution

Page 124

1  throughout the United States?
2    A.  Yes.
3    Q.  Has the product been sold on any third-party
4  websites that you are aware of?
5    A.  No.
6    Q.  With respect to retail stores has the product
7  been sold in convenience stores?
8    A.  Yeah.
9    Q.  Is that the main avenue through which the
10  product has been sold in retail stores?
11    A.  Yes.
12    Q.  Do you know approximately --
13    A.  Well -- Sorry, go ahead.
14    Q.  Do you know approximately what percentage of
15  sales have been through convenience stores?
16    A.  No.  Not off the top of my head.
17        I want to go back to that question.  But yes,
18  we do sell a lot in the retail stores.  But that first
19  year or so, when we first got the drinks, '14, '15,
20  most of my sales with the product, cans, were done
21  through events, and our own doing, not our
22  distributor.
23    Q.  Then once you picked up Foothill Distributing
24  the products started being sold more in retail stores;
25  is that correct?

Page 169

1  on BeastUp, yeah. My dad is about the only -- He is
2  the one that gave me the 20,000 to kind of kind
3  invest-wise, if you're looking at investors. But
4  everything else has just been loans and stuff through
5  the banks to help me get -- and my personal money
6  from fighting fires and stuff. But yeah.
7      I think I have a sheet. I just -- It's not
8  current, but I remember tallying everything up from
9  the start to finish. And I think that was at the
10 end of 2015. It was around 100 and I want to say
11 90-something thousand dollars that I had been put
12 into the business.
13     Q. What about just the marketing side? Do you
14 have an estimate of how much has been spent on
15 marketing the brand?
16     A. I would have to break it all down. Yeah,
17 not right now, I don't have that number, but...
18     Q. All right. With respect to the marketing
19 channels, we have looked at the exhibit that has a
20 list of events that BeastUp has attended or sponsored;
21 correct?
22     A. Yes.
23     Q. And BeastUp markets through its website and
24 social media sites; correct?
25     A. Uh-huh.

Page 170

1      Q. Uses point-of-sale materials; correct?
2      A. Yes.
3      Q. Does it sponsor individual athletes or has
4  it?
5      A. Yes.
6      Q. And who?
7      A. Keith -- man, I've got them all written down
8  at home. There is a bull rider named Keith that we
9  sponsored personally. Dalton Hedden, who is a
10 wakeboarder.
11     I can't think off the top of my head. We
12 have a few that we personally sponsor. There is a
13 little kid in Chico that raises Motocross right now
14 that we sponsor.
15     We have done some -- gave some product to
16 a kid named Kinser Endicott, who is a professional
17 Motocrosser.
18     There's more. I just don't have them. I
19 don't have that list.
20     Q. Does the company have a list of the athletes
21 it has sponsored?
22     A. Yes.
23     Q. That is information you could get if you found
24 that list?
25     A. Yeah. I just saw that list yesterday. I

Page 171

1  didn't think to bring it.
2      Q. Beyond the Chico State teams you have already
3  told me about, has BeastUp sponsored any other teams?
4      A. Well, unless we are talking about -- I
5  sponsored, I think it's not really a sports team, but
6  like Tough Mudder or something like that where these
7  girls ran through and did this Tough Mudder thing. I
8  sponsored them and made their shirts and stuff, and
9  they had some product.
10     Not necessarily a -- Yeah, we did sponsor an
11 off-road racing team, a rock-climbing, I don't know if
12 it was a team, but a -- they competed in Oroville, I
13 think, did some big rock-climbing stuff. I'm not sure
14 if they were a team, but we sponsored them.
15     Q. Is this motor racing?
16     A. No, off-road 4-wheel-drive, rock-climbing
17 type stuff.
18     Q. Do you know what that race was called?
19     A. No. But the one that was in that -- The
20 image with the green and black vehicle, that was a
21 stampede race, I think, in 2015. But he was -- I
22 think he was on basically a team, so I'm not sure.
23     Yeah, other than -- that's the only teams I
24 can think of that we were kind of involved with.
25     MR. BELLINGER: Eve, this next exhibit is

Page 172

1  going to be Tab R in the share file that you received.
2      If you would mark this Exhibit 17, please.
3      (At this time seven pages of color graphics
4  and posters, BEASTUP PROD 0158, 0173 through 0175,
5  0210, 0214 and 0217, were marked Exhibit 17.)
6      Q. BY MR. BELLINGER: And do you recognize
7  Exhibit 17?
8      A. Yes.
9      Q. And what is Exhibit 17?
10     A. This looks like a poster my son made for one
11 of the stores here in Red Bluff. It was One Stop, I
12 believe.
13     Q. So is the first page of Exhibit 17 displayed
14 in the store?
15     A. Not right now. They -- We actually did a
16 couple of different -- This is one of the stores that
17 did two for $2. Then they did this price one time.
18     So we have been -- We have done a couple
19 things with this store. This is just one of our
20 things.
21     We would actually give this image to Walker
22 Printing in Red Bluff, who does all of our
23 poster-building stuff. And this was created in a
24 bigger size and put on outside the front of the
25 store.

Page 201

1 have you had any communications with anyone at Monster
2 that you recall?
3    A. Before I was served, I can't -- Morris Turek
4 had received a complaint. He had notified me. He
5 filed back. They fired back. And then they asked
6 that I respond, which I did. I responded, I think her
7 name was Lynda or something, responded to her. And
8 nothing. She never responded back.
9       Then Morris Turek hit me back and said that
10 we didn't respond. But I told him, yes, I did.
11      So I believe that's when Eve got involved.
12 I had to get Eve involved. And then I sent her the
13 letter that I had sent to Lynda to show that I did
14 respond before the time that they required, and --
15    Q. Okay. I'm saying -- I appreciate that.
16    A. Oh, sorry.
17    Q. No, no. Prior to that exchange had you had
18 any communications with anyone at Monster?
19    A. No.
20    Q. One of the defenses that has been raised by
21 BeastUp in this case is that Monster was aware of
22 Defendant's use of its mark.
23      Do you have any factual information you
24 believe shows that Monster was aware, prior to this
25 suit, of BeastUp or its marks?

Page 202

1    A. Well, I would -- If they did a trademark
2 search prior to them trademarking "Pump up the Beast"
3 and all of that, I'm sure my mark would have probably
4 popped up as a -- for them to see that there could be
5 a conflict. I guess that would be the evidence we're
6 talking about. I'm not sure.
7    Q. And you don't have any knowledge of that?
8    A. I don't know what Monster did prior to them
9 getting their mark.
10    Q. Okay. But I'm just asking what you personally
11 are aware of. Do you have any personal knowledge of
12 facts that you think show that Monster had long been
13 aware of BeastUp before this --
14    A. No.
15    Q. -- suit was filed?
16    A. No, I don't.
17    Q. Has BeastUp had any communications with any
18 insurance company regarding this lawsuit?
19    A. No.
20    Q. Does it have any insurance agreement under
21 which an insurer may be obligated to cover the cost of
22 this lawsuit?
23    A. No.
24    Q. Has it tendered a claim to any insurance
25 company?

Page 203

1    A. No.
2       MR. BELLINGER: Why don't we take a short
3 break.
4       THE WITNESS: Okay.
5       THE VIDEOGRAPHER: We are off the record.
6 The time is 1454.
7       (Recess taken.)
8       THE VIDEOGRAPHER: We are back on the record,
9 and the time is 1459.
10    Q. BY MR. BELLINGER: You brought with you
11 today an additional tax return document from 2009?
12    A. Yes.
13       MR. BELLINGER: You set it on the table.
14 So why don't we go ahead and mark that as Exhibit 20.
15       (At this time a two-page 2009 Schedule C tax
16 form was marked Exhibit 20.)
17    Q. BY MR. BELLINGER: Does Exhibit 20 reflect
18 the tax return for BeastUp in 2009?
19    A. Yes.
20    Q. Apart from the BeastUp product and Monster's
21 line of beverages are you aware of any other beverages
22 that use "Beast" on the can labeling?
23    A. Well, I don't know how far this -- that
24 business in Australia is, but that would be the only
25 energy drink, The Beast.

Page 204

1       But no, not that I can think of.
2    Q. And the product you referenced in Australia,
3 have you ever seen that product sold in the United
4 States?
5    A. No, I've never seen it. So I don't know if
6 that is still -- if they are still in business. I
7 don't know. But I've never seen it.
8       But that's the only energy drink that I
9 know that probably referenced The Beast, except for
10 Monster's "Unleash the Beast!" slogan they've got on
11 the back.
12    Q. And other than your BeastUp product and
13 Monster's product are you aware of any other beverage
14 cans that use claw or scratch marks on the can?
15    A. No, not that I can think of. No.
16       MR. BELLINGER: Okay. Well thank you for
17 your time. I am going to adjourn the deposition, but
18 leave it open to finish it at a later date.
19       We've had some -- I have had some
20 correspondence with Ms. Brown prior to the deposition.
21       Monster served a first set of discovery
22 requests, including documents requests and
23 interrogatories. We received Defendant's responses
24 belatedly which were deficient.
25       We attempted to meet and confer prior to

Page 205

1 this deposition, but we were given dates by Ms. Brown
2 that were after the deposition to confer.  So we will
3 confer on the dates she provided.
4        During the course of this deposition it has
5 become apparent that many documents responsive to
6 Monster's requests have not been produced, including
7 financial documents, sales information, searches of
8 e-mails were not conducted.
9        Monster also served a second set of discovery
10 requests.  The responses were due Monday.  We have not
11 received those responses, either.
12        And therefore we are leaving this deposition
13 open to complete it once we have received complete
14 discovery responses and document production from the
15 Defendant.
16        MS. BROWN (telephonically):  And I would have
17 on the record that everything that Mr. Bellinger just
18 stated is in dispute, and that Defendant does not
19 agree that the responses were deficient, which is why
20 we are having a meet and confer on Monday.  But that
21 Defendant has diligently provided everything that he
22 had, and will continue to supplement that production
23 in good faith.
24        MR. BELLINGER:  Are you objecting to
25 continuing the deposition once the production has been

Page 206

1 completed?
2        MS. BROWN (telephonically):  I mean I at
3 this point am not.
4        We will have our meet and confer on Monday
5 and see.  It seems to me like you have had, you know,
6 plenty of time to ask whatever questions you need.
7 However, if there are additional documents or
8 additional information that is new that does come up
9 that we did not have, then yes, you can reopen the
10 deposition, as long as it is new information that you
11 genuinely did not have.
12        MR. BELLINGER:  All right.  Well, I will
13 state that there are numerous documents that we don't
14 have.  We don't have a single e-mail that has been
15 produced.  We don't have Defendant's responses to our
16 second set of discovery, even though those were due
17 Monday.  So it is our position there is additional
18 information that should be provided.
19        MS. BROWN (telephonically):  I understand
20 that there are documents, but that does not necessarily
21 equal information.  There might not be any new
22 information.
23        For example, one of the reasons that we are
24 in a dispute right now is that we disagree that some
25 of the things that you are asking for exist or are

Page 207

1 responsive at all.
2        And so I understand that you are saying that
3 there are no e-mails, but it might be the answer that
4 no e-mails exist.  So I am not going to equate not
5 having documents with not having information.
6        MR. BELLINGER:  All right.  Well, I disagree
7 with that.  We can continue during the meet and confer.
8        But for now from Monster's perspective the
9 deposition is left open.
10        THE VIDEOGRAPHER:  Okay.  Ms. Brown, this is
11 Terry Fox, the Videographer.  Would you like a copy of
12 the DVDs on this?
13        MS. BROWN (telephonically):  I would.  Thank
14 you.
15        THE REPORTER:  And this is the Reporter.
16        Are you also wanting a copy of the deposition
17 transcript?
18        MS. BROWN (telephonically):  Yes, please.
19        THE REPORTER:  And would you like -- If you
20 would like something e-mailed to you, I do not have
21 your e-mail address.  So could you state that, if you
22 want that used, or if you want the hard copy sent?
23        MS. BROWN (telephonically):  No, e-mail would
24 be perfect actually.
25        It is ejbrown@bricolagelaw.  And let me spell

Page 208

1 that for you.  It's b-r-i-c-o-l-a-g-e-l-a-w, all one
2 word, .com.
3        THE REPORTER:  Thank you.  We are going to go
4 ahead and have Exhibit 4, I believe it was, the can
5 will be a photograph that I took, just for your
6 information.
7        MS. BROWN (telephonically):  Okay.
8        THE REPORTER:  And I believe all of the
9 exhibits will be scanned and attached to the
10 deposition.
11        MS. BROWN (telephonically):  Thank you so
12 much.
13        THE REPORTER:  And I should ask you, also.
14        Do you want an e-copy or are you wanting the
15 hard copy?
16        MR. BELLINGER:  You can contact our office.
17        THE REPORTER:  Okay.  And did you want to say
18 something about the signing or reviewing of the
19 deposition?
20        MR. BELLINGER:  I have nothing to say.
21        THE REPORTER:  Okay.
22        MS. BROWN (telephonically):  I would like for
23 the Deponent to have the right to review the deposition
24 and sign it.
25        THE REPORTER:  Okay.  We will include that

Deposition of
ROBERT WAELTY

MONSTER ENERGY V. BEASTUP
January 25, 2018

---

Page 209

1 then.

2      MS. BROWN (telephonically):  Okay.

3      THE VIDEOGRAPHER:  I will do my read-off

4 here.

5      This is the end of the deposition of Robert

6 Waelty.

7      All original videos will be retained at the

8 offices of the Sullivan Group of Court Reporters at

9 323-525-3860.

10      We are off the record.  And the time is 1507.

11      (The deposition concluded at 3:07 p.m.)

12           --oo0oo--

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 210

1                PENALTY OF PERJURY

2

3

4           I, the undersigned, hereby certify that I

5  have read the foregoing deposition, that I know the

6  contents thereof, and that the same is true and

7  correct.

8

9

10           Executed on _____, 2018,

11  at _____, California.

12

13

14                _____

15                     ROBERT WAELTY

16

17

18           --oo0oo--

19

20

21

22

23

24

25

---

Page 211

1           DEPONENT'S CHANGES OR CORRECTIONS

2  Note:  If you are adding to your testimony, print the
   exact words you want to add.  If you are deleting from

3  your testimony, print the exact words you want to
   delete. Specify with "Add" or "Delete" before each

4  entry.  Please sign and date this form.

5  Deposition of:  ROBERT WAELTY
   Name of Case:  MONSTER ENERGY COMPANY vs. BEASTUP, LLC

6  Date of Deposition:  JANUARY 25, 2018

7  I, _____, have made the
   following changes in my deposition:

8

9  PAGE    LINE    ADD/DELETE

10  ____   ____   _____

11  ____   ____   _____

12  ____   ____   _____

13  ____   ____   _____

14  ____   ____   _____

15  ____   ____   _____

16  ____   ____   _____

17  ____   ____   _____

18  ____   ____   _____

19  ____   ____   _____

20  ____   ____   _____

21  ____   ____   _____

22  ____   ____   _____

23  ____   ____   _____

24  ____   ____   _____

25  SIGNATURE _____ DATE _____

---

Page 212

1           DEPONENT'S CHANGES OR CORRECTIONS

2  Note:  If you are adding to your testimony, print the
   exact words you want to add.  If you are deleting from

3  your testimony, print the exact words you want to
   delete. Specify with "Add" or "Delete" before each

4  entry.  Please sign and date this form.

5  Deposition of:  ROBERT WAELTY
   Name of Case:  MONSTER ENERGY COMPANY vs. BEASTUP, LLC

6  Date of Deposition:  JANUARY 25, 2018

7  I, _____, have made the
   following changes in my deposition:

8

9  PAGE    LINE    ADD/DELETE

10  ____   ____   _____

11  ____   ____   _____

12  ____   ____   _____

13  ____   ____   _____

14  ____   ____   _____

15  ____   ____   _____

16  ____   ____   _____

17  ____   ____   _____

18  ____   ____   _____

19  ____   ____   _____

20  ____   ____   _____

21  ____   ____   _____

22  ____   ____   _____

23  ____   ____   _____

24  ____   ____   _____

25  SIGNATURE _____ DATE _____

---

Deposition of                                                          MONSTER ENERGY V. BEASTUP
ROBERT WAELTY                                                          January 25, 2018

Page 213

```
 1              CERTIFICATE OF REPORTER

 2

 3

 4         I, SHARON L. DUNBAR, do hereby certify:

 5         That prior to being examined, the witness

 6  whose signature is affixed to the foregoing deposition,

 7  was sworn by me to testify to the truth, the whole

 8  truth, and nothing but the truth in the within-entitled

 9  cause; that said deposition was taken down in

10  stenographic shorthand by me, a Certified Shorthand

11  Reporter, at the time and place herein stated, and

12  was thereafter reduced to typewritten form using

13  computer-assisted transcription, and that the

14  deposition is a true record of testimony given by

15  the witness.

16         I further certify that I am not of counsel

17  or attorney for any of the parties hereto, or in any

18  way interested in the outcome of this cause, and that

19  I am not related to any of the parties hereto.

20         WITNESS MY HAND this 28th day of January,

21  2018.

22

23         Sharon L. Dunbar

           SHARON L. DUNBAR, CSR No. 4051

24              State of California

25
```

# EXHIBIT 13

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Marko R. Zoretic
Marko.Zoretic@knobbe.com

March 12, 2018

**VIA EMAIL**

Eve Brown
Bricolage Law, LLC
128 School Street
Walpole, MA 02081

      Re:    <u>Monster Energy Company v.  BeastUp, LLC.</u>
              Case No. 2:17-CV-01605-KJM-EFB
              Our Ref.:  HANBEVL.6127L

Dear Eve:

We write to follow up on our January 29, 2018 meet and confer regarding the deficiencies in Defendant BeastUp, LLC's ("Defendant") responses to Plaintiff Monster Energy Company's ("MEC") First Set of Interrogatories and First Set of Requests for Production (collectively, "MEC's First Set of Discovery Requests") and Defendant's previous failure to serve responses to MEC's Second Set of Interrogatories and Second Set of Requests for Production (collectively, "MEC's Second Set of Discovery Requests").

You agreed that Defendant would supplement its written responses to several of MEC's interrogatories and document requests, and would supplement Defendant's document production.  We asked you for any authority supporting your refusal to provide timely responses to MEC's Second Set of Discovery Requests.  You were unable to identify any authority.  Indeed, your basis for this refusal was that "you want[ed] to understand where we are coming from" and you did not want to "waste client funds" by providing responses to MEC's Second Set of Discovery Requests before you met and conferred with us regarding MEC's First Set of Discovery Requests.

Your statement in your February 2, 2018 email that MEC must incur the expenses for inspecting and copying Defendant's archival invoices, financial records, and other documents at Defendant's principal place of business, which is also the personal home of Defendant's founder, Mr. Robert Waelty, is not well taken.  First, Defendant's January 9, 2018 responses to MEC's First Set of Requests for Production (which were also untimely) did not state that any responsive documents were available for inspection or that they were available for inspection only.  Second, on January 25, 2018, MEC's counsel had already travelled to Red Bluff, CA, the city of Mr. Waelty's home and business, for the Rule 30(b)(6) deposition of Defendant (Mr. Waelty was Defendant's designated witness).  But you again failed to inform us until well <u>after</u> the deposition that documents were available for inspection at Mr. Waelty's home, and that they were available for inspection only.  Defendant's inexcusable delay in providing the requisite notice to MEC regarding inspection of Defendant's documents would result in MEC bearing additional costs that could and should have been avoided.  Accordingly, please (1) confirm that Defendant will immediately produce these documents at its own expense; or (2) confirm that Defendant will pay the costs for us to travel back to Red Bluff to inspect the documents.  To the extent you intend not to

**Knobbe Martens**

produce the documents, please immediately identify the volume of documents you are making available for inspection.

On February 2, 2018, Defendant supplemented its document production with approximately 200 pages of documents.  On February 5, 2018, Defendant supplemented its responses to MEC's First Set of Interrogatories and provided its belated responses to MEC's Second Set of Interrogatories (Nos. 13–16).  Defendant's responses and document production remain deficient, as further detailed below.

## Documents Identified During Rule 30(b)(6) Deposition

During the Rule 30(b)(6) deposition of Defendant, Mr. Waelty testified that he regularly conducted business communications using various email accounts (e.g., beastupenergy@gmail.com, info@beastup.com, sniperwaelty@yahoo.com, and beastupgear@gmail.com) from 2008 to present.  But Defendant's production to date contains only a mere handful of emails.  <u>Please confirm that Defendant will conduct the required search of each of these and any other of Defendant's email accounts for documents responsive to MEC's Requests for Production</u>.

Further, Mr. Waelty identified numerous communications that he had with various individuals, as detailed below.  But we have only received some emails between Mr. Waelty and his former attorney, Mr. Turek, two individuals from Power Brands Consulting (Alina and Kris), Legal Zoom, and an individual from PSI.  Mr. Waelty also identified various documents during his deposition that are responsive to MEC's Requests for Production.  We have identified these communications and documents below, including where they were referenced in Mr. Waelty's deposition, and the Requests for Production to which they are responsive.  Please confirm that Defendant will promptly supplement its production and produce these documents.

- Communications with Foothill Distributing (e.g. Tr. at 13:19–14:12) (e.g. RFP Nos. 9 and 34)
- Communications with Thunder Beast and Stephen Norberg (Tr. at 15:14–16:22) (e.g. RFP Nos. 7–8, and 38)
- Communications with Tony Thompson (Tr. at 30:18–31:15) (e.g., RFP Nos. 10 and 47)
- Communications with Ryan Kinyon (Tr. at 32:3–33:22) (e.g., RFP Nos. 11, and 23–25)
- Communications with Tim Crew (Tr. at 41:18–44:9) (e.g. RFP Nos. 11, 23, and 38)
- Communications with Tom Jahnke regarding Defendant's can designs (Tr. at 58:10–59:7) (e.g. RFP Nos. 1 and 3)
- All sales invoices (Tr. at 62:9–63:1) (e.g. RFP Nos. 13 and 14)
- Documents reflecting the amount of Defendant's products that have been given away (Tr. at 63:2–64:5) (e.g. RFP Nos. 13 and 14)
- All records showing Defendant's purchase of inventory (Tr. at 64:15–65:3) (e.g. RFP Nos. 13 and 26)
- All documents filed with the Board of Equalization (Tr. at 64:4–65:12) (e.g. RFP Nos. 13 and 26)
- The form Defendant uses to track product provided to stores (Tr. 65:21–66:2) (e.g. RFP No. 13)
- Communications with Power Brands Consulting, including Alina Guerrero, Kris Guiao, Ashiliegh Brookham, Cristi Allen, Patty Villa, Michelle Mallillin, Evan Silver, Marty Molina, and Darin Ezra (Tr. 94:9–98:2, 119:14–120:5) (e.g. RFP Nos. 1, 3, 23, and 27)

**Knobbe Martens**

- Communications with A.J. Collins, including the mentioned drawings (Tr. at 112:7–113:8) (e.g. RFP Nos. 1 and 3)
- Communications with PSI, including Ben Ebeling, and communications between Jessee Waelty and PSI (Tr. at 117:12–119:13) (e.g. RFP Nos. 1, 3, 23, and 27)
- Pictures of the BeastUp products being sold next to MEC's products (Tr. at 127:23–128:14) (e.g. RFP Nos. 7 and 15)
- The final, executed version of Deposition Exhibit 12 (BEASTUP PROD 0010-21) (Tr. at 144:15–145:3) (e.g. RFP Nos. 33–34)
- Sales documents from Foothill Distributing (Tr. at 145:11–146:6 and 148:14–149:8) (e.g. RFP Nos. 13 and 14)
- The sheet showing the investments made into Defendant's business (Tr. at 168:22–169:17) (e.g. RFP No. 23 and 26)
- The list of athletes Defendant has sponsored (Tr. at 170:20–171:1) (e.g. RFP Nos. 23–25)

**<u>Defendant's Deficient Document Production</u>**

**<u>Request for Production Nos. 1–2</u>**

During our call, you agreed that Defendant would supplement its production and produce the art specification form and all packaging designs. While Defendant produced packaging designs for its energy drinks, it did not produce the art specification form. Please immediately produce this form.

**<u>Request for Production Nos. 11 and 13</u>**

During our call, you agreed that Defendant would supplement its production and produce documents sufficient to show Defendant's total net and gross sales (both in units and dollars) and total net and gross profits for the BeastUp Products, including, but not limited to, invoices and receipts, to the extent that they exist. As detailed above, MEC should not bear the costs of inspecting Defendant's responsive documents at Mr. Waelty's home. Accordingly, please immediately supplement Defendant's production and produce all documents responsive to these requests.

**<u>Request for Production No. 26</u>**

During our call, you agreed that Defendant would supplement its production and produce documents sufficient to show Defendant's costs and expenditures in connection with promoting and advertising the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products, including, but not limited to, invoices and receipts. As detailed above, MEC should not bear the costs of inspecting Defendant's responsive documents at Mr. Waelty's home. Accordingly, please immediately supplement Defendant's production and produce all documents responsive to this request.

**<u>Request for Production Nos. 28, 30, 32, 35, 43, 46</u>**

During our call, you agreed that you would confer with Defendant whether any other responsive documents exist and that Defendant would supplement its document production as appropriate. Please confirm that Defendant has produced all documents responsive to these requests.

knobbe.com

# Knobbe Martens

**Request for Production No. 29**

During our call, you agreed that Defendant would supplement its response to indicate that no responsive documents exist.  Defendant supplemented its response to provide that "Defendant has already produced all documents responsive to this Request that were located after a reasonable search. To the extent additional documents are later uncovered, Defendant will continue to supplement its production."  To date, Defendant has not produced any documents referring to the degree of care exercised by purchasers who buy the BeastUp Products.  Please immediately produce all documents responsive to this Request.  Alternatively, please immediately supplement Defendant's response to indicate that no responsive documents exist.

**Request for Production No. 34**

During our call, you agreed that you would confer with Defendant whether any documents exist showing Defendant's sale of the BeastUp Products on Defendant's website and that Defendant would supplement its document production as appropriate.  To date, Defendant has not produced any documents showing Defendant's sale of the BeastUp Products on Defendant's website.  Please confirm that Defendant has produced all documents responsive to this request.

**Request for Production No. 36**

During our call, you agreed that Defendant would supplement its production and produce current and previous versions of all websites maintained by Defendant.  Further, Defendant supplemented its response to this Request to state that "Defendant hereby supplements its production to provide additional documents responsive to this Request." Nevertheless, Defendant has failed to produce any copies of its websites.  Please immediately supplement Defendant's production and produce current and previous versions of all websites maintained by Defendant.

**Request for Production No. 38**

During our call, you agreed that Defendant would supplement its production and produce all documents relating to communications between Defendant and any third parties relating to this lawsuit, including, but not limited to, all communications with Stephen Norberg.  Defendant failed to produce any communications with Mr. Norberg.  Please immediately supplement Defendant's production and produce all documents relating to communications between Defendant and any third parties relating to this lawsuit, including, but not limited to, all communications with Mr. Norberg.

**Request for Production No. 47**

Request for Production No. 47 seeks communications between any of the following individuals that refer to or mention MEC, the Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's Products: Robert Waelty, Jessee Waelty, John Waelty, Colter Hedden, and/or Tony Thompson.  Defendant agreed to produces all responsive documents located after a reasonable search, but Defendant

knobbe.com

**Knobbe Martens**

has failed to produce any communications between these individuals.  Please confirm that Defendant will promptly supplement its production to include all communications responsive to his Request.

## Defendant's Deficient Responses to MEC's Interrogatories

### Interrogatory No. 1

During our call, you agreed to supplement Defendant's response to Interrogatory No. 1 to identify the SKU numbers for each sweatshirt, t-shirt, tank top, workout shirt (long and short-sleeved), hat, lanyard, wristband, beanie, coffee cup, sticker/decal, and energy drink sold by Defendant to the extent such SKU numbers exist.  Defendant supplemented its response and stated that "Images, ingredient lists, prices, SKU and UPC codes, and descriptions of each product have been produced to Plaintiff, to the extent Defendant has such information in its possession, custody, or control and was able to locate them after a reasonable search."  But to the extent Defendant relies on documents in response to this interrogatory, Defendant should identify specifically, by document production number, which documents it is relying on.  Please confirm that Defendant will supplement its interrogatory response to specifically identify such documents.  Further, Defendants have failed to produce any SKU and UPC codes information for Defendant's sweatshirts, t-shirts, tank tops, workout shirts, hats, lanyards, wristbands, beanies, coffee cups, or sticker/decal.  Please confirm that Defendants will promptly supplement its response to provide the missing information.

### Interrogatory No. 2

During our call, you agreed to supplement Defendant's response to identify the wholesale price for each product identified in Defendant's response to Interrogatory No. 1.  Defendant supplemented its response to identify the retail prices for various products sold by Defendant.  Defendant also stated that "Price lists, cost estimates, and wholesale quotes have been produced to Plaintiff."  But to the extent Defendant relies on documents in response to this interrogatory, Defendant should identify specifically, by document production number, which documents it is relying on.  Please confirm that Defendant will supplement its interrogatory response to specifically identify such documents.  Further, Defendant has not provided any cost estimates, wholesale quotes, or wholesale prices for Defendant's sweatshirts, t-shirts, tank tops, workout shirts, hats, lanyards, wristbands, beanies, coffee cups, or sticker/decal.  Please confirm that Defendant will promptly supplement its response to identify the wholesale price for each of these products.

### Interrogatory No. 3

During our call, you agreed to supplement Defendant's response to identify Jessee Waelty's role in the development, selection, or approval of the BEASTUP mark.  You also agreed that Defendant would supplement its response to identify which individuals at Power Brands Consulting were involved in the development of the BEASTUP beverages.  Defendant's supplemental response identifies Jessee Waelty's role in the development, selection, or approval of the BEASTUP mark, but fails to identify the roles of Power Brand Consulting employees Kris Guiao, Ashiliegh Brookham, or Alina Guerrero.  Please confirm that Defendant will promptly supplement its response to identify the roles of these individuals in the development, selection, or approval of the BEASTUP mark.

**Knobbe Martens**

## Interrogatory No. 7

During our call, you agreed to supplement Defendant's response if additional information is available. Defendant supplemented its response and stated that Legal Zoom conducted a trademark search and Defendant produced the results of that search. Defendant, however, only produced an email from Legal Zoom stating that the search results were attached to the email, not the results themselves (BEASTUP PROD 0548-549). Please immediately produce the results of Legal Zoom's search.

## Interrogatory No. 8

During our call, you agreed to supplement Defendant's response to identify Defendant's net and gross sales and net and gross profits for each of the BeastUp Products since the date of first sale of each product. Defendant supplemented its response to state that Defendant has produced available financial and sales documents and that "additional documents are kept in hard copy form and will be made available to Plaintiff for inspection and copying at Defendant's principal place of business, at Plaintiff's expense." But to the extent Defendant relies on documents in response to this interrogatory, Defendant should identify specifically, by document production number, which documents it is relying on. Please confirm that Defendant will supplement its interrogatory response to specifically identify such documents. Further, as detailed above, MEC should not bear the costs of inspecting Defendant's responsive documents at Mr. Waelty's home. Accordingly, please supplement Defendant's response to identify Defendant's net and gross sales and net and gross profits for each of the BeastUp Products since the date of first sale of each product. If Defendant is relying on documents it is making available for inspection in response to this interrogatory, it must immediately identify them with specificity and produce them.

## Interrogatory No. 9

During our call, you agreed to supplement Defendant's response to identify when the BeastUp Products were sold on Defendant's website. Defendant failed to provide this information. Please immediately supplement Defendant's response to identify when the BeastUp Products were sold on Defendant's website.

## Interrogatory No. 13

Interrogatory No. 13 seeks the factual and legal basis for Defendant's affirmative defense of "Laches, Waiver and/or Acquiescence." Defendant's response that "Defendant has been openly using its BEASTUP mark in commerce since 2009 without objection or comment from Plaintiff" is deficient. Defendant failed to identify any facts supporting the prima facie elements of laches, waiver or acquiescence, including, for example, facts regarding whether MEC knew of Defendant's use of the BEASTUP mark and Defendant's Claw Logos, whether MEC actively represented to Defendant that it would not assert a right or a claim against Defendant, and whether MEC unreasonably delayed in bringing this suit. Accordingly, please immediately supplement Defendant's response to identify all facts to support Defendant's affirmative defense.

# Knobbe Martens

**Interrogatory No. 14**

Interrogatory No. 14 seeks the factual and legal basis for Defendant's affirmative defense of "Unclean Hands."  Defendant's response is deficient.  Defendant has failed to identify any facts supporting the elements of unclean hands, including what conduct by MEC, if any, has amount to unclean hands in this particular case.  Defendant's unsupported assertion that MEC has "vexatiously harass[ed] and intimidate[d] other businesses beyond what the law reasonably allows" is insufficient.  Further, while Defendant alleges that third-parties "have documented Plaintiff's bad faith pattern of behavior," Defendant failed to identify any of these alleged third-party articles, scholarly journals, websites, and news stories.  Please immediately supplement Defendant's response to identify (1) all facts to support Defendant's affirmative defense of Unclean Hands and (2) all third-party articles, scholarly journals, websites, and news stories that Defendant intends to rely upon in this case.

**Interrogatory No. 15**

Interrogatory No. 15 seeks the factual and legal basis for Defendant's affirmative defense of "Priority."  In its response, Defendant alleged that it has seniority with respect to some of MEC's marks because the registrations for those marks "appear to have originated after 2009."  Each of the nine registrations identified by Defendant has a first use date that predates the first use of Defendant's BEASTUP mark by at least three years.  Please confirm that there is no other factual basis for Defendant's affirmative defense of "Priority."  Alternatively, please immediately supplement Defendant's response to identify the factual basis for Defendant's affirmative defense of "Priority."

## **Request for Conference of Counsel**

We are available for a meet and confer with Defendant on all of the issues raised in this letter any time between 9:00 a.m. and 1:30 p.m. (Pacific Time) on March 16 and March 20.  Please let me know what dates and times you are available.

Sincerely,

 */s/ Marko R. Zoretic*

Marko R. Zoretic

27748241

knobbe.com

EXHIBIT 14

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Friday, February 02, 2018 12:48 PM
**To:** Marko.Zoretic; Matt.Bellinger; Julianna.Simon
**Subject:** RE: BeastUp Discovery

Attached please find BeastUp's Supplemental Responses to MEC's First Set of RFPs (1-46) and Second Set of RFPs (47).

 A link to the documents themselves will be provided separately.

Please note that, as stated in the responses, additional documents, including archival invoices and financial records, are in hard copy format only. These records will be made available to MEC for inspection and copying, at MEC's expense, at BeastUp's principal place of business. To the extent that documents are kept in electronic format or were not unduly burdensome to scan, we have done so.

In further response to Julianna's letter, and as discussed over the phone and in prior emails, Defendant's responses to MEC's RFAs were not waived. As you know, I was unavoidably delayed due to the blizzard the first week of January. I kept you apprised of the situation and responded in good faith as soon as I was able. No prejudice resulted to MEC due to the one-week postponement, and no rights or admissions have been waived.

Again, I will forward a link to the supplemental documents. I will also be sending Defendant's supplemental interrogatory responses under separate email.

 Eve J. Brown, Esq.
*Owner, Principal*
**Bricolage Law, LLC**
128 School Street
Walpole, Massachusetts 02081
(508) 734-3404
bricolagelaw.com
_____
**From:** Eve Brown
**Sent:** Monday, January 29, 2018 11:57 AM
**To:** 'Marko.Zoretic' <Marko.Zoretic@knobbe.com>; Matt.Bellinger <Matt.Bellinger@knobbe.com>; Julianna.Simon <Julianna.Simon@knobbe.com>
**Subject:** BeastUp Discovery

Hi Marko, Matt, and Julianna,

It would be a great help to me in getting you the documents and information you seek from BeastUp if you could summarize, given last week's deposition, what you would still like me to try to obtain from my client. I know that there were some things that Mr. Waelty said during the depo that he had in hard copy form, and some documents that are electronic but that I did not have prior to Thursday.

I would like to work with you to get everything you need, but it would help the process if I could have your cooperation and patience as my client and I sort through years of paper files. As you know, BeastUp is a one-man, part-time operation. I understand that you want to fight and argue, but that is not productive. I assure you in good faith that my client and I are both doing out utmost to comply with your requests, and are not hiding anything intentionally. He will continue to search, and I will continue to supplement production as additional documents are shared with me.

Under the Rules, you are of course also welcome to inspect BeastUp's documents as they are kept in the usual course of business in Red Bluff, if you do not feel like my client's responses are comprehensive or fast enough for you. Again, we want to work with you here, and I have no desire to waste our or the court's time spatting with you any more than necessary.

If you list for me what you feel you are missing, I will coordinate with my client to get you whatever I can that is responsive.

If you would still like to speak over the phone, you can reach me on my cell today at 617-671-5044.

Sincerely,
Eve

Eve J. Brown, Esq.
*Owner, Principal*
**Bricolage Law, LLC**
128 School Street
Walpole, Massachusetts 02081
(508) 734-3404
bricolagelaw.com

# EXHIBIT 15

**From:** Eve J. Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Monday, April 02, 2018 7:06 AM
**To:** Marko.Zoretic
**Cc:** Matt.Bellinger
**Subject:** RE: Monster v. BeastUp

Marko,

I am still reviewing your discovery concerns, but in the meantime, wanted to let you know that I have arranged with my client for you to meet him at the same hotel in Red Bluff where you took his deposition to inspect the hard copy box of documents. He can meet you tomorrow or Wednesday of this week or Monday of next week. He or his son will be there as well. You may copy the documents while on the premises, or take my client with you if you remove the documents for copying.

Please advise as to when you would like to meet him and I will have him and the box there for you.

Eve

**From:** Eve Brown
**Sent:** Wednesday, March 28, 2018 1:56 PM
**To:** 'Marko.Zoretic' <Marko.Zoretic@knobbe.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: Monster v. BeastUp

Hi Marko,

I apologize – I will review your bullet points and get back to you.

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Wednesday, March 28, 2018 12:45 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: Monster v. BeastUp

Eve,

If you are not available at a requested meet and confer time (despite stating that you were generally available all week), we would expect the professional courtesy of a response.  Informing us that you were not available only after we followed up with you days after our request, and then still not providing any available times to meet and confer, is not conducting the meet-and-confer process in good faith.

Further, regarding an alleged "revised version" of our meet and confer letter that you suggest you were waiting for (and apparently requesting as a prerequisite to continue our meet and confer), please see our March 22 email below which you appear to wholly ignore concerning the bullet points on pages 2–3

- 1 -

of our March 12, 2018 letter.  During our March 20 meet and confer, we discussed the bullet points in our March 12 letter, and you represented that those documents were largely produced on Feb. 2, 2018 in the range BEAST UP PROD 0242–445.  As you can see by the revised bullet point list in our March 22 email, your representation was not correct.

Accordingly, please let us know today if you're available tomorrow at 10:00 am, 11:00 am or 12:30 pm Pacific to continue our March 20 meet and confer based on our March 12, 2018 letter and my March 22, 2018 email . If you are not available tomorrow, please propose times on Thursday.

Moreover, during our March 20 meet and confer, you agreed that BeastUp would supplement its interrogatory responses to specifically identify the documents it was relying on.  We have not received any such promised supplementation despite your promise to provide them, and despite being on notice of such deficiencies since no later than March 12 (at least Interrogatory Nos. 1, 2, 7, 8, and 14 ).  Accordingly, that issue is now ripe for a motion to compel.

Regards,
Marko

**Marko Zoretic**
Partner
949-721-7695 **Direct**
**Knobbe Martens**

---

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Wednesday, March 28, 2018 8:36 AM
**To:** Marko.Zoretic
**Cc:** Matt.Bellinger
**Subject:** RE: Monster v. BeastUp

Marko,

I was generally available last week, but did not hear from you until Thursday evening, at which point I was no longer available at the one time (the following morning at 10am) that you had proposed.

I have not yet heard back from you about a revised version of your meet and confer letter that specifies which documents you still feel are missing. As you recall, a large segment of the documents you complained of in your original letter had already been produced, but had been overlooked by you or your team. I hope you understand that I am reluctant to undertake additional legwork on my end without assurance from you that you have actually reviewed my client's production first.

Once you provide me with an updated outline of your discovery concerns, we can schedule a call to discuss and resolve them.

I am awaiting confirmation from my client about when and where you should pick up the box. It should be available for you whenever you would like to access it, but I will make sure and let you know.

Eve

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Tuesday, March 27, 2018 4:42 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: Monster v. BeastUp

Eve,

We have not received a response to our email below to continue our meet and confer, despite your representation that you were generally available last week.  Please let us know what times you are available tomorrow and Thursday.  We have also not received any further document production from BeastUp, nor any further supplemental responses to Monster's interrogatories.

Further, we have not heard from you regarding what date and time next week the box of BeastUp's documents will be available for pick up so that we can make copies. Please let us know today so that we can make the necessary arrangements.

Regards,
Marko

**Marko Zoretic**
Partner

949-721-7695 **Direct**

**Knobbe Martens**

---

**From:** Marko.Zoretic
**Sent:** Thursday, March 22, 2018 4:40 PM
**To:** 'Eve Brown'
**Cc:** Matt.Bellinger
**Subject:** RE: Monster v. BeastUp

Thank you Eve. Please let us know what date and time next week the box will be available for pick up.  We will have Legal Photocopy Service in Redding pick up the box, make copies, and return the originals.

During our call on Tuesday, you mentioned that you believe that the documents identified in the bullet points on pages 2–3 of our March 12, 2018 letter were largely produced on Feb. 2, 2018 in the range BEAST UP PROD 0242–445.  From our review however, it does not include at least the following identified in our letter:

- Communications with Foothill Distributing (e.g. Tr. at 13:19–14:12) (e.g. RFP Nos. 9 and 34)
- Communications with Tony Thompson (Tr. at 30:18–31:15) (e.g., RFP Nos. 10 and 47)
- Communications with Tim Crew (Tr. at 41:18–44:9) (e.g. RFP Nos. 11, 23, and 38)
- Communications with Tom Jahnke regarding Defendant's can designs (Tr. at 58:10–59:7) (e.g. RFP Nos. 1 and 3)

- All sales invoices (Tr. at 62:9–63:1) (e.g. RFP Nos. 13 and 14)
- Documents reflecting the amount of Defendant's products that have been given away (Tr. at 63:2–64:5) (e.g. RFP Nos. 13 and 14)
- All records showing Defendant's purchase of inventory (Tr. at 64:15–65:3) (e.g. RFP Nos. 13 and 26)
- All documents filed with the Board of Equalization (Tr. at 64:4–65:12) (e.g. RFP Nos. 13 and 26)
- The form Defendant uses to track product provided to stores (Tr. 65:21–66:2) (e.g. RFP No. 13)
- Communications with A.J. Collins, including the mentioned drawings (Tr. at 112:7–113:8) (e.g. RFP Nos. 1 and 3)
- Communications with PSI, including Ben Ebeling, and communications between Jessee Waelty and PSI (Tr. at 117:12–119:13) (e.g. RFP Nos. 1, 3, 23, and 27) (one produced at BEATUP PROD 0552-553)
- The final, executed version of Deposition Exhibit 12 (BEASTUP PROD 0010-21) (Tr. at 144:15–145:3) (e.g. RFP Nos. 33–34)
- Sales documents from Foothill Distributing (Tr. at 145:11–146:6 and 148:14–149:8) (e.g. RFP Nos. 13 and 14)
- The sheet showing the investments made into Defendant's business (Tr. at 168:22–169:17) (e.g. RFP No. 23 and 26)
- The list of athletes Defendant has sponsored (Tr. at 170:20–171:1) (e.g. RFP Nos. 23–25)

Further:

- As mentioned in our March 13, 2018 letter, Mr. Waelty testified that he regularly conducted business communications using various email accounts (e.g., beastupenergy@gmail.com, info@beastup.com, sniperwaelty@yahoo.com, and beastupgear@gmail.com) from 2008 to present.  But Defendant's production does not appear to have emails from the following accounts: beastupenergy@gmail.com, info@beastup.com, and beastupgear@gmail.com. Please confirm that Defendant will conduct the required search of each of these and any other of Defendant's email accounts for documents responsive to MEC's Requests for Production.
- Although there are some requested communications with Stephen Norberg, there are earlier communications that were not produced.  Please confirm that Defendant will search for and produce all the requested communications with Mr. Norberg.
- The emails produced at BEAST UP PROD 0242-243 (see Nov. 22 and Nov. 28 emails) refer to attachments, but there were no attachments produced with the emails.  Please produce the attachments or identify where in the production the attachments were produced.
- The email produced at BEAST UP PROD 0246 refers to a "Creative Brief."  Please produce the "Creative Brief" or identify where in the production the documents is produced.
- The email at BEAST UP PROD 0274 refers to an attached and completed "Power Brands Agreement."  Please produce the agreement.
- The emails produced at BEAST UP PROD 0320, 0324, 0535, 0548 ("search.doc"), and 0666 refer to attachments, but there were no attachments produced with the emails.  Please produce the attachments or identify where in the production the attachments were produced.
- Please produce the "attached two draft letters for your review" that are referred to in the Nov. 6, 2011 email produced at BEASTUP PROD 0598.
- Please produce the letter referred to in the May 12, 2010 email produced at BEASTUP PROD 0615.

During our call you stated that you were generally available this week to continue our meet-and-confer.  Please let us know if you're available on Friday at 10:30 am Pacific (1:30 pm Eastern).

Regards,
Marko

**Marko Zoretic**
Partner
949-721-7695 **Direct**
**Knobbe Martens**

***

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Thursday, March 22, 2018 8:32 AM
**To:** Marko.Zoretic
**Subject:** RE: Monster v. BeastUp

Marko,

I just heard back from my client that there are "over 600 hard copy receipts, invoices, bank statements etc... All in one large box."

He cannot afford to copy or scan these hard copies but will make the box available to you for inspection and copying if you wish to do so. I have not seen the documents yet, but my client did say that he does not believe there is anything in there germane to Monster Energy's claims. That said, if you want to view his old receipts, they are available for your inspection.

***

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Monday, March 19, 2018 5:10 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: Monster v. BeastUp

Hi Eve,

The letter set forth 1:30 pm Pacific. But we can proceed at 10:30 am Pacific, 1:30 pm Eastern.

Regards,
Marko

***

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Monday, March 19, 2018 2:07 PM
**To:** Marko.Zoretic
**Cc:** Matt.Bellinger
**Subject:** RE: Monster v. BeastUp

Just to clarify, did you mean EST or PST? 1:30 EST is better for me.

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Monday, March 19, 2018 2:55 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: Monster v. BeastUp

Thank you. We will call you at that time.

Regards,
Marko

**Marko Zoretic**
Partner
949-721-7695 **Direct**
**Knobbe Martens**

---

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Monday, March 19, 2018 11:51 AM
**To:** Marko.Zoretic
**Cc:** Matt.Bellinger
**Subject:** RE: Monster v. BeastUp

Yes, that time works tomorrow. I will be on my cell. 617-671-5044.

---

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Monday, March 19, 2018 2:37 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** RE: Monster v. BeastUp

Eve,

We write to follow up on our March 12, 2018 letter requesting a meet and confer on March 16 or March 20.  Are you available on March 20 at 1:30 pm?

Regards,
Marko

**Marko Zoretic**
Partner
949-721-7695 **Direct**
**Knobbe Martens**

---

**From:** Eve Brown [mailto:ejbrown@bricolagelaw.com]
**Sent:** Monday, March 12, 2018 12:22 PM
**To:** Marko.Zoretic
**Cc:** Matt.Bellinger
**Subject:** RE: Monster v. BeastUp

Received. I will respond as soon as possible.

---

**From:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Sent:** Monday, March 12, 2018 2:47 PM
**To:** Eve Brown <ejbrown@bricolagelaw.com>
**Cc:** Matt.Bellinger <Matt.Bellinger@knobbe.com>
**Subject:** Monster v. BeastUp

Eve,

Please see the attached letter.

Regards,
Marko

**Marko Zoretic**
Partner
Marko.Zoretic@knobbe.com
949-721-7695 **Direct**
**Knobbe Martens**
2040 Main St., 14th Fl.
Irvine, CA 92614
www.knobbe.com/marko-zoretic

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT 16

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Marko R. Zoretic
Marko.Zoretic@knobbe.com

April 4, 2018

**<u>VIA EMAIL</u>**

Eve Brown
Bricolage Law, LLC
128 School Street
Walpole, MA 02081

       Re:   <u>Monster Energy Company v.  BeastUp, LLC.</u>
               Case No. 2:17-CV-01605-KJM-EFB
               Our Ref.:  HANBEVL.6127L

Dear Eve:

We write to summarize our April 3, 2018 meet and confer regarding the issues raised in our March 12, 2018 letter and March 22, 2018 email.

Regarding the communications identified in the bullet point list of documents in our March 22, 2018 email, reproduced below, you agreed that you would go through each specific item with Mr. Waelty, have him conduct the requested search, and produce the requested documents or state that there were no responsive documents.  You agreed that you would confirm in writing, for each request, that the respective search was conducted and state whether the requested documents are being produced or that there are no responsive documents.

- Communications with Foothill Distributing (e.g. Tr. at 13:19–14:12) (e.g. RFP Nos. 9 and 34)
- Communications with Tony Thompson (Tr. at 30:18–31:15) (e.g., RFP Nos. 10 and 47)
- Communications with Tim Crew (Tr. at 41:18–44:9) (e.g. RFP Nos. 11, 23, and 38)
- Communications with Tom Jahnke regarding Defendant's can designs (Tr. at 58:10–59:7) (e.g. RFP Nos. 1 and 3)
- Communications with A.J. Collins, including the mentioned drawings (Tr. at 112:7–113:8) (e.g. RFP Nos. 1 and 3)
- Communications with PSI, including Ben Ebeling, and communications between Jessee Waelty and PSI (Tr. at 117:12–119:13) (e.g. RFP Nos. 1, 3, 23, and 27) (one produced at  BEATUP PROD 0552-553)

I explained that BeastUp's production did not appear to have any emails from the following email accounts that Mr. Waelty testified he used: beastupenergy@gmail.com, info@beastup.com, and beastupgear@gmail.com.  I explained to you that it was nonsensical that there were no emails produced from at least the beastupenergy@gmail.com account because that is the contact address identified on www.beastup.com.   You stated that the email addresses may only be forwarding messages to sniperwaelty@yahoo.com, but you did not know.  You agreed to investigate if the emails from these

# Knobbe Martens

accounts are forwarded to sniperwaelty@yahoo.com, and if they are not forwarded to that account, you agreed that Mr. Waelty will conduct the required search of each of these and any other of Defendant's email accounts for documents responsive to MEC's Requests for Production.

You agreed to identify where in the production the following email attachments or documents referred to in the emails have been produced, and if they have not been produced, you agreed to produce them.

- The attachments identified in the emails produced at BEAST UP PROD 0242-243 (see Nov. 22 and Nov. 28 emails).
- The "Creative Brief" referred to in the email produced at BEAST UP PROD 0246.
- The attached and completed "Power Brands Agreement" referred to in the email produced at BEAST UP PROD 0274.
- The attachments referred to in the emails produced at BEAST UP PROD 0320, 0324, 0535, 0548 ("search.doc"), and 0666.
- The "attached two draft letters for your review" that are referred to in the Nov. 6, 2011 email produced at BEASTUP PROD 0598.
- The letter referred to in the May 12, 2010 email produced at BEASTUP PROD 0615.

You stated that you believe that other documents identified in the bullet point list of documents in our March 22, 2018 email, reproduced below, may be included in the box of documents that Mr. Waelty made available for inspection and scanning on April 3, 2018. We agreed to review those documents to determine if any of the requested documents are included.

- All sales invoices (Tr. at 62:9–63:1) (e.g. RFP Nos. 13 and 14)
- Documents reflecting the amount of Defendant's products that have been given away (Tr. at 63:2–64:5) (e.g. RFP Nos. 13 and 14)
- All records showing Defendant's purchase of inventory (Tr. at 64:15–65:3) (e.g. RFP Nos. 13 and 26)
- All documents filed with the Board of Equalization (Tr. at 64:4–65:12) (e.g. RFP Nos. 13 and 26)
- The form Defendant uses to track product provided to stores (Tr. 65:21–66:2) (e.g. RFP No. 13)
- The final, executed version of Deposition Exhibit 12 (BEASTUP PROD 0010-21) (Tr. at 144:15–145:3) (e.g. RFP Nos. 33–34)
- Sales documents from Foothill Distributing (Tr. at 145:11–146:6 and 148:14–149:8) (e.g. RFP Nos. 13 and 14)
- The final, executed version of Deposition Exhibit 12 (BEASTUP PROD 0010-21) (Tr. at 144:15–145:3) (e.g. RFP Nos. 33–34)
- The sheet showing the investments made into Defendant's business (Tr. at 168:22–169:17) (e.g. RFP No. 23 and 26)
- The list of athletes Defendant has sponsored (Tr. at 170:20–171:1) (e.g. RFP Nos. 23–25)

We discussed earlier communications with Stephen Norberg that we believe were not produced (in connection with RFP No. 38). You stated that you believe the initial communication(s) with Stephen Norberg were telephonic, and that all of the written communications have been produced. I agreed to

**Knobbe Martens**

provide you with more information regarding the date of email communications we believe have not been produced and you agreed to investigate the matter further once we provided that information to you.  Please be advised that based on the Aug. 7, 2017 email from Mr. Waelty to Mr. Norberg (produced at BEAST UP PROD 0313 and referring to an "update"), there appears to be communications between Mr. Waelty and Mr. Norberg that occurred before Aug. 7, 2017 that have not been produced.  Please confirm that there are no such other written communications or confirm that there are such communications that will be produced and produce them.   Please also confirm that BeastUp has produced all documents relating to communications between BeastUp and any third parties relating to this lawsuit.

Regarding RFP Nos. 1–2, you stated that you understood that BeastUp did not have the Art Specification Form. I directed you to the November 28, 2011 email produced at BEAST UP PROD 0242 (also identified above), which indicates that the document is attached to the email.  You stated that you would locate the attachments and produce them.

Regarding RFP Nos. 11, 13, 26, 28, 29, 30, 32, 34, 35, 43, and 46, you stated that you believe that responsive documents may be included in the box of documents that Mr. Waelty made available for inspection.

Regarding RFP No. 36, which requests, *inter alia*, copies of current and previous versions of www.beastup.com, you stated that BeastUp did not have any copies of previous versions of www.beastup.com.

Regarding RFP No. 47, we discussed that BeastUp's production did not include any communications between the following individuals: Robert Waelty, Jessee Waelty, John Waelty, Colter Hedden, and/or Tony Thompson, responsive to RFP No. 47, or any RFP. You stated that you believed that there were no such communications, but you agreed to confirm your answer with the client, and if there were such documents, you agreed to produce them.

Regarding Interrogatory Nos. 1, 2, 7, 8, and 14, you reaffirmed your earlier commitment made during our March 20, 2018 meet and confer that you would supplement BeastUp's responses to these interrogatories to specifically identify the documents relied on.

Regarding Interrogatory No. 1, you further agreed that BeastUp will supplement its response to provide the missing SKU and UPC codes information for Defendant's sweatshirts, t-shirts, tank tops, workout shirts, hats, lanyards, wristbands, beanies, coffee cups, or sticker/decal to the extent they exist. You stated your understanding that such information may not exist.

Regarding Interrogatory No. 2, you further agreed that BeastUp will supplemental its response to provide the requested wholesale pricing information.

Regarding Interrogatory No. 3, you agreed that BeastUp will supplement its response to explain the roles of Power Brand Consulting employees Kris Guiao, Ashiliegh Brookham, and Alina Guerrero in the development, selection, or approval of the BEASTUP mark.

**knobbe.com**

# Knobbe Martens

Regarding Interrogatory No. 7, to assist you in locating search results responsive to the interrogatory, I directed you to at least BEAST UP PROD 0318 (in addition to BEAST UP PROD 0548–549 previously identified for you).

Regarding Interrogatory No. 8, I stated our concern that any supplemental interrogatory response by BeastUp merely referring to documents may not be sufficient to fully respond to the interrogatory. I requested that to the extent an explanation is necessary to understand the financial documents relied on in response to the interrogatory, that it should be provided.

Regarding Interrogatory No. 9, you stated that you were still in the process of determining when BeastUp Products were sold on Defendant's website and that you would supplement the response.

Regarding Interrogatory No. 13, you agreed to supplement the response to identify all facts supporting Defendant's affirmative defense of "Laches, Waver and/or Acquiescence."

Regarding Interrogatory No. 14, you agreed to supplement the response to identify (1) all facts to support Defendant's affirmative defense of Unclean Hands and (2) all third-party articles, scholarly journals, websites, and news stories that Defendant intends to rely upon in this case. You stated, however, that you were not aware of any specific third-party articles, scholarly journals, websites, or news stories that Defendant intends to rely upon in this case.

Regarding Interrogatory No. 15, you agreed that to the extent there was any other factual and legal basis for Defendant's affirmative defense of "Priority," BeastUp would supplement its response.

You agreed that you would provide these promised supplemental interrogatory responses by April 11, 2018. We look forward to receiving them. We also look forward to receiving the additional documents and other confirmations you agreed to provide by April 11.

Sincerely,

*/s/ Marko R. Zoretic*

Marko R. Zoretic

27978365

knobbe.com

# EXHIBIT 17

**Lance Goble**

| | |
|---|---|
| **From:** | Jessee Waelty <beastupenergy@gmail.com> |
| **Sent:** | Tuesday, April 19, 2016 9:50 AM |
| **To:** | Lance Goble |
| **Subject:** | RE: BeastUp |

Thanks Lance. Sorry to hear about Friday night. Must of been my dad John who just helps out and wants to be apart of what I got going..we didn't invite him back to the booth the other days cause he was acting unprofessional Friday. After surviving his cancer last year he's been a handful to be around..kinda crazy. I apologize for his behavior and will make sure he doesn't speak poorly of your company.

Thanks,
Rob

On Apr 18, 2016 5:54 PM, "Lance Goble" <lance.goble@foothilldistributing.com> wrote:

Rob,

I recognize your frustration and have heard many of the details of the dissatisfaction from my friends, customers, and employees this weekend. I did also meet your owner Bill face to face for the first time Friday night and after that confrontation I did hope to avoid any further embarrassment this weekend for either of us by steering clear. He made it clear that he would be seeking a new distributor and we definitely don't want to stand in his way doing what he wants with the brand.

Please reach out to Gary Parkinson to arrange for the return of our existing Beast Up inventory to you. We agree that non problematic is the way to go, it has been a pleasure to be your distributor and we are all disappointed that Beast Up has not yet fulfilled its potential and are parting ways.

All of us here at Foothill Distributing wish you the best on the next chapter of the Beast Up story.

Regards,

Lance

**From:** Jessee Waelty [mailto:beastupenergy@gmail.com]
**Sent:** Monday, April 18, 2016 3:24 PM

1

**To:** lance.goble@foothilldistributing.com; Gary.Burks@FoothillDistributing.com
**Subject:** BeastUp

Lance,

Not sure how to make this any easier...But I've been advised by my business associates (mentors from Damon John) that we need to take back our brand and pull out of the contract with Foothill Distributing. This isn't easy for us to do, and we've had many conversations over this the last few months, but we can't sit back anymore and watch our company fade. We fill that if the company is going to fail, then let us be the ones that do that, not another company.

The sales reports and stores still selling us pretty much speaks for its self after a year and a half. I know your company at first gave it a little push but somewhat gassed out after a few months. I've also spoken with some of your employees that work the field and asked what the issues may be within the company...I was advised that I should probably distribute my own brand cause the focus is on the Mossy Oak drinks.

I could get into details over how many store owners within your territory have never heard of us or even advised that you carry us, or the ones that do or did had a problem with the drivers never restocking it. But I'd like to make this transaction non problematic.

Let us know if you'd like to meet on this face to face or just part ways. By know means are we upset at your company, we just want to put in the hard work and build the brand at our pace.

Also, this weekend was strange to see you drive by in a cart 5-7 times and walk by our booth and not even acknowledge us..made us feel not part of the team we thought we had. Burks would of stopped by and had a cold one with us..

Sincerely,

Rob

2

3

FD000021

# EXHIBIT 18

**From:** "Eve J. Brown" <ejbrown@bricolagelaw.com>
**Date:** April 11, 2018 at 9:12:22 AM PDT
**To:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Subject: BeastUp**

Hi Marko,

I am still waiting on a few responses from my client for the supplemental
discovery we discussed. I hope to be able to get you my formal response
tomorrow.

Eve J. Brown
**Bricolage Law, LLC**
Tel.  (617) 671-5044
Email:  ejbrown@bricolagelaw.com
Web: bricolagelaw.com

# EXHIBIT 19

**From:** "Eve J. Brown" <ejbrown@bricolagelaw.com>
**Date:** April 16, 2018 at 6:53:11 AM PDT
**To:** Marko.Zoretic <Marko.Zoretic@knobbe.com>
**Subject: BeastUp update**

Hi Marko,

I apologize for the delay on the BeastUp supplemental answers. My client is
going through a difficult time with his wife's cancer treatments, and it has been a
struggle to go back and spend time on the email searches. Would you be
amenable to an extension? I don't expect that I will have any additional
documents or information for you until at least next week, and I appreciate that if
we go too long, your time may be limited as well.

Eve J. Brown
**Bricolage Law, LLC**
Tel.  (617) 671-5044
Email:  ejbrown@bricolagelaw.com
Web: bricolagelaw.com