Steven J. Nataupsky (CA SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (CA SBN 156511)
lynda.zadrasymes@knobbe.com
Matthew Bellinger (CA SBN 222228)
matt.bellinger@knobbe.com
Marko R. Zoretic (CA SBN 233952)
marko.zoretic@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation, | Case No. 2:17-CV-01605-KJM-EFB |
| Plaintiff, | **MONSTER ENERGY COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BEASTUP LLC, a California limited liability company, | Hon. Kimberly J. Mueller |
| Defendant. | Date:          November 2, 2018<br>Time:          10:00 a.m.<br>Location:    Courtroom 3 |

# TABLE OF CONTENTS

Page No.

I.     SUMMARY OF ARGUMENT ................................................................ 1

II.    SUMMARY JUDGMENT STANDARD ................................................ 4

III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON
       MONSTER'S CLAIMS ......................................................................... 4

       A.   Monster Is Entitled to Summary Judgment on its Trademark
            Infringement and False Designation of Origin Claims ................... 4

            1.   Monster Has Valid, Protectable Marks ................................. 5

            2.   The *Sleekcraft* Factors Weigh Overwhelmingly in Favor of
                 Finding a Likelihood of Confusion ..................................... 5

                 a.   Monster Has Strong Rights in Its Marks ................... 6

                 b.   The Parties' Goods Are Identical .............................. 7

                 c.   Defendant's BEASTUP Mark and Claw Marks Are
                      Highly Similar to Monster's BEAST-Inclusive Marks
                      and Claw Icon .......................................................... 8

                 d.   Unrebutted Survey Evidence Shows That a
                      Substantial Number of Consumers Are Likely to Be
                      Confused by Defendant's Marks ............................... 9

                 e.   The Parties' Goods Travel Through the
                      Same Channels ......................................................... 10

                 f.   The Parties' Energy Drinks Are Relatively
                      Inexpensive, and Therefore Are Purchased with
                      Less Care ................................................................. 11

                 g.   Defendant Knew of Monster's Marks Before
                      Adopting Defendant's Marks .................................... 11

                 h.   Likelihood of Expansion – the Parties' Product Lines
                      Are Already Identical ............................................... 11

       B.   Monster Is Entitled to Summary Judgment on its Unfair
            Competition Claims ...................................................................... 11

# TABLE OF CONTENTS
## (Cont'd)

**Page No.**

C.    Monster Is Entitled to Summary Judgment on Its Trademark
      Cancellation Claim ........................................................................... 12

D.    Monster Is Entitled to Summary Judgment on Its Dilution Claim ................. 12

      1.    Monster's Claw Icon Became Famous Before Defendant
            Began Using Its Claw Marks ................................................. 13

      2.    Defendant's Claw Marks Are Likely to Dilute Monster's
            Claw Icon ........................................................................... 13

IV.   SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST
      DEFENDANT'S AFFIRMATIVE DEFENSES .......................................... 14

A.    Monster Is Entitled to Summary Judgment on Defendant's Laches/
      Waiver/Acquiescence Defense .......................................................... 14

      1.    No Evidence Rebuts the Strong Presumption Against Laches
            in this Case ......................................................................... 14

      2.    No Evidence Supports Defendant's Waiver or
            Acquiescence Defenses ........................................................ 16

B.    Monster Is Entitled to Summary Judgment on Defendant's Unclean
      Hands Defense .............................................................................. 17

      1.    There Is No Evidence that Monster Intended to
            Deceive Customers .............................................................. 17

      2.    Defendant's Unclean Hands Defense Is Based on Activity
            Protected by the *Noerr-Pennington* Doctrine ...................... 17

C.    Monster Is Entitled to Summary Judgment on Defendant's
      Priority Defense ............................................................................ 19

V.    CONCLUSION ..................................................................................... 20

# TABLE OF AUTHORITIES

Page No(s).

*2Die4Kourt v. Hillair Capital Mgmt., LLC,*
No. SACV 16-1304-JVS, 2016 WL 4487895
(C.D. Cal. Aug. 23, 2016) ................................................................17

*Adidas Am., Inc. v. TRB Acquisitions LLC,*
No. 3:15-cv-2113-SI, 2017 WL 337983 (D. Or. Jan. 23, 2017) ....................18

*AMF, Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979) .....................................................5, 6, 9

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,*
174 F.3d 1036 (9th Cir. 1999) ..................................................5, 7, 11

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.,*
156 F. Supp. 3d 1173 (E.D. Cal. 2016) ..................................................10

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ..................................................................4

*Conversive, Inc. v. Conversagent, Inc.,*
433 F. Supp. 2d 1079 (C.D. Cal. 2006) .........................................5, 6, 11

*Farouk Sys., Inc. v. Chi Nail Franchises, LLC,*
No. CV 13-7533, 2015 WL 11347663 (C.D. Cal. Sept. 8, 2015) ........................15

*Gateway, Inc. v. Companion Prods., Inc.,*
320 F. Supp. 2d 912 (D.S.D. 2002) ...................................................19

*GoTo.com, Inc. v. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000) .......................................................11

*Hokto Kinoko Co. v. Concord Farms, Inc.,*
810 F. Supp. 2d 1013 (C.D. Cal. 2011) ...............................................15

*Internet Specialties W., Inc. v. Milon DiGiorgio Enters., Inc.,*
559 F.3d 985 (9th Cir. 2009) ....................................................14, 15

*Jada Toys, Inc. v. Mattel, Inc.,*
518 F.3d 628 (9th Cir. 2008) ........................................................14

*James. R. Glidewell Dental Ceramics v. Keating Dental Arts,*
No. SACV11-01309-DOC, 2013 WL 655314 (C.D. Cal. Feb. 21, 2013) .....................17

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,*
633 F.3d 1158 (9th Cir. 2011) ...................................................12, 13

# TABLE OF AUTHORITIES
## (Cont'd)

Page No(s).

*Manistee Town Ctr. v. City of Glendale*,
  227 F.3d 1090 (9th Cir. 2000) ...........................................................17

*Marketquest Grp., Inc. v. BIC Corp.*,
  316 F. Supp. 3d 1234 (S.D. Cal. 2018).............................................16

*Monster Energy Co. v. Integrated Supply Network LLC*,
  No. ED CV 17-548-CBM-RAO, 2018 WL 3357532
  (C.D. Cal. June 4, 2018) .............................................................17, 18

*Official Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) .................................................................6

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
  894 F.3d 1015 (9th Cir. 2018) ...........................................................15

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ...........................................6, 7, 10, 11

*Pom Wonderful LLC v. Hubbard*,
  No. CV 13-06917 RGK, 2016 WL 3621281 (C.D. Cal. June 29, 2016)............................6, 7

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)..............................................................................18

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
  96 F.3d 1217 (9th Cir. 1996) .............................................................19

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) .............................................................18

*Sturm, Ruger & Co., Inc. v. Arcadia Mach. & Tool, Inc.*,
  No. CV 85-8459 MRP, 1988 WL 391514 (C.D. Cal. Nov. 8, 1988) .........................................7

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  846 F. Supp. 2d 1063 (N.D. Cal. 2012)..............................................16

*Synoptek, LLC v. Synaptek Corp.*,
  309 F. Supp. 3d 825 (C.D. Cal. 2018) ...............................................12

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
  610 F.3d 1088 (9th Cir. 2010) ...........................................................14

*Warner Bros. Entm't v. Global Asylum, Inc.*,
  107 U.S.P.Q.2d 1910, 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012)...........................7, 9, 10

**TABLE OF AUTHORITIES**
**(Cont'd)**

**Page No(s).**

**OTHER AUTHORITIES**

15 U.S.C. § 1057.................................................................................................5

15 U.S.C. § 1114.................................................................................................4

15 U.S.C. § 1115.................................................................................................5

15 U.S.C. § 1125...........................................................................................4, 13

California Business & Professions Code § 17200............................................11

California Business & Professions Code § 17208............................................15

Fed. R. Civ. P. 56...............................................................................................4

## I.  SUMMARY OF ARGUMENT

Plaintiff Monster Energy Company ("Monster") moves for summary judgment on the claims asserted in its Complaint, namely trademark infringement, false designation of origin, trademark dilution, unfair competition, and cancellation of Defendant BeastUp LLC's U.S. Trademark Registration No. 4,584,629 for the BEASTUP mark.  Monster also seeks summary judgment on the three Affirmative Defenses raised by Defendant.

In 2002, Monster launched its original MONSTER ENERGY® drink.  Statement of Undisputed Facts ("SUF") 1.  The container for the drink prominently displays Monster's famous Ⓜ® mark ("Claw Icon") and UNLEASH THE BEAST!® mark.  SUF 2.  Monster's successful line of MONSTER™ drinks has since grown to include numerous other well-known products, all of which display the Claw Icon on the product containers.  SUF 3.  As Monster's product lineup expanded, Monster also introduced variations on its UNLEASH THE BEAST!® mark for use in connection with its beverages, including UNLEASH THE NITRO BEAST!®, REHAB THE BEAST!®, UNLEASH THE ULTRA BEAST!®, and PUMP UP THE BEAST!®, among others (collectively, the "BEAST-Inclusive Marks").  SUF 4, 17-20.  The vast majority of the MONSTER™ line of drinks displays one of the BEAST-Inclusive Marks on the product container.  SUF 16.  One example of a beverage container that displays the Claw Icon and a BEAST-Inclusive Mark is shown below.  SUF 19.

  

/ / /

Since 2002, Monster has invested over $5.5 billion dollars marketing and promoting its MONSTER line of drinks, including the Claw Icon and BEAST-Inclusive Marks.  SUF 21.  The marks are prominently featured in Monster's marketing and promotion efforts, including appearing in millions of point-of-sale materials, on clothing, on promotional items, and on Monster's website and social media sites.  SUF 22-25.  The marks are also featured in connection with Monster's sponsorships of athletes, teams, and athletic events, including Monster's extensive promotional efforts in connection with motorsports.  SUF 25.  Through Monster's huge investment and continuous effort in marketing and promoting its products, Monster has become a nationwide leader in the energy drink market.  SUF 26.  Since 2002 through the time Monster filed this lawsuit in 2017, Monster sold more than 12 billion beverages displaying both its Claw Icon and BEAST-Inclusive Marks together on the product containers.  SUF 27.

As a result of the foregoing, Monster has developed strong rights in its Claw Icon and BEAST-Inclusive Marks.  Consumers readily associate the marks with Monster and its products.  Monster has presented unrebutted survey evidence from a marketing and survey expert showing that an overwhelming number of energy drink purchasers – approximately 67% – attributed the Claw Icon to Monster.  SUF 45-48.  The Claw Icon and BEAST-Inclusive Marks are assets of enormous value as symbols of Monster and its products, and Monster is the owner of multiple trademark registrations for the marks.  SUF 5-15, 24.

In May 2014, over a decade after Monster launched its MONSTER line of drinks, Defendant began selling its BeastUp energy drink.  SUF 34, 36, 61.  Like the MONSTER line of drinks, the BeastUp energy drink prominently displays a BEAST-inclusive mark and claw marks on the product container.  The containers display the BEASTUP name together with multiple claw designs, including a claw-like logo beneath the BEASTUP name and two sets of silver claw marks located near the top and bottom of each can (collectively, "Defendant's Claw Marks").  SUF 35.  An image of the BeastUp energy drink is shown below.  *Id.*

/ / /

/ / /



Monster's claims for trademark infringement, false designation of origin, unfair competition, and cancellation of Defendant's trademark registration are based on a likelihood of confusion between the parties' marks as used in the marketplace on identical goods.  Here, the only reasonable conclusion to draw from the undisputed facts is that confusion is likely.

Defendant's Claw Marks are confusingly similar in appearance to Monster's Claw Icon.  Likewise, the term BEAST is the dominant portion of Defendant's BEASTUP mark, and the mark is confusingly similar to at least Monster's UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!® marks.  Monster indisputably began using both of those marks prior to Defendant's use of the BEASTUP mark in connection with energy drinks.  The likelihood of confusion is exacerbated by the fact that Defendant uses a mark that prominently features "BEAST" on its energy drink cans together with claw marks, which is something Monster exclusively began doing over a decade before Defendant launched its energy drink.  SUF 2, 16, 31.

Unrebutted survey evidence showing a high level of confusion – 27.9% – between the parties' marks further reinforces the conclusion that confusion is likely.  SUF 37-44.  The parties' products are also identical (energy drinks) and are sold through the same channels, including next to each other on store shelves, which makes confusion even more likely.  SUF 50-54.  Defendant also markets its energy drink in the same manner that Monster markets its energy drinks, including through the sponsorship of motorsports events.  SUF 25, 56.

The Court should also grant summary judgment in favor of Monster on its trademark dilution claim.  The Claw Icon has become famous among the general public by virtue of

1   Monster's substantial use and promotion of the mark.  SUF 2, 16, 21-23, 25-31.  There is no

2   genuine dispute that Defendant's similar Claw Marks are likely to cause dilution with Monster's

3   Claw Icon.

4         Finally, Monster is entitled to summary judgment on Defendant's affirmative defenses

5   of laches/waiver/acquiescence, unclean hands, and priority.  There is a strong presumption that

6   laches does not apply because Monster filed this lawsuit within four years (the state law

7   statutory period analogous to Monster's asserted claims and relevant to assessing laches) after

8   Defendant launched the BeastUp energy drink.  Defendant has no evidence to rebut that

9   presumption.  Defendant likewise has no evidence that Monster waived its claims or otherwise

10  acquiesced to Defendant's infringing conduct.  The alleged actions by Monster upon which

11  Defendant relies for its unclean hands defense – namely Monster asserting its trademark rights –

12  constitute protected activity that cannot form the basis for an unclean hands defense.  Finally, it

13  is undisputed that Monster has priority for its Claw Icon and asserted UNLEASH THE

14  BEAST!® and UNLEASH THE NITRO BEAST!® marks.  Accordingly, Monster is entitled to

15  summary judgment on each of these defenses.

16              **II.  SUMMARY JUDGMENT STANDARD**

17        Summary judgment is appropriate if there is no genuine issue of material fact in dispute

18  and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Where the

19  non-moving party bears the burden of proof, "the burden on the moving party may be

20  discharged by 'showing' – that is, pointing out to the district court – that there is an absence of

21  evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

22  (1986).

23   **III.  SUMMARY JUDGMENT SHOULD BE GRANTED ON MONSTER'S CLAIMS**

24  **A.    Monster Is Entitled to Summary Judgment on its Trademark Infringement and**

25         **False Designation of Origin Claims**

26        To prevail on its claims for trademark infringement and false designation of origin under

27  15 U.S.C. §§ 1114 and 1125, respectively, Monster must show: (1) it has valid, protectable

28  / / /

trademarks, and (2) Defendant's use of its marks is likely to cause confusion. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 n. 8 (9th Cir. 1999).

### 1. <u>Monster Has Valid, Protectable Marks</u>

There is no genuine dispute that Monster has valid and protectable rights in its marks. Federal registration of a mark is *prima facie* evidence that the plaintiff owns a valid trademark. 15 U.S.C. § 1057(b).  Monster owns multiple trademark registrations for the Claw Icon in connection with beverages and/or nutritional supplements. SUF 5-8.  Monster also owns federal trademark registrations for its BEAST-Inclusive Marks in connection with beverages, including registrations for its UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!® marks. SUF 9-14.  Monster used all of these marks before Defendant first used its marks in connection with beverages, and thus Monster has priority for the marks.  SUF 5-14, 17-20.

U.S. Trademark Registration Nos. 2,903,214 (　), 3,134,841 (　), 3,434,822 (　), 3,434,821 (　), and 2,769,364 (UNLEASH THE BEAST!) are also incontestable and are therefore conclusive evidence of the validity of the registered marks and Monster's ownership of the marks.  *See* 15 U.S.C. § 1115(b); SUF 5-9.  In addition to the foregoing registrations, Monster has acquired strong common law rights in its Claw Icon and BEAST-Inclusive Marks due to Monster's extensive sales throughout the United States of products displaying the marks and billions of dollars spent advertising and promoting the marks.  SUF 2-4, 16-31.

### 2. <u>The *Sleekcraft* Factors Weigh Overwhelmingly in Favor of Finding a Likelihood of Confusion</u>

Courts determine whether there is a likelihood of confusion by weighing the eight *Sleekcraft* factors: (1) the strength of the mark, (2) the proximity of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) the likelihood of expansion of the product lines.  *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979); *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1090 (C.D. Cal. 2006) (same).  It is often possible to reach a conclusion regarding likelihood of confusion after considering a subset of the factors.  *Brookfield*, 174 F.3d

at 1054.  The relevant *Sleekcraft* factors weigh overwhelmingly in favor of Monster and the Court should grant summary judgment on Monster's trademark infringement and false designation of origin claims.  *See Conversive*, 433 F. Supp. 2d at 1093 (granting summary judgment of trademark infringement where *Sleekcraft* factors all weighed in favor of or were neutral as to likelihood of confusion); *Pom Wonderful LLC v. Hubbard*, No. CV 13-06917 RGK (JPRx), 2016 WL 3621281, at *9-*13 (C.D. Cal. June 29, 2016) (granting summary judgment of trademark infringement).

### a.   Monster Has Strong Rights in Its Marks

To determine the strength of a trademark, courts consider where the mark lies on the traditional distinctiveness spectrum (generic, descriptive, suggestive, arbitrary, or fanciful) and may consider factors such as the extent of the trademark owner's sales and marketing efforts relating to the trademark.  *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126-27 (9th Cir. 2014).   Arbitrary and fanciful marks, which are the most distinctive on the spectrum, receive the most trademark protection.  *Id.* at 1126.  A mark is arbitrary if it "is non-descriptive of any quality of the goods or services."  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993).   There is no dispute that Monster's Claw Icon and its UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!® marks (and Monster's other BEAST-Inclusive Marks) are arbitrary marks.  The marks do not describe or suggest any ingredient, quality, or characteristic of Monster's energy drinks.  The marks are thus entitled to strong protection without the need to show secondary meaning.  *Official Airline Guides*, 6 F.3d at 1390-91.

Nevertheless, it is undisputed that Monster has made an enormous investment in the promotion and advertisements of its marks.  Monster has spent over $5.5 billion marketing and promoting the MONSTER line of drinks since 2002.  SUF 21.  The Claw Icon and at least the UNLEASH THE BEAST!® mark are prominently featured in Monster's marketing and promotional efforts, including appearing on millions of point-of-sale materials, on promotional items, on Monster's website and social media sites, and in connection with Monster's sponsorship of athletes, teams, and various live events.  SUF 23, 25.  The marks have also

appeared on billions of beverage containers.  SUF 27, 28.  From 2002 through 2013, which was the year before Defendant began selling its BEASTUP energy drink, Monster had already sold more than 6.8 billon beverages displaying the Claw Icon together with one of the BEAST-Inclusive Marks on the product containers. SUF 28.  During the same period, Monster spent approximately $2.2 billion on the advertising and promotion of its MONSTER line of drinks.  SUF 22.

        As a result of Monster's enormous efforts and investment, the Claw Icon and the UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!® marks, as well as Monster's other BEAST-Inclusive Marks, have become strong marks that customers readily associate with Monster.  *See Pom Wonderful*, 775 F.3d at 1126-27 (sales of more than 190 million bottles of juice displaying the mark was evidence that mark was commercially strong).  Unrebutted survey evidence from marketing expert Dr. Itamar Simonson confirms that the Claw Icon has obtained widespread customer recognition.  SUF 45-48.  That survey showed that over two-thirds (67.2%) of energy drink purchasers attributed the Claw Icon to Monster.  SUF 46; *see, e.g., Warner Bros. Entm't v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 2012 WL 6951315, at *4-*5 (C.D. Cal. Dec. 10, 2012), *aff'd*, 544 F. App'x 683 (9th Cir. 2013) (noting courts have found that consumer association of over 50% is sufficient to establish secondary meaning); *Sturm, Ruger & Co., Inc. v. Arcadia Mach. & Tool, Inc.*, No. CV 85-8459 MRP, 1988 WL 391514, at *3 and *8 (C.D. Cal. Nov. 8, 1988) (finding that product's appearance had "a very strong secondary meaning" based on survey evidence of 46% association).

        There can be no genuine dispute that Monster has very strong rights in its marks, and thus this factor weighs heavily in favor of a likelihood of confusion.

### b.      The Parties' Goods Are Identical

        The parties both use their marks on identical goods, namely energy drinks.  SUF 1-4, 35, 55.  Thus, this factor weighs strongly in favor of a likelihood of confusion.  *See Brookfield*, 174 F.3d at 1056; *see also Pom Wonderful*, 2016 WL 3621281, at *12.

/ / /

/ / /

c.     <u>Defendant's BEASTUP Mark and Claw Marks Are Highly Similar to Monster's BEAST-Inclusive Marks and Claw Icon</u>

The term "BEAST" is a common word, a core concept, and the object noun in Monster's UNLEASH THE BEAST!® mark and UNLEASH THE NITRO BEAST!® mark, as well as the other BEAST-Inclusive Marks Monster subsequently adopted. Defendant's BEASTUP mark is highly similar to at least Monster's UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!® marks. The parties' marks share the same distinctive term "BEAST". The term "BEAST" is the dominant element of the BEASTUP mark and consumers are likely to give it more attention than the common term "UP" appended to the end of the mark. The parties' marks also invoke similar commercial impressions of being a "beast" (BEASTUP) or, for example, letting loose one's inner "beast" (i.e., UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!®). Customers who encounter Defendant's BEASTUP mark in connection with Defendant's energy drinks are likely to believe that it is another variation of Monster's BEAST-Inclusive Marks in a slightly revised way, consistent with Monster's prior expansion of UNLEASH THE BEAST!® to include other BEAST-containing marks.

Defendant's Claw Marks are also confusingly similar to Monster's Claw Icon. The claw logo featured near the center of the BeastUp can includes a jagged, three-pronged shape highly reminiscent of Monster's three-pronged Claw Icon. The two sets of claw marks located near the top and bottom of the BeastUp can each include three and four jagged prongs, which are also highly similar to Monster's Claw Icon. Those two sets of claw marks on the BeastUp can appear to be tearing through the beverage can, similar to the manner in which the Claw Icon appears on Monster's cans. Indeed, Monster's Claw Icon was designed to create the impression of a claw tearing through the can. SUF 49. The claw marks on the top and bottom of the BeastUp can also include a middle prong that extends further than the two adjacent prongs, similar to the appearance of the Claw Icon.

The level of similarity between the parties' marks is enhanced by the fact that, like Monster, Defendant is using a BEAST-inclusive mark together with claw marks. Consumers are accustomed to seeing the Claw Icon and a BEAST-Inclusive Mark appearing together on

1   Monster's energy drink cans.   Consequently, consumers viewing the BEASTUP mark and

2   Defendant's Claw Marks together as they appear on Defendant's energy drink cans in the

3   marketplace are even more likely to find the marks similar to Monster's marks.  *See Sleekcraft*

4   *Boats*, 599 F.2d at 351 (similarity of marks "must be considered as they are encountered in the

5   marketplace").  Given the high degree of similarity of the marks and the manner in which they

6   are used, this is yet another fact that weighs heavily in favor of Monster.

7               **d.**      **Unrebutted Survey Evidence Shows That a Substantial Number of**

8                        **Consumers Are Likely to Be Confused by Defendant's Marks**

9          Likelihood of confusion may be shown through properly conducted survey evidence.

10   *See, e.g., Warner Bros.*, 2012 WL 6951315, at *9-*10.  Here, the unrebutted survey evidence

11   shows a substantial confusion rate of 27.9%.  SUF 41.

12          Mr. Robert Klein, a marketing and survey expert, surveyed four hundred qualified

13   participants to determine whether potential customers would be confused between the

14   BEASTUP energy drink and Monster's products.  SUF 37-38.  Mr. Klein used widely accepted

15   survey methodologies, including use of a "test" and a "control" group.  SUF 39.  Respondents in

16   the test group were shown the BEASTUP energy drink can and asked a series of questions to

17   determine the extent of a likelihood of confusion with Monster's marks.  SUF 40.  Respondents

18   in the control group were shown a can in which the infringing BEASTUP mark and Defendant's

19   Claw Marks had been removed, and were asked the same series of questions as the respondents

20   in the control group.  *Id.*  The purpose of the control group was to serve as a control for any

21   guessing or other noise.  SUF 39.  The survey results showed that, after controlling for noise or

22   guessing, 27.9% of potential purchasers believed that the BeastUp energy drinks were either put

23   out by Monster, are another energy drink put out by the same company that puts out the

24   MONSTER ENERGY® drink, or are from a company that needed authorization or approval

25   from Monster to put out such a product.  SUF 41.

26          Based on the results of the survey, Mr. Klein concluded that potential purchasers of the

27   BeastUp energy drink will be confused and believe the drink is put out by Monster or authorized

28   by Monster.   SUF 42.   Courts have found similar survey confusion rates as supporting a

1  conclusion that confusion is likely.  *See, e.g., Warner Bros.*, 2012 WL 6951315, at *9

2  ("Generally, confusion levels of 25 to 50 percent provide 'solid support' for a finding of

3  likelihood of confusion . . . .").  Thus, this factor also shows that confusion is likely.

4                    e.        **The Parties' Goods Travel Through the Same Channels**

5          Where the parties sell highly similar goods in identical marketing channels, there is a

6  higher likelihood that consumers would be confused.  *See Pom Wonderful*, 775 F.3d at 1130-31

7  (marketing channel factor weighed in favor of trademark owner, where both parties sold

8  pomegranate juices in supermarkets).  Monster's energy drinks and Defendant's energy drinks

9  are sold through the same channels, including, gas stations, convenience stores, and grocery

10  stores.  SUF 50-51.  Defendant has even touted on its social media accounts that the BeastUp

11  energy drinks are sold side-by-side with Monster's energy drinks, as shown below.

 

21  SUF 52-54.  This further increases the likelihood of confusion.

22          Additionally, the parties both market and promote their products through the sponsorship

23  of athletes, teams, and competitions in motorsports and other sports.  SUF 25, 56.   The parties'

24  use of identical marketing channels further weighs in favor of a likelihood of confusion.  *See*

25  *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1182-83 (E.D. Cal.

26  2016).

27  / / /

28  / / /

**f.** **The Parties' Energy Drinks Are Relatively Inexpensive, and Therefore Are Purchased with Less Care**

The parties' energy drinks are relatively inexpensive. Monster's beverages retail for $2-3 on average for a single drink, and Defendant's beverages retail for an average of $2.50 per drink. SUF 57-58. The parties' beverages are likely to be purchased casually or on an impulse, which increases the likelihood of confusion. *See Pom Wonderful*, 775 F.3d at 1127 (single-serve beverages costing between $1.99 and $2.49 weighed in favor of a likelihood of confusion because consumers are likely to exercise a low degree of care when purchasing).

**g.** **Defendant Knew of Monster's Marks Before Adopting Defendant's Marks**

Demonstrating defendant's bad faith is not necessary to find a likelihood of confusion. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000). However, a defendant's knowledge of plaintiff's marks and plaintiff's products prior to adopting its own similar mark may show a likelihood of confusion. *See Conversive*, 433 F. Supp. 2d at 1093. The undisputed evidence shows that Defendant's Vice President became aware of Monster and its UNLEASH THE BEAST!® mark sometime between 2004 to 2006—years before Defendant started its business and began selling its energy drink. SUF 59. This factor, to the extent relevant, weighs in favor of a likelihood of confusion.

**h.** **Likelihood of Expansion – the Parties' Product Lines Are Already Identical**

"The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." *Brookfield*, 174 F.3d at 1060. Given that the parties both sell energy drinks, this factor is not important here.

**B.** **Monster Is Entitled to Summary Judgment on its Unfair Competition Claims**

Because summary judgment of trademark infringement and false designation of origin is appropriate, Monster is also entitled to summary judgment on its claims for unfair competition under California Business & Professions Code § 17200 and under California common law. *See Conversive*, 433 F. Supp. 2d at 1093-94 (granting summary judgment of false designation of

origin, California state law unfair competition, and California common law unfair competition because summary judgment was proper as to trademark infringement claim, where the elements of the claims are based on a likelihood of confusion).

**C.      Monster Is Entitled to Summary Judgment on Its Trademark Cancellation Claim**

The Lanham Act, 15 U.S.C. § 1119, gives federal courts the authority to cancel a trademark registration.  *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 834 (C.D. Cal. 2018).  A court may cancel a trademark registration if: (1) there is a valid ground why the trademark should not be registered, and (2) the party petitioning for cancellation has standing. *Id.* (citation omitted).  A trademark registration may be cancelled on the basis that it creates a likelihood of confusion with another party's marks.[1] *Id.* (citing 15 U.S.C. § 1052(d)).

Monster has standing to seek cancellation of Defendant's U.S. Trademark Registration No. 4,584,629 for the BEASTUP mark ("Defendant's Registration") because Monster is asserting a likelihood of confusion with its own BEAST-Inclusive Marks as the basis for cancellation.  For the reasons provided *supra*, there is also a likelihood of confusion between Defendant's BEASTUP mark and at least Monster's UNLEASH THE BEAST!® and UNLEASH THE NITRO BEAST!® marks that are the subject of Monster's U.S. Trademark Registration Nos. 4,584,629 and 4,584,629, respectively.[2]  Accordingly, the Court should grant summary judgment on Monster's claim to cancel Defendant's Registration.

**D.      Monster Is Entitled to Summary Judgment on Its Dilution Claim**

In order to prove dilution by blurring, a plaintiff must show: (1) the mark is famous and distinctive, (2) the defendant is making use of the mark in commerce, (3) the defendant's use began after the mark became famous, and (4) the defendant's use of the mark is likely to cause dilution.  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1168 (9th

---

[1] Courts must view the marks "in their entirety and as they appear in the marketplace." *Synoptek,* 309 F. Supp. 3d at 836 (citing *GoTo.com,* 202 F.3d at 1206).

[2] The goods identified in Defendant's Registration are "sports drinks, namely, energy drinks."  SUF 60.  The identical nature of the goods listed in Defendant's Registration to Monster's energy drinks supports a finding that confusion is likely.

Cir. 2011).  The defendant's mark need not be identical or nearly identical, but the plaintiff must show, based on the factors in 15 U.S.C. § 1125(c)(2)(B), that the defendant's mark is likely to impair the distinctiveness of plaintiff's famous mark.  *Id.* at 1172.  There is no genuine dispute that the Claw Icon is famous or that Defendant's Claw Marks are likely to dilute Monster's Claw Icon.  Accordingly, Monster is entitled to summary judgment on its dilution claim.

### 1.   Monster's Claw Icon Became Famous Before Defendant Began Using Its Claw Marks

As discussed *supra*, Monster's Claw Icon is famous.  Moreover, the mark became famous prior to Defendant's use of its Claw Marks on energy drinks.  Between 2002 to 2013, Monster invested more than $2.2 billion into advertising and promoting its MONSTER brand, including its Claw Icon.  SUF 22.  During the same period, Monster sold more than $10 billion worth of cans of its MONSTER line of beverages, all of which display the Claw Icon.  SUF 29.  Unrebutted survey evidence shows that 67.2% of energy drink consumers attribute the Claw Icon to Monster, which supports a conclusion that the mark has become famous among the general public.  SUF 46-48.

### 2.   Defendant's Claw Marks Are Likely to Dilute Monster's Claw Icon

In determining whether a defendant's use of a mark is likely to cause dilution by blurring, courts may consider all relevant factors including: (1) the degree of similarity between the marks, (2) the degree of inherent or acquired distinctiveness of the famous mark, (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark, (4) the degree of recognition of the famous mark, (5) whether the user of the junior mark intended to create an association with the famous mark, and (6) any actual association between the junior mark and the famous mark.  15 U.S.C. § 1125(c).

As discussed *supra* with respect to likelihood of confusion, Defendant's Claw Marks are highly similar to Monster's Claw Icon and the Claw Icon is an inherently distinctive mark.  Additionally, Monster is engaged in the exclusive use of its Claw Icon and Defendant has not produced evidence of any third-party uses of similar marks.  SUF 31.  The Claw Icon also enjoys a high degree of recognition due to Monster's extensive marketing and promotion

featuring the mark and Monster's substantial sales of beverages that prominently display the mark on the product container. SUF 21-23, 25-30. The Simonson survey also showed that a large percentage of energy drink consumers (67.2%) associate the Claw Icon with Monster, and Dr. Simonson further opined that the results indicate the mark is famous. SUF 46-47.

While survey evidence is not necessary to show a likelihood of dilution, *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1091 (9th Cir. 2010), survey evidence showing that consumers believe products sold under the junior mark are made or put out by the owner of the famous mark supports a finding of dilution. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 (9th Cir. 2008). The unrebutted Klein report shows that 27.9% of energy drink consumers believed that the BeastUp energy drink was put out or made by Monster or was from a company that required permission from Monster. SUF 41. Comments from the survey takers confirm that Defendant's Claw Marks were a reason why they believed the BeastUp product was made or put out by Monster, or required permission from Monster. SUF 43. Regardless of whether Defendant intentionally chose its marks to dilute Monster's Claw Icon or not, the undisputed evidence strongly points to a likelihood of dilution. *See Visa*, 610 F.3d at 1091 ("Good intentions alone do not negate a showing of a likelihood of dilution."). Accordingly, Monster is entitled to summary judgment on its dilution claim.

## IV. SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST DEFENDANT'S AFFIRMATIVE DEFENSES

**A.** **Monster Is Entitled to Summary Judgment on Defendant's Laches/Waiver/ Acquiescence Defense**

    **1.** **No Evidence Rebuts the Strong Presumption Against Laches in this Case**

Defendant asserts that Monster's claims are barred by laches. Dkt. No. 28 ¶ 101. To establish a laches defense, Defendant must prove: (1) Monster unreasonably delayed in bringing suit, and (2) Defendant was prejudiced by the delay. *See Internet Specialties W., Inc. v. Milon DiGiorgio Enters., Inc.*, 559 F.3d 985, 990 (9th Cir. 2009). Defendant cannot prove either element.

/ / /

There is a strong presumption that laches does not bar a Lanham Act claim when relief is sought within the statute of limitations period from the most closely analogous state law claim. *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018).   The relevant period for assessing laches here is the four-year period from California's trademark infringement statute.   *Id.* (finding four-year limitations period from California's trademark infringement statute was the most closely analogous state statute of limitations for trademark infringement and cancellation claims); *Internet Specialties*, 559 F.3d at 990-91 (applying four-year limitations period to trademark infringement claim); *see also* Cal. Bus. & Prof. Code § 17208 (unfair competition claims subject to four year statute of limitations).   Additionally, laches runs "from the time the plaintiff knew or should have known about its potential cause of action." *Pinkette*, 894 F.3d at 1025 (citation omitted).

Monster did not unreasonably delay in filing this lawsuit.   The earliest time that Monster's claims for infringement, false designation of origin, unfair competition, and dilution stated in Monster's complaint could have accrued was May 2014—the first time Defendant's energy drinks were sold.  SUF 34, 36, 61.  The earliest time that Monster's cancellation claim could have accrued was August 12, 2014, when Defendant's Registration issued.   SUF 61. Monster filed its Complaint on August 2, 2017, less than four years after Defendant's infringement began and when Defendant's Registration issued.  SUF 62.  Thus, there is a strong presumption against the application of laches to Monster's claims.  *See, e.g., Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1036 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013) (granting summary judgment of no laches because fifteen month delay was not unreasonable and defendant failed to point to specific facts to show that it suffered prejudice as a result of the alleged delay); *see also Farouk Sys., Inc. v. Chi Nail Franchises, LLC*, No. CV 13-7533, 2015 WL 11347663, at *5 (C.D. Cal. Sept. 8, 2015) (denying defendant's motion for summary judgment of laches where plaintiff filed suit 3 years 11 months after learning of infringement and defendant failed to rebut the strong presumption against laches).  Defendant has failed to present any evidence to rebut the presumption that laches does not apply here.

/ / /

Defendant states in its Affirmative Defense that it had been using its marks in connection with hats and shirts for more than eight years prior to the time the Complaint was filed.  *See* Dkt. No. 28 ¶ 101.  However, the claims in Monster's Complaint stem from Defendant's use of its marks in connection with its BeastUp energy drink, not its prior use in connection with clothing.  *See*, *e.g.*, Dkt. No. 1 ¶¶ 40-44.  The earliest possible time for assessing any delay regarding Monster's infringement and unfair competition claims is May 2014, when Defendant began selling its energy drink.  Indeed, Monster could not have brought those claims before that time.  *See*, *e.g.*, *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (infringement claims must be based on a defendant's actual use of the mark and not merely an intent to use the mark).  In addition, Defendant did not begin using in commerce the silver claw marks that appear near the top and bottom of the BeastUp energy drink can until May 2014 when Defendant launched that drink.  SUF 36.

There is also no evidence that Defendant was prejudiced by any delay from the time it launched the BeastUp energy drink to the time Monster filed this lawsuit.  Defendant's laches defense fails for this additional reason.

### 2.   No Evidence Supports Defendant's Waiver or Acquiescence Defenses

Waiver is the "intentional relinquishment of a known right with knowledge and the intent to relinquish it."  *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1294 (S.D. Cal. 2018) (internal quotation omitted).  In order for waiver to apply, it "must be manifested in an unequivocal manner."  *Id.* (internal quotation omitted).  There is no evidence that Monster relinquished its claims against Defendant.

The elements of an acquiescence defense are: "(1) the senior user actively represented that it would not assert a right or a claim, (2) the delay between the active representation and assertion of the right or claim was not excusable, and (3) the delay caused the defendant undue prejudice."  *Id.* at 1293.  Monster never represented that it would not assert a right or claim against Defendant.  SUF 63.  Not surprisingly, Defendant has failed to produce any evidence in support of this defense.

/ / /

1    Accordingly, Monster is entitled to summary judgment on Defendant's waiver and
2    acquiescence defenses.

3    **B.**    **Monster Is Entitled to Summary Judgment on Defendant's Unclean Hands Defense**

4         **1.**    **There Is No Evidence that Monster Intended to Deceive Customers**

5    A defendant alleging unclean hands must show: (1) the plaintiff's conduct was
6    inequitable, and (2) the plaintiff's inequitable conduct relates to the subject matter of its claims.
7    *Monster Energy Co. v. Integrated Supply Network LLC*, No. ED CV 17-548-CBM-RAO, 2018
8    WL 3357532, at *5 (C.D. Cal. June 4, 2018) (citing *2Die4Kourt v. Hillair Capital Mgmt., LLC*,
9    No. SACV 16-1304-JVS, 2016 WL 4487895, at *9 (C.D. Cal. Aug. 23, 2016), *aff'd*, 692 F.
10   App'x 366 (9th Cir. 2017)).   In the context of a trademark suit, "it is not enough that the
11   trademark plaintiff engaged in misconduct regarding the trademark generally.   Rather, the
12   trademark defendant must also show that the plaintiff used the trademark with the specific intent
13   to deceive consumers."   *2Die4Kourt*, 2016 WL 4487895, at *9.

14   Here, Defendant alleges in support of its unclean hands defense that "[Monster] has
15   engaged in a pattern of filing frivolous lawsuits against legitimate trademark owners in order to
16   acquire a greater monopoly over generic words and phrases than the Lanham Act allows."  Dkt.
17   No. 28 ¶ 102.  Defendant has made no allegation, let alone produced any evidence, that Monster
18   used its trademarks with a specific intent to deceive customers.   Accordingly, Defendant's
19   unclean hands defense fails for this reason alone.

20        **2.**    **Defendant's Unclean Hands Defense Is Based on Activity Protected by the**
21              ***Noerr-Pennington* Doctrine**

22   Under the federal *Noerr-Pennington* doctrine, "[t]hose who petition government for
23   redress are generally immune from antitrust liability."  *Manistee Town Ctr. v. City of Glendale*,
24   227 F.3d 1090, 1092 (9th Cir. 2000) (citation omitted).  Though originally rooted in antitrust
25   law, the doctrine extends beyond antitrust statutes and also bars causes of action and defenses
26   that implicate the right to petition the government for redress.   *See James. R. Glidewell Dental*
27   *Ceramics v. Keating Dental Arts*, No. SACV11-01309-DOC, 2013 WL 655314, at *13-14 (C.D.
28   Cal. Feb. 21, 2013) (holding *Noerr-Pennington* doctrine precluded liability for filing trademark

infringement lawsuit); *Monster Energy Co.*, 2018 WL 3357532, at *4 (*Noerr-Pennington* doctrine precludes trademark misuse defense based on alleged trademark bullying).

Monster's filings in federal courts and before the United States Patent and Trademark Office to enforce trademark rights are unquestionably protected petitioning activities under the *Noerr-Pennington* doctrine. *Monster Energy*, 2018 WL 3357532, at *4 ("Plaintiff's filings with the USPTO and the courts . . . are protected under the *Noerr-Pennington* doctrine."); *see also Adidas Am., Inc. v. TRB Acquisitions LLC*, No. 3:15-cv-2113-SI, 2017 WL 337983, at *4-8 (D. Or. Jan. 23, 2017) (dismissing affirmative defenses of unclean hands and trademark misuse because allegations were based on conduct protected by the *Noerr-Pennington* doctrine).

The "sham" litigation exception to the *Noerr-Pennington* doctrine does not apply here. Under this exception, the *Noerr-Pennington* doctrine does not protect petitioning activity if it is a "mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 49 (1993) (internal citations omitted and alterations in original). The Ninth Circuit has identified three scenarios where the "sham" exception may apply: (1) where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful, (2) where there has been a series of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose," and (3) where the unlawful conduct consists of making misrepresentations to the court. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006). Only the second situation is potentially implicated here because Defendant's affirmative defense only alleges a "pattern of filing frivolous lawsuits." Dkt. No. 28 ¶ 102. However, there is no evidence supporting that baseless assertion – it is merely an oft-repeated opinion of Defendant's counsel.

There is no evidence that Monster has a policy of starting legal proceedings without regard to the merits and for any unlawful purpose. Indeed, Monster has never been found to have filed an objectively baseless infringement claim. *See Adidas*, 2017 WL 337983, at *6 (declining to extend "sham" litigation exception where defendant could not identify a single lawsuit that was purportedly baseless).

Monster's enforcement of its trademarks against infringers also does not constitute unclean hands because Monster is entitled to protect its intellectual property. "Aggressively promoting and protecting a trademark, however, does not constitute unclean hands. Indeed, in view of the strength of the mark and the very substantial good will attaching to it, plaintiffs can be expected to be, and are entitled to be, aggressive in asserting their trademark rights against others." *Gateway, Inc. v. Companion Prods., Inc.*, 320 F. Supp. 2d 912, 928 (D.S.D. 2002) (internal quotations and alterations omitted) (cited by *Monster Energy*, 2018 WL 3357532, at *4 n.6 ("Plaintiff's conduct in enforcing its trademark rights with the courts and in USPTO proceedings does not constitute 'misuse.'")).

**C.     <u>Monster Is Entitled to Summary Judgment on Defendant's Priority Defense</u>**

Defendant alleges in its Third Affirmative Defense that it has priority of use regarding Monster's BEAST-Inclusive Marks and nine of Monster's trademark registrations relating to the Claw Icon. Dkt. No. 28 ¶ 103. However, it is undisputed that Monster has been using its Claw Icon and UNLEASH THE BEAST!® mark in connection with its energy drinks since 2002, which is well before Defendant's business was formed in 2009. SUF 1-4, 32-33. It is likewise undisputed that Monster has used the UNLEASH THE NITRO BEAST!® mark in connection with its drinks since at least July 2009, which is before Defendant filed the application leading to Defendant's Registration and before Defendant began using the BEASTUP mark in connection with beverages. SUF 17, 34-35, 60-61. Thus, the undisputed facts show that Monster, not Defendant, has priority for the marks.

Defendant's basis for disputing priority for Monster's trademark registrations identified in its affirmative defense is that the filing dates of the registrations are allegedly after the date Defendant began using its marks in connection with clothing in 2009.[3] SUF 64. However, the test for trademark ownership is priority of **use**. *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). Monster began using the marks that are the subject of the nine registrations identified in Defendant's Affirmative Defense much earlier than the filing dates of

---

[3] Defendant was formed in 2009 and started as a clothing company. SUF 32.

the trademark registrations.  Indeed, each of the nine registrations list first use in commerce dates between 2002–2006, years before Defendant's business existed.  SUF 65.

It is undisputed that Monster began using its Claw Icon in connection with beverages and other goods in 2002 and has priority with respect to that mark.[4]  SUF 1-3.  In addition, four of the registrations identified by Defendant – U.S. Registration Nos. 3,908,600, 3,908,601, 3,914,828, and 3,923,683 – were filed in April 2009, which is prior to the time Defendant began using any of its claw logos.  SUF 66.  Defendant did not create the claw-like logo displayed near the center of its beverage cans until September 2009, and the claw marks located near the top and bottom of the beverage cans were not used in commerce until May 2014 when Defendant first sold its energy drink.  SUF 36, 67.

Moreover, the Court also does not need to decide the issue of priority as to all the various goods listed in the nine registrations, which include goods such as sports helmets, bags, and wristbands, in order to grant the present motion.  Monster identified many of those registrations to show that the Claw Icon has been used on a wide-variety of goods and consequently is widely-recognized by consumers.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Monster respectfully requests that the Court grant summary judgment in favor of Monster on all of the claims asserted in Monster's Complaint and on each of Defendant's Affirmative Defenses.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  October 4, 2018        By: _/s/  Matthew S. Bellinger_
                                        Steven J. Nataupsky
                                        Lynda J. Zadra-Symes
                                        Matthew S. Bellinger
                                        Marko R. Zoretic

                                Attorneys for Plaintiff
                                MONSTER ENERGY COMPANY

---

[4] Monster has also continuously used its Claw Icon and UNLEASH THE BEAST!® marks in connection with clothing since 2002, and owns federal registrations for those marks for clothing.  SUF 24.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2018, I caused the **MONSTER ENERGY COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to the following counsel of record:

Eve J. Brown
BARTON GILMAN LLP
10 Dorrance Street, Suite 800
Providence, RI  02903
(401) 273-7171
ejbrown@bartongilman.com


                                         */s/ Matthew S. Bellinger*
                                         Matthew S. Bellinger

28930209