# EXHIBIT 1

1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4

5

6    MONSTER ENERGY COMPANY,          )
     a Delaware corporation,          )
7                                     )
                          Plaintiff,  )
8                                     )
          vs.                         )        No. 2:17-CV-01605
9                                     )                  -KJM-EFB
     BEASTUP LLC, a California        )
10   limited liability company,       )
                                      )
11                        Defendant.  )
     _____)

12

13

14               VIDEOTAPED DEPOSITION OF

15                    ROBERT WAELTY

16                 RED BLUFF, CALIFORNIA

17              THURSDAY, JANUARY 25, 2018

18

19

20

21

22

23
     Reported by:
24   SHARON L. DUNBAR
     LICENSE NO. 4051
25   NO. 18-60437

**Exhibit 1**
- 1 -

```
 1   APPEARANCES:

 2

     For Plaintiff:          KNOBBE - MARTENS
 3                           Attorneys at Law
                             2040 Main Street
 4                           Fourteenth Floor
                             Irvine, CA  92614
 5                           949-760-0404
                             matt.bellinger@knobbe.com
 6
                             BY:  MATTHEW BELLINGER, Esq.
 7

 8   For Defendants:         BRICOLAGE LAW
                             Attorneys at Law
 9                           1089 Beacon Street
                             Suite 4D
10                           Brookline, MA  02446
                             508-734-3404
11                           ejbrown@bricolagelaw.com

12                           BY:  EVE J. BROWN, Esq.

13
     Videographer:           Terry Fox
14                           REDDING VIDEO PRODUCTIONS
                             reddingvideoproductions.com
15                           530-222-5281

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 1**
**- 2 -**

1                    INDEX OF EXAMINATION

2

3                                                    PAGE

4      Examination by MR. BELLINGER.................  7

5

6

7

8

9                        --oo0oo--

10

11

12

13          DEPOSITION OF ROBERT WAELTY, taken on

14    behalf of the Plaintiffs herein, at the Hampton Inn

15    Conference Room, 520 Adobe Road, Red Bluff, California,

16    on Thursday, the 25th day of January, 2018, commencing

17    at the hour of 9:08 a.m., before SHARON L. DUNBAR,

18    a Certified Shorthand Reporter of the State of

19    California.

20

21

22

23                        --oo0oo--

24

25

**Exhibit 1**
**- 3 -**

```
 1    Martens for Plaintiff, Monster Energy Company.
 2            MS. BROWN (telephonically):  This is Eve
 3    Brown, Bricolage Law, representing Defendant BeastUp.
 4            MR. BELLINGER:  And for the record Ms. Brown
 5    is appearing by telephone.
 6
 7                    ROBERT WAELTY,
 8            having been duly sworn, was examined
 9            and testified as follows:
10
11                     EXAMINATION
12    BY MR. BELLINGER:
13        Q.    Morning.
14        A.    Morning.
15        Q.    Can you please state your name and address
16    for the record?
17        A.    Robert Waelty, spelling of W-a-e-l-t-y,
18    20790 Live Oak Road, Red Bluff, California.
19        Q.    Have you ever been deposed before?
20        A.    No.
21        Q.    Just since this is your first time through
22    through the process let me explain things for you.
23            The Court Reporter is writing down everything
24    that we say.  And for that reason it's important that
25    we only speak one at a time, because the Court Reporter
```

09:09:26   5
09:09:26   10
09:09:43   15
09:09:56   20
09:10:07   25

THE SULLIVAN GROUP OF COURT REPORTERS                    7

**Exhibit 1**
**- 4 -**

1    saw our product, and wanted to meet with us, because

2    he's always looking for opportunities for business.

3         So when we came down there, he asked us to

4    meet him at a restaurant.  And we met and we talked.

10:00:05  5    And he said that he had enough business experience

6    that he could help us get to the next level, and he

7    had a lot of contacts and things like that.  So he

8    just basically invited himself to help us out.  So

9    from there we just kind of e-mailed each other back

10:00:23  10    and forth, and he would give us advice.

11         He actually set up an appointment.  And we all

12    went to it at Stapletons in Gridley.  It's a bottling

13    company, where we were going to talk to them about our

14    new product and see if they could fill the bottles,

10:00:44  15    you know, what we wanted, and just kind of let them

16    know that we were going to go through them, stay

17    local up here for our next product.

18    Q.    And where are they located?

19    A.    Gridley, California.  It's a bottling

10:01:01  20    company.

21    Q.    But as part of the relationship with Mr. Crew,

22    no additional financing --

23    A.    No.

24    Q.    -- or money was obtained?

10:01:14  25    A.    No.  He didn't give us any money or anything

**Exhibit 1**
**- 5 -**

|   |   |
|---|---|
|   | 1   like that.  But he was going to try to find us some. |
|   | 2   He was the man. |
|   | 3       Q.   And when did that relationship end? |
|   | 4       A.   We are still friends and everything.  I still |
| 10:01:26 | 5   talk to him.  But he had other -- Since this was kind |
|   | 6   of going on, he wants to wait to see how this all |
|   | 7   comes about.  But he's doing some other stuff.  But |
|   | 8   that was, yeah, we kind of just -- early, or I mean |
|   | 9   in the middle of 2017. |
| 10:01:51 | 10      Q.   Has BeastUp ever been -- Other than this |
|   | 11  lawsuit has BeastUp ever been a party to a lawsuit? |
|   | 12      A.   No. |
|   | 13      Q.   What goods has BeastUp sold under the BeastUp |
|   | 14  mark over the years? |
| 10:02:08 | 15      A.   Just the one beverage that we have, and hats, |
|   | 16  sweatshirts, T-shirts, lanyards, wristbands, beanie |
|   | 17  hats.  Did I say T-shirts?  Yeah. |
|   | 18      Q.   And has it sold the clothing continuously |
|   | 19  since 2009? |
| 10:02:42 | 20      A.   Yes. |
|   | 21      Q.   And has it continuously sold beverages since |
|   | 22  around 2014? |
|   | 23      A.   Yes. |
|   | 24      Q.   And has it only sold the one 12-ounce can |
| 10:02:59 | 25  beverage product? |

**Exhibit 1**
**- 6 -**

1    A.    Yes.  We, well...

2    Q.    Has the beverage product changed at all over

3  time?

4    A.    No, not the original -- We actually, when we

10:03:18   5  went through Power Brands, we paid for two beverages.

6  One was going to be a pre, basically before you

7  compete, and then one is a post.  It had more

8  electrolytes and glucosamine and stuff for your joints.

9  We were only able to develop the first one, the energy

10:03:34   10  drink one.  The second one we are going to come out

11  with when we had the money, the funds.

12          Well, Power Brands couldn't get us -- it was

13  too expensive at that time to get us, to get into

14  development or manufacturing it.  So when I spoke

10:03:52   15  with -- So when I left Power Brands I get a sheet

16  that tells me what to do.  So I started calling

17  people, trying to get ingredients, how much are the

18  cans?  So I am doing everything.

19          And then I reached a company, I think it was

10:04:07   20  ReMax, I believe so, and they -- he asked me if I was

21  trying to do this all by myself?  And I said yeah.

22  And he said, basically told me I was crazy; that I

23  needed to go reach out to this company called

24  Production Services International, because they

10:04:23   25  take you from start to finish, and they will give

**Exhibit 1**
**- 7 -**

1    does BeastUp currently have in its possession?

2         A.   90 cases left.

3         Q.   And with respect to the cases that have been

4    purchased, have all but 90 been either sold or

10:16:37    5    distributed?

6         A.   Yes.  Or I had some of them -- some of the

7    pallets I had some damage done to them, so -- but

8    that's all been handled, taken care of.

9         Q.   Approximately how many were damaged?

10:16:54   10        A.   Four, maybe four or five pallets.

11        Q.   And how many cases per pallet?

12        A.   110.

13        Q.   And what happened to the damaged product?

14        A.   Some of it, well, one of -- a couple of them

10:17:13   15   had leaked out of the top maybe from manufacturing,

16   which created it to leak throughout the whole pallet

17   and got some of the cardboard wet.  So we ended up

18   not being able to sell those.

19             And on that first production run they put a

10:17:32   20   best-used-by date on my can, because they didn't know

21   what to put on the cans.  So that kind of hurt me in

22   the tail end of things.  Because now everybody looks

23   at a best-used-by date as an expiration date, and

24   trying to bring in something or have something that

10:17:49   25   has a best-used-by date, they thought it was expired.

Exhibit 1
- 8 -

|  |  |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 10:18:06 | 5 |

1    So I ended up having four pallets or so that

2  I wasn't able to sell.  So those are write-offs.

3    Q.  So you are saying you had four to five pallets

4  that were damaged, and then the additional --

10:18:06   5    A.  No.  Well, yeah.  There are four pallets or

6  so that expired, and then probably three or so pallets

7  that had damage like from the cans leaking.

8      Yeah, I would have to look.  I took a bunch of

9  pictures of all of that, but...

10:18:30  10    Q.  And currently there is no further production

11  runs planned; is that right?

12    A.  Not on schedule.  But I mean our intentions

13  were to start another production run through the

14  Gridley facility.  But we can't schedule anything

10:18:50  15  yet.

16      MR. BALLINGER:  Mark this as Exhibit 2.

17      (At this time a color graphic, BEASTUP PROD

18  0177, was marked Exhibit 2.)

19    Q.  BY MR. BELLINGER:  This is an exhibit bearing

10:19:14  20  BeastUp Production No. 0177.

21      Do you recognize this document?

22    A.  Yes.

23    Q.  All right.  And what is it?

24    A.  It's actually something that we created when

10:19:27  25  we were to present to distributors.

1    So this is a document that I showed Foothill
2    that, you know, this is kind of where we are going with
3    our brand.  "We are going to have a sports bottle.
4    We've got this."  It was just something to kind of let
10:19:44    5    them know that this is what we were shooting for.  It
6    was kind of an information sheet what was inside, what
7    was going to be inside the drinks.  It was, yeah, like
8    a sales sheet, or I don't know.
9        Q.    When was it created?
10:20:00    10        A.    Probably in 2014.
11        Q.    And was it actually shown or distributed to
12    anybody?
13        A.    To Foothill, I know for sure.  That was
14    actually our first distributor that we went and talked
10:20:16    15    to.  And they ended up accepting us or inviting us in.
16    The distributor just sold --
17        (Reporter interrupts.)
18        THE WITNESS:  They just cut ties with Monster,
19    because I believe Coca-Cola or somebody bought Monster
10:20:34    20    from them to distribute, so they had no energy drink.
21    So when we walked in it was perfect timing, they said.
22    So we jumped in.
23        Q.    BY MR. BELLINGER:  Now, the upper right
24    corner, near the upper right corner of Exhibit 2
10:20:47    25    there's four silver markings.

```
 1            Do you see that?

 2       A.   Yes.

 3       Q.   And in the court papers Monster has referred

 4  to those as "claw marks."  What term have you used to

 5  describe those?

 6       A.   Say scratch marks.

 7       Q.   Scratch marks.  Okay.

 8       A.   Yeah.

 9       Q.   And those scratch marks also appear on the

10  12-ounce BeastUp can that has been sold; is that

11  true?

12       A.   Yes.

13       Q.   And there is two products shown on Exhibit 2;

14  correct?

15       A.   Yes.

16       Q.   Is the 12-ounce can on the bottom the product

17  that was actually sold?

18       A.   Yes.

19       Q.   And what's the product on the top?

20       A.   That was our second drink that we -- That

21  was going to be the second drink that when we went

22  in production with that one, that was going to be our

23  BeastUp Refuel drink, beverage that we would follow

24  up after we hopefully made enough money to put that

25  in production was kind of our plan.
```

Time stamps: 10:21:00 (line 5), 10:21:11 (line 10), 10:21:25 (line 15), 10:21:36 (line 20), 10:21:54 (line 25)

THE SULLIVAN GROUP OF COURT REPORTERS                52

**Exhibit 1**
**- 11 -**

```
 1        Q.   And is the Refuel product the post-recovery
 2   product that you were describing earlier?
 3        A.   Yes.  Which, if you ask me, I will tell you
 4   how that all came about.
 5        The Refuel product, when we decided to
 6   actually put that in production, and I have some of
 7   the -- I don't think Eve's got these, but the actual
 8   documents from the flavor house and the places back
 9   in March 2016.  I got that back.  Because we started
10   the process in I think it was January 2016 trying to
11   get through PSI, get my second thing -- or get my
12   second one launched.
13        Well, nobody would take on a sports drink.
14   So they were trying to reach out to companies, "Hey,
15   we're trying to get a sports drink going here."
16        And PSI said that people just weren't biting
17   onto it.  You're not going to produce enough production
18   to them for them to go through all of the whatever, the
19   process.
20        So that's when BeastUp Extreme, we decided,
21   "Okay.  Well, let's just take out the glucosamine.
22   And we will just throw caffeine in there."  And then
23   as soon as we did that, oh, then everybody bid on it.
24   So we were going to come out with BeastUp Extreme, and
25   it was going to be more of another type of an energy
```

Time stamps:
10:22:14 (line 5)
10:22:31 (line 10)
10:22:45 (line 15)
10:22:59 (line 20)
10:23:16 (line 25)

1    redesign the look of the can?

2         A.   Yes.

3         Q.   Is the plan to redesign the look of the can

4    on the bottom of Exhibit 2 such that it would look

10:28:47    5    like the can shown on Exhibit 3?

6         A.   Yes.

7         Q.   So both potentially new products would have

8    the same or similar can design?

9         A.   Yeah.  It would be a black can.

10:29:05   10         Q.   And what steps, if any, has BeastUp taken

11    with respect to redesigning the can image of the

12    current product?

13         A.   I had sent out an e-mail to the artist that

14    does all of the -- that did the first original

10:29:24   15    converting so they can -- he does the artwork so he

16    can send it to Ball, and then Ball makes the plates.

17    I e-mailed him about helping us out with the new

18    artwork on that, and -- yeah, we -- yeah, that's

19    about it.  I mean, I --

10:29:44   20         Q.   Who is the artist?

21         A.   The artist is, it's -- his name is Tom

22    J-a-h-n-k-e.  He owns Advertising Art Studios out of

23    Brookfield, Wisconsin.

24         Q.   And when did you e-mail him about potentially

10:30:17   25    changing the can art?

**Exhibit 1**
**- 13 -**

10:30:59

10:31:14

10:31:42

10:31:51

10:32:00

A. I don't have it on here. But it would have been 2016. I just wrote "new drink" on my notes here. That is our new drink. So I would imagine that was 2016. I e-mailed him to see if he could help us out with the new design. But I couldn't really -- I mean we couldn't go forward. I just wanted to find out if he would help us.

Q. So other than that e-mail exchange in 2016 has BeastUp done, taken any other steps with respect to potential redesign of its can, current can?

A. No.

MR. BELLINGER: We can take and mark this can as Exhibit 4. Just put the label on the bottom.

(At this time a 12-ounce BeastUp Energy Drink can was marked Exhibit 4, after which a photograph was taken for inclusion in the deposition transcript.)

Q. BY MR. BELLINGER: So let me show you what has been marked as Exhibit 4. If you can hold that up for the camera so it is in the shot?

A. (Complies.)

Q. Thank you. Is this BeastUp's current can design?

A. Yes.

Q. And that's been the same can design since 2014?

```
 1        A.    Yes.
 2        Q.    With respect to the what you have called
 3   scratch marks that are located on the can, have those
 4   scratch marks been used on any other products?
 5        A.    No.
 6        Q.    BeastUp has never sold clothing with those
 7   scratch marks on them?
 8        A.    No.
 9        Q.    What terms, if any, have you heard people use
10   to refer to the scratch marks?
11        A.    I haven't heard anybody refer to the scratch
12   marks.  If anything I have gotten -- they said that I
13   should have made the word a little brighter because
14   sometimes they just can't read it until they get
15   closer.  That's the only thing I've gotten.  And that
16   it's a 12-ounce can is the only negativity that I've
17   gotten on the can design.
18        Q.    When you say make the word brighter, you are
19   referring to the "BeastUp" name on the can?
20        A.    Yes.
21        Q.    And does BeastUp use the scratch marks in
22   advertising materials for the beverage product?
23        A.    If it does, it's usually with the -- If
24   this image or the image of the can design is on there,
25   maybe it will have some scratch marks.  But other than
```

10:32:18  (line 5)
10:32:31  (line 10)
10:32:49  (line 15)
10:33:02  (line 20)
10:33:19  (line 25)

1    that, yeah, it's -- yeah, nothing.  No.

2         Q.   I would like to jump back and ask some more

3    questions about sales, particularly of the beverage

4    products.

10:33:41   5         A.   Yeah.

6         Q.   So how does BeastUp track its sales?

7         A.   Well, we have QuickBooks.  So we started

8    -- We started the QuickBooks thing.  And I had my

9    brother's -- or my son's girlfriend was kind of, she

10:33:58   10   worked at another company that she did that, so she

11   would come over and do our QuickBooks for us.  But as

12   relationships go sometimes, you know, so she's kind

13   of  in and out.  She never did it for us last year.

14        I just end up -- I just basically take all

10:34:15   15   of our sales and receipts and everything, and then I

16   break it all down, give it to my tax guy, and we go

17   from there.

18        But everything, it is all documented and

19   filed.

10:34:31   20        Q.   So which are some years of sales reflected

21   in QuickBooks?

22        A.   I would say '15.  In 2015 I know.  Maybe

23   2016.  I never -- I'm not familiar with that program,

24   so I don't even really touch it.  She's -- she tried

10:34:55   25   to show me.  But it's kind of -- you've got to do a

**Exhibit 1**
**- 16 -**

|  | 1 | Studio, and when I paid nearly, you know, $4,500 or |
|--|---|---|
|  | 2 | so for that. |
|  | 3 | Q.   So you took the artwork that Power Brands had |
|  | 4 | developed, and transferred it over to PSI -- |
| 12:35:29 | 5 | A.   Yeah. |
|  | 6 | Q.   -- and they finalized it -- |
|  | 7 | A.   And they -- |
|  | 8 | Q.   -- on the -- |
|  | 9 | A.   -- have their -- |
| 12:35:33 | 10 | Q.   Sorry, if you could let me -- |
|  | 11 | A.   Oh, sorry. |
|  | 12 | Q.   I have to let you answer -- |
|  | 13 | A.   Yeah. |
|  | 14 | Q.   -- or the Court Reporter is going to get |
| 12:35:37 | 15 | upset at us. |
|  | 16 | So you took the artwork that Power Brands, |
|  | 17 | to the extent, however far they got, and they |
|  | 18 | transferred it over to PSI, and then they finalized |
|  | 19 | it to have printed on the can; is that right? |
| 12:35:51 | 20 | A.   Yes. |
|  | 21 | Q.   And approximately how long did PSI work on |
|  | 22 | the labeling in connection with this other artist, |
|  | 23 | graphic artist? |
|  | 24 | A.   So February 2013 is when I started an |
| 12:36:18 | 25 | agreement with PSI. |

**Exhibit 1**
**- 17 -**

|       | 1  | July of 2013 I have down here that the can |
|-------|----|--------------------------------------------|
|       | 2  | was being changed.  That's when they started doing the |
|       | 3  | artwork and changing it was July 2013.  So that's -- |
|       | 4  | I'm assuming that is when Tom came on board, the |
| 12:36:37 | 5 | artist, and started doing all the artwork for me was |
|       | 6  | July of 2013. |
|       | 7  | Q.   And then returning to this page, Production |
|       | 8  | No. 0075, towards the center of the can there's a black |
|       | 9  | and red logo. |
| 12:36:52 | 10 | Do you see that? |
|       | 11 | A.   Yes. |
|       | 12 | Q.   What is that intended to represent? |
|       | 13 | A.   That's our logo that we use on all of our |
|       | 14 | products.  It's a B and a U for BeastUp. |
| 12:37:04 | 15 | Q.   And who designed that logo? |
|       | 16 | A.   His name is A.J. Collins.  He's one of my |
|       | 17 | sister's friends -- or boyfriends back in the day. |
|       | 18 | And he is the one that finalized the artwork, like |
|       | 19 | took it to, you know, cement -- created it.  Not |
| 12:37:27 | 20 | really created the whole artwork, but just finalized |
|       | 21 | everything for me so I can actually use it and scan |
|       | 22 | it, PDF it, and do whatever I needed to, you know, |
|       | 23 | send it to the silkscreen machine guys. |
|       | 24 | Q.   So when was that logo created? |
| 12:37:51 | 25 | A.   I have September 2009, but I have a question |

THE SULLIVAN GROUP OF COURT REPORTERS                    112

Exhibit 1
- 18 -

1    mark.  I put September 2009, A.J. Collins.

2         Q.   And do you have any documentation regarding

3    the design of what you call the BU logo?

4         A.   Yeah.  I have like the original thing that he

12:38:13   5    drew up for me that's all in pencil and stuff that we

6    were able to like scan and then create on like a photo

7    illustrator program, and then started cleaning up

8    everything and highlighting that.  So I have that.

9         Q.   And when was the -- Around what time period

12:38:32   10   was that logo finalized?

11        A.   I guess it would be when we first started

12   putting it on the shirts, because -- Let me see if I

13   have it here.

14             I'm guessing right then, September 2009 or

12:39:10   15   so is when we started.  But we never put the logo on

16   the shirt.  I believe, I would have to look at some of

17   my past photos and stuff, but I think the first time

18   we put it on the shirt was when we went through

19   storenvy, and we had the big logo put on the side.

12:39:34   20   Yeah.

21        Q.   Do you know where Mr. Collins resides now?

22        A.   No.

23        Q.   When was the last time you had communications

24   with him?

12:39:46   25        A.   Oh, he does live in Red Bluff here, but I

THE SULLIVAN GROUP OF COURT REPORTERS                    113

**Exhibit 1**
**- 19 -**

```
          1    don't see him very often.  I run a pretty busy life.
          2    But he's around here in Red Bluff.
          3        Q.   Do you know where he works?
          4        A.   No.
12:40:01  5        Q.   Do you recall any communications with
          6    Mr. Collins in designing this what you call the BU
          7    logo as to whether it looks like Monster's M claw icon
          8    mark?
          9        A.   No.
12:40:26  10       Q.   So did you supply this what you call the BU
          11   logo to Power Brands for inclusion on the label?
          12       A.   Yes.
          13       Q.   Did you give them any other information beyond
          14   the listing of motorsport events in this logo?
12:40:41  15       A.   As in what we were trying to target?
          16       Q.   Yeah, let me ask the question.
          17            When you approached Power Brands and were
          18   going to have them work on designing the label, what,
          19   if anything, did you give to them as a starting point?
12:40:56  20       A.   Basically I just gave them the, what I was
          21   saying, the racers' schedule.  I gave them the logo
          22   that we had created.  And that was about it.
          23       Q.   Who came up with the -- on the can, the word
          24   "BeastUp" that is in the stylized font?  Who came up
12:41:23  25   with that?
```

THE SULLIVAN GROUP OF COURT REPORTERS                    114

**Exhibit 1**
**- 20 -**

1        A.    Just through our distributor, through, you

2    know, retail stores and stuff like that, through

3    sponsored events, friends and family, firefighters,

4    guys that I know, you know.  I've sold stuff to them,

12:55:30    5    yeah.

6        Q.    Does BeastUp sell its products or has it on

7    its website?

8        A.    We tried.  But every time someone would click

9    on to try to order, I guess the weight would deter them

12:55:43    10    from buying it, because they would have to pay for the

11    shipping.  So we never sold a case through like the

12    website.  But I did get e-mails from individuals that

13    wanted the product.  And then I would just get their

14    address, and I would ship it down to them.  There was

12:55:57    15    a guy down in LA that was buying some.

16        Q.    So beyond Los Angeles, any other locations

17    outside of Northern California that you can recall

18    the product being sold to?

19        A.    Not at this time.  Yeah, I can't.  I know

12:56:16    20    I've shipped it to a couple different people, but I'm

21    just not sure where they live right now.

22        Q.    Is the intent to expand distribution of the

23    product throughout the state?

24        A.    Yes.

12:56:29    25        Q.    Is the intent to expand distribution

THE SULLIVAN GROUP OF COURT REPORTERS                    123

**Exhibit 1**
**- 21 -**

1    throughout the United States?

2         A.   Yes.

3         Q.   Has the product been sold on any third-party

4    websites that you are aware of?

12:56:42    5    A.   No.

6         Q.   With respect to retail stores has the product

7    been sold in convenience stores?

8         A.   Yeah.

9         Q.   Is that the main avenue through which the

12:56:54    10   product has been sold in retail stores?

11        A.   Yes.

12        Q.   Do you know approximately --

13        A.   Well -- Sorry, go ahead.

14        Q.   Do you know approximately what percentage of

12:57:05    15   sales have been through convenience stores?

16        A.   No.  Not off the top of my head.

17             I want to go back to that question.  But yes,

18   we do sell a lot in the retail stores.  But that first

19   year or so, when we first got the drinks, '14, '15,

12:57:21    20   most of my sales with the product, cans, were done

21   through events, and our own doing, not our

22   distributor.

23        Q.   Then once you picked up Foothill Distributing

24   the products started being sold more in retail stores;

12:57:40    25   is that correct?

**Exhibit 1**
**- 22 -**

1   A.   Yeah.  We only had a few stores before

2   Foothill jumped on.  Because we got the product in

3   I think it was May, and then Foothill, we signed up

4   with Foothill in June.  So we got into a couple

12:57:55   5   stores.  And then Foothill signed on.  And we were

6   pretty much tied -- had our hands tied.

7        We couldn't go to any of the retail stores,

8   because they sell to all of the retail stores.  So

9   we were just able to get into the gym, some little

12:58:11   10   sandwich stops and stuff like that.  And we ran our own

11   little route, so...

12   Q.   So prior to picking up Foothill, the stores

13   that you were in, were they convenience stores?

14   A.   Yes.

12:58:22   15   Q.   And then once Foothill picked up the product

16   were they primarily selling to gas stations and

17   convenience stores?

18   A.   They took over those spots, yeah.  Those

19   stores.

12:58:31   20   Q.   And were those primarily gas stations and

21   convenience stores?

22   A.   Yes.

23   Q.   And have the products sold in the refrigerated

24   sections of the stores?

12:58:44   25   A.   Yes.

**Exhibit 1**
**- 23 -**

```
            1       Q.   Are they sold with other energy drinks?

            2       A.   Kind of.  It was kind of a struggle.

            3            So getting into the stores, even though

            4       Power Brands was -- correction.  Foothill had some

12:58:57    5       pull, we still struggled with space, because Coca-Cola,

            6       Pepsi, whoever, they buy up the space.  So it was hard

            7       for us to even get near the energy drinks.

            8            Some retail stores or convenience stores, we

            9       were over by the sandwiches or over by the sodas.  We

12:59:18   10       never -- There is not too many stores that we were like

           11       right next to a lot of the energy drinks section.

           12            But we got into FoodMaxx, which was also on

           13       that Complaint, but we were on the -- it wasn't

           14       refrigerated, but it was on a rack, which we were

12:59:34   15       put next to all the energy drinks there.

           16            The other FoodMaxx in Chico, I believe they

           17       stuck us next to the energy drinks.

           18            The one in Redding I believe pushed us over

           19       by the paper towel section.  So we were on a separate

12:59:50   20       rack, but not near the energy drinks.

           21            So it was just a struggle.  We had a hard

           22       time trying to get, you know, get near the big players

           23       and stuff, so...

           24       Q.   Was that the intent, to have the product

01:00:04   25       positioned in the energy drink section in the stores?
```

Exhibit 1
- 24 -

1      A.    Yeah.   We wanted to let everybody know there

2   was kind of a new energy drink in Northern California,

3   so we wanted to be by the energy drinks.

4          And that particular image that was sent

01:00:16   5   with our rack next to the energy drinks, that one I

6   struggled with.   They kept moving it.   I don't know

7   who it was, but I would find it down in the Mexican

8   section with all of the beans and stuff.   And then I

9   would have to push it back and put it there.   So I

01:00:35   10   struggled with that store.   I don't know who -- what

11   the deal was there.

12      Q.    So you would have to physically move the

13   product back to the energy drink section?

14      A.    Yeah, I would have to roll it back over

01:00:45   15   there.   And it was a little irritating.

16          But it didn't happen like on the daily.   It

17   was, you know, once a week or so I would find that my

18   rack moved a little bit, either just a couple rows

19   down or on another aisle.

01:01:01   20      Q.    Have you seen the BeastUp product positioned

21   near Monster energy drinks in stores?

22      A.    Yes.

23      Q.    Have you seen it positioned next to the

24   Monster energy drinks in the refrigerated section of

01:01:21   25   gas stations, convenience stores?

Exhibit 1
- 25 -

| | |
|---|---|
| 1 | A.   It probably -- yeah, I would imagine.  I |
| 2 | know it's positioned -- I got some pictures.  I was |
| 3 | looking back last night just to kind of refresh my |
| 4 | memory.  But it was next to a bunch of Rock Stars. |
| 01:01:38 5 | And then I don't know if there's -- we've ever had |
| 6 | an image where it was refrigerated in our freezer -- |
| 7 | refrigerator next to a Monster.  I know it was on a |
| 8 | rack next to Monster.  But refrigerated, I don't. |
| 9 | Q.   What pictures were you looking at to refresh |
| 01:01:54 10 | your memory yesterday? |
| 11 | A.   Just on our Instagram account and Facebook |
| 12 | and stuff.  We have a -- We usually post everything |
| 13 | we do.  So if we need to reference anything like that, |
| 14 | I can pull up some images, but... |
| 01:02:10 15 | MR. BELLINGER:  Let's mark this as Exhibit 8, |
| 16 | I believe. |
| 17 | And Eve, this is Tab G. |
| 18 | MS. BROWN (telephonically):  Okay.  Got it. |
| 19 | (At this time a two-page Distribution |
| 01:02:30 20 | Spreadsheet was marked Exhibit 8.) |
| 21 | Q.   BY MR. BELLINGER:  Before you is what has |
| 22 | been marked as Exhibit 8, which bears Production |
| 23 | No. BeastUp 0059 through 0060. |
| 24 | Do you recognize Exhibit 8? |
| 01:02:42 25 | A.   Yes.  This would be something that Foothill |

Exhibit 1
- 26 -

1    would send out to us to let us know their --

2              (Reporter interrupts.)

3              THE WITNESS:  Just to let us know where our

4    product was being sent, how many cases were sold at

01:03:03    5    each store.  It was kind of a tracking thing for us.

6         Q.   BY MR. BELLINGER:  So this was created by

7    Foothill?

8         A.   Yes.

9         Q.   And on the fourth column, the heading says,

01:03:17    10    "1 Year, 1/1/2014 thru 11/12/2014."

11              And is this showing sales from that time

12    period, January 1st, 2014 through November 12th,

13    2014?

14         A.   Yeah.  I see that first column, yeah.

01:03:37    15              This, I will tell -- To be honest with you,

16    when they would send me this, it would kind of

17    confuse me.  Because what I take from it is this is

18    the amount of cases that were given to these stores

19    in this first column.  I mean obviously I didn't give

01:03:53    20    it to them in January of 2014, but starting in June.

21         Q.   So this would reflect the amount that

22    Foothill sold to each of these stores?

23         A.   Yes.

24         Q.   And would Foothill purchase cases from

01:04:08    25    BeastUp?

**Exhibit 1**
**- 27 -**

1      Q.   This is a print-out from the BeastUp webpage?

2      A.   Yes.

3      Q.   And on the first page is this a listing of

4  the places where the BeastUp beverage is currently

01:09:00   5  sold?

6      A.   Yes.  Well, some of these we haven't sold to

7  in a while, but they probably still have the product

8  on the shelf.

9           But the main one on this first page is --

01:09:15  10  that we deal with is Code 3.  They sell a lot of our

11  product.  All these other ones there's product in

12  there, or there should be.

13      Q.   And where is Code 3 located?

14      A.   In Chico.  Butte County.

01:09:42  15      Q.   Are you aware of the BeastUp product currently

16  being sold at any retail stores other than what is

17  listed on Exhibit 9?

18      A.   No.

19      Q.   Do you know whether any of the stores listed

01:09:59  20  on Exhibit 9 also sell Monster beverages?

21      A.   Circle 7 Days, yes.  One Stop, yes.  Antelope

22  Liquors, yes.  Gas 4 Less, yes.  Not sure about Lariat

23  Bowl, I don't think they do.  Gott's Country Store,

24  yes.  Tehama County Family Fitness Center, no.  And

01:10:28  25  A&R Meats, no.

**Exhibit 1**
**- 28 -**

1                MR. BELLINGER:  Mark this as Exhibit 10.

2                Eve, this is Tab AA in the file that was

3     sent to you.

4                MS. BROWN (telephonically):  Thank you.

01:10:43    5                (At this time a color Facebook photo and

6     comments was marked Exhibit 10.)

7          Q.   BY MR. BELLINGER:  In front of you is what

8     has been marked as Exhibit 10.  Do you recognize this

9     document?

01:11:05   10          A.   Yes.

11          Q.   And is this a print-out from BeastUp's

12    Facebook page?

13          A.   It appears that it is.

14          Q.   And what is shown in this picture?

01:11:17   15          A.   It shows that rack that we were just talking

16    about, non-refrigerated on a roll rack positioned next

17    to the energy drink section.

18          Q.   Was this the rack that you mentioned you would

19    have to go and roll around --

01:11:32   20          A.   Yeah.

21          Q.   -- from other aisles in the store?

22          A.   Yes.  Well, not all the time.  But they did

23    a lot of forklift work right here where a lot of the

24    drinks were.  I was actually in there when the guy

01:11:45   25    was -- actually knocked a couple cans off my stuff

Exhibit 1
- 29 -

1   and damaged a few of the cans because he didn't move

2   the rack and he just powered through there.  But

3   yeah, that would the spot.

4       Q.   And in the text of the post to the right,

01:12:01   5   it says, in part, "Great price, posted up next to the

6   big dogs."

7        Do you see that?

8       A.   Yes.

9       Q.   Is that referring to Monster in that

01:12:09   10   picture?

11       A.   That's referring to all you guys:  Rockstar,

12   Red Bull, Monster.  This was the whole energy drink

13   section.

14       Q.   And is the BeastUp product still sold at this

01:12:23   15   store?

16       A.   No.

17       Q.   When was the last time it was sold there, to

18   your knowledge?

19       A.   Now I don't know.  I can't remember.  It was

01:12:37   20   actually -- yeah, it would have had to have been in --

21   yeah, I don't remember.  I could find it, find out.

22   But I can't remember the date.

23        MR. BELLINGER:  Mark this as Exhibit 11.

24        Eve, this is Tab BB.

01:13:20   25        MS. BROWN (telephonically):  Got it.  Thanks.

**Exhibit 1**
**- 30 -**

```
 1              (At this time a color Facebook photo and
 2     comment was marked Exhibit 11.)
 3         Q.    BY MR. BELLINGER:   In front of you is what
 4     is marked as Exhibit 11.   Do you recognize this?
 5         A.    I didn't take the picture or anything, but --
 6         Q.    Is this taken from BeastUp's Facebook page?
 7         A.    Yeah.   That was October 2014?   Yeah.
 8         Q.    Do you know --
 9         A.    I don't really -- yeah.   Looking at it,
10     yeah.
11         Q.    Do you know who took this photo?
12         A.    Probably my son.
13         Q.    Does it show the BeastUp product next to a
14     Monster product?
15         A.    It appears, yes.
16         Q.    This is at an am/pm convenience store;
17     correct?
18         A.    That's what it says, yes.
19         Q.    And there is a sticker on the cooler door.
20                Do you see that?
21         A.    The BeastUp sticker?
22         Q.    Yeah.
23         A.    Yes.
24         Q.    Is that typical of the point-of-sale
25     materials that BeastUp uses to promote its products
```

01:13:30 (line 5)
01:13:48 (line 10)
01:13:56 (line 15)
01:14:16 (line 20)
01:14:22 (line 25)

1    in stores?

2        A.   When the stores would allow.  This might

3    have been a rare occasion, because most of the retail

4    stores do not allow you to put stickers or anything

01:14:35    5    on the window.

6            But yeah, we did have some of these printed

7    up.  But mainly we went to like little, little teeny

8    hanging tabs or some kind of a graphic of the can

9    design type.

01:14:57    10           Yeah, we would utilize these.  I think this

11    is more or less when we first started.  And then we

12    realized that they don't allow you to stick stickers

13    on the window, because they would move our product,

14    also.  We would come in and our product wouldn't be

01:15:10    15    in the same spot.  It would be somewhere else

16    because -- it was just a big struggle with the

17    stores.

18        Q.   So if the other tab, point-of-sale materials,

19    would those also -- would they look similar to this

01:15:25    20    sticker in Exhibit 11?

21        A.   No.  They were all black with the BeastUp on

22    it with a price.  They didn't represent or look like

23    the can or anything.  They were solid black.

24        Q.   Did the tab design have the what you call

01:15:43    25    scratch marks on it?

**Exhibit 1**
**- 32 -**

<table>
<tbody>
<tr><td></td><td>1</td><td>PROD 0129 through 0142, was marked Exhibit 16.)</td></tr>
<tr><td></td><td>2</td><td>Q.   BY MR. BELLINGER:  All right.  In front of</td></tr>
<tr><td></td><td>3</td><td>you is Exhibit 16.</td></tr>
<tr><td></td><td>4</td><td>Is this the marketing plan you have been</td></tr>
<tr><td>01:46:13</td><td>5</td><td>referring to in some prior answers?</td></tr>
<tr><td></td><td>6</td><td>A.   Yes.</td></tr>
<tr><td></td><td>7</td><td>Q.   You say your son created this?</td></tr>
<tr><td></td><td>8</td><td>A.   Yes.</td></tr>
<tr><td></td><td>9</td><td>Q.   He created it as part of his schoolwork?</td></tr>
<tr><td>01:46:22</td><td>10</td><td>A.   Yes.  He created it.</td></tr>
<tr><td></td><td>11</td><td>Q.   Did you have any involvement in creating this</td></tr>
<tr><td></td><td>12</td><td>document?</td></tr>
<tr><td></td><td>13</td><td>A.   No.  Actually I would have told him there's --</td></tr>
<tr><td></td><td>14</td><td>because I looked at this last night.  And I would have</td></tr>
<tr><td>01:46:34</td><td>15</td><td>told him probably, you know, he could have changed some</td></tr>
<tr><td></td><td>16</td><td>things, but...</td></tr>
<tr><td></td><td>17</td><td>Q.   What do you think could have been changed?</td></tr>
<tr><td></td><td>18</td><td>A.   Well, just our -- my personal information.</td></tr>
<tr><td></td><td>19</td><td>You know, Robert is a current fire captain.  He is a</td></tr>
<tr><td>01:46:50</td><td>20</td><td>former sniper with both the 82nd Airborne Division and</td></tr>
<tr><td></td><td>21</td><td>3, too, which are both the same.  So that I would have</td></tr>
<tr><td></td><td>22</td><td>had him change.  But other than that, everything else</td></tr>
<tr><td></td><td>23</td><td>looks good.</td></tr>
<tr><td></td><td>24</td><td>Q.   On the second page there is a listing,</td></tr>
<tr><td>01:47:11</td><td>25</td><td>Competition.  Do you see that?</td></tr>
</tbody>
</table>

01:47:22 A. Yes.
Q. And there is a listing who the company viewed its major competitors to be?
A. Yes.
Q. One of those is Monster; right?
A. Yes.
Q. Is there a particular product of Monster that BeastUp considered to be a main competitive product?
01:47:35 A. I'm not sure. I guess all of them are I guess would be competitive products, the whole line of Monster stuff. But I don't think any particular drink.
Q. And do you know when this marketing plan was created?
01:47:52 A. No.
Q. Do you know what research was done regarding Monster to get the information that is included in this report?
A. No.
01:48:14 Q. If you'd turn to the page of the document that says BeastUp Production 0132?
A. (Complies.) Okay.
Q. The second bullet point from the bottom states, in part, "Red Bull and Monster Energy are both
01:48:34 predominate in sponsoring all different types of

```
 1    sporting events."
 2          If you skip a few lines down, it says,
 3    "BeastUp will be in direct competition with both Red
 4    Bull and Monster sometimes at the same events."
 5          Is that a true statement?
 6    A.    Well, I've never been to an event -- Where
 7    are you reading at?
 8    Q.    Sure.
 9    A.    Same page?
10    Q.    The page at the bottom says, BeastUp.  It has
11    the number 0132.
12    A.    Okay.  "BeastUp is only similarity to Red Bull
13    and Monster," that bottom portion?
14    Q.    The bullet point up from that.
15    A.    Okay.
16    Q.    So within that second bullet point from the
17    bottom, it states, "BeastUp will be in direct
18    competition with Red Bull and Monster sometimes at the
19    same events."
20    A.    It could, I mean eventually.  I don't think
21    we have ever been to a competition or an event with --
22    and set up with them.
23    Q.    Okay.
24    A.    But I think it's him saying that in the
25    future hopefully.
```

01:48:48 (line 5)
01:49:00 (line 10)
01:49:13 (line 15)
01:49:24 (line 20)
01:49:37 (line 25)

**Exhibit 1**
**- 35 -**

```
 1          Q.   BeastUp is targeting the same sorts of events
 2     that Monster and Red Bull are targeting?
 3          A.   Extreme sports stuff, yes.
 4          Q.   If you turn to the page of the document, the
 5     number at the bottom is BeastUp 0134.  It has a heading
 6     at the top, Target Market & Market Segmentation.
 7               Do you see that?
 8          A.   Yes.
 9          Q.   And there it says, Customer Demographics?
10          A.   Yes.
11          Q.   It says age 16 to 34?
12          A.   Uh-huh.
13          Q.   And so how is that determined to be the
14     target demographic for the BeastUp product?
15          A.   That's the target of demographic that my
16     son -- those are the ages that he had put on this,
17     his marketing plan, so...
18          Q.   Do you --
19          A.   But it's where we are at.  It is 16 to 35,
20     16 to 34, either way, but it's, yeah, in that age
21     group.  I'm not sure why the 34 is there, but...
22          Q.   Do you know how that target age group was
23     selected?
24          A.   Just I would imagine that's the more active
25     group of individuals that are out doing the extreme
```

01:49:53 (line 5)
01:50:11 (line 10)
01:50:23 (line 15)
01:50:37 (line 20)
01:50:52 (line 25)

**Exhibit 1**
**- 36 -**

1    sports events, doing -- you know, I don't think

2    anybody that's 55 doing a back flip on a quad.  So

3    that's more the active extreme sports guys.

4        Q.   With respect to the events that BeastUp has

01:51:14    5    sponsored, have you seen Monster-sponsored athletes at

6    those events?

7        A.   I would have to go to that events thing.  But

8    I don't think so.

9             Anything that we have sponsored, which has

01:51:35    10    only been the Monster Trucks and the rodeos -- yeah,

11    there could have been a Monster-sponsored bull rider

12    or something like that.  So yeah, I will say yeah, I

13    guess.  Yeah.

14        Q.   Go to the page that says at the bottom

01:52:00    15    BeastUp Production 0136.

16        A.   (Complies.)

17        Q.   The first bullet, it says, "BeastUp currently

18    has its own website, beastup.com."

19             Do you see that?

01:52:20    20    A.   Yes.

21        Q.   Does BeastUp own any other websites?

22        A.   No.

23        Q.   Has it in the past operated under any other

24    websites?

01:52:29    25    A.   No.

**Exhibit 1**
**- 37 -**

1    Red Bull and Monster?

2         A.    Yes.   The same age group, I would imagine,

3    and the clientele type of sports athletes.

4               MR. BELLINGER:   Shall we take a break?

01:56:25   5               THE VIDEOGRAPHER:   We are off the record.

6    The time is 1356, and this will be the end of DVD

7    No. 2.

8               (Recess taken.)

9               THE VIDEOGRAPHER:   Okay.   We are back on the

02:04:33   10   record.   The time is 1404 and this is the start of

11   DVD No. 3.

12        Q.    BY MR. BELLINGER:   What is the average retail

13   price at which the BeastUp energy drink is typically

14   sold?

02:04:46   15        A.    Well, I'm not -- Foothill was selling it for

16   I think it was 2.50, around there or so, pretty close

17   to that price range.   That's pretty much -- it ran

18   between like 2.20, 2.60, .70, whatever.   It depends

19   on what the retail store manager marked it up to.

02:05:11   20             But when we would go in, we had kind of a

21   breakdown.   If they bought three cases versus five

22   cases or something like that, we would lower the

23   price.   So we had -- we have our own little, I guess,

24   price sheet for them.   But it would sell, that

02:05:28   25   average, $1.99 to 2.50; something like that.

Exhibit 1
- 38 -

1          Unless we were -- We started trying to

2     offload some product, you know, just to kind of get

3     our name more out there and stuff, and we would give

4     them promo prices.  And it would sell, I think I got

02:05:43     5     them right now in the store for two for $2, you know.

6     Because I would sell them a case for $12 or something

7     like that, 50 cents a can, and he would mark them up

8     99 cents.

9          Q.    So in the retail store it may appear anywhere

02:06:01     10     from $1 a can to 2.50 a can?

11          A.    Yes.

12          Q.    Is that a fair range?

13          A.    Yes.

14          Q.    Do you know how much BeastUp has spent

02:06:11     15     advertising and promoting its products?

16          A.    Not off the top of my head.  But quite a

17     bit.  Yeah, I think it's well over 100-and-some

18     thousand dollars.  Not just promotion, but just

19     including our need, research and development, and

02:06:33     20     all of the stuff we have been through.  It's pretty

21     steep.

22          Q.    So does that hundred-thousand-dollar number

23     represent the total investment that has been made in

24     the company then?

02:06:47     25          A.    I guess it's an investment if I'm spending it

THE SULLIVAN GROUP OF COURT REPORTERS                    168

**Exhibit 1**
**- 39 -**

```
 1   on BeastUp, yeah.  My dad is about the only -- He is
 2   the one that gave me the 20,000 to kind of help
 3   invest-wise, if you're looking at investors.  But
 4   everything else has just been loans and stuff through
```
02:07:00
```
 5   the banks to help me get -- and my personal money
 6   from fighting fires and stuff.  But yeah.
 7            I think I have a sheet.  I just -- It's not
 8   current, but I remember tallying everything up from
 9   the start to finish.  And I think that was at the
```
02:07:19
```
10   end of 2015.  It was around 100 and I want to say
11   90-something thousand dollars that I had been put
12   into the business.
13       Q.   What about just the marketing side?  Do you
14   have an estimate of how much has been spent on
```
02:07:39
```
15   marketing the brand?
16       A.   I would have to break it all down.  Yeah,
17   not right now, I don't have that number, but...
18       Q.   All right.  With respect to the marketing
19   channels, we have looked at the exhibit that has a
```
02:07:54
```
20   list of events that BeastUp has attended or sponsored;
21   correct?
22       A.   Yes.
23       Q.   And BeastUp markets through its website and
24   social media sites; correct?
```
02:08:03
```
25       A.   Uh-huh.
```

**Exhibit 1**
**- 40 -**

1      Q.    Uses point-of-sale materials; correct?

2      A.    Yes.

3      Q.    Does it sponsor individual athletes or has

4   it?

02:08:14   5      A.    Yes.

6      Q.    And who?

7      A.    Keith -- man, I've got them all written down

8   at home.  There is a bull rider named Keith that we

9   sponsored personally.  Dalton Hedden, who is a

02:08:31  10   wakeboarder.

11           I can't think off the top of my head.  We

12   have a few that we personally sponsor.  There is a

13   little kid in Chico that raises Motocross right now

14   that we sponsor.

02:08:50  15           We have done some -- gave some product to

16   a kid named Kinser Endicott, who is a professional

17   Motocrosser.

18           There's more.  I just don't have them.  I

19   don't have that list.

02:09:08  20      Q.    Does the company have a list of the athletes

21   it has sponsored?

22      A.    Yes.

23      Q.    That is information you could get if you found

24   that list?

02:09:18  25      A.    Yeah.  I just saw that list yesterday.  I

             1    didn't think to bring it.

             2        Q.   Beyond the Chico State teams you have already

             3    told me about, has BeastUp sponsored any other teams?

             4        A.   Well, unless we are talking about -- I

02:09:50     5    sponsored, I think it's not really a sports team, but

             6    like Tough Mudder or something like that where these

             7    girls ran through and did this Tough Mudder thing.  I

             8    sponsored them and made their shirts and stuff, and

             9    they had some product.

02:10:08    10            Not necessarily a -- Yeah, we did sponsor an

            11    off-road racing team, a rock-climbing, I don't know if

            12    it was a team, but a -- they competed in Oroville, I

            13    think, did some big rock-climbing stuff.  I'm not sure

            14    if they were a team, but we sponsored them.

02:10:28    15        Q.   Is this motor racing?

            16        A.   No, off-road 4-wheel-drive, rock-climbing

            17    type stuff.

            18        Q.   Do you know what that race was called?

            19        A.   No.  But the one that was in that -- The

02:10:43    20    image with the green and black vehicle, that was a

            21    stampede race, I think, in 2015.  But he was -- I

            22    think he was on basically a team, so I'm not sure.

            23            Yeah, other than -- that's the only teams I

            24    can think of that we were kind of involved with.

02:11:11    25            MR. BELLINGER:  Eve, this next exhibit is

Exhibit 1
- 42 -

```
 1   going to be Tab R in the share file that you received.

 2           If you would mark this Exhibit 17, please.

 3           (At this time seven pages of color graphics

 4   and posters, BEASTUP PROD 0158, 0173 through 0175,

 5   0210, 0214 and 0217, were marked Exhibit 17.)

 6       Q.   BY MR. BELLINGER:  And do you recognize

 7   Exhibit 17?

 8       A.   Yes.

 9       Q.   And what is Exhibit 17?

10       A.   This looks like a poster my son made for one

11   of the stores here in Red Bluff.  It was One Stop, I

12   believe.

13       Q.   So is the first page of Exhibit 17 displayed

14   in the store?

15       A.   Not right now.  They -- We actually did a

16   couple of different -- This is one of the stores that

17   did two for $2.  Then they did this price one time.

18           So we have been -- We have done a couple

19   things with this store.  This is just one of our

20   things.

21           We would actually give this image to Walker

22   Printing in Red Bluff, who does all of our

23   poster-building stuff.  And this was created in a

24   bigger size and put on outside the front of the

25   store.
```

02:11:19   (line 5)
02:12:30   (line 10)
02:12:51   (line 15)
02:13:11   (line 20)
02:13:25   (line 25)

02:20:05
02:20:20
02:20:40
02:21:01
02:21:25

Q. Do you recall which specific Monster Energy Supercross races he raced in?

A. He raced that series. He went to Oakland, to LA. It was just that little series they had. I think he missed one or so. But he raced three or four of them at least. I remember they were like one-thousand-something dollars each. So I remember.

Q. That was under a BeastUp sponsorship at that time, too?

A. Yes.

Q. So other than the ways we have gone through so far, are there any other ways in which BeastUp promotes its product beyond what you have told me about?

A. No. Just basically through social media and -- yeah. No, not that I'm aware of.

Q. Who is responsible for maintaining BeastUp's social media sites?

A. Myself and my son.

Q. Who is responsible for maintaining the website?

A. Myself.

MR. BELLINGER: Eve, the next exhibit is going to be Tab S in the share file you received.

Please mark this as Exhibit 18.

1          (At this time 15 pages of color posters,

2    BEASTUP PROD 0046, 0047, 0159, 0178 through 0184, 0208,

3    0218, 0225, 0237 and 0239, were marked Exhibit 18.)

4          Q.     BY MR. BELLINGER:   In front of you is what has

02:21:55   5    been marked Exhibit 18.

6               Do you recognize these documents?

7          A.    Yes.

8          Q.    If you need to take a minute to flip through

9    the exhibit, please do.   But what are these?

02:22:06   10         A.    This is a promotional poster that's probably,

11    I don't know, three feet by -- or two and a half feet

12    by three and a half feet or whatever.   It's a pretty

13    good-sized poster that they use to spread throughout

14    the town to promote this event.

02:22:25   15         Q.    You are referring to the first page of the

16    exhibit?

17         A.    Yes, this Ryderz Xtreme FMX show.   We were

18    one of the sponsors there, so our mark is there with

19    our logo.

02:22:37   20         Q.    Okay.   The second page of the exhibit.

21         A.    That's pretty much the same thing.   It was a

22    Monster Truck event in our home town.   And they offered

23    us the sponsor package to sponsor the riders for the

24    show.   So we sponsored basically the dirt bike show.

02:22:56   25    And that has our trademark and our logo there.

1      Q.   So to the next page of the exhibit with

2   Production No. 08159.

3           What is that?

4      A.   This was the Big Bike Weekend.  We sponsored

02:23:11   5   that.  It was at Win-River Casino.  And they put our

6   logo on everything there on it.

7      Q.   All right.  Go to the next page.  It is

8   hard to see an exhibit number, but it is titled

9   Bottomfeeder Brawl at the top.

02:23:34   10      A.   Yeah.  That was the Chico Wakeboard Team

11   threw a little event out at one of the lakes that's

12   close to here.  Yeah, that's -- yeah, it should be.

13      Q.   Go to the next page.  That is Production

14   No. 0179.

02:23:53   15           What is this?

16      A.   I believe this is just a flyer used for

17   promoting an event that was happening in Red Bluff

18   here.  This is a local track in Red Bluff.

19           So this Finger Lake, we actually -- we do

02:24:11   20   a  lot with them with sponsoring and just being

21   there since we race, both me and my son.  So they are

22   a local business.

23      Q.   And when was this event?  What year?

24      A.   This was April 9th.  We have been to a few

02:24:26   25   of them throughout the years.  I'm not exactly, the

**Exhibit 1**
**- 46 -**

1     year on this one, but...

2          Q.   The next page, Production No. 0180.

3               Is that another flyer of the same event?

4          A.   Yes.  Different dates, though.  Same style

02:24:43   5   race.

6          Q.   The same is true for  --

7          A.   Yeah.

8          Q.   -- the next four pages; is that right?

9          A.   Yes.  They are just different days.

02:24:58   10         Q.   If you go to the next page, that is Production

11    No. 0208.

12              What is that?

13         A.   A bunch of hot girls.  No, it's a picture of

14    us next to one of the sponsored vehicles that we

02:25:14   15   sponsored for that event, so...

16         Q.   Which event was this?

17         A.   That was the Monster Truck, Monster Truck

18    event in 2015.

19         Q.   And what was the event specifically?

02:25:25   20        A.   Just a Monster Truck Show.  So when we

21    sponsored those riders or the guys on the motorcycles,

22    they threw us a bone and put our brand on their Monster

23    Truck, because they didn't have anybody to put on the

24    Monster Truck basically is what he told me.  So they

02:25:40   25   were helping us out just to kind of get our name out

Exhibit 1
- 47 -

```
 1    there.  So they put the brand on the truck.

 2         Q.    So did that truck compete in any events?

 3         A.    Yes.

 4         Q.    With the wrap, the BeastUp wrap on it?

 5         A.    Yes.

 6         Q.    Which events?

 7         A.    Whatever they do in the Monster Truck, Best

 8    for Show, the race, they do a race.  I'm not a Monster

 9    Truck guy so -- and I never really got to see the

10    event because I was running the booth.  We had a

11    booth there.

12              But I believe they have two Monster trucks

13    that race, and whoever wins, it's like a tournament

14    style.

15         Q.    And where was the race?

16         A.    In Red Bluff.

17         Q.    Did that truck compete in any other races

18    beyond that one?

19         A.    No.

20         Q.    Just a one-off thing?

21         A.    Yeah, just that one.

22         Q.    If you turn to the next page.  It's the

23    Red Bluff Rodeo.

24              What is shown here?

25         A.    That is an image of the bull-riding event
```

02:25:51 — line 5
02:26:04 — line 10
02:26:18 — line 15
02:26:28 — line 20
02:26:41 — line 25

1    or the Red Bluff Round-Up that we have annually.

2           So I sponsored the event.  So part of the

3    sponsorship was they throw my trademark name on a

4    board above the bull-riding chutes.

02:27:01    5           And I sponsored the actual bullfighters, so

6    the bullfighters had "BeastUp" on them and stuff,

7    patches that we created, so that's about it.

8        Q.    Go to the next page, Production No. 0225.

9           What is that?

02:27:16   10        A.    That looks like one of our Chico State

11   Wakeboard kids on the far right.  His name is Rex.

12   He must have -- It's just a picture of him at the end

13   of a competition standing there.

14        Q.    The next page, 0237.

02:27:38   15           What is that?

16        A.    This is the Tehama Family Fitness Beast

17   competition that we sponsored in Red Bluff.  And that

18   was just a flyer that they posted up inside the gym,

19   and I think they shared it on social media.

02:27:57   20        Q.    And the last page, what is that?

21        A.    This is a picture of a 100-some-thousand-

22   dollar boat that this guy owned that allowed us to

23   bring it to Villa Lagos.  It's a private pond out

24   here south of Red Bluff.

02:28:19   25           So we invited people to come out and just

1    get the experience and have a Chico ride day for the

2    wakeboard team.  So it was just a little get-together

3    for us and them.

4        Q.    Has BeastUp worked with any companies to help

02:28:40    5    them market and promote its products?

6        A.    Just that Damond John Company or Academy.

7        Q.    Has it worked with any ad agencies or branding

8    agencies beyond that?

9        A.    No.  But I get tons of e-mails daily to --

02:28:58    10    for that.

11            MR. BELLINGER:  The next exhibit, Eve, is

12    going to be Tab U of the share file you have.

13            This is Exhibit 19.

14            (At this time four pages of color posters,

02:29:47    15    BEASTUP PROD 0178, 0199, 0200 and 0210, were marked

16    Exhibit 19.)

17        Q.    BY MR. BELLINGER:  Do you recognize

18    Exhibit 19?

19        A.    Yes.

02:29:56    20        Q.    And what are these documents?

21        A.    I believe this one is an Executive Summary.

22    It might have been something that my son used for his

23    schoolwork in college (indicating).

24            This here appears to be, the second page,

02:30:13    25    is the one we utilized for our marketing card, just

02:30:32
02:30:45
02:30:55
02:31:29
02:31:55

down-sized (indicating).

And this would be the same. The third page is the front side of the card (indicating).

And this was part of his school college work, his Marketing Mix, something he developed (indicating).

Q. And on the last page of the exhibit at the bottom, it says, "Designed by Athletes. For Athletes. Be a Beast."

Do you see that?

A. Yes.

Q. Does BeastUp use that phrase in its marketing materials, "Be a Beast"?

A. No.

Q. Have you seen that before other than on this page?

A. No. Never really paid attention to it. It was part of his schoolwork. But, yeah, "Be a Beast." That's just what it means: Be a Beast.

Q. So when did BeastUp first become aware of Monster's "Unleash the Beast!" mark or other "Beast" marks?

A. I can't recall of that exact time and frame. But I would imagine it would have been during my son's racing career. But yeah. Yeah, I would imagine.

1    then.

2            MS. BROWN (telephonically):  Okay.

3            THE VIDEOGRAPHER:  I will do my read-off

4    here.

03:07:10    5            This is the end of the deposition of Robert

6    Waelty.

7            All original videos will be retained at the

8    offices of the Sullivan Group of Court Reporters at

9    323-525-3860.

03:07:24   10            We are off the record.  And the time is 1507.

11            (The deposition concluded at 3:07 p.m.)

12                         --ooOoo--

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1
- 52 -

```
1                    PENALTY OF PERJURY

2

3

4         I, the undersigned, hereby certify that I

5    have read the foregoing deposition, that I know the

6    contents thereof, and that the same is true and

7    correct.

8

9

10         Executed on _____, 2018,

11   at _____, California.

12

13

14                    _____

15                         ROBERT WAELTY

16

17

18                    --oo0oo--

19

20

21

22

23

24

25
```

Exhibit 1
- 53 -

1                    CERTIFICATE OF REPORTER

2

3

4          I, SHARON L. DUNBAR, do hereby certify:

5          That prior to being examined, the witness

6    whose signature is affixed to the foregoing deposition,

7    was sworn by me to testify to the truth, the whole

8    truth, and nothing but the truth in the within-entitled

9    cause; that said deposition was taken down in

10   stenographic shorthand by me, a Certified Shorthand

11   Reporter, at the time and place herein stated, and

12   was thereafter reduced to typewritten form using

13   computer-assisted transcription, and that the

14   deposition is a true record of testimony given by

15   the witness.

16          I further certify that I am not of counsel

17   or attorney for any of the parties hereto, or in any

18   way interested in the outcome of this cause, and that

19   I am not related to any of the parties hereto.

20          WITNESS MY HAND this 28th day of January,

21   2018.

22

23                    _Sharon L. Dunbar_
                      SHARON L. DUNBAR, CSR No. 4051
24                         State of California

25

**Exhibit 1**
**- 54 -**

# EXHIBIT 2



## BeastUp LLC
PO Box 8670
Red Bluff, CA 96080

**Founded in 2009**
**Apparel**
**Sport Drink**
**Energy Drink**

**WWW.BEASTUP.COM**
**INFO@BEASTUP.COM**

# Beast UP

__BEAST UP Beverage Blends__



### BeastUp Refuel

| | Amount per 16oz |
|---|---|
| Magnesium | 40mg |
| Potassium | 40mg |
| Sodium | 40mg |
| l-arginine | 100mg |
| Glucosamine | 150mg |
| Vit B2 (Riboflavin) | 50% |
| Vit B3 (Niacin) | 50% |
| Vit B6 | 50% |
| Vit B12 | 50% |
| Cane sugar/Natural flavors | |

### BeastUp Alert Energy

| | Amount per 12oz |
|---|---|
| Pyridoxine (Vitamin B6) | 1mg (50%) |
| Cyanocobalamin (Vitamin B12) | 3mcg |
| Ginkgo Biloba | 25mg |
| Caffeine | 100mg |
| Taurine | 550mg |
| L-theanine | 175mg |
| Cane Sugar | |
| Stevia | |
| Natural Flavors | |



Exhibit No. 2
Witness: Weakly
# of pgs: 1
Sharon L. Dunbar, CSR #051
JAN 2 5 2018





@beastupbrand

BEASTUP PROD 0177

**Exhibit 2**
**- 1 -**

# EXHIBIT 3



4-1

**Exhibit 3**
**- 1 -**



**Exhibit 3**
**- 2 -**

EXHIBIT 4

1/23/2018                                          BeastUp - Posts

Exhibit No. 10
Witness: Waelty
# of pgs: 1

Sharon L. Dunbar, CSR 4051
JAN 2 5 2018





**BeastUp**
Like This Page · June 7, 2016 near Red Bluff, CA ·

FoodMaxx in Redding, Chico and Red Bluff California now carrying BeastUp! Great price..posted up next to the big dogs... #beastup #beastupenergy #allnatural #norcal

Like            Comment            Share

79                                Chronological

32 Shares                          10 Comments

View 4 more comments

Stacy Domoe Nice                           2
Like · Reply · 1y

Heather Metz That's rad              2
Like · Reply · 1y

Teri Gridley Very exciting                 2
Like · Reply · 1y

Nick Perry Is it possible to pay for a case or two or three to be shipped? BeastUp is about the only thing I miss about Red Bluff

Write a comment...

**Exhibit 4**
**- 1 -**

# EXHIBIT 5

1/23/2018                                          BeastUp - Posts

Exhibit No. 11
Witness: WaeNty
# of pgs: 1

Sharon L. Dunbar, CSR 4051
JAN 2 5 2018





**BeastUp**
Like This Page · October 7, 2014 ·

BeastUp spotted in North Main st. AmPm in Red Bluff! Make your day better and BeastUp!

Like          Comment          Share

32

2 Shares

Write a comment...

**Exhibit 5**
**- 1 -**

# EXHIBIT 6

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4

    MONSTER ENERGY COMPANY,              )
 5  a Delaware corporation,              )
                                         )
 6                   Plaintiff,          )
                                         ) Case No.
 7  vs.                                  ) 2:17-CV-01605KJM-EFB
                                         )
 8  BEASTUP LLC, a California            )
    limited liability company,           )
 9                                       )
                     Defendants.         )
10  _____)

11

12

13

14

15             VIDEOTAPED DEPOSITION OF

16                  JESSEE WAELTY

17             RED BLUFF, CALIFORNIA

18                  MAY 18, 2018

19

20

21

22

23
    Reported By:
24  CHRISTENA GRAY
    CSR 9360
25  No. 18-65332
```

**Exhibit 6**
**- 1 -**

```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4

    MONSTER ENERGY COMPANY,           )
 5  a Delaware corporation,           )
                                      )
 6                  Plaintiff,        )
                                      ) Case No.
 7  vs.                               ) 2:17-CV-01605KJM-EFB
                                      )
 8  BEASTUP LLC, a California         )
    limited liability company,       )
 9                                    )
                    Defendants.       )
10  _____)

11

12

13

14

15         VIDEOTAPED DEPOSITION OF JESSEE WAELTY, a

16         witness herein, taken on behalf of the

17         plaintiff at 520 Adobe Road, Red Bluff,

18         California, at 9:06 a.m., on Friday, May 18,

19         2018, before Christena Gray, CSR 9360.

20

21

22

23

24

25
```

**Exhibit 6**
**- 2 -**

```
 1    APPEARANCES OF COUNSEL:

 2

      For Plaintiff:
 3
              KNOBBE MARTENS
 4            BY MARKO R. ZORETIC
              2040 Main Street, 14th Floor
 5            Irvine, California 92614
              (949) 760-0404
 6            marko.zoretic@knobbe.com

 7

 8    Also Present:  JOANNE FOX, Videographer

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 6**
**- 3 -**

```
 1                    RED BLUFF, CALIFORNIA

 2                      MAY 18, 2018

 3

 4            THE VIDEOGRAPHER:  Ladies and gentlemen, we are

 5   on video record with the deposition of Jessee Waelty.

 6   The date is May 18, 2018.  The time is 9:06 a.m.

 7            I am Joanne Fox, the video specialist, from the

 8   firm of Redding Video Productions on behalf of the

 9   Sullivan Group of Court Reporters, Inc.

10            This is the beginning of DVD number one

11   regarding case number 2:17-CV-01065-KJM-EFB, Monster

12   Energy Company, a Delaware Corporation, versus BeastUp

13   LLC, a California limited liability company, in the

14   United States District Court for the Eastern District of

15   California.

16            The court -- excuse me.  The deposition is

17   being taken at Hampton Inn, 520 Adobe Road, Red Bluff,

18   California.  The court reporter is Christena Gray, CSR

19   number 9360 on behalf of Sullivan Group of Court

20   Reporters, Inc.

21            Counsel will now please introduce themselves,

22   state who they represent, and the witness will be sworn

23   in by the court reporter.

24            MR. ZORETIC:  This is Marko Zoretic of Knobbe

25   Martens representing the plaintiff, Monster Energy.
```

09:06:18
09:06:38
09:07:08
09:07:23
09:07:35

**Exhibit 6**
**- 4 -**

```
1                      JESSEE WAELTY,

2              HAVING BEEN DULY ADMINISTERED AN

3              OATH BY THE REPORTER, WAS EXAMINED

4                   AND TESTIFIED AS FOLLOWS:

5

6                        -EXAMINATION-

7  BY MR. ZORETIC:

8       Q.  Good morning.

9       A.  Good morning.

10      Q.  Can you please state your full name and address

11 for the record.

12      A.  It is Jessee Lee Waelty.  Address 20790 Live

13 Oak Road, Red Bluff, California 96080.

14      Q.  And what is your occupation?

15      A.  Occupation.  I now work for a excavation

16 company doing construction work.

17      Q.  And what is the name of that company?

18      A.  It's Walberg Excavation -- or Walberg Inc.,

19 sorry.

20      Q.  And what is your position at that company?

21      A.  Just a laborer slash operator possibly soon.

22      Q.  And you've heard of the company BeastUp,

23 correct?

24      A.  Yes, I have.

25      Q.  And what is that?
```

09:07:51    10

09:08:13    15

09:08:29    20

09:08:45    25

**Exhibit 6**
**- 5 -**

```
 1          A.   BeastUp is a company my dad started.  They're
 2   an energy drink and apparel company.
 3              MR. ZORETIC:  Could you read back the answer?
 4              (The record was read by the reporter.)
 5              MR. ZORETIC:  Q.  Are you an employee of
 6   BeastUp?
 7          A.   No.  I just work -- I just like help out with
 8   my dad.  I wouldn't say employee.
 9          Q.   Are you an owner of BeastUp?
10          A.   Vice president.  I don't know.
11          Q.   So you have a position of vice president of
12   BeastUp?
13          A.   I would say I'm a vice president.  I don't
14   know.  Like marketing management.  Vice president.
15   Family owned.  I don't know.
16          Q.   So do you know if there are any shares to
17   BeastUp?
18          A.   I don't believe there's any shares.
19          Q.   So how do you -- on what basis do you say
20   you're the vice president of BeastUp?
21          A.   Because it's my dad that owns it so --
22          Q.   So he decided that you would be VP?
23          A.   I just call myself VP.
24          Q.   You just call yourself VP?
25          A.   Yeah.  Because we don't have much of a team so
```

09:09:14 — line 5
09:09:26 — line 10
09:09:42 — line 15
09:09:55 — line 20
09:10:05 — line 25

**Exhibit 6**
**- 6 -**

```
 1   it's like my dad's CEO, and I'm the next guy down.
 2        Q.  Have you ever been deposed before?
 3        A.  What's that?
 4        Q.  Have you ever had your deposition taken before?
 5        A.  No.
 6        Q.  All right.  So you're not represented by
 7   attorney here, so I'm just going to go over some ground
 8   rules, basic ground rules of what a deposition is --
 9        A.  Okay.
10        Q.  -- so you have an understanding.
11        A.  All right.
12        Q.  So basically I'm going to be asking you
13   questions, and you'll be providing answers, so if you
14   could please wait until I completed my question --
15        A.  Oh.
16        Q.  -- that will help the reporter out, and I'll
17   try to avoid talking over you.  Do you understand that?
18        A.  Yeah.  I'm sorry.
19        Q.  It's important for you to speak up and answer
20   orally so the reporter can hear you clearly.  So if you
21   could please avoid "uh-hums" and things like that and
22   answer "yes" or "no" or respond fully.  Do you
23   understand that?
24        A.  I do.
25        Q.  Do you understand that you are under oath?
```

09:10:21 — line 5
09:10:29 — line 10
09:10:39 — line 15
09:10:49 — line 20
09:11:01 — line 25

**Exhibit 6**
**- 7 -**

1          Q.   Oh, when you raced, it was in Oakland?

2          A.   Yeah.

3          Q.   Okay.  And then you think you may have -- you

4     would attended the -- so you would have attended the

09:31:08    5     Anaheim event, correct, in around 2012?

6          A.   Yeah.

7          Q.   Okay.  When was the first time you became aware

8     of Monster Energy?

9          A.   Ever since we were little -- or I was little

09:31:24   10     racing, there was kids, athletes like that were

11     sponsored by Monster Energy.

12          Q.   And when did you start racing?

13          A.   I started racing when I was seven years old.

14     Started riding when I was three, maybe.

09:31:46   15          Q.   So then approximately what year would that be

16     when you -- well, how old are you now?

17          A.   Twenty-five.

18          Q.   Twenty-five.  Okay.

19               So around, I guess -- let's see.  Early 2000,

09:32:10   20     at least, you were aware of Monster Energy?

21          A.   I would say 14, maybe, when I actually like was

22     even aware of what was going on, yeah.

23          Q.   So when you were about 14 years old?

24          A.   I would say, yeah.

09:32:22   25          Q.   So you're saying when you were about 14 is when

**Exhibit 6**
**- 8 -**

1    you became aware of Monster Energy?

2         A.   Probably.

3         Q.   Okay.   So what year were you born?

4         A.   1992.

09:32:34    5    Q.   Okay.   So somewhere around 2005, 2006 is when

6    you became aware of Monster Energy?

7         A.   Sure.

8         Q.   Have you ever had a Monster Energy beverage?

9         A.   When I was younger, yeah.

09:32:59   10    Q.   What do you mean when you were younger?

11        A.   A long time ago, and I didn't like it.   I

12   remember that.

13        Q.   Do you know which one you had?

14        A.   I think it was just the original -- the

09:33:12   15   original one.

16        Q.   Can you describe that, what it looks like?

17        A.   The green one -- or the black and green one.   I

18   don't think they had flavors back in the day.

19        Q.   How many Monster Energy drinks have you had in

09:33:24   20   total ever?

21        A.   Maybe under five, I would say.

22        Q.   When was the last time you had one?

23        A.   Oh, man.   Fifteen years ago, maybe.

24        Q.   You're aware that Monster uses "Unleash the

09:33:48   25   Beast" on beverages, correct?

**Exhibit 6**
**- 9 -**

```
1            A.   Correct.
2            Q.   And when was the first time you became aware of
3    that?
4            A.   I always seen it or heard it.  When?
5            Q.   Sorry, I didn't catch that.  Yeah, when?  When
6    was the first time you became aware that Monster uses
7    "Unleash the Beast" on beverages?
8            A.   Let's see.  Probably when I knew about Monster,
9    I guess.
10           Q.   So sometime in the mid-2000?
11           A.   Yeah.
12           Q.   And how did you know that they used "Unleash
13   the Beast" on beverages?
14           A.   Either it was a commercial or I know it's on
15   their can on the back, and I think that was just the
16   slogan they had.  I don't know.
17           Q.   So before BeastUp launched its BeastUp Energy
18   Drink, you were aware that Monster was using "Unleash
19   the Beast" on beverages, correct?
20           A.   Yeah.
21           Q.   Have you ever seen your father drink a Monster
22   Energy beverage?
23           A.   No.
24           Q.   Do you know when was the first time your father
25   saw a Monster Energy beverage?
```

09:34:01 — 5
09:34:14 — 10
09:34:29 — 15
09:34:47 — 20
09:34:55 — 25

```
              1        A.   No.

              2        Q.   Prior to this lawsuit, have you ever had any

              3   discussions with your father about Monster Energy?

              4        A.   Have I had any discussions about it?

09:35:09      5        Q.   About Monster?

              6        A.   I mean, just about what we have going on.

              7   That's it.

              8        Q.   In terms of you're referring to the litigation?

              9        A.   Yeah.

09:35:16     10        Q.   Okay.  So prior to this -- the litigation, have

             11   you had any discussions with your father about Monster

             12   Energy?

             13        A.   No.

             14        Q.   Have you ever had any -- start that again.

09:35:26     15             So prior to the lawsuit, have you ever had any

             16   discussions with your father about Monster Energy cans?

             17        A.   No.

             18        Q.   Prior to the lawsuit, have you ever had any

             19   discussions with your father about the design of the

09:35:38     20   Monster Energy cans?

             21        A.   No.

             22        Q.   So you are currently working at Walberg,

             23   correct?

             24        A.   Correct.

09:36:00     25        Q.   When did you start working there?
```

**Exhibit 6**
**- 11 -**

1     can find that, could you also send that to me?

2          A.   Yes.

3          Q.   Okay.  Well, thank you very much for your time.

4          A.   No problem.  Thank you.

12:08:54    5          THE VIDEOGRAPHER:  This is the end of the

6     deposition of Jessee Waelty.

7          All original videos will be retained at the

8     offices of Sullivan Group of Court Reporters, Inc.  The

9     phone number 323-525-3860.

12:09:09   10          We are off the record.  The time is 12:08 p.m.

11          (The videotaped deposition concluded at 12:08 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 6**
**- 12 -**

1          I, CHRISTENA GRAY, a Certified Shorthand

2   Reporter of the State of California, do herby certify:

3          That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were administered an oath; that a record of

7   the proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11         Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [ ] was [X] was not requested.

15         I further certify I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or any party to this action.

18         IN WITNESS WHEREOF, I have this date subscribed

19  my name.

20

21  Dated: May 29, 2018

22

23  _____

24          CHRISTENA GRAY, CSR No. 9360

25

**Exhibit 6**
**- 13 -**

# EXHIBIT 7

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

Attorneys for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY | Case No. 2:17-CV-01605-KJM-EFB |
| v. | |
| BEASTUP LLC | BEASTUP'S SUPPLEMENTAL RESPONSES TO MONSTER ENERGY COMPANY'S FIRST SET OF INTERROGATORIES (1-12) AND RESPONSES TO MONSTER ENERGY COMPANY'S SECOND SET OF INTERROGATORIES (NOS. 13–16) |

Defendant BeastUp LLC hereby provides supplemental responds to Plaintiff Monster Energy Company's First Set of Interrogatories and responses to Monster Energy Company's Second Set of Interrogatories.

### GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.      Defendant objects to Plaintiff's "Definitions" to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.      Defendant objects to the extent that any Interrogatory seeks information protected

- 1 -

Exhibit 7
- 1 -

from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Interrogatory seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Interrogatory seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Interrogatory is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.      Defendant objects to the extent that any Interrogatory contains discrete subparts contrary to FRCP 33(a).

## INTERROGATORIES AND RESPONSES

**INTERROGATORY NO. 1:**

Identify and describe each of the BeastUp Products.

**SUPPLEMENTAL RESPONSE:**

Defendant sells the following products under the BeastUp marks: (1) clothing items, including sweatshirts, t-shirts, tank tops, workout shirts (long and short-sleeved), hats, lanyards, wristbands, beanies, coffee cups and stickers/decals; and (2) two performance beverage formulations, one designed to increase mental clarity and focus that is currently sold in 12 oz. aluminum can, and one designed for refueling after strenuous physical activity that is ready for production and will be sold in a 16 oz. plastic bottle. Images, ingredient lists, prices, SKU and UPC codes, and descriptions of each product have been produced to Plaintiff, to the extent Defendant has such information in its possession, custody, or control and was able to locate them after a reasonable search.

**Exhibit 7**

**SUPPLEMENTAL RESPONSE:**

1.      Name: Robert Waelty

        Role: Robert Waelty is the CEO of BeastUp LLC, and was the primary individual

        responsible for the conception, development, selection, and approval of Defendant's mark

        and all packaging and presentation thereof.

2.      Name: Jessee Waelty

        Role:   Jessee Waelty is Robert Waelty's son, and is a professional Motocross racer. Jessee

        Waelty was consulted and provided opinions and advice with respect to the creation and

        adoption of Defendant's mark and all packaging and presentation thereof.

3.      Name: Power Brands Consulting, LLC

        Role: Power Brands is an independent beverage consulting company that was hired by

        Defendant in 2011 to support the development of BeastUp-branded beverages, pursuant to

        a Product Development Agreement that is being produced to Plaintiff together with these

        responses. Power Brands was solely involved in beverage-related branding; Defendant's

        BeastUp mark and logos were already in use on clothing prior to Defendant's expansion

        into beverages. The individuals at Power Brands who were involved in Defendant's

        beverage-related branding were: Kris Guiao (Creative Director); Ashlliegh Brookham

        (Executive Assistant/Project Manager); and Alina Guerrero (Senior Beverage Scientist).

**INTERROGATORY NO. 4:**

Describe in detail, with reference to any supporting documents, information, and

materials, when and how You first became aware of MEC, the Claw Icon, any of MEC's

BEAST-Inclusive Marks, and any of MEC's Products and describe all circumstances

surrounding such knowledge.

**Exhibit 7**

**SUPPLEMENTAL RESPONSE:**

Defendant first became aware of Monster Energy Company in approximately 2004-2005, in the context of motocross racing. Jessee Waelty, a professional motocross racer, was exposed to various brands, including Monster Energy, RockStar, and Red Bull, as energy drink companies began to aggressively advertise and sponsor bikes and related extreme sports events. Defendant does not recall the specific date when it first learned of MEC's Claw Icon, any of MEC's BEAST-Inclusive Marks, or any of MEC's specific Products. Defendant's recollection applies only to a general awareness of MEC as a company in connection with exposure to broad-level advertising.

**INTERROGATORY NO. 7:**

Describe any research (including, but not limited to, surveys, polls, market research, investigations, analyses, studies, or searches) regarding the BEASTUP mark or Defendant's Claw Logos, including, but not limited to, stating the person(s) who authorized the research, when the research was conducted, the person(s) who conducted the research, the reason the research was conducted, the results of the research, and identifying all documents relating to the research.

**SUPPLEMENTAL RESPONSE:**

Robert Waelty performed an amateur search of the USPTO's public TESS database in or around September 2008 for the mark BEASTUP. He does not recall specific search terms and does not have documents relating to that search in his possession. He recalls identifying a single potential competitor, "The Beast," which was a brand from Austria. Defendant later retained LegalZoom to perform an additional search for marks including the word BEAST in connection with apparel in

**Exhibit 7**

Class 25. LegalZoom's search results have been produced to Plaintiff. All other responsive documents located after a reasonable search have been produced to Plaintiff.

**INTERROGATORY NO. 8:**

State Your net and gross sales (in units and dollars) and net and gross profits, on a monthly basis, for each of the BeastUp Products since the date of first sale of each product.

**SUPPLEMENTAL RESPONSE:**

Defendant objects to this Interrogatory to the extent that it is unduly burdensome, and that such information is not kept in Defendant's ordinary course of business. Defendant has produced available financial and sales documents to Plaintiff. Additional documents are kept in hard copy form and will be made available to Plaintiff for inspection and copying at Defendant's principal place of business, at Plaintiff's expense.

**INTERROGATORY NO. 11:**

Describe in detail, with reference to any supporting documents, information, and materials, the manner in which You have advertised, marketed, and/or promoted the BEASTUP mark, Defendant's Claw Logos, and the BeastUp Products, including identifying the publications, radio stations, television stations, websites, advertising programs, social media, or other media channels through which You have promoted the marks and the products.

**SUPPLEMENTAL RESPONSE:**

Defendant has advertised, marketed, and promoted BEASTUP through social media (Facebook, Twitter, Instagram), Defendant's website, sponsorship of the Chico State University wake board team, sponsorship of the AMA Motocross West, sponsorship of CalROCS Rock Crawling Series, sponsorship of the Finger Lakes Iron Man Race, sponsorship of the Red Bluff Roundup Rodeo, sponsorship West Coast Monster Truck Show, sponsorship of Tehama's Fittest Beast, sponsorship

**Exhibit 7**

Corning Skate Comp, sponsorship of Wake fest Chico Park, sponsorship of Big Bike Weekend, sponsorship of Corning Zombie Run, sponsorship American Cancer Society Color Run, enjoy Magazine, promotional artwork on company vans, and the sale of stickers designed to decorate race vehicles. All supporting and illustrative documentation in Defendant's possession has been produced to Plaintiff.

**INTERROGATORY NO. 13:**

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Laches, Waiver and/or Acquiescence."

**RESPONSE:**

Defendant objects to this Interrogatory to the extent it asks for a legal conclusion. Notwithstanding this objection, Defendant has been openly using its BEASTUP mark in commerce since 2009 without objection or comment from Plaintiff.

**INTERROGATORY NO. 14:**

Describe in detail, with reference to any supporting documents, information, and materials, the complete factual and legal basis for Your affirmative defense of "Unclean Hands."

**RESPONSE:**

Defendant objects to this Interrogatory to the extent it asks for a legal conclusion. Notwithstanding this objection, upon information and belief, Plaintiff is publicly known as a "trademark bully," notorious for misusing the courts to vexatiously harass and intimidate other businesses beyond what the law reasonably allows. Numerous third-party articles, scholarly journals, websites, and news stories have documented Plaintiff's bad faith pattern of behavior.

**Exhibit 7**

and provide a description of each person's role and responsibilities.

**RESPONSE:**

Robert Waelty is Defendant's founder, owner, and sole employee.

## VERIFICATION

The foregoing Responses are based on a diligent and reasonable effort by me to obtain

information currently available.  I reserve the right to make changes in or additions to any of these

answers if it appears at any time that errors or omissions have been made or if more accurate or

complete information becomes available.  Subject to these limitations, these Responses are true to

the best of my present knowledge, information, and belief.

Subscribed and sworn to under the pains and penalties of perjury this 5th of February, 2018.


                                             */s/ Robert Waelty*_____
                                             Robert Waelty, on behalf of BEASTUP LLC
                                             Defendant

As to objections:                            */s/ Eve J. Brown*_____
                                             Eve J. Brown

                                             BRICOLAGE LAW, LLC
                                             128 School Street
                                             Walpole, MA 02081
                                             Telephone: (508) 734-3404
                                             E-mail: ejbrown@bricolagelaw.com

                                             Attorney for Defendant

**Exhibit 7**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses has been served upon the

attorneys for Plaintiff, Marko Zoretic, Lynda Zadra-Symes, and Matthew Bellinger of Knobbe

Martens Olson & Bear LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614, by e-mail to

Marko.Zoretic@knobbe.com, Lynda.ZadraSymes@knobbe.com, and Matt.Bellinger@knobbe.com,

this 5th day of February, 2018.

<div align="right">

*/s/ Eve J. Brown*
Eve J. Brown

</div>

**Exhibit 7**
**- 8 -**

EXHIBIT 8

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404

Attorneys for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY<br><br>v.<br><br>BEASTUP LLC | Case No. 2:17-CV-01605-KJM-EFB<br><br><br>BEASTUP'S SUPPLEMENTAL RESPONSES TO MONSTER ENERGY COMPANY'S FIRST AND SECOND SETS OF INTERROGATORIES (1-16) |

Defendant BeastUp LLC hereby provides supplemental responds to Plaintiff Monster Energy Company's First and Second Sets of Interrogatories.

## GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.     Defendant objects to Plaintiff's "Definitions" to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.     Defendant objects to the extent that any Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable

**Exhibit 8**

privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Interrogatory seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Interrogatory seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Interrogatory is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.      Defendant objects to the extent that any Interrogatory contains discrete subparts contrary to FRCP 33(a).

## INTERROGATORIES AND RESPONSES

**INTERROGATORY NO. 2:**

For each product identified in response to Interrogatory No. 1, identify the date the product was first sold and its average wholesale and retail price.

**SUPPLEMENTAL RESPONSE:**

Defendant's first products were clothing items in April 2009. On average, clothing items are purchased wholesale at between $8.00 and $20.00 and sold to the public at between $12.00 and $30.00, depending on factors such as whether a sale applied, where and when the item was sold, and the volume of items sold. Defendant launched its beverage in May 2014. Defendant's cost to produce each beverage, not including overhead and R&D, is approximately $.83/can. Defendant sells cans to distributors and retail stores for $1.05-$1.45 per can, depending on the overall volume of cans purchased and whether the purchase is subject to a promotion. Defendant believes that retail stores sell cans to the public for an average $2.50 each. Average retail prices for specific items are as follows:

- 2 -

**Exhibit 8**

- Tank tops: $15.00
- T-shirts: $20.00
- Workout Long Sleeve Shirts: $25
- Workout Short Sleeve Shirts: $22
- Hats: $20
- Beverage cans: $2.50

**INTERROGATORY NO. 3:**

Identify each person involved with the development, selection, or approval of the BEASTUP

mark and Defendant's Claw Logos, and for each person so identified, describe in detail, with

reference to any supporting documents, information, and materials, their role in such

development, selection, or approval.

**SUPPLEMENTAL RESPONSE:**

Defendant objects to this Interrogatory to the extent that it misleadingly characterizes Defendant's

logo as "Claw Logos." Defendant's response applies to Defendant's BEASTUP mark, as it

appears in any and all iterations in connection with Defendant's goods.

1.     Name: Robert Waelty

       Role: Robert Waelty is the CEO of BeastUp LLC, and was the primary individual

       responsible for the conception, development, selection, and approval of Defendant's mark

       and all packaging and presentation thereof.

2.     Name: Jessee Waelty

       Role:   Jessee Waelty is Robert Waelty's son, and is a professional Motocross racer. Jessee

       Waelty was consulted and provided opinions and advice with respect to the creation and

       adoption of Defendant's mark and all packaging and presentation thereof.

3.     Name: Power Brands Consulting, LLC

       Role: Power Brands is an independent beverage consulting company that was hired by

       Defendant in 2011 to support the development of BeastUp-branded beverages, pursuant to

**Exhibit 8**

commerce since 2009 without objection or comment from Plaintiff.

**INTERROGATORY NO. 14:**

Describe in detail, with reference to any supporting documents, information, and

materials, the complete factual and legal basis for Your affirmative defense of "Unclean

Hands."

**SUPPLEMENTAL RESPONSE:**

Defendant objects to this Interrogatory to the extent it asks for a legal conclusion.

Notwithstanding this objection, upon information and belief, Plaintiff is publicly known as a

"trademark bully," notorious for misusing the courts to vexatiously harass and intimidate other

businesses beyond what the law reasonably allows. Numerous third-party articles, scholarly

journals, websites, and news stories have documented Plaintiff's bad faith pattern of behavior,

supported by Monster Energy's own TTAB and federal court records. Such documents are not in

Defendant's possession, custody, or control, but are equally available to Plaintiff through a public

Internet search. A sampling of such documents is produced to Plaintiff herewith as MEC

BULLYING 001-0155.

**INTERROGATORY NO. 15:**

Describe in detail, with reference to any supporting documents, information, and

materials, the complete factual and legal basis for Your affirmative defense of "Priority."

**RESPONSE:**

Defendant objects to this Interrogatory to the extent it asks for a legal conclusion.

Notwithstanding this objection, Defendant denies that Plaintiff's marks are famous. Defendant

further denies that Plaintiff's "BEAST-inclusive marks" and the following marks relied upon by

**Exhibit 8**

Plaintiff are senior to or have priority rights over Defendant's mark, based on filing dates

subsequent to Plaintiff's first date of use.

| Registration No. | Filing Date |
|---|---|
| 3,908,600 | 04/02/2009 |
| 3,908,601 | 04/02/2009 |
| 3,914,828 | 04/02/2009 |
| 3,923,683 | 04/02/2009 |
| 3,963,668 | 07/27/2010 |
| 3,963,669 | 07/28/2010 |
| 4,011,301 | 07/27/2010 |
| 4,051,650 | 07/27/2010 |
| 4,332,062 | 10/05/2012 |

## VERIFICATION

The foregoing Responses are based on a diligent and reasonable effort by me to obtain

information currently available.  I reserve the right to make changes in or additions to any of these

answers if it appears at any time that errors or omissions have been made or if more accurate or

complete information becomes available.  Subject to these limitations, these Responses are true to

the best of my present knowledge, information, and belief.  Subscribed and sworn to under the

pains and penalties of perjury this 31st day of May, 2018.


*/s/ Robert Waelty*_____
Robert Waelty, on behalf of BEASTUP LLC
Defendant

As to objections:                    */s/ Eve J. Brown*_____

- 7 -

**Exhibit 8**
- 5 -

Eve J. Brown

BRICOLAGE LAW, LLC
128 School Street
Walpole, MA 02081
Telephone: (508) 734-3404
E-mail: ejbrown@bricolagelaw.com

Attorney for Defendant

**Exhibit 8**
**- 6 -**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses has been served upon the

attorneys for Plaintiff, Marko Zoretic, Lynda Zadra-Symes, and Matthew Bellinger of Knobbe

Martens Olson & Bear LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614, by e-mail to

Marko.Zoretic@knobbe.com, Lynda.ZadraSymes@knobbe.com, and Matt.Bellinger@knobbe.com,

this 31st day of May, 2018.

<div style="text-align:right">

*/s/ Eve J. Brown*

Eve J. Brown
</div>

# EXHIBIT 9

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
1080 Beacon Street, 4D
Brookline, MA 02446
Telephone: (857) 245-5430

Attorney for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY | Case No. 2:17-CV-01605-KJM-EFB |
| v. | |
| BEASTUP LLC | BEASTUP'S RESPONSES TO MONSTER ENERGY COMPANY'S THIRD SET OF INTERROGATORIES (17-25) |

Defendant BeastUp LLC hereby responds to Plaintiff Monster Energy Company's Third Set of Interrogatories.

### GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.      Defendant objects to Plaintiff's "Definitions" to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.      Defendant objects to the extent that any Interrogatory seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable

- 1 -

**Exhibit 9**
- 1 -

privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Interrogatory seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Interrogatory seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Interrogatory is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

6.      Defendant objects to the extent that any Interrogatory contains discrete subparts contrary to FRCP 33(a).

## INTERROGATORIES AND RESPONSES

**INTERROGATORY NO. 17:**

State in detail, with reference to any supporting documents, information, and materials, the complete basis for Your denial that there is a likelihood of confusion between the BeastUp Products on the one hand, and MEC or any of MEC's Products on the other, including in Your response the complete basis for Your contention that any of the Sleekcraft factors (the strength of the mark; the proximity or relatedness of the goods; the similarity of the marks; evidence of actual confusion; the marketing channels used; types of goods and the degree of care likely to be exercised by the purchaser; the defendant's intent in selecting the mark; and the likelihood of expansion of product lines) support Your denial.

**RESPONSE:**

Defendant objects that this discovery request seeks attorney work product, impressions, conclusions, opinion, or legal research or theories, which are not discoverable. To the extent that

Plaintiff initiated this lawsuit, Defendant's plans were suspended. While Defendant hopes to thrive and expand, the demands of this litigation, together with the needs of Mr. Waelty's family and full-time job as a Fire Captain for CAL FIRE, have rendered such plans temporarily untenable.

**INTERROGATORY NO. 24:**

Identify Your major competitors for the BeastUp Products and identify their competing products.

**RESPONSE:**

Defendant considers its competitors to be Red Bull Energy Drinks, Monster Energy Drinks, Rockstar Energy Drinks, Bang Energy Drinks, NOS Energy Drinks, AMP Energy Drink, and Full Throttle Energy Drink.

**INTERROGATORY NO. 25:**

Identify, with reference to any supporting documents, information, and materials, all of Your sponsorships or endorsements of events or competitors referencing the BEASTUP mark and/or the BeastUp Products.

**RESPONSE:**

Defendant has already provided the requested information to Plaintiff in its Supplemental Answer to Interrogatory No. 11, served upon Plaintiff on February 5, 2018. Defendant repeats the requested information below:

Defendant sponsors the Chico State University wake board team; the AMA Motocross West; CalROCS Rock Crawling Series; the Finger Lakes Iron Man Race; the Red Bluff Roundup Rodeo; the West Coast Monster Truck Show; Tehama's Fittest Beast; Corning Skate Competition; Wake Fest at Chico Park; Big Bike Weekend; the Corning Zombie Run; and the American Cancer

Society Color Run. All supporting and illustrative documentation in Defendant's possession has been produced to Plaintiff.

**VERIFICATION**

The foregoing Responses are based on a diligent and reasonable effort by me to obtain information currently available.  I reserve the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  Subject to these limitations, these Responses are true to the best of my present knowledge, information, and belief.  Subscribed and sworn to under the pains and penalties of perjury this 15th day of June, 2018.

*/s/ Robert Waelty*
_____

Robert Waelty, on behalf of BEASTUP LLC
Defendant

As to objections:                              */s/ Eve J. Brown*_____
                                                     Eve J. Brown

- 8 -

**Exhibit 9**
**- 4 -**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses has been served upon the

attorneys for Plaintiff, Marko Zoretic and Matthew Bellinger of Knobbe Martens Olson & Bear LLP,

2040 Main Street, 14th Floor, Irvine, CA 92614, by e-mail to Marko.Zoretic@knobbe.com and

Matt.Bellinger@knobbe.com, this 15th day of June, 2018.

<div align="right">

*/s/ Eve J. Brown*
Eve J. Brown

</div>

**Exhibit 9**
**- 5 -**

# EXHIBIT 10

Eve J. Brown (CA SBN 247051)
ejbrown@bricolagelaw.com
BRICOLAGE LAW, LLC
1080 Beacon Street, 4D
Brookline, MA 02446
(857) 245-5430

Attorneys for Defendant
BEASTUP LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MONSTER ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:17-CV-01605-KJM-EFB |
| | ) | |
| v. | ) | BEASTUP'S [AMENDED] RESPONSES |
| | ) | TO MONSTER  ENERGY COMPANY'S |
| BEASTUP LLC, | ) | SECOND SET OF REQUESTS FOR |
| | ) | ADMISSION |
| Defendant. | ) | |
| | ) | |

Defendant BeastUp LLC ("Defendant") hereby responds to Plaintiff Monster Energy Company ("Plaintiff")'s First Set of Requests for Admission. These responses are based upon information and records presently available to Defendant. Defendant reserves its right to supplement, modify, revise, or amend its responses as appropriate.

No incidental or implied admissions are intended by these responses. The fact that Defendant has objected or responded to any Request shall not be deemed an admission that Defendant accepts or admits the existence of any facts set forth or assumed by such Request, or that such objection or response constitutes admissible evidence. The fact that Defendant has responded to part or all of any Request is not intended to and shall not be construed to be a waiver by Defendant

- 1 -

**Exhibit 10**
**- 1 -**

of any objection to any Request or portion thereof.

## GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response set forth below and are not waived with respect to any response.

1.      Defendant objects to Plaintiff's "Definitions" to the extent they exceed the requirements of, or purport to create obligations greater than, those imposed by the FRCP.

2.      Defendant objects to the extent that any Request seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or other limitation on discovery.

3.      Defendant objects to the extent that any Request seeks information not relevant to this proceeding or not reasonably calculated to the lead to the discovery of admissible evidence.

4.      Defendant objects to the extent that any Request seeks information not in Defendant's possession, custody, or control.

5.      Defendant objects to the extent that any Request is overbroad, lacks reasonable specificity, or seeks information that would be unduly burdensome for Defendant to provide.

## REQUESTS FOR ADMISSION AND RESPONSES

**REQUEST FOR ADMISSION NO. 6:**

Admit that Your BeastUp beverage is an energy drink.

**RESPONSE:**

Defendant objects that Plaintiff's use of the term "energy drink" is vague, ambiguous, and designed to conflate Plaintiff's and Defendant's disparate products. Defendant's beverage is a performance drink, created and developed for athletes to increase alertness, clarity, and focus without triggering reactive hypoglycemia.

- 2 -

**Exhibit 10**
**- 2 -**

**REQUEST FOR ADMISSION NO. 7:**

Admit that Your BeastUp beverages have been sold in gas stations.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Your BeastUp beverages have been sold at Shell, 14385 Wonderland Blvd., Redding,

California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Shell, located at 14385 Wonderland Blvd., Redding, California, is a gas station.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Your BeastUp beverages have been sold at Gas 4 Less, 58 Antelope Blvd., Red Bluff,

California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Gas 4 Less, located at 58 Antelope Blvd., Red Bluff, California, is a gas station.

**RESPONSE:**

Admitted.

**Exhibit 10**

**REQUEST FOR ADMISSION NO. 12:**

Admit that Your BeastUp beverages have been sold at Shell, 1725 Cascade Blvd., Shasta Lake, California.

**RESPONSE:**

Admitted that BeastUp beverages have been sold at 1725 Cascade Blvd., Shasta Lake, California. Denied that the establishment at such addess is a Shell. The gas station at that address is a Chevron.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Shell, located at 1725 Cascade Blvd., Shasta Lake, California, is a gas station.

**RESPONSE:**

Admitted that the establishment at 1725 Cascade Blvd., Shasta Lake, California, is a gas station. It is a Chevron, however, not a Shell.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Your BeastUp beverages have been sold at Chevron, 809 Solano St., Corning, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 15:**

Admit that Chevron, located at 809 Solano St., Corning, California, is a gas station.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 16:**

Admit that Your BeastUp beverages have been sold at Shell, 2176 Solano St., Corning, California.

- 4 -

**Exhibit 10**
**- 4 -**

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 17:**

Admit that Shell, located at 2176 Solano St., Corning, California, is a gas station.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 18:**

Admit that Your BeastUp beverages have been sold in convenience stores.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 19:**

Admit that Your BeastUp beverages have been sold at KC's Corner Mart, 14361 Holiday Rd.,

Redding, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 20:**

Admit that KC's Corner Mart, located at 14361 Holiday Rd., Redding, California, is a

convenience store.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 21:**

Admit that Your BeastUp beverages have been sold at ampm, 2800 Main St., Red Bluff,

California.

**Exhibit 10**

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 22:**

Admit that ampm, located at 2800 Main St., Red Bluff, California, is a convenience store.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 23:**

Admit that Your BeastUp beverages have been sold at One Stop, 714 Walnut St., Red Bluff,

California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 24:**

Admit that One Stop, located at 714 Walnut St., Red Bluff, California, is a convenience store.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 25:**

Admit that Your BeastUp beverages have been sold at Red Bluff Food Mart, 15 Antelope Blvd.,

Red Bluff, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 26:**

Admit that Red Bluff Food Mart, located at 15 Antelope Blvd., Red Bluff, California, is a

convenience store.

**Exhibit 10**
**- 6 -**

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Your BeastUp beverages have been sold in restaurants.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Your BeastUp beverages have been sold at Primo Pizzeria, 237 S Main Street, Dorris,

California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 29:**

Admit that Primo Pizzeria, located at 237 S Main Street, Dorris, California, is a restaurant.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 30:**

Admit that Your BeastUp beverages have been sold at Cozy Diner, 259 S Main St., Red Bluff,

California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 31:**

Admit that Cozy Diner, located at 259 S Main St., Red Bluff, California, is a restaurant.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 32:**

Admit that Your BeastUp beverages have been sold at Canyon Creek Roadhouse, 9607 Oroville-

Quincy Hwy, Berry Creek, California.

**RESPONSE:**

Defendant is not able to locate records confirming or denying Request No. 32.

**REQUEST FOR ADMISSION NO. 33:**

Admit that Canyon Creek Roadhouse, located at 9607 Oroville-Quincy Hwy, Berry Creek,

California, is a restaurant.

**RESPONSE:**

Defendant lacks suffiient information about Canyon Creek Roadhouse to admit or deny this

Request.

**REQUEST FOR ADMISSION NO. 34:**

Admit that Your BeastUp beverages have been sold in grocery stores.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 35:**

Admit that Your BeastUp beverages have been sold at Rancho Market, 8510 Airport Rd.,

Redding, California.

**RESPONSE:**

Admitted.

**Exhibit 10**

**REQUEST FOR ADMISSION NO. 36:**

Admit that Rancho Market, located at 8510 Airport Rd., Redding, California, is a grocery store.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 37:**

Admit that Your BeastUp beverages have been sold at Kent's Meats and Groceries, 8080 Airport Road, Redding, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 38:**

Admit that Kent's Meats and Groceries, located at 8080 Airport Road, Redding, California, is a grocery store.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 39:**

Admit that Your BeastUp beverages have been sold at Nu-Way Market, 8049 State Highway 99E, Los Molinos, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 40:**

Admit that Nu-Way Market, located at 8049 State Highway 99E, Los Molinos, California, is a grocery store.

**Exhibit 10**
**- 9 -**

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 41:**

Admit that Your BeastUp beverages have been sold at Code 3 Coffee., 13407 Garner Lane, Chico, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 42:**

Admit that Your BeastUp beverages have been sold at Circle 7 Days, 1055 Walnut St, Red Bluff, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 43:**

Admit that Your BeastUp beverages have been sold at Antelope Liquors, 445 Antelope Blvd, Red Bluff, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 44:**

Admit that Your BeastUp beverages have been sold at Lariat Bowl, 365 S Main St, Red Bluff, California.

**RESPONSE:**

Admitted.

**Exhibit 10**
**- 10 -**

**REQUEST FOR ADMISSION NO. 45:**

Admit that Your BeastUp beverages have been sold at Gott Country Store, 18367 Bowman Rd, Cottonwood, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 46:**

Admit that Your BeastUp beverages have been sold at Tehama Family Fitness Center, 2498 S Main St, Red Bluff, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 47:**

Admit that Your BeastUp beverages have been sold at A&R Custom Butchering, 22777, Antelope Blvd, Red Bluff, California.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 48:**

Admit that Your BeastUp beverages have been sold at Tai's Deli, 2130 Main Street, Suite A, Red Bluff, California.

**RESPONSE:**

Admitted, with the correction that the establishment is Tia's Deli, not Tai's Deli.

**REQUEST FOR ADMISSION NO. 49:**

Admit that the majority of Your BeastUp beverages have been sold in Tehama County or Shasta County.

**RESPONSE TO REQUESTS NO. 70-204:**

Defendant objects to these requests because they require the application of law to fact that is

likely to create a dispute between the parties as to the admissibility of evidence at trial. Given the

parties' ongoing disagreements over evidentiary issues in this matter, such determinations are best

resolved in the presence of the judge. Defendant further objects to the extent that these requests

ask Defendant to speak to the authenticity of documents not created by Defendant, and/or to the

regularity of activities not conducted by Defendant. Notwithstanding this objection, Defendant has

no reason to believe that any documents produced in this case are inauthentic or in conflict with

the Federal Rules of Evidence. Defendant admits that all documents produced by Defendant in

this case were produced to Plaintiff in the exact condition in which they appeared in Defendant's

possession, or in which they were provided to Defendant by the third party who created them.

Dated: June 15, 2018                    */s/ Eve J. Brown*
                                        Eve J. Brown

                                        BRICOLAGE LAW, LLC
                                        1080 Beacon Street, 4D
                                        Brookline, MA 02446
                                        Telephone: (857) 245-5430
                                        E-mail: ejbrown@bricolagelaw.com

                                        Attorney for Defendant

- 17 -

**Exhibit 10**
**- 12 -**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing responses to Plaintiff's Second Set of

Requests for Admission has been served upon the attorneys for Plaintiff, Marko Zoretic and Matthew

Bellinger of Knobbe Martens Olson & Bear LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614,

by e-mail to Marko.Zoretic@knobbe.comand Matt.Bellinger@knobbe.com, this 15th day of June,

2018.

<div align="center">

*/s/ Eve J. Brown*

Eve J. Brown
</div>

**Exhibit 10**
**- 13 -**

# EXHIBIT 11



# United States of America
### United States Patent and Trademark Office

# BEASTUP

**Reg. No. 4,584,629**

BEASTUP LLC (CALIFORNIA LIMITED LIABILITY COMPANY)
P.O. BOX 8670
**Registered Aug. 12, 2014** RED BLUFF, CA 96080

**Int. Cl.: 32**

FOR: SPORTS DRINKS, NAMELY, ENERGY DRINKS, IN CLASS 32 (U.S. CLS. 45, 46 AND 48).

**TRADEMARK**

FIRST USE 5-0-2014; IN COMMERCE 5-0-2014.

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SN 77-841,371, FILED 10-5-2009.

ERIN FALK, EXAMINING ATTORNEY



**Deputy Director of the United States**
**Patent and Trademark Office**

BEASTUP PROD 0039

**Exhibit 11**
**- 1 -**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.
>
> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse)  **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date). The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

Page: 2 / RN # 4,584,629

BEASTUP PROD 0040

**Exhibit 11**