Steven J. Nataupsky (CA SBN 155913)
steven.nataupsky@knobbe.com
Lynda J. Zadra-Symes (CA SBN 156511)
lynda.zadrasymes@knobbe.com
Matthew Bellinger (CA SBN 222228)
matt.bellinger@knobbe.com
Marko R. Zoretic (CA SBN 233952)
marko.zoretic@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
MONSTER ENERGY COMPANY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BEASTUP LLC, a California limited liability company,<br><br>Defendant. | Case No. 2:17-CV-01605-KJM-EFB<br><br>**DECLARATION OF DR. ITAMAR SIMONSON IN SUPPORT OF MONSTER ENERGY COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Kimberly J. Mueller<br><br>Date:     November 2, 2018<br>Time:     10:00 a.m.<br>Location: Courtroom 3 |

I, Itamar Simonson, Ph.D., hereby state and declare as follows:

1. I have personal knowledge of the matters set forth herein, and if I am called upon to testify, I could testify competently thereto.

2. I have been retained as an expert for Monster Energy Company ("Monster") in connection with the above-captioned case.

3. I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University.

4. I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

5. My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, study methods, and human judgment and decision making. Most of my research has focused on buyers' purchasing behavior, the effect of product characteristics (such as brand name, price, and features), the competitive context, and marketing activities (such as promotions and advertising) on buying decisions, and trademark infringement from the customer's perspective.

6. At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing. I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing. In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7. I have taught several doctoral courses. One doctoral course I taught examined methods for conducting consumer research. It focused on the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. A second doctoral course I taught focused on buyer behavior, covering such topics as buyer decision making

processes, influences on purchase decisions, and persuasion. A third doctoral course I taught dealt with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a doctoral course on buyer behavior, and a doctoral course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.  I have conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to consumer behavior and information processing, trademark, branding, marketing strategies, and advertising-related issues. I serve on eight editorial boards, including for leading journals such as the Journal of Consumer Research, Journal of Marketing Research, and the Journal of Consumer Psychology. I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. I twice received the Outstanding Reviewer Award from the Journal of Consumer Research. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. And, I have served as an expert in prior litigations involving various marketing and buyer behavior issues, class actions, trademark-related matters, false advertising, branding, and other areas.

9.  Additional information regarding my experience and credentials is included in my curriculum vitae, which is included in the exhibit attached hereto.

10. I was previously asked by counsel for Monster in 2016 to conduct a survey that was designed to determine whether and to what extent Monster's ⓜ® mark ("Claw Icon") has acquired secondary meaning or distinctiveness. Attached hereto as Exhibit 1 is a true and correct copy of my Expert Report ("Expert Report") in this case, with Exhibits A-K referenced in the report, where I describe the survey and its results. My Expert Report truly and accurately sets forth my opinions in this matter and the bases for those opinions.

11. The survey employed a standard scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure secondary

meaning, if any, with respect to the Claw Icon mark; and, (2) a control survey cell designed to measure the extent of mismeasurement error (or "noise"). The control survey cell serves as a baseline, similar to a placebo group when a new medication is tested. Specifically, it provides a measure of the degree to which respondents are likely to report that they associate the Claw Icon mark with an energy drink from the named source Monster or from a single anonymous source, not as a result of the secondary meaning or acquired distinctiveness of the Claw Icon mark for energy drinks; instead, some respondents might name Monster because of other factors such as the survey questions, survey procedures, the market share or brand popularity or some other potential influence on the respondents' answers.

12. This survey employed a standard mall-intercept methodology. Respondents in the survey were interviewed at shopping centers in 12 locations around the country. Over 400 respondents participated in the survey. To qualify for the survey, respondents had to meet various criteria, including being likely to purchase one or more energy drinks in the next three months.

13. Respondents were randomly assigned to a Test group or a Control group; the only difference between the two groups was the mark they were asked about. Respondents in the Test group were shown the Claw Icon mark and respondents Control group were shown instead the ⬭ mark. All respondents were asked if they associated the mark with any particular company or companies. If they responded affirmatively, they were asked if they could name the company/ies.

14. In response to the question whether they associated the symbol shown to them with a particular company or companies, 92.7% of those in the Test group (shown the Claw-Icon mark) and 30.5% of those in the Control group answered Yes. When asked to name the company/ies, 85.4% of the entire Test group named "Monster" (or similar). By contrast, only 18.2% of those in the Control group named Monster. The difference between the two groups = 67.2%. In addition, in the Test group, 82.5% of all respondents mentioned just one company and that company was Monster. By contrast, in the Control group, only 15.3% of the

respondents mentioned just one company and that company was Monster. The difference between these two figures is 67.2%.

15. The survey results indicate that the Monster Claw Icon mark has acquired secondary meaning. After subtracting the Control, 67.2% of the respondents associated the Claw Icon mark with a particular company or companies and then named Monster. Furthermore, among those respondents who named just one company, 67.2% (after subtracting the Control) named Monster. These results indicate that the degree to which the Claw Icon mark is recognized and uniquely associated with Monster far exceeds the level indicating secondary meaning, and the findings indicate that the mark is famous.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___1___ day of October, 2018, in Burlingame, California.

_____
Itamar Simonson, Ph.D.

# CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2018, I caused the **DECLARATION OF DR. ITAMAR SIMONSON IN SUPPORT OF MONSTER ENERGY COMPANY'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to the following counsel of record:

Eve J. Brown
BARTON GILMAN LLP
10 Dorrance Street, Suite 800
Providence, RI  02903
(401) 273-7171
ejbrown@bartongilman.com

                                                                                */s/ Matthew S. Bellinger*
                                                                                Matthew S. Bellinger

29151365