UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BEASTUP LLC, a California limited liability company,<br><br>Defendant. | No. 2:17-cv-01605-KJM-EFB<br><br><br>ORDER |

This trademark action arises from two energy drink companies' use of stylized claw marks and a formulation of the word "beast" on their cans and in their advertisements. Plaintiff Monster Energy Company ("Monster") has brought this lawsuit against defendant BeastUp LLC ("BeastUp") to stop BeastUp from using claw marks, its "BEASTUP" mark, and any variation of the word "beast" on its energy drinks. Plaintiff moves for summary judgment. ECF No. 38. Defendant filed an untimely opposition, ECF No. 47, and, consequently, plaintiff filed an untimely reply[1], ECF No. 48. The court submitted the matter without a hearing. For the reasons explained below, the court GRANTS in part and DENIES in part plaintiff's motion.

---

[1] In its reply, plaintiff argues defendant filed an untimely opposition and, therefore, the court should grant the motion for summary judgment as conceded. Reply at 1. The hearing on the motion was noticed for November 2, 2018, but defendant did not file its opposition until October 30, 2018, eleven days after the due date provided by the scheduling provisions of Local

I.      BACKGROUND

        A.      Procedural History

                Monster filed this lawsuit against BeastUp on August 2, 2017, asserting the following claims relating to BeastUp's alleged infringement of plaintiff's trademarks: (1) trademark infringement and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark infringement under 15 U.S.C. § 1114; (3) trademark dilution under 15 U.S.C. § 1125(c); (4) a claim for cancellation of BeastUp's U.S. Trademark Registration No. 4,584,629 under 15 U.S.C. § 1119; (5) unfair competition in violation of California Business & Professions Code section 17200 *et seq.*; and (6) unfair competition under California common law.  Compl., ECF No.1, ¶ 1.  BeastUp filed an Amended Answer raising three affirmative defenses: laches, waiver or acquiescence; unclean hands; and priority.  ECF No. 28 ¶¶ 101–03.

                On October 4, 2018, Monster filed the instant motion for summary judgment. Mot., ECF No. 38; Mem., ECF No. 39.  Monster also seeks summary judgment on BeastUp's three affirmative defenses.  Mem. at 1.

        B.      Factual Background

                Plaintiff filed a statement of undisputed facts.  *See* ECF No. 40.  Defendant neither filed an alternative statement of facts nor responded to plaintiff's statement of facts.  The court refers to each listed fact as undisputed.

                1.      Undisputed Facts

                Monster develops, markets, sells and distributes ready-to-drink beverages, including energy drinks.  Sacks Decl. ECF No. 41, ¶ 3.  Monster launched its line of Monster Energy drinks in 2002 and has, since that time, used its Claw Icon mark and "UNLEASH THE BEAST!" mark in connection with its energy drinks and other products.  Sacks Decl. ¶ 3 & Ex. 6, ECF No. 41-1.  Monster applied for and received U.S. Trademark Registration No. 2,903,214 for its Claw Icon on November 16, 2004, and No. 2,769,364 for "UNLEASH THE BEAST!" on

---

Rule 230(c), and after the date provided for plaintiff to file a reply.  Further, defendant did not explain the delay in filing its opposition.  In the interest of resolving the motion on the merits, however, the court considers the opposition.

September 30, 2003, both in International Class 32 for beverages. Sacks Decl. Exs. 1, 5.

Monster also uses and owns U.S. Trademark Registrations for several other marks incorporating the term "beast" in connection with its Monster line of beverages, including UNLEASH THE BEAST!, UNLEASH THE NITRO BEAST!, REHAB THE BEAST!, UNLEASH THE ULTRA BEAST!, and PUMP UP THE BEAST! marks, among others. Sacks Decl. ¶ 9 & Exs. 7–15. The container of each product in the Monster line of beverages displays the Claw Icon, and the vast majority also display a mark incorporating the word BEAST. Sacks Decl. ¶ 10. Images of one of the Monster Energy drink cans bearing these marks are shown below.



Since 2002, Monster has spent over $5.5 billion marketing and promoting its Monster line of energy drinks, including the Claw Icon and its various marks containing the word BEAST. *Id.* ¶ 23. Monster features these marks in its marketing and promotion efforts, appearing on point-of-sale materials, clothing and promotional items, as well as Monster's website and social media accounts, and in connection with Monster's sponsorship of athletes, teams and events, including extensive promotion efforts in connection with motorsports. *Id.* ¶¶ 25–26, 29–52. From 2002 to the time this lawsuit was filed, Monster sold more than twelve billion beverages displaying both its Claw Icon and marks containing the word BEAST together on the product containers. *Id.* ¶ 22.

1    BeastUp produces, distributes, markets and sells energy drinks and other products

2  under the BeastUp brand name.  Bellinger Decl. Ex. 7, ECF No. 42-1, at 2.  In May 2014,

3  BeastUp began selling its BeastUp energy drink.  Bellinger Decl. Ex. 8, at 2.  The BeastUp

4  energy drink can displays the BEASTUP name together with a stylized logo beneath the

5  BEASTUP name and what appear to be two sets of silver claw marks running diagonally near the

6  top and bottom of each can (collectively defendant's "claw logo and claw marks").  Bellinger

7  Decl. Ex. 3.  BeastUp began using these claw marks in May 2014.  Bellinger Decl. Ex. 1 at 9

8  (50:16–51:10),[2] 10–11 (51:23–52:12), 14–15 (59:12–60:8).  BeastUp applied for and received

9  U.S. Trademark Registration No. 4,584,629 for its BEASTUP mark on August 12, 2014, in

10  International Class 32 for beverages.  Bellinger Decl. Ex. 11.  An image of the BeastUp energy

11  drink can bearing these marks is shown below.



22    Monster brought this action against BeastUp based on claimed similarities in

23  appearance between the parties' marks as used in the marketplace on identical goods.  Compl.

24  ¶¶ 40–42, 47.  Specifically, Monster asserts BeastUp's use of claw marks in connection with the

25  BEASTUP mark creates a likelihood of confusion, mistake or deception among consumers

27    [2] Citations within the parentheses refer to the internal page and line numbers of plaintiff's
exhibits, rather than the ECF page numbers.

28

4

regarding the source, origin, relationship or association of BeastUp's products with Monster's products and marks. *Id.* ¶¶ 48, 50. Monster further contends BeastUp's use of the infringing marks threatens to undermine Monster's business reputation and goodwill. *Id.* ¶ 53.

II.     LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to show "there is a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986) (citing Fed. R. Civ. P. 56(e); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts."). Also, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank*, 391 U.S. at 289).

1    III.    DISCUSSION

2           Plaintiff seeks summary judgment on its claims for trademark infringement and

3    false designation of origin, unfair competition and trademark cancellation as well as defendant's

4    affirmative defenses of laches, waiver, acquiescence, unclean hands and priority.  Mem., ECF No.

5    39, at 1.  Defendant argues plaintiff has not met its burden of showing as an initial matter that no

6    genuine issue exists as to any material fact, and the court should therefore deny plaintiff's

7    summary judgment motion.  Opp'n, ECF No. 47, at 7–15.

8           A.    Trademark Infringement and False Designation of Origin

9           In its complaint, as noted, plaintiff has alleged causes of action for trademark

10   infringement and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114 and 1125.

11   Compl.  ¶¶ 54–71.  A claim for false designation of origin under 15 U.S.C. § 1125 requires proof

12   of the same elements as a claim for trademark infringement under 15 U.S.C. § 1114.  *Brookfield

13   Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999) (citing

14   15 U.S.C. §§ 1114(1), 1125(a)(1)).  Therefore, the court analyzes these claims together for

15   purposes of resolving plaintiff's motion.

16          The Lanham Act allows the holder of a protectable trademark to hold liable any

17   other person who, without consent, "use[s] in commerce any . . . registered mark in connection

18   with the sale, offering for sale, distribution, or advertising of any goods or services or in

19   connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."

20   15 U.S.C. § 1114(1)(a).  To prevail on a trademark infringement claim under the Lanham Act, a

21   plaintiff "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the

22   defendant's use of the mark is likely to cause consumer confusion."  *Rearden LLC v. Rearden

23   Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (quoting *Network Automation, Inc. v.

24   Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011)).  Summary judgment on

25   trademark disputes, on likelihood of confusion grounds specifically, is generally disfavored due

26   to the intensely factual nature of the analysis.  *Id.* (quoting *Interstellar Starship Servs., Ltd. v.

27   Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999)); *id.* at 1210.  Plaintiff argues it is entitled to

28   summary judgment on its trademark infringement and false designation of origin claims because

there is no genuine dispute that it has valid, protectable trademarks and that defendant's use of the marks is likely to cause confusion. Mem. at 4–5. Defendant, in turn, contends summary judgment is inappropriate because material facts remain in dispute regarding the likelihood of confusion. Opp'n at 7–9.

### 1. Valid Protectable Mark

Federal registration of a trademark "provides 'prima facie evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption' that the mark is a protectable mark." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113–14 (9th Cir. 2010) (quoting 15 U.S.C. §§ 1057, 1115(a), and *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005)). It is undisputed that plaintiff owns multiple trademark registrations for the Claw Icon in connection with beverages and nutritional supplements. Sacks Decl. Exs. 1–4. Plaintiff also owns trademark registrations for its marks incorporating the word BEAST in connection with beverages and supplements, including registrations for UNLEASH THE BEAST! and UNLEASH THE NITRO BEAST! marks. *Id*. Exs. 5, 8, 10, 11, 13, 15. These registrations thus entitle plaintiff to the presumption of validity and shift the burden to defendant "to show by a preponderance of the evidence that the mark is not protectable." *Zobmondo Entm't*, 602 F.3d at 1113–14 (citing *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002); *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775–76 (9th Cir. 1981)). Here, however, defendant has not previously contested and does not now contest plaintiff's trademark registrations or the validity of plaintiff's marks. Therefore, the court finds no triable issues of fact as to whether plaintiff's marks are valid and protectable. They are.

### 2. Likelihood of Confusion

Likelihood of confusion is a question of material fact. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 n.5 (9th Cir. 1985) ("[T]he question of likelihood of confusion is routinely submitted for jury determination as a question of fact."). "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." *Rearden*, 683 F.3d at 1209. "Eight factors, sometimes referred to as the

*Sleekcraft* factors, guide the inquiry into whether a defendant's use of a mark is likely to confuse consumers . . . ." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated in part on other grounds*, *Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (9th Cir. 2003)). The eight factors are: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *Rearden*, 683 F.3d at 1209 (citing *Sleekcraft*, 599 F.2d at 348–49).

"The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a 'rote checklist.'" *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (quoting *Rearden*, 683 F.3d at 1209). "Not all factors are created equal, and their relative weight varies based on the context of a particular case." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1984 (2018). "Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield Commc'ns*, 174 F.3d at 1054 (citing *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1130–32 (9th Cir. 1998)); *see also Stone Creek*, 875 F.3d at 432 ("Two particularly probative factors are the similarity of the marks and the proximity of the goods."). "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Rearden*, 683 F.3d at 1209. "Given the open-ended nature of this multi-prong inquiry, it is not surprising that summary judgment on 'likelihood of confusion' grounds is generally disfavored." *Id*. at 1210. "However, in cases where the evidence is clear," the Ninth Circuit has "not hesitated to affirm summary judgment on this point." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006). The court addresses each *Sleekcraft* factor in turn.

a.  <u>Strength of the Mark</u>

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) (citing *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)), *overruled on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A mark's strength is evaluated based on two components: "the mark's inherent distinctiveness (i.e., its conceptual strength)" and "the mark's recognition in the market (i.e., its commercial strength)."  *Stone Creek*, 875 F.3d at 432 (citing *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011)).

"A mark's conceptual strength 'depends largely on the obviousness of its connection to the good or service to which it refers.'"  *JL Beverage Co.*, 828 F.3d at 1107 (quoting *Fortune Dynamic*, 618 F.3d at 1032–33).  "To determine a mark's conceptual strength, we classify a mark along a spectrum of five categories ranging from [most to least distinctive]: arbitrary, fanciful, suggestive, descriptive, and generic."  *Id.* (citing *Network Automation*, 638 F.3d at 1149).  "The more distinctive a mark, the greater its conceptual strength; in other words, a mark's conceptual strength is proportional to the mark's distinctiveness."  *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005).  "Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and 'trigger the highest degree of trademark protection.'"  *JL Beverage Co.*, 828 F.3d at 1107 (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005)).  "An arbitrary mark consists of common words arranged in an arbitrary way that is non-descriptive of any quality of the goods or services," while fanciful marks consist of "coined phrase[s]," such as "Kodak" cameras, "invented solely to function as a trademark.  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993).  Suggestive marks, which fall in the middle of the spectrum, "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product."  *JL Beverage Co.*, 828 F.3d at 1107 (citing *Fortune Dynamic*, 618 F.3d at 1033).  Finally, descriptive and generic marks are the two weakest categories.  *Id.*  "Descriptive marks define a particular characteristic of the

product in a way that does not require any imagination, while generic marks describe the product in its entirety and are not entitled to trademark protection." *Id.* (citing *Surfvivor Media*, 406 F.3d at 632).

"After identifying whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful, the court determines the mark's commercial strength." *Id.* (citing *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogated in part on other grounds*, *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990). Commercial strength "is based on actual marketplace recognition." *Network Automation*, 638 F.3d at 1149 (internal quotations omitted). "Commercial strength may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition." *Adidas Am., Inc. v. Calmese*, 662 F. Supp. 2d 1294, 1303 (D. Or. 2009) (citing *M2 Software*, 421 F.3d at 1081). Further, "a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success" or by advertising expenditures that increase its market recognition. *M2 Software*, 421 F.3d at 1081 (citing cases).

The court first analyzes the conceptual strength of Monster's Claw Icon and marks incorporating the word BEAST. Plaintiff argues the marks are arbitrary because they do not describe or suggest any ingredient, quality or characteristic of Monster's energy drinks. Mem. at 6. Defendant counters that plaintiff has not shown its marks are strong or famous to the degree required by the Lanham Act. Opp'n at 12. Plaintiff responds that fame is not a *Sleekcraft* factor and that defendant has not shown any genuine dispute regarding whether the marks are arbitrary. Reply at 3–4.

Even when viewing the evidence in the light most favorable to defendant as the nonmovant, as required, there is no genuine dispute of material fact concerning the conceptual strength of plaintiff's marks. The Claw Icon does not describe and has no commonly understood connection with the products it here represents: plaintiff's energy drinks and supplements. *See, e.g.*, *Fortune Dynamic*, 618 F.3d at 1033 (listing "Apple computers and Camel cigarettes" as examples of "actual words with no connection to the product . . . that are inherently distinctive and therefore receive maximum trademark protection" (internal quotations omitted)). Further,

while a fact-finder could reasonably conclude plaintiff's various marks incorporating the word BEAST are suggestive, rather than arbitrary, marks because the term "beast" might suggest features of plaintiff's energy drinks—e.g., increasing energy—defendant has not provided any evidence in response to plaintiff's showing to refute plaintiff's assertion that the marks at issue are conceptually strong and thus entitled to a wide scope of protection.

Second, the court analyzes the commercial strength of plaintiff's marks. Plaintiff asserts it has invested over $5.5 billion in advertising and promoting its marks since 2002. Mem. at 6; Sacks Decl. ¶ 23. Plaintiff further asserts it prominently features the Claw Icon and marks incorporating the word BEAST in these marketing and promotion efforts, with the marks appearing on beverage containers, point-of-sale materials, clothing and promotional items, as well as on Monster's website and social media profiles, and in connection with Monster's sponsorship of athletes, teams and various live events. Mem. at 6–7; Sacks Decl. ¶¶ 22, 25–26, 29–52. Plaintiff has proffered evidence that its products hold a 38 percent market share of the U.S. energy drink market, measured in dollar values. Sacks Decl. ¶ 21. Plaintiff also represents that from 2002 to 2013, the year before defendant began selling its BEASTUP energy drink, it sold more than 6.8 billion beverages displaying the Claw Icon together with one of its marks incorporating the word BEAST on the can. Mem. at 7; Sacks Decl. ¶ 22. This uncontroverted evidence suffices to demonstrate that plaintiff's Claw Icon and marks incorporating the word BEAST are commercially strong. Defendant has not controverted any of the evidence showing the commercial strength of plaintiff's marks.

Viewing the evidence in the light most favorable to the defendant, the court finds no genuine dispute of material fact as to the strength of plaintiff's marks.

b. Proximity of the Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield Commc'ns*, 174 F.3d at 1055 (citing *Official Airline Guides*, 6 F.3d at 1392). "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350 (citing *Stork Rest. v. Sahati*, 166 F.2d 348,

356 (9th Cir. 1948)).  In addressing this factor, the court focuses on whether the consuming public is likely to somehow associate defendant's products with plaintiff.  *Brookfield Commc'ns*, 174 F.3d at 1056; 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 24:24 (5th ed. 2017) ("Goods are 'related' if customers are likely to mistakenly think that the infringer's goods come from the same source as the senior user's goods or are sponsored by, affiliated with or connected with the senior user.").

Here, plaintiff asserts the parties "use their marks on identical goods, namely energy drinks."  Mem. at 7.  In support of this argument, plaintiff proffers evidence that both companies sell energy drinks and that defendant itself considers the Monster line of energy drinks to be a competitor for defendant's BeastUp products.  Sacks Decl. ¶ 3; Bellinger Decl. Ex. 1 at 34 (160:2–12); *id.* Exs. 3, 9 at 3, 10 at 2.  Additionally, plaintiff provides evidence that both plaintiff's and defendant's drinks are sold in gas stations, convenience stores, restaurants and grocery stores.  Sacks Decl. ¶ 24; Bellinger Decl. Ex. 1 at 22–25 (124:6–127:19); *id.* Ex. 10 at 3–11.  In fact, plaintiff's and defendant's competing beverages are sometimes sold side-by-side.  Bellinger Decl. Ex. 1 at 24–26 (126:24–128:8), 30 (135:4–13), 31 (136:3–23); *id.* Exs. 4, 5.

Defendant argues plaintiff has shown only one instance of plaintiff's and defendant's energy drinks being displayed and sold in the same aisle of a store.  Opp'n at 13.  This argument, however, focuses only on physical proximity and does not address the proximity of the goods in use and function.  Given plaintiff's uncontroverted evidence contending the products are identical and plaintiff and defendant are direct competitors, there is no genuine dispute of material fact that the products are related.

This factor favors granting summary judgment.

### c.  Similarity of the Marks

The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis."  *GoTo.com, Inc.*, 202 F.3d at 1205.  The greater the similarity between the two marks, the greater the likelihood of confusion.  *Id.* at 1206.  "Similarity of the marks is tested on three levels: sight, sound, and meaning."  *Sleekcraft*, 599 F.2d at 351.  The Ninth Circuit has "developed three axioms that apply to the 'similarity' analysis: 1) Marks should

be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences." *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).

The court turns first to defendant's BEASTUP mark, which plaintiff argues is highly similar to its UNLEASH THE BEAST! mark and other marks incorporating the word BEAST. Mem. at 8. Plaintiff asserts the parties' marks share the distinctive term "BEAST." Mem. at 8. Specifically, plaintiff asserts it uses the term "beast" as the object noun in its various marks incorporating the word BEAST, and defendant uses the term "BEAST" as the dominant element of its "BEASTUP" mark. Mem. at 8. At the same time, as defendant argues in its opposition, "[m]arks are not 'similar' for purposes of assessing likelihood of confusion simply because they contain an identical or nearly identical word." *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1147 (C.D. Cal. 1998) (quoting *Mejia & Assocs. v. IBM Corp.*, 920 F. Supp. 540, 547 (S.D.N.Y. 1996)). Rather, in determining whether marks are similar, courts may look to lettering styles and capitalization, colors, locations of the mark on the product, prominence, sound and meaning. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1128–29 (9th Cir. 2014).

Plaintiff presented no expert testimony on this issue, and the court conducts its own analysis. Considering the appearance of plaintiff's mark incorporating the word BEAST on the left and defendant's BEASTUP mark on the right, the court notes several visual similarities.




In addition to both marks containing the word "BEAST," each mark is printed diagonally on the can, sloping up from its lower end on the left to its higher end on the right. BeastUp's mark is presented in silver-colored font with red trim that is offset from a dark or black background on a white can; Monster's marks incorporating the word BEAST appear in a variety of colored fonts, including silver, and on many different-colored backgrounds, including white and black.

Nevertheless, the visual appearance of defendant's BEASTUP mark and plaintiff's marks containing the word BEAST differ in several significant ways. First, although both marks use the term "BEAST," they do not display the term in an identical manner; defendant uses the term "BEAST" in all capital letters as a component part of its single-word mark, BEASTUP, with no additional punctuation, while plaintiff uses the term "BEAST" as an individual word in a short sentence comprising one of its marks containing that word, which always end with an exclamation point, such as the phrase here, UNLEASH THE ULTRA BEAST! or UNLEASH THE BEAST! The parties thus present the term "BEAST" in different order, with "BEAST" coming first in defendant's BEASTUP mark and last in plaintiff's marks incorporating the word BEAST (e.g., UNLEASH THE BEAST! or REHAB THE BEAST!). Second, defendant's BEASTUP mark uses only capital letters, while plaintiff's marks incorporating the word BEAST use both capital and lower-case letters. Third, the marks use substantially different fonts. Although registered as a word mark—a trademark without any design elements—in the images provided to the court, plaintiff's marks incorporating the word BEAST all employ a block-type font, Sacks Decl. Ex. 7, a block-type font with stylized smeared edges, *id*. Exs. 6, 14, a stylized font resembling handwriting, *id*. Ex. 12, or a combination of all these fonts, *id*. Ex. 9; *see M2 Software*, 421 F.3d at 1082 (affirming finding that similarity of marks factor weighed only slightly in plaintiff's favor when plaintiff's word mark had distinct, consistent stylistic differences from defendant's mark). Defendant's BEASTUP mark uses a thicker, script-like stylized font. Fourth, in all the images provided, plaintiff's marks containing the word BEAST appear in small print on the back of the can, while defendant's BEASTUP mark is displayed prominently in large print on the front of the can. Viewed in the context of the marketplace, these visual differences distinguish the two marks.

The court next compares the sound and meaning of the parties' marks. There is no evidence of record that consumers pronounce the word "BEAST" differently when it appears in one mark as compared to the other. As noted above, however, defendant uses "BEAST" as part of its standalone BEASTUP mark, while plaintiff uses "BEAST" as the last word in a short declaratory sentence. Thus, the marks, while containing similar elements, do not sound precisely the same. The two marks also have similar meanings, both invoking impressions of being a "beast" or unleashing one's inner "beast."

Plaintiff further maintains defendant's larger claw logo and smaller claw marks are confusingly similar to plaintiff's Claw Icon. Mem. at 8. A visual inspection of Monster's Claw Icon on the left and BeastUp's claw logo and claw marks on the right in their marketplace context again reveals several visual similarities.

 

Plaintiff's Claw Icon and defendant's claw logo each are displayed prominently on the front and near the center of the parties' energy drink cans. Plaintiff's Claw Icon and defendant's claw logo also share a jagged, three-pronged shape. Further, plaintiff's can displays the three-pronged Claw Icon, which appears in several different colors, including silver, and on many different-colored backgrounds, including white. Similarly, two sets of silver claw marks appear near the top and bottom of defendant's can; these claw marks include three and four

prongs and appear on a white background.  Additionally, the middle prong of both plaintiff's Claw Icon and defendant's three-pronged claw mark at the top of the can extends further than the two adjacent prongs.  Finally, both plaintiff's Claw Icon and defendant's claw marks appear to be tearing through the wall of the beverage can.

Despite these similarities, the visual appearance in the marketplace of plaintiff's Claw Icon and defendant's stylized claw logo and silver claw marks differ in important ways.  First, plaintiff's Claw Icon and defendant's claw logo clearly differ in their orientation and location on the can.  Monster's Claw Icon is displayed on the top two-thirds of the can, above the product name, and its three prongs point down to form an "M."  BeastUp's claw logo appears on the bottom third of the can, below the product name, and its prongs point up to form an interlocking "B" and "U," each with three vertical, irregular lines.  Second, while plaintiff's Claw Icon appears to be ripping through the can and has consistent, almost straight edges, defendant's claw logo appears printed on the can and has more-stylized, barbed edges.  Third, plaintiff's Claw Icon appears in various colors depending on the product labeled but is always one uniform color in each occurrence.  In contrast, defendant's claw logo uses two different colors: the "B" is black, and the "U" is red.  Finally, although three-pronged claw marks appear on both plaintiff's and defendant's cans, the orientation of plaintiff's Claw Icon is vertical, while the orientation of defendant's silver claw marks is more horizontal or diagonal, distinguishing the marks.

Plaintiff further asserts the fact that defendant uses its BEASTUP mark together with claw marks enhances the level of similarity between the parties' marks because consumers have seen plaintiff's Claw Icon and a mark incorporating the word BEAST appear in the marketplace together on Monster's energy drink cans for nearly two decades.  Mem. at 8–9; Sacks Decl. ¶ 3–4, 22.  Comparing the marks at issue as composites, however, the marks are not displayed in an identical manner.  While both sets of marks incorporate the term "BEAST" in conjunction with claw marks, as described above, there are many visual distinctions between defendant's BEASTUP mark, claw logo and claw marks and plaintiff's marks incorporating the word BEAST and Claw Icon as these marks appear in the marketplace.  A factfinder could

reasonably find the marks are dissimilar, even when viewed as composites of multiple marks. *See Miss World*, 856 F.2d at 1451 (affirming finding of dissimilarity in composite marks).

Balancing the marks' visual similarities and the aural and definitional similarities between defendant's BEASTUP mark and plaintiff's marks incorporating the word BEAST more heavily than the marks' visual dissimilarities, the similarity factor weighs against a finding of likelihood of confusion. When viewed in the context in which they appear in the marketplace, the marks contain noticeable and distinct differences in their display of the term "BEAST," capitalization, fonts, color scheme, design elements, orientation and location on the can and prominence. On the one hand, the transposition or reorganization of the elements of a mark does not preclude a finding of similarity and likelihood of confusion. *See, e.g.*, *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (finding "Perfumebay.com" and "eBay.com" to be similar); *GoTo.com, Inc.*, 202 F.3d at 1206 (finding actionable similarity despite use of different colors in logo); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) (actionable similarity between "Century Investments & Realty" and "Century 21"); *Saks & Co. v. Hill*, 843 F.Supp. 620, 623 (S.D. Cal. 1993) ("Saks Thrift Avenue" likely to be confused with "Saks Fifth Avenue"). Nevertheless, based on the significant differences in the appearance of defendant's BEASTUP mark, claw logo, and claw marks and plaintiff's marks incorporating the word BEAST and Claw Icon, a factfinder could reasonably find the marks are dissimilar. Therefore, the court concludes a triable issue remains regarding the similarity of the marks factor. This factor thus favors defendant.

### d. Evidence of Actual Confusion

"[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding." *Rearden*, 683 F.3d at 1210. Moreover, "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352 (citing *Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 639 (9th Cir. 1963)). Nevertheless, "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not

dispositive.  Consequently, this factor is weighed heavily only when there is evidence of past

confusion . . . ."  *Id.* at 353 (internal citation omitted).

Plaintiff offers as evidence of actual confusion a survey of relevant potential

customers conducted by its expert, Robert Klein, in which 27.9 percent of the surveyed customers

believed there was some affiliation between plaintiff's and defendant's products.  Klein Decl. Ex.

1, ECF No. 43-1, at 2–3, 14–18.  Based on the results, Klein concluded potential customers of

BeastUp will "believe that energy drinks bearing the Beastup [sic] name, stylized logo, and other

claw marks are either put out by Monster, are another energy drink brand put out by the company

that puts out Monster Energy drink [sic], or are from a company that needed authorization or

approval from Monster to put out such products."  Klein Decl. Ex 1 at 14.  This level of confusion

falls within the range courts have found to support a finding of likelihood of confusion.  *See*

*Warner Bros. Entm't v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG (CWx), 2012 WL 6951315, at

*10 (C.D. Cal. Dec. 10, 2012) ("Generally, confusion levels of 25 to 50 percent provide 'solid

support' for a finding of likelihood of confusion."), *aff'd*, 544 F. App'x 683 (9th Cir. 2013); *see*

*also Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902–03 (9th Cir. 2002) (survey in

which 27.7 percent of respondents confused about source association could support jury finding

that actual purchasers who encountered allegedly infringing products would be confused about

their source), *superseded by statute on other grounds as discussed in Levi Strauss & Co. v.*

*Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1166–72 (9th Cir. 2011); McCarthy, *supra*,

§ 32:188 (confusion levels over 50 percent viewed as "persuasive evidence" of likely confusion,

figures in 25 to 50 percent range treated as "solid support" for such a finding, and figures below

20 percent may only be viewed in connection with other evidence showing likelihood of

confusion).

Defendant has not contested plaintiff's survey evidence or provided its own

evidence demonstrating an absence of actual confusion.  Rather, defendant broadly and

inexplicably asserts plaintiff has conceded that no evidence of actual confusion exists.  Opp'n at

14–15.  Accordingly, given that the level of confusion provides "solid support" of infringement,

this factor weighs heavily in favor of plaintiff.  *See Thane Int'l, Inc.*, 305 F.3d at 902 ("Evidence

18

of actual confusion 'constitutes persuasive proof that future [source] confusion is likely.' . . . If enough people have been actually confused, then a likelihood that people are confused is established. (quoting *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001))).

e. <u>Marketing Channels Used</u>

"Convergent marketing channels increase the likelihood of confusion." *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC*, 775 F.3d at 1130 (citing *Nutri/Sys., Inc.*, 809 F.2d at 606). "The greater the degree of overlap, the more likely there is to be confusion." *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180 (C.D. Cal. 2010) (citing *Sleekcraft*, 599 F.2d at 353).

Here, the evidence before the court demonstrates the parties are in direct competition. First, plaintiff provides evidence that both parties sell their energy drinks through the same retailers, namely, gas stations, convenience stores, restaurants, and grocery stores. And defendant's and plaintiff's energy drinks have been sold side-by-side in the same stores. Sacks Decl. ¶ 24; Bellinger Decl. Ex. 1 at 22 (124:6–127:19), 24–26 (126:24–128:8), 29–31 (134:7–136:23); *id.* Exs. 4–5; *id.* Ex. 10 at 3–11. Second, plaintiff offers evidence that both parties market their energy drinks by sponsoring athletes, teams and events involving motorsports and other extreme sports. Sacks Decl. ¶¶ 32–42; *id.* Exs. 27–28; Bellinger Decl. Ex. 1 at 34–36 (160:20–162:3), 40–42 (169:18–171:24), 45–50 (179:4–184:3); *id.* Ex. 7 at 5–6; *id.* Ex. 9, at 3–4.

The similarities between the parties' distribution channels and marketing strategies suggest an overlapping general class of consumers of the parties' products. Defendant does not dispute this evidence. The marketing channels factor favors plaintiff.

          f.   Type of Goods and Degree of Care Likely to Be Exercised by Purchaser

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Survivor Media*, 406 F.3d at 634 (citing *Brookfield Commc'ns*, 174 F.3d at 1060). Courts look both to the "relative sophistication of the relevant consumer," *Fortune Dynamic*, 618 F.3d at 1038, and the cost of the item, *Brookfield Commc'ns*, 174 F.3d at 1060, in determining the degree of care likely to be exercised by the purchaser. The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused— when he is purchasing expensive items." *Id.* "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Id.*

Plaintiff contends the parties' energy drinks are "relatively inexpensive" and "likely to be purchased casually or on an impulse." Mem. at 11. To support this argument, plaintiff provides evidence that Monster's energy drink typically retails for $2 to $3 per drink and BeastUp's energy drink retails for $2.50 per drink. Sacks Decl. ¶ 24 & Ex. 17; Bellinger Decl. Ex. 1 at 38–39 (167:12–168:13) & Ex. 8 at 2–3. When beverages cost only a few dollars, courts have found the price supports a finding that consumers purchasing such products exercise a low degree of care. *See, e.g.*, *Pom Wonderful LLC*, 775 F.3d at 1127 (fact that single-serve beverages cost between $1.99 and $2.49 weighed in favor of finding likelihood of confusion "because consumers are likely to exercise a low degree of care" when purchasing the beverages); *Hansen Beverage Co. v. Cytosport, Inc.*, No. CV 09-0031-VBF(AGRx), 2009 WL 5104260, at *20 (C.D. Cal. Nov. 4, 2009) (fact that beverages cost $2 to $4 each supported finding that consumers likely to associate both drinks with same source); *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1077 (E.D. Cal. 2009) (fact that protein drinks cost $3 to $5 favored finding likelihood of confusion); *CSC Brands LP v. Herdez Corp.*, 191 F. Supp. 2d 1145, 1153 (E.D. Cal. 2001) ("Given that these beverages are sold in supermarkets and are low cost, the degree of care likely to be exercised by purchasers is minimal.").

This factor weighs in favor of a finding of likely consumer confusion.

### g.  Defendant's Intent in Selecting Mark

While "not required for a finding of trademark infringement," *Brookfield Commc'ns*, 174 F.3d at 1059, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides*, 6 F.3d at 1394 (citing *E .& J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992)). Plaintiff argues defendant knew of plaintiff's energy drinks and the Claw Icon and marks incorporating the word BEAST years before defendant started its business and began selling its own energy drink bearing a similar mark. Mem. at 11.  In support of this assertion, plaintiff provides evidence that defendant's Vice President Jessee Waetly first became aware of Monster and its UNLEASH THE BEAST! mark between 2004 and 2006, before defendant launched its BeastUp energy drink in 2014.  Bellinger Decl. Ex. 6, at 9–10 (25:5–26:20); Ex. 7, at 4.

Defendant does not dispute it knew of Monster and its Claw Icon and marks incorporating the word BEAST before starting its business. *See, e.g.*, Bellinger Decl. Ex. 6 at 9–10 (25:24–26:20 (testimony of Jessee Waetly stating he first became aware of plaintiff's marks incorporating the word BEAST sometime in the mid-200s).  Defendant instead argues it adopted its mark in good faith and with no intent to deceive consumers or to affiliate defendant with plaintiff.  Opp'n at 10.  However, "an intent to confuse consumers is not required for a finding of trademark infringement." *Brookfield Commc'ns*, 174 F.3d at 1059 (citing *Dreamwerks*, 142 F.3d at 1132 n.12 ("Absence of malice is no defense to trademark infringement.")).  Therefore, the intent factor only slightly favors plaintiff.

### h.  Likelihood of Expansion of Product Lines

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354.  When, however, the parties "already compete to a significant extent," as they do here, this factor is "relatively unimportant" to the likelihood of confusion analysis. *Brookfield Commc'ns*, 174 F.3d at 1060.  Neither party has submitted evidence of planned expansion, and plaintiff does not allege defendant's use impedes its expansion plans.  Therefore, this factor is neutral.

i.   <u>Evaluation of the Factors</u>

Evaluating all the factors and the evidence provided by the parties, the court cannot find plaintiff has, as a matter of law, demonstrated a likelihood of consumer confusion, although it is a close call.  While six of the eight factors favor plaintiff, in determining whether a likelihood of confusion of the parties' marks exists, the court does not "merely count beans or tally points."  *Stone Creek*, 875 F.3d at 431; *see also Thane Int'l, Inc.*, 305 F.3d at 901 ("The list of [*Sleekcraft*] factors is not a score-card—whether a party 'wins' a majority of the factors is not the point.").  "Not all factors are created equal, and their relative weight varies based on the context of a particular case."  *Stone Creek*, 875 F.3d at 431.  Here, a triable issue remains on the "critical question" of the degree of similarity of the marks.  *GoTo.com, Inc.*, 202 F.3d at 1205; *see SunEarth, Inc. v. Sun Earth Solar Power Co.*, No. C 11-4991 CW, 2013 WL 4528539, at *13 (N.D. Cal. Aug. 23, 2013) ("[T]he classic type of source confusion, 'forward confusion,' [is] where customers 'want to buy the senior user's product and because of the similarity of marks, mistakenly buy the junior user's product instead' . . . ." (quoting McCarthy, *supra*, § 23:10), *amended in part*, No. C 11-4991 CW, 2013 WL 6157208 (N.D. Cal. Nov. 22, 2013), *and aff'd*, 650 F. App'x 473 (9th Cir. 2016), *on reh'g en banc*, 839 F.3d 1179 (9th Cir. 2016).  Therefore, the question of likelihood of consumer confusion "should be answered as a matter of fact by a jury, not as a matter of law by a court."  *Fortune Dynamic*, 618 F.3d at 1031.

The court DENIES plaintiff's motion for summary judgment on its trademark infringement and false designation of origin claims under 15 U.S.C. §§ 1114 and 1125.

B.   <u>Unfair Competition</u>

Plaintiff also requests the court grant summary judgment on its unfair competition claims under California Business & Professions Code section 17200 *et seq.*, and California common law.  Mem. at 11–12.  The standard for federal Lanham Act unfair competition is the same as that for Lanham Act trademark infringement.  See *Brookfield Commc'ns*, 174 F.3d at 1045 (both trademark infringement and unfair competition under Lanham Act require establishing defendant is using mark confusingly similar to valid, protectable trademark of plaintiff).  Further, the elements of California "state common law claims of unfair competition and actions pursuant

to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (citing *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991); *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1362 (C.D. Cal. 1984)).

The court DENIES summary judgment on plaintiff's unfair competition claims for the same reasons it has denied summary judgment on plaintiff's Lanham Act claims.

C.     Trademark Cancellation

Plaintiff additionally seeks cancellation of defendant's U.S. Trademark Registration No. 4,584,629 for the BEASTUP mark based on the likelihood of confusion of defendant's mark with plaintiff's marks containing the word BEAST.  Mem. at 12.  The Lanham Act gives federal courts authority to cancel trademark registrations.  15 U.S.C. § 1119. Cancellation of a trademark registration is proper "when (1) there is a valid ground why the trademark should not continue to be registered and (2) the party petitioning for cancellation has standing." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984) (internal quotations omitted) (quoting *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed. Cir. 1984)).

1.      Standing

To establish standing, "the cancellation petitioner must plead and prove facts showing a 'real interest' in the proceedings," which requires a demonstration that the petitioner "is 'more than an intermeddler' but rather has a personal interest [in the cancellation], and that 'there is a real controversy between the parties.'" *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1034 (C.D. Cal. 2011) (quoting first *Rosso & Mastracco, Inc. v. Giant Food, Inc.*, 720 F.2d 1263, 1265 (Fed. Cir. 1983), then *Star-Kist Foods*, 735 F.2d at 349), *aff'd*, 738 F.3d 1085 (9th Cir. 2013).  Plaintiff has a "real interest" in this action in that it is asserting it owns the Claw Icon and various marks containing the word BEAST.  Further, plaintiff has shown the presence of a real controversy between the parties by alleging a likelihood of confusion between its marks incorporating the word BEAST and defendant's registered BEASTUP mark

that "is not wholly without merit." McCarthy, *supra*, § 20:46. Therefore, plaintiff has standing to seek cancellation.

### 2. Cancellation Grounds

"Federal courts may cancel registrations based on the same grounds that would be applied by the U.S. Patent and Trademark Office," namely those provided by 15 U.S.C. § 1064. *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 869–70 (N.D. Cal. 2012) (citing *D. & M. Antique Imp. Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1268 (S.D.N.Y. 1969)), *aff'd*, 737 F.3d 546 (9th Cir. 2013). "For the first five years after registration, a trademark registration may be challenged for any reason that would have been sufficient to refuse the original registration, 15 U.S.C. § 1064(1), such as likelihood of confusion, 15 U.S.C. § 1052(d)." *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 834 (C.D. Cal. 2018). "Once a trademark has been registered for more than five years, and thus is incontestable, the grounds available to cancel the registration narrow significantly," and no longer include likelihood of confusion. *Kleven v. Hereford*, No. CV 13-02783-AB(AGRx), 2015 WL 4977185, at *21 (C.D. Cal. Aug. 21, 2015).

Here, defendant's BEASTUP mark has been registered for less than five years, since August 12, 2014. Bellinger Decl. Ex. 11. Therefore, plaintiff may seek cancellation on grounds of likelihood of confusion. As explained above, however, the court finds a genuine factual dispute remains regarding the likelihood of confusion between plaintiff's marks containing the word BEAST and defendant's BEASTUP mark.

Because the record before the court shows a triable issue on likelihood of confusion posed by the coexistence of the parties' marks in the marketplace, the court DENIES plaintiff's summary judgment motion as to its trademark cancellation claim.

### D. Trademark Dilution

Plaintiff further moves for summary judgment on its trademark dilution claim under 15 U.S.C. § 1125(c). Mem. at 12–14. "Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value." *Avery Dennison Corp. v. Sumpton*, 189 F.3d

24

868, 875 (9th Cir. 1999).  It "refers to the 'whittling away of the value of a trademark' when it's used to identify different products."  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002) (quoting McCarthy*, supra*, § 24:67).  "For example, Tylenol snowboards, Netscape sex shops and Harry Potter dry cleaners would all weaken the 'commercial magnetism' of these marks and diminish their ability to evoke their original associations."  *Id.* (citing Ralph S. Brown, Jr., *Advertising and the Public Interest: Legal Protection of Trade Symbols*, 57 Yale L.J. 1165, 1187 (1948), *reprinted in* 108 Yale L.J. 1619 (1999)).  "These uses dilute the selling power of these trademarks by blurring their uniqueness and singularity, [or] by tarnishing them with negative associations."  *Id.* (internal citation omitted).

To prove a claim for dilution under 15 U.S.C. § 1125(c), "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment."  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).  "Whether a defendant's mark creates a likelihood of dilution is a factual question generally not appropriate for decision on summary judgment."  *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010) (citing *Jada Toys, Inc.*, 518 F.3d at 632).  Nevertheless, a court may grant summary judgment on a dilution claim if no reasonable factfinder "could fail to find a likelihood of dilution."  *Id.*  Plaintiff's dilution claim focuses on its Claw Icon.  Compl. ¶¶ 73–79.  Plaintiff argues it is entitled to summary judgment on its dilution claim because no genuine dispute exists as to the fame of plaintiff's Claw Icon or the likelihood defendant's claw marks will dilute plaintiff's Claw Icon. Mem. at 13.

### 1.   Fame of Plaintiff's Mark

To satisfy the fame element of a federal dilution claim, "a mark must be truly prominent and renowned."  *Avery Dennison Corp.*, 189 F.3d at 875 (brackets, internal quotations and citation omitted).  "A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  The protection afforded by a dilution claim thus can extend

25

only to marks that are a "household name." *Thane Int'l, Inc.*, 305 F.3d at 911 (citing *A.B.C. Carpet Co., Inc. v. Naeini*, No. 00-CV-4884-FB, 2002 WL 100604, at \*5 (E.D.N.Y. Jan. 22, 2002)). Examples of marks with the requisite degree of fame include "TIFFANY," "POLAROID," "ROLLS ROYCE," "KODAK," "CENTURY 21" and "OSCAR" (of the Motion Picture Academy). *Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1362–63 (9th Cir. 1993) (citing McCarthy, *supra*, § 24:14); *see also Dahon N. Am., Inc. v. Hon*, No. 11–cv–05835–ODW (JCGx), 2012 WL 1413681, at \*9 (C.D. Cal. Apr. 24, 2012) ("[T]rademark dilution claims are restricted to truly famous marks, such as Budweiser beer, Camel cigarettes, and Barbie dolls." (citing *Bd. of Regents, Univ. of Tex. Sys. v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008)).

To evaluate the fame of a mark, courts consider several nonexclusive factors, including (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) "[w]hether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." *Jada Toys, Inc.*, 518 F.3d at 635 (citing 15 U.S.C. § 1125(c)(2)(A)). The date of the defendant's first alleged use of the infringing mark in commerce, and not necessarily the particular use being challenged in the litigation, fixes the date by which the court measures the famousness of a plaintiff's mark. *See Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1012–13 (9th Cir. 2004); *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1031 (N.D. Cal. 2015). Here, the evidence before the court shows defendant first used its claw marks in commerce in May 2014 when it began selling its BeastUp energy drink. Bellinger Decl. Ex. 1 at 6 (44:13–23), 9–10 (50:16–51:10), 10–11 (51:23–52:12), 14–15 (59:12–60:8), 15–16 (60:21–61:1); *id.* Exs. 2–3; *id.* Ex. 8 at 2. Therefore, plaintiff must demonstrate its Claw Icon achieved the requisite level of fame by May 2014.

To support its fame argument, plaintiff provides much of the same evidence it offered to show the strength of its marks. That evidence establishes plaintiff began using the Claw Icon in 2002 and displays it on the product containers of all beverages in the Monster line

26

of energy drinks. Sacks Decl. ¶¶ 3–4, 9–10; *id.* Exs. 6–7, 9, 12, 14. Plaintiff's evidence further shows that between 2002 and 2013, the year before defendant began selling its BEASTUP energy drink, plaintiff spent $2.2 billion in advertising and promoting its marks, including the Claw Icon. Sacks Decl. ¶ 23. This advertising expanded the use of the Claw Icon beyond the beverage containers to other goods such as clothing, backpacks, water bottles, sports helmets, wristbands, stickers and decals, as well as to sponsorships of athletes, teams, competitions, tours and other events and general marketing, such as posters, signs, and stickers. Sacks Decl. ¶¶ 25, 33–45. As noted above, plaintiff provides evidence that its line of drinks holds a 38 percent by dollar value market share of the U.S. energy drink market and that from 2002 to 2013 plaintiff sold more than $10 billion worth, more than 6.8 billion cans, of its Monster line of energy drinks displaying the Claw Icon on the container. Sacks Decl. ¶¶ 21, 22. To show the fame of its Claw Icon, plaintiff also offers survey evidence showing 67.2 percent of potential energy drink consumers associate the Claw Icon with Monster. Simonson Decl., ECF No. 44, ¶¶ 14–15; *id.* Ex. 1, ECF No. 44-1, at 5, 9–10.

Defendant disputes the sufficiency of plaintiff's evidence to support a finding of fame. Opp'n at 10. Defendant first argues plaintiff relies on self-serving statements in the declaration of its own chairman and CEO, Rodney Sacks, to assert the fame of its Claw Icon and lacks credible evidence to support those statements. Opp'n at 11. Defendant cannot avoid summary judgment, however, simply by labeling plaintiff's evidence "self-serving." *Horphag Res. Ltd. v. Garcia*, 475 F.3d 1029, 1037 (9th Cir. 2007) (defendant could not avoid summary judgment on trademark dilution claim by calling plaintiff's evidence a "bald assertion"); *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (holding non-moving party cannot avoid summary judgment when moving party has provided competent evidence simply by arguing evidence is "self-serving speculation that should be disregarded").

Defendant also argues plaintiff's survey evidence does not provide sufficient market context for any of plaintiff's sales figures or raw number data and does not explain how those figures relate to those of plaintiff's competitors. Opp'n at 11–12. The court finds this argument has some force. Plaintiff's evidence suggests its Claw Icon has attained a level of

national recognition among energy drink consumers, but a showing of specialized or niche market fame does not satisfy the rigorous fame standard of trademark dilution. *See, e.g.*, *MGA Entm't, Inc. v. Dynacraft BSC, Inc.*, No. 2:17-CV-08222-ODW-KS, 2018 WL 2448123, at \*6 (C.D. Cal. May 30, 2018) ("[T]he Trademark Dilution Revision Act of 2006 restricted the statute from protecting marks that are famous only in 'niche' markets."); *Planet Coffee Roasters, Inc. v. Dam*, No. SACV 09-00571-MLG, 2009 WL 2486457, at \*3 (C.D. Cal. Aug. 12, 2009) (same); *Century 21 Real Estate LLC v. Century Ins. Grp.*, No. 03-0053-PHX-SMM, 2007 WL 484555, at \*14 (D. Ariz. Feb. 8, 2007) (same), *aff'd sub nom.*, *Century 21 Real Estate LLC v. Century Sur. Co.*, 300 F. App'x 527 (9th Cir. 2008). While the evidence here shows extensive advertisement and sales of Monster's line of energy drinks bearing the Claw Icon over more than a decade prior to defendant's first use, it does not conclusively show the Claw Icon attained the requisite level of nationwide fame among the general population. *See* 15 U.S.C. § 1125(c)(2)(A) (fame requires mark be "widely recognized by the general consuming public of the United States").

The court cannot, as a matter of law, find that plaintiff's Claw Icon is sufficiently famous.

### 2.    Likelihood of Dilution by Blurring

Plaintiff argues defendant's claw marks will cause dilution by blurring. Mem. at 13–14. Blurring "occurs when a defendant uses a plaintiff's trademark to identify the defendant's goods or services, creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1326 n.7 (9th Cir. 1998). To assess dilution by way of blurring, courts look to (1) the degree of similarity between the marks; (2) the degree of distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusively use of the mark; (4) the famous mark's degree of recognition; (5) whether the user of the mark intended to create an association with the famous mark; and (6) any actual association between the two marks. 15 U.S.C. § 1125(c)(2)(B). The likelihood of dilution factors are "strikingly similar" to the likelihood of confusion test for trademark infringement analysis. *See Airwair Int'l Ltd. v. Vans,*

*Inc.*, No. 5:12-CV-05060-EJD, 2013 WL 3786309, at *7 n.1 (N.D. Cal. July 17, 2013) (applying likelihood of confusion analysis to assess dilution by blurring).

Plaintiff's likelihood of dilution arguments repeat many of its likelihood of confusion arguments. The first and fifth factors, the degree of similarity between the marks and intent to create an association with the famous mark, favor denying summary judgment. Plaintiff argues defendant's claw marks are highly similar to plaintiff's Claw Icon. Mem. at 13. Although plaintiff need only show defendant's claw marks are "likely to impair the distinctiveness" of plaintiff's Claw Icon, *Abercrombie & Fitch Trading Co.*, 633 F.3d at 1172, as explained above, a triable issue of fact remains as to the similarity of the marks when viewed in their overall marketplace context. Therefore, the first factor weighs against a finding of likelihood of dilution. With respect to the fifth factor, defendant's intent, plaintiff offers no evidence but argues it does not negate a showing of likelihood of dilution. Mem. at 14 (citing *Visa*, 610 F.3d at 1091). The intent factor is neutral.

The remaining blurring factors favor plaintiff. With respect to distinctiveness, the court has found above the Claw Icon is a strong mark with some degree of distinctiveness, but a genuine factual dispute remains as to its fame. With respect to plaintiff's exclusive use of the mark, plaintiff asserts it "is engaged in the exclusive use of its Claw Icon" and defendant has not produced evidence of third-party use of similar marks. Mem. at 13. Regarding exclusivity and recognition, plaintiff has offered uncontroverted evidence showing it has exclusively used the Claw Icon and that the Claw Icon has attained a high degree of recognition due to plaintiff's extensive sales, advertising and promotion featuring the mark. Sacks Decl. ¶¶ 4, 21–23, 25–26, 29–42, 44; *id.* Exs. 19, 22, 25–35. Plaintiff also has provided survey evidence showing 67.2 percent of energy drink consumers associate the Claw Icon with Monster. Simonson Decl. Ex. 1 at 5, 9–10. Finally, regarding actual association, plaintiff provides a survey of potential customers showing 27.9 percent of customers polled believed some affiliation existed between plaintiff's and defendant's products. Klein Decl. Ex. 1 at 2–3, 14–18. Further, some survey respondents stated defendant's marks were a reason they believed the BeastUp energy drink was

put out by Monster, put out by the same company as Monster or required authorization from Monster.  Klein Decl. Ex. 1 at 62, 64, 76, 80, 122, 124, 128, 134, 136, 140, 158, 164, 182.

For the same reasons discussed above regarding likelihood of confusion, plaintiff has not shown dilution as a matter of law.  A genuine factual dispute exists as to the critical similarity factor.  Because plaintiff has not satisfied the fame or likelihood of dilution elements, the court denies summary judgment on plaintiff's trademark dilution claim.

E.    Defendant's Affirmative Defenses

In addition to moving for summary judgment on its own claims, plaintiff seeks summary judgment on defendant's affirmative defenses of laches, waiver, acquiescence, unclean hands and priority.  Mem. at 14–20.  Defendant bears the burden of proof on its affirmative defenses.  *Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir. 1981).  Plaintiff contends the court should grant summary judgment on defendant's affirmative defenses because defendant does not respond to plaintiff's arguments for summary judgment and has not presented any evidence to support these defenses.  Reply at 9.  Defendant asserts disputes remain as to genuine issues of material fact, precluding summary judgment.  Opp'n at 8–9.

1.    Laches

"Laches is an equitable defense to Lanham Act claims."  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 989 (9th Cir. 2009) (citing *GoTo.Com, Inc.*, 202 F.3d at 1209).  To prevail on a laches defense, a defendant must prove (1) the plaintiff unreasonably delayed in bringing suit, and (2) as a result of the delay, the defendant suffered prejudice.  *Id.* at 990.  Plaintiff argues defendant cannot prove either element, Mem. at 14, while defendant contends an issue of material fact remains as to whether plaintiff waited an unreasonable and prejudicial length of time in bringing its lawsuit, Opp'n at 9.

In assessing the reasonableness of delay, the court "must first decide whether [a plaintiff] filed suit within the applicable" statute of limitations period.  *Internet Specialties W., Inc.*, 559 F.3d at 990.  When a plaintiff filed suit within the limitations period, "the strong presumption is that laches is inapplicable."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).  The Lanham Act contains no statute of limitations, so federal

courts borrow the statute of limitations from analogous state law.  *See id.* at 836.  In this case, the court finds California's four-year statute of limitations for trademark infringement actions governs as the most analogous limitations period.  *See Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018) (finding California's four-year statute of limitations for trademark infringement actions most analogous); *Internet Specialties W., Inc.*, 559 F.3d at 990 & n.2 (applying four-year limitations period from California trademark infringement law).  Additionally, the court measures delay from the time plaintiff knew or should have known of the allegedly infringing conduct.  *Eat Right Foods, Ltd. v. Whole Foods Market, Inc.*, 880 F.3d 1109, 1116 (9th Cir. 2018) (citing *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012)).

Here, plaintiff timely filed suit within the four-year statutory period.  Although defendant asserts in its affirmative defense it has been using its marks in connection with hats and shirts since 2009, Am. Ans., ECF No. 28, ¶ 101, plaintiff's claims stem from defendant's use of its marks in connection with its BeastUp energy drink, not prior use in connection with clothing.  Compl. ¶¶ 40–44.  Therefore, plaintiff could have known of its potential claims for trademark infringement, false designation of origin, unfair competition and trademark dilution no earlier than May 2014, when defendant began selling its BeastUp energy drinks using the allegedly infringing marks.  *See* Bellinger Decl. Ex. 8 at 2.  Plaintiff could have known of its potential trademark cancellation claim no earlier than August 12, 2014, when defendant's trademark registration issued.  *See* Bellinger Decl. Ex. 11.  Plaintiff filed its complaint on August 2, 2017, less than four years after its potential claims accrued.  *See* Compl.  Accordingly, a strong presumption against the application of laches arises.  *Jarrow Formulas, Inc.*, 304 F.3d at 835.  Further, defendant has not provided evidence showing it suffered prejudice as the result of any delay by plaintiff in filing this lawsuit.  Plaintiff is entitled to summary judgment on defendant's laches defense; its motion in this respect is GRANTED.

2.      Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."  *United States v. King Features Entm't, Inc.*, 843 F.2d

394, 399 (9th Cir. 1988) (citing *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983)).  To

apply, "waiver must be manifested in an unequivocal manner."  *Marketquest Group, Inc. v. BIC*

*Corp.*, 316 F. Supp. 3d 1234, 1294 (S.D. Cal. 2018) (internal quotations and citation omitted); *see*

*also Groves v. Prickett*, 420 F.2d 1119, 1126 (9th Cir. 1970) ("[T]o constitute an 'implied waiver'

of substantial rights, the conduct relied upon must be clear, decisive and unequivocal . . . .").

   Here, defendant has not addressed this affirmative defense in its opposition and

proffers no evidence of plaintiff's "clear, decisive and unequivocal" intent to relinquish its

trademark claims against defendant.  To the contrary, plaintiff sought to enforce its rights less

than three years after defendant began its alleged infringement.  Accordingly, the court finds no

genuine dispute that plaintiff did not waive its rights and GRANTS summary judgment to

plaintiff on the waiver defense.

3. <u>Acquiescence</u>

   The equitable defense of acquiescence "limits a party's right to bring suit

following an *affirmative* act by word or deed by the party that conveys implied consent [to use of

a mark] to another."  *Eat Right Foods Ltd.*, 880 F.3d at 1121 (alteration and emphasis in original)

(internal quotations omitted) (quoting *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate*

*Educ., Inc.*, 621 F.3d 981, 988 (9th Cir. 2010)).  To establish an acquiescence defense, a

defendant must show: "(1) the senior user actively represented that it would not assert a right or a

claim; (2) the delay between the active representation and assertion of the right or claim was not

excusable; and (3) the delay caused the defendant undue prejudice."  *Seller Agency Council, Inc.*,

621 F.3d at 989 (quoting *ProFitness Physical Therapy Ctr v. Pro-Fit Orthopedic & Sports*

*Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002)).  Acquiescence thus shares two elements

in common with laches, but also "requires an affirmative representation by the plaintiff that it will

not assert a claim."  *Eat Right Foods Ltd.*, 880 F.3d at 1121 (citing *Seller Agency Council*,

621 F.3d at 989).

   Plaintiff asserts defendant cannot show plaintiff affirmatively represented it would

not assert a right or claim against defendant.  Mem. at 16.  Defendant has not produced any

evidence of affirmative conduct that could provide a foundation for an acquiescence defense.

Further, to the extent defendant's acquiescence defense focuses on any delay by plaintiff, defendant's inability to prevail on its laches defense dooms its acquiescence defense as well. *E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1414 (E.D. Cal. 1994). Therefore, the court GRANTS summary judgment on defendant's acquiescence defense.

### 4.    Unclean Hands

"The doctrine [of unclean hands] bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989). "To prevail on an unclean hands defense, 'the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'" *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 909 (9th Cir. 2003) (quoting *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997)). In the trademark context, however, "it is not enough that the trademark plaintiff engaged in misconduct regarding the trademark generally." *2Die4Kourt v. Hillair Capital Mgmt., LLC*, No. SACV 16-01304 JVS(DFMx), 2016 WL 4487895, at *9 (C.D. Cal. Aug. 23, 2016), *aff'd*, 692 Fed. App'x 366 (9th Cir. 2017). "Rather, the trademark defendant must also show that the plaintiff used the trademark with the specific intent to deceive consumers." *Id.* (citing *Japan Telecom. Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) ("To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers . . . ."); *Dollar Sys., Inc.*, 890 F.2d at 173 ("Bad intent is the essence of the defense of unclean hands." (citing *Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302, 308 (9th Cir. 1982)).

Here, plaintiff argues defendant has made no allegation and produced no evidence that plaintiff used its trademarks with the specific intent to deceive customers. Mem. at 17. In its amended answer, defendant alleges "plaintiff has engaged in a pattern of filing frivolous lawsuits against legitimate trademark owners in order to acquire a greater monopoly over generic words and phrases than the Lanham Act allows." Am. Ans. ¶ 102. Beyond these allegations, defendant does not offer any evidence plaintiff has used its marks with the specific intent to deceive

consumers. Accordingly, the court grants summary judgment to plaintiff on defendant's unclean hands defense.

### 5. Priority

A party acquires ownership of a trademark through priority of use. *Brookfield Commc'ns*, 174 F.3d at 1047 (quoting *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)). For a party to establish it has priority in a particular mark over a rival user, the party must show it was the first to use the mark in commerce. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009) ("It is a cardinal principle of federal trademark law that the party who uses the mark first gets priority."). The Lanham Act protects the earlier "*use* of a mark in commerce." *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004) (emphasis in original). "[I]t is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd.*, 96 F.3d at 1219. "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Commc'ns*, 174 F.3d at 1047 (citing cases).

Defendant alleges in support of its third affirmative defense that it has priority of use regarding plaintiff's marks incorporating the word BEAST and nine of plaintiff's trademark registrations relating to the Claw Icon. Am. Ans. ¶¶ 13, 103. Plaintiff seeks summary judgment on defendant's priority defense, asserting it, not defendant, has priority with respect to the marks, Mem. at 19, while defendant claims a question of material fact remains as to the question of priority, Opp'n at 8. The uncontroverted evidence shows plaintiff has used its Claw Icon and UNLEASH THE BEAST! mark in connection with its energy drinks since April 2002, before defendant formed its business and began using its BEASTUP mark in commerce in connection with clothing in 2009. Sacks Decl. ¶¶ 3–4, 10; Ex. 6; Bellinger Decl. Ex. 1 at 19 (113:9–19); *id.* Ex. 7 at 2–3; *id.* Ex. 8 at 2–3. The evidence also shows plaintiff has used the UNLEASH THE NITRO BEAST! mark in connection with its energy drinks since at least July 2009. Sacks Decl. ¶ 12 & Ex. 7. Defendant filed its application for trademark registration for the BEASTUP mark

34

on October 5, 2009, and began using the BEASTUP mark in connection with beverages in May 2014. Bellinger Decl. Ex. 1 at 6 (44:21–23), 14–15 (59:24–601); *id.* Ex. 3; *id.* Ex. 8, at 2; *id.* Ex. 11. Defendant did not submit evidence to contradict these established facts. The court thus finds plaintiff has priority of use with respect to the Claw Icon and marks incorporating the word BEAST.

Further, defendant alleges it has priority over the nine marks of plaintiff's identified in defendant's Amended Answer, which all incorporate plaintiff's Claw Icon, because plaintiff filed applications for trademark registrations for these marks after defendant's first use of its marks on clothing and accessories in 2009. Am. Ans. ¶ 13; Bellinger Decl. Ex. 1 at 6 (44:13–20), 19 (113:11–19); *id.* Ex. 8 at 4–5. Plaintiff, however, asserts it began using the relevant marks earlier than the filing dates of the trademark registrations. Mem. at 19–20. And the evidence before the court shows each of the trademark registrations identified by defendant in the Amended Answer lists a date of first use in commerce between 2002 and 2006. Sacks Decl. ¶¶ 25, 27–28; *id.* Exs. 18, 21, 24. Defendant did not create its own claw logo until September 2009 and did not use the claw logo or the silver claw marks near the top and bottom of the can for its energy drink can until May 2014 when defendant began selling its energy drink. Bellinger Decl. Ex. 1 at 9–10 (50:16–51:10), 10–11 (51:23–52:12), 14–15 (59:12–60:8), 18–19 (112:7–113:20). Therefore, defendant also has not shown priority of use over the nine marks identified in the Amended Answer.

Because defendant has not raised a genuine issue of material fact regarding which party has priority of use over the identified marks, the court GRANTS summary judgment to plaintiff on defendant's priority defense.

IV.    CONCLUSION

For the foregoing reasons, the court DENIES plaintiff's motion for summary judgment of plaintiff's claims for trademark infringement, false designation or origin, unfair competition, trademark cancellation and trademark dilution. The court GRANTS the motion as to defendant's affirmative defenses of laches, waiver, acquiescence, unclean hands and priority. The court sets **October 4, 2019 at 10:00 a.m.** as the date for the final pretrial conference. The

parties' joint final pretrial conference statement is due fourteen (14) days prior to the final pretrial conference.

IT IS SO ORDERED.

DATED: August 13, 2019.

UNITED STATES DISTRICT JUDGE