1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Monster Energy Company,                    No. 2:17-cv-01605-KJM-JDP

12                       Plaintiff,             ORDER; FINDINGS OF FACT
                                                AND CONCLUSIONS OF LAW
13        v.

14   BeastUp LLC,

15                       Defendant.

16

17        The court conducted a bench trial from December 7 to December 9, 2021 on plaintiff

18   Monster Energy Company's claims against defendant BeastUp LLC.  Monster asserts six claims:

19        1.    Trademark infringement and false designation of origin under 15 U.S.C.

20              § 1125(a);

21        2.    Trademark infringement under 15 U.S.C. § 1114;

22        3.    Trademark dilution under 15 U.S.C. § 1125(c);

23        4.    Petition for cancelation of BeastUp's U.S. Trademark Registration No. 4,584,629

24              under 15 U.S.C. § 1119;

25        5.    Unfair competition under California Business and Professions Code §§ 17200 *et*

26              *seq.*; and

27        6.    Unfair competition under California common law.

1    At the conclusion of trial, the court found Monster had proven each of the six claims above and

2    issued a bench order to that effect.  *See* Mins., ECF No. 100; Hr'g Tr., ECF No. 106.

3         Under Federal Rule of Civil Procedure 52, "[i]n an action tried on the facts without a

4    jury . . . , the court must find the facts specially and state its conclusions of law separately."  Fed.

5    R. Civ. P. 52(a)(1).  The court may record its findings and fact and conclusions of law "in an

6    opinion or a memorandum of decision filed by the court."  *Id.*  To that end, the court directed

7    Monster to file proposed findings of fact and conclusions of law.  The court permitted BeastUp to

8    make objections to Monster's proposed findings of fact and conclusions of law.  Monster filed its

9    proposed findings of fact and conclusions of law, ECF No. 107, and BeastUp did not make

10   objections.

11        After reviewing the record and the proposed findings of fact and conclusions of law, the

12   court makes the following findings of fact and conclusions of law.  Although the court has

13   adopted many portions of Monster's proposed findings of fact and conclusions of law as

14   consistent with its own conclusions, this order reflects the court's independent review of the

15   record and the law.  Some findings of facts described below may also constitute conclusions of

16   law and vice versa.  To the extent a finding of fact represents a conclusion of law, the court

17   adopts it as such.  The same is true of any conclusions of law that may also reflect factual

18   findings.

19   **I.    GENERAL BACKGROUND**

20        Monster launched its original Monster Energy drink in 2002.  *See* Undisputed Fact No. 2,

21   Am. Final Pretrial Order, ECF No. 64.  Since 2002, Monster's original Monster Energy drink has

22   displayed both its "Claw Icon"[1] and UNLEASH THE BEAST! marks on the container.  *See*

23   Undisputed Fact No. 3; Trial Tr. at 21:8–23:8, ECF No. 103 (testimony of Rodney Sacks).  An

24   /////

_____



[1]

1   example of the original Monster Energy drink container is shown below:



2   *See* Ex. 460.[2]

3          Since 2002, Monster has expanded its MONSTER line of energy drinks to include other

4   energy drink products, all of which display the Claw Icon on the product containers.  Undisputed

5   Fact No. 4; Trial Tr. at 22:11–15 (testimony of Rodney Sacks); Exs. 460–484.  The vast majority,

6   more than 90 percent, of the MONSTER line of energy drinks also display at least one mark

7   containing BEAST on the product containers, such as the UNLEASH THE BEAST! and

8   UNLEASH THE NITRO BEAST! marks.  *See* Trial Tr. at 22:16–23:12, 35:3–44:9 (testimony of

9   Rodney Sacks); Exs. 460–467; Undisputed Fact Nos. 5 and 29.  Monster also uses other marks

10  containing BEAST in connection with its beverages, such as

11          1.      REHAB THE BEAST!

12          2.      UNLEASH THE ULTRA BEAST!

13          3.      PUMP UP THE BEAST!

14          4.      UNLEASH THE CAFFEINE FREE BEAST!

15          5.      UNLEASH THE SALTY BEAST! and

16          6.      HYDRATE THE BEAST!

17  *See* Trial Tr. at 35:3–44:9 (testimony of Rodney Sacks); Exs. 468–485, 490–491; Undisputed

18  Fact Nos. 5 and 29.

---

[2] References to exhibits, abbreviated "Ex." in this order, refer to Monster's trial exhibits.

1    Monster owns numerous U.S. trademark registrations for its Claw Icon mark and BEAST-

2  containing marks in connection with beverages and other goods and services.  *See* Exs. 98, 100,

3  102, 103, 105, 107–111, 113, 115, 116, 118, 120, 122, 124, 126, 127, 129, 131, 133, and 137;

4  Undisputed Fact Nos. 6–28.  Monster is the owner of the following trademark registrations:

| MARK | REG. NO. | GOODS | DATE FILED | REG. DATE |
|---|---|---|---|---|
|  | 2,903,214 (incontestable[3]) | Drinks, namely, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and non-carbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not | 5/7/2003 | 11/16/2004 |
|  | 3,434,821 (incontestable) | Nutritional supplements | 9/7/2007 | 5/27/2008 |
|  | 3,434,822 (incontestable) | Non-alcoholic beverages, namely, energy drinks, excluding perishable beverage products that contain fruit juice or soy | 9/7/2007 | 5/27/2008 |
|  | 3,963,668 (incontestable) | Stickers; sticker kits comprising stickers and decals; decals; posters | 7/28/2010 | 5/17/2011 |

---

[3]  "Registration of a mark . . . ordinarily renders the registered mark incontestable after five years of continuous use."  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) (citing 125 U.S.C. § 1065).  For incontestable marks, "registration is conclusive evidence of the registrant's exclusive right to use the mark," subject to a number of conditions and defenses specifically listed in the Lanham Act, but not relevant here.  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985).

| MARK | REG. NO. | GOODS | DATE FILED | REG. DATE |
|---|---|---|---|---|
|  | 3,963,669 (incontestable) | All purpose sport bags; all-purpose carrying bags; backpacks; duffel bags | 7/28/2010 | 5/17/2011 |
|  | 4,011,301 | Sports helmets; video recordings featuring sports, extreme sports, and motor sports | 7/27/2010 | 8/16/2011 |
|  | 4,051,650 | Clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely hats and beanies | 7/28/2010 | 11/8/2011 |
|  | 4,332,062 (incontestable) | Silicone wrist bands; silicone bracelets; jewelry, namely, bracelets and wristbands | 10/5/2012 | 5/7/2013 |
|  | 3,134,841 (incontestable) | Beverages, namely, carbonated soft drinks, carbonated soft drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated energy and sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not | 5/7/2003 | 8/29/2006 |
|  | 3,908,600 | Stickers; sticker kits comprising stickers and decals; decals | 4/2/2009 | 1/18/2011 |

| MARK | REG. NO. | GOODS | DATE FILED | REG. DATE |
|------|----------|-------|------------|-----------|
|  | 3,908,601 (incontestable) | Clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely, hats and beanies | 4/2/2009 | 1/18/2011 |
|  | 3,914,828 (incontestable) | Sports helmets | 4/2/2009 | 2/1/2011 |
|  | 3,923,683 | All purpose sport bags; all-purpose carrying bags; backpacks; duffle bags | 4/2/2009 | 2/22/2011 |
| UNLEASH THE BEAST! | 2,769,364 (incontestable) | Fruit juice drinks, soft drinks, carbonated soft drinks and soft drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs | 12/18/2002 | 9/30/2003 |
| UNLEASH THE BEAST! | 4,975,822 | Clothing, namely, tops, shirts, t-shirts, hooded sweatshirts, sweat shirts | 3/7/2014 | 6/14/2016 |
| UNLEASH THE NITRO BEAST! | 4,394,044 (incontestable) | Non-alcoholic beverages, namely, carbonated soft drinks; carbonated drinks enhanced with vitamins, minerals, nutrients, proteins, amino acids and/or herbs; carbonated energy or sports drinks | 12/14/2010 | 8/27/2013 |

*See* Exs. 98, 100, 102, 103, 105, 107, 116, 118, 120, 122, 124, 126, 127, 129, 131, 133; Undisputed Fact Nos. 6–21; Trial Tr. at 79:4–81:8.

Monster also owns registrations for its BEAST-containing marks in connection with a variety of beverages, including the following U.S. Trademark Registration Nos.:

1.    4,336,329 for REHAB THE BEAST! (incontestable);

6

2.      4,292,502 for REHAB THE BEAST! WWW.MONSTERENERGY.COM (incontestable);

3.      4,371,544 for UNLEASH THE ULTRA BEAST! (incontestable);

4.      4,482,659 for PUMP UP THE BEAST! (incontestable);

5.      4,482,660 for PUMP UP THE BEAST! (incontestable);

6.      4,542,107 for PUMP UP THE BEAST! (incontestable);

7.      4,546,402 for PUMP UP THE BEAST! (incontestable).

*See* Exs. 108–111, 113, 115, 137; Undisputed Fact Nos. 22–28; Trial Tr. at 79:4–81:8.

In May 2014, BeastUp began selling its BeastUp energy drink.  *See* Trial Tr. at 261:4–20 (testimony of Robert Waelty).  The BeastUp energy drink container displays the BEASTUP mark on the front of the product container.  The container also displays the BeastUp Logo: a red and black jagged logo with talon-like features beneath the BEASTUP name.  The container also displays two sets of silver claw or scratch marks near the top and bottom of each can.  An image of the BeastUp energy drink can is shown below.



*See* Ex. 4.

BeastUp is the owner of U.S. Trademark Registration No. 4,584,629 covering the mark BEASTUP in connection with "sports drinks, namely, energy drinks" in International Class 32.  *See* Ex. 94; Undisputed Fact No. 42.

1    **II.    MONSTER'S CLAIMS**

2       **A.    Claims 1 and 2: False Designation of Origin and Trademark Infringement**

3          To prevail on a claim for false designation of origin or trademark infringement, a plaintiff

4    must prove: (1) it has a protectable ownership interest in the mark, and (2) the defendant's use of

5    the mark is likely to cause consumer confusion. *Rearden, LLC v. Rearden Commerce*, 683 F.3d

6    1190, 1202 (9th Cir. 2012). A claim for false designation of origin under 15 U.S.C. § 1125

7    requires proof of the same elements as a claim for trademark infringement under 15 U.S.C

8    § 1114. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir.

9    1999).

10         The court previously determined that Monster has a protectable interest in its BEAST-

11   containing marks and its Claw Icon mark. *See* Order (Aug. 13, 2019) at 7, ECF No. 49. The only

12   issue for trial on Monster's false designation of origin and trademark infringement claims was

13   whether Monster could prove there was a likelihood of confusion. Courts determine whether

14   there is a likelihood of confusion by weighing eight factors: (1) the strength of the mark, (2) the

15   proximity of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the

16   marketing channels used, (6) the type of goods and the degree of care likely to be exercised by the

17   purchaser, (7) defendant's intent in selecting the mark, and (8) the likelihood of expansion of the

18   product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). These eight

19   factors "must be applied in a flexible fashion" and are "not a rote checklist." *Rearden*, 683 F.3d

20   at 1209. "In other words, 'we do not count beans.'" *Id.* (quoting *Dreamwerks Prod. Grp., Inc. v.*

21   *SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)). The court considers the eight factors listed

22   above.

23              **1.    Factor 1: Strength of the Mark:**

24         "The stronger a mark—meaning the more likely it is to be remembered and associated in

25   the public mind with the mark's owner—the greater the protection it is accorded by the trademark

26   laws." *Brookfield*, 174 F.3d at 1058. A mark's strength is evaluated based on two components:

27   "the mark's recognition in the market (i.e., its commercial strength) and the mark's inherent

28   distinctiveness (i.e., its conceptual strength)." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*,

8

875 F.3d 426, 432 (9th Cir. 2017), *abrogated in part on other grounds by Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020), *as explained in Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022).

First, to determine the conceptual strength of a trademark, courts consider where the mark lies on the traditional distinctiveness spectrum—generic, descriptive, suggestive, arbitrary, or fanciful—and may consider factors such as the extent of the trademark owner's sales and marketing efforts relating to the trademark.  *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014).  Arbitrary and fanciful marks, which are the most distinctive on the spectrum, receive the most trademark protection.  *Id.* at 1126.  A mark is arbitrary if it "is non-descriptive of any quality of the goods or services."  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993).  Monster's Claw Icon mark and BEAST-containing marks are conceptually strong.  The court finds the marks are arbitrary or fanciful because the marks do not describe or suggest any ingredient, quality, or characteristic of Monster's energy drinks.  But even if Monster's marks are suggestive rather than arbitrary or fanciful, the court's ultimate conclusion would be the same.

Second, a mark's commercial strength "is based on 'actual marketplace recognition.'"  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (quoting *Brookfield*, 174 F.3d at 1058).  "Commercial strength may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition."  *Adidas Am., Inc. v. Calmese*, 662 F. Supp. 2d 1294, 1303 (D. Or. 2009).  Monster showed at trial that it has widely and extensively marketed drinks using the Claw Icon mark and the UNLEASH THE BEAST! mark and other BEAST-containing marks since 2002.  *See* Trial Tr. at 23:22–35:2, 55:4–66:9, 66:22–67:13, 82:4–110:21, 116:19–122:5, 180:12–22 (testimony of Rodney Sacks); Exs. 152–162, 164, 196, 197, 276, 279, 312, 317, 318, 325, 326, 348, 355, 356, 381, 404, 423, 429, 433.  Monster's sales of its MONSTER line of drinks displaying the Claw Icon mark and BEAST-containing marks on drink containers have totaled billions of cans and billions of dollars in revenue since 2002, and during that time, Monster also has spent billions of dollars promoting its trademarks.  *See* Trial Tr. at 47:9–52:21, 122:25–124:20, 187:16–188:11 (testimony of Rodney

1  Sacks); Ex. 377.  Monster presented reliable and unrebutted survey evidence at trial to show its

2  Claw Icon mark is widely recognized.  According to Dr. Itamar Simonson, 67.2 percent of survey

3  respondents associated the Claw Icon mark with Monster.  *See* Trial Tr. at 198:2–199:4, 205:13–

4  206:16.  The Claw Icon mark has been used with the UNLEASH THE BEAST! mark and

5  Monster's other BEAST-containing marks in many manifestations since 2002.  Although the

6  UNLEASH THE BEAST! mark is not as commercially strong as the Claw Icon mark, the court

7  finds that the UNLEASH THE BEAST! mark is a commercially strong mark.

8        In sum, the evidence of the extensive sales and marketing of Monster's Claw Icon mark

9  and BEAST-containing marks demonstrates the marks are commercially strong.  This factor

10 supports the conclusion that consumer confusion is likely.

11                          **2.      Factor 2: Proximity**

12       The second factor is the proximity of the parties' goods.  "Related goods are generally

13 more likely than unrelated goods to confuse the public as to the producers of the goods."

14 *Brookfield*, 174 F.3d at 1055.  The parties' products are energy drinks, and BeastUp does not

15 dispute that its energy drink product is nearly identical to at least one of Monster's products.  This

16 factor supports the conclusion that consumer confusion is likely.

17                      **3.      Factor 3: Similarity of the Marks**

18       The third factor is the similarity of the parties' marks.  When assessing similarities of the

19 parties' marks, the marks must be considered in their entirety "with similarities weighed more

20 heavily than differences."  *Brookfield*, 174 F.3d at 1054.

21       Upon close inspection, the parties' marks are similar.  Both the BeastUp Logo and

22 Monster's Claw Icon mark feature three vertical jagged lines with talon-like features, and the

23 images comprising the jagged lines are similar.  The BeastUp Scratch Marks are similar to

24 Monster's Claw Icon mark.  The BeastUp Scratch Marks each include three or four jagged prongs

25 similar to Monster's jagged Claw Icon mark.  The BeastUp Scratch Marks also appear to be

26 tearing through the BeastUp beverage can, similar to the manner in which the Claw Icon mark

27 appears on Monster's cans.

The BEASTUP mark is also similar to Monster's UNLEASH THE BEAST! and UNLEASH THE NITRO BEAST! marks, as well as the other BEAST-containing marks Monster has adopted.  The parties' marks share the same distinctive term "BEAST."  The term "BEAST" is the dominant element of the BEASTUP mark.  The parties' marks also evoke similar commercial impressions of being aggressive and letting loose one's inner "beast."  *See* Trial Tr. at 18:13–20 (testimony of Rodney Sacks); R. Waelty Dep. at 106:9–107:1 (Jan. 24, 2018).  Monster and BeastUp also both use their claw-like marks and their "beast" marks together.

Survey evidence presented by Monster's expert, Robert Klein, shows the marks are similar as well.  Mr. Klein's survey found that 27.9 percent of respondents believed the BeastUp energy drink was put out by or associated with Monster.  In response to open-ended survey questions, many respondents specifically pointed out similarities between Monster's marks and the BeastUp Logo, the BeastUp Scratch Marks, or the BEASTUP name.  *See* Trial Tr. at 229:19–230:7, 238:14–239:19 (testimony of Robert Klein).  BeastUp did not rebut this testimony or the survey.

BeastUp has pointed out a number of differences between its marks and Monster's marks, including the prominence of the BEASTUP name on BeastUp's cans and differences between the BeastUp Logo and the Claw Icon mark.  Notwithstanding these differences, the court finds the parties' marks are similar.  In addition, the similarities described above weigh more heavily than these differences.  This factor supports the conclusion that consumer confusion is likely.

### 4. Factor 4: Actual Confusion

The fourth factor is evidence of actual confusion.  Survey evidence may be used to establish actual confusion.  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001).  As noted, Mr. Klein found that after accounting for other factors, more than one in four respondents believed BeastUp's product was related to Monster.  That result is sufficient to show consumers were likely confused when exposed to the two competing marks.  *See, e.g.*, *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902–03 (9th Cir. 2002); *Warner Bros. Entm't v. Global*

1     *Asylum, Inc.*, No. 12-9547, 2012 WL 6951315, at *9 (C.D. Cal. Dec. 10, 2012), *aff'd*, 544 F.

2     App'x 683 (9th Cir. 2013).  This factor supports the conclusion that consumer confusion is likely.

3                 **5.      Factor 5: Marketing Channels**

4         The fifth factor concerns the marketing channels the parties used.  "Convergent marketing

5     channels increase the likelihood of confusion." *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d

6     601, 606 (9th Cir. 1987).  Monster has dedicated significantly more resources to its marketing

7     efforts, but Monster and BeastUp use similar marketing channels.  Both Monster and BeastUp

8     market and sell their energy drinks in the same types of stores, including gas stations,

9     convenience stores, and grocery stores, and the parties' energy drinks have been sold in some of

10    the same stores.  *See* Trial Tr. at 45:5–16, 53:13–54:3 (testimony of Rodney Sacks); R. Waelty

11    Dep. at 124:9–125:22, 127:20–22, 132:23–133:12, 133:10–25, 147:12–24 (Jan. 25, 2018); Exs.

12    10, 11.  The parties also both market their products in similar ways with sponsorships, including

13    by promoting extreme sports events.  *See* Trial Tr. at 85:6–86:6 (testimony of Rodney Sacks);

14    Trial Tr. at 295:19–296:8 (testimony of Robert Waelty); 1/25/2018 R. Waelty Dep. at 140:5–

15    141:1, 141:9–141:21 (Jan. 25, 2018); J. Waelty Dep. at 70:4–20, 88:14–89:9 (May 18, 2019); Ex.

16    56.  Monster's marketing expenditures are much greater than BeastUp's, and BeastUp markets its

17    product in a smaller geographic area, but their use of similar channels supports the conclusion

18    that confusion is likely among consumers exposed to both companies' marketing.  *Cf. Sleekcraft*,

19    599 F.2d at 353 ("Although different submarkets are involved, the general class of . . . purchasers

20    exposed to the products overlap.")

21                **6.      Factor 6: Types of Goods and Degree of Care**

22        The sixth factor is the type of the goods and the degree of care likely to be exercised by

23    purchasers.  "In analyzing the degree of care that a consumer might exercise in purchasing the

24    parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to

25    distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d

26    625, 634 (9th Cir. 2005) (citing *Brookfield Commc'ns*, 174 F.3d at 1060).  It is undisputed that

27    the parties' energy drinks are inexpensive and are often purchased on impulse with a lower degree

of care.  *See* Trial Tr. at 44:22–47:8 [Sacks]; R. Waelty Dep. at 168:9–13 (Jan. 25, 2018).  This factor supports the conclusion that consumer confusion is likely.

### 7.      Factor 7: The Defendant's Intent

The seventh factor is the defendant's intent in selecting its mark.  "A party claiming trademark infringement need not prove intent to deceive because intent is not a necessary element of trademark infringement." *Official Airline Guides,* 6 F.3d at 1394.  But "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Id.*

Here, the court finds no evidence of bad faith intent by BeastUp in adopting its marks.  On the one hand, Mr. Waelty testified persuasively at trial about the independent origins of the BEASTUP mark.  *See* Trial Tr. at 250:17–251:10.  On the other hand, knowledge of a plaintiff's prior use of a similar mark can support an inference of intent to ride on the coattails of the plaintiff's mark.  Intent can also be presumed based on similarity of the parties' marks.  Monster did show that BeastUp had knowledge of Monster and its trademarks before BeastUp launched its energy drink, but nothing more.  *See* Trial Tr. at 293:12–25 (testimony of R. Waelty); J. Waelty Dep. at 25:5–9, 25:24–26:20 (May 18, 2018).  This factor is neutral.

### 8.      Factor 8: Likelihood of Expansion

The eighth factor is the likelihood of expansion of the parties' product lines.  This factor "is relatively unimportant where two companies already compete to a significant extent." *Brookfield*, 174 F.3d at 1060.  This factor is thus inapplicable in this case; the parties' energy drinks are virtually identical product types.

### 9.      Summary and Conclusion for Claims 1 and 2

In sum, factors 1 through 6 favor Monster, factor 7 is neutral, and factor 8 is inapplicable.  The court thus finds a likelihood of confusion between BeastUp's marks and Monster's mark.  Monster has proven its first two claims.

## B.     Trademark Dilution (Claim 3)

Monster asserts that BeastUp's use of the BeastUp Logo and BeastUp Scratch Marks dilutes the distinctive quality of the Claw Icon mark.  The court interprets Monster's claim as one for dilution by blurring.  Dilution by blurring is an association arising from the similarity between a mark or tradename and a famous mark that impairs the distinctiveness of the famous mark. 15 U.S.C. § 1125(c)(2)(B).  In order to prove dilution by blurring, a plaintiff must show: (1) the plaintiff's mark is famous and distinctive, (2) the defendant is making use of the mark in commerce, (3) the defendant's use began after the plaintiff's mark became famous, and (4) the defendant's use of the mark is likely to cause dilution.  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1168 (9th Cir. 2011); *Jada Toys v. Mattel*, 518 F.3d 628, 634 (9th Cir. 2008); 15 U.S.C. § 1125(c)(2)(B).  The court considers these elements in turn.

### 1.     Element 1: Famous and Distinctive

A mark is famous for purposes of dilution if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).  "In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors." *Id.*  These include, by way of example:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

> (iii) The extent of actual recognition of the mark.

> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.*

First, with respect to the duration, extent, and geographic reach of the advertising and publicity of the Claw Icon mark, the mark had been used and promoted by Monster for more than a decade before BeastUp began selling its energy drink.  Monster widely used and promoted its

Claw Icon mark as part of a nationwide marketing campaign, including using the mark on point-of-sale materials displayed in retail stores, on other promotional goods such as clothing, on Monster's websites and social media sites, and in connection with numerous sponsorship activities, including sponsorship of athletes, teams, and sporting events. *See* Trial Tr. at 23:22–35:2, 55:4–66:9, 66:22–67:13, 82:4–110:21, 116:19–122:4, 180:12–22 (testimony of Rodney Sacks); Exs. 152–162, 164, 196, 197, 276, 279, 312, 317, 318, 325, 326, 348, 355, 356, 381, 404, 423, 429, 433.  Monster has spent approximately $6 billion marketing its MONSTER brand and the Claw Icon mark in the U.S. since 2002. *See* Trial Tr. at 124:8–20 (testimony of Rodney Sacks).  By 2013, which is the year before BeastUp began selling its energy drink, Monster's marketing expenditures in the U.S. were nearly $2 billion. *See id.* at 123:6–124:7 (testimony of Rodney Sacks).

Second, with respect to the amount, volume, and geographic extent of sales of goods or services offered under the Claw Icon mark, Monster has sold billions of cans of beverages displaying this mark in hundreds of thousands of retail locations across the United States. *See id.* 47:9–53:12 (testimony of Rodney Sacks); Ex. 377.  Since 2002, Monster has sold over 26 billion cans of its MONSTER drinks, all of which display the Claw Icon mark on the cans. *See* Trial Tr. at 51:16–19 (testimony of Rodney Sacks).  By 2013, Monster's sales of cans displaying both the Claw Icon mark and a mark containing BEAST on the can had exceeded 6.8 billion cans. *See id.* at 51:3–11 (testimony of Rodney Sacks).

Third, with respect to the extent of actual recognition of the mark, the record shows the Claw Icon mark is well-recognized as a result of Monster's extensive marketing and use of the mark.  This conclusion is supported by the results of the Simonson survey, which found that 67.2 percent of survey respondents associated the Claw Icon mark with Monster.  *See* Trial Tr. at 198:2–199:4, 205:13–206:16 (testimony of Itamar Simonson).  Monster also introduced numerous examples of unsolicited mentions of the Claw Icon mark in the press, including in publications such as the *Wall Street Journal*, *Fortune* magazine, and *Newsweek* magazine, that further show the mark is well-recognized in the industry and among consumers. *See* Trial Tr. at 26:2–11, 68:4–71:18 (testimony of Rodney Sacks); Exs. 357, 358, 362, 365, 423.

1     Fourth, with respect to registration of the Claw Icon mark, Monster owns many

2  incontestable registrations[4] for the Claw Icon mark on the principal register.  *See* Exs. 98, 100,

3  102, 103, 116, 118, 120, 122, 124, 127, 129, 131, 133; Statement of Undisputed Fact Nos. 6–18.

4     Monster has satisfied the first element of a dilution claim.  Its marks "possess[] the

5  requisite degree of recognition."  15 U.S.C. § 1125(c)(2)(A).

6              **2.     Element 2: Use in Commerce**

7     BeastUp stipulated that it was making use of its scratch marks and logo in commerce.  *See*

8  Trial Tr. at 112:4–113:8.  This satisfies the second element of Monster's dilution claim.

9              **3.     Element 3: Defendant's Use After the Plaintiff's Mark Became**
10                    **Famous**

11     The third element of a dilution claim is whether BeastUp's use of the scratch marks and

12  logo began after the Claw Icon mark became famous.  The Claw Icon mark became famous in

13  2010 or earlier, including in light of the extensive press coverage involving the mark as well as

14  Monster's promotion of the mark on its website and social media sites.  *See, e.g.*, Exs. 281, 357,

15  362, 365; Trial Tr. at 121:7–24 (testimony of Rodney Sacks).  As noted above, BeastUp's use of

16  its scratch marks and logo in connection with its energy drink began in 2014.  This satisfies the

17  third element of a dilution claim.

18              **4.     Element 4: Likely to Cause Dilution by Blurring**

19     The fourth element of a dilution claim is whether BeastUp's use of the scratch marks and

20  logo is likely to cause dilution by blurring.  "[T]he plain language of 15 U.S.C. § 1125(c) does

21  not require that a plaintiff establish that the junior mark is identical, nearly identical or

22  substantially similar to the senior mark in order to obtain injunctive relief.  Rather, a plaintiff

23  must show, based on the factors set forth in § 1125(c)(2)(B), including the degree of similarity,

24  that a junior mark is likely to impair the distinctiveness of the famous mark."  *Levi Strauss*,

25  633 F.3d at 1172.  In determining whether a mark is likely to cause dilution by blurring, the court

26  may consider all relevant factors, including the following:

---

[4] *See supra* note 3.

1          (i) The degree of similarity between the mark or trade name and the
2  famous mark.

3          (ii) The degree of inherent or acquired distinctiveness of the famous
4  mark.

5          (iii) The extent to which the owner of the famous mark is engaging
6  in substantially exclusive use of the mark.

7          (iv) The degree of recognition of the famous mark.

8          (v) Whether the user of the mark or trade name intended to create an
9  association with the famous mark.

10          (vi) Any actual association between the mark or trade name and the
11  famous mark.

12  15 U.S.C. § 1125(c)(2)(A).

13        The court has considered each of these factors and finds that BeastUp's use of its scratch

14  marks and logo is likely to cause dilution by blurring with the Claw Icon mark.  First, the court

15  finds the Claw Icon mark and the BeastUp Logo and BeastUp Scratch Marks are similar, based

16  on the court's own perception and also based on the Klein survey, as discussed above.  Second,

17  the Claw Icon has acquired distinctiveness, at least, through Monster's saturation of the market

18  and marketing campaigns, as discussed above.  Third, although the court gives this factor limited

19  weight, no evidence suggests any other seller of energy drinks uses a claw-like logo within the

20  United States.  *See* R. Waelty Dep. at 204:12–15 (Jan. 25, 2018).  Fourth, the court finds there is a

21  high degree of recognition of the Claw Icon mark.  As noted above, the Simonson survey showed

22  more than 67 percent of respondents associated the Claw Icon mark with Monster.  Fifth,

23  BeastUp did not act in bad faith, but the evidence demonstrates BeastUp had a goal of achieving

24  side-by-side placement of its BeastUp energy drinks with Monster's energy drinks, including in

25  stores such as AM/PM convenience stores and Food Maxx markets.  *See* Exs. 10, 11.  This

26  suggests BeastUp intended to create an association between its product and Monster's products,

27  among those of other energy drink manufacturers.  Sixth, as discussed above, the Klein survey

28  supports a finding of actual association between BeastUp's marks and the Claw Icon mark.

29        Monster has proven its claim for dilution by blurring.

1  **C.      Cancelation (Claim 4)**

2        Monster requests that the court order cancelation of BeastUp's trademark registration for

3  the BEASTUP mark based on a likelihood of confusion with Monster's BEAST-containing

4  marks.  "In any action involving a registered mark the court may . . . order the cancelation of

5  registrations, in whole or in part . . . and otherwise rectify the register with respect to the

6  registrations of any party to the action."  15 U.S.C. § 1119.  To prevail on its claim for

7  cancelation, Monster must prove: (1) there is a valid ground why the trademark should not be

8  registered; and (2) Monster has standing to seek cancelation of the registration.  *Synoptek, LLC v.*

9  *Synaptek Corp.*, 309 F. Supp. 3d 825, 834 (C.D. Cal. 2018) (citing *Star–Kist Foods, Inc. v. P. J.*

10 *Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984)).

11       The court previously determined Monster has standing to seek cancelation of BeastUp's

12 trademark registration.  *See* Order (Aug. 13, 2019) at 23–24, ECF No. 49.  Monster will prevail if

13 it shows a valid ground for cancelation.  Monster may prove a valid ground for cancelation by

14 showing the BEASTUP mark creates a likelihood of confusion with Monster's BEAST-

15 containing Marks.  *Synoptek*, 309 F. Supp. 3d at 834 (citing 15 U.S.C. § 1052(d)).  For the

16 reasons above, there is a likelihood of confusion between the BEASTUP mark used in connection

17 with BeastUp's energy drinks and Monster's UNLEASH THE BEAST! Mark at least.

18       BeastUp's registration (No. 4,584,629) is cancelled.

19 **D.      Unfair Competition (Claims 5 and 6)**

20       Monster asserts claims against BeastUp for unfair competition under California Business

21 and Professions Code §§ 17200 *et seq.* and unfair competition under California common law.

22 State common law claims of unfair competition and actions based on California Business and

23 Professions Code § 17200 are "substantially congruent" to claims made under the Lanham Act.

24 *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (quoting *Acad. of Motion Picture*

25 *Ars & Sci. v. Creative House Productions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991)).  For the

26 same reasons the court has provided above in finding Monster has established its claims for false

27 designation of origin and unfair competition, the court also finds Monster has proven its claims

28 against BeastUp for unfair competition.

## III.   REMEDIES

Monster seeks a permanent injunction.  "The Lanham Act gives courts the 'power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation' of a registrant's rights."  *Westinghouse Elec. Corp. v. General Circuit Breaker and Elec. Supply Co.*, 106 F.3d 894, 903 (9th Cir. 1997) (quoting 15 U.S.C. § 1116(a)).  "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The court considers the totality of the circumstances when determining if a permanent injunction is appropriate.  *La Quinta Worldwide, LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014).

Monster is entitled to permanent injunctive relief under this standard.  First, Monster is entitled to a rebuttable presumption of irreparable harm because it has prevailed on its trademark infringement and dilution claims.  A plaintiff seeking an injunction is entitled to a rebuttable presumption of irreparable harm if a violation of the Lanham Act is established.  15 U.S.C. § 1116(a).  BeastUp did not rebut that presumption.  In addition, Mr. Sacks testified persuasively at trial about the importance of trademarks to Monster's business and the damage caused by confusingly similar marks.  *See* Trial Tr. at 127:14–128:2, 132:13–133:22, 134:25–135:21.

Second, the court finds monetary damages will not adequately compensate Monster for the injury caused by BeastUp's infringement and dilution of Monster's trademarks due to the nature of injury, which includes consumer confusion and loss of control over Monster's trademarks and brand image.  *See Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.").  Moreover, Monster did not seek monetary relief from BeastUp at trial.

19

1      Third, the court has considered the balance of hardships between Monster and BeastUp

2 and determines that injunctive relief is warranted.  Monster has undeniably invested heavily in its

3 Claw Icon mark and BEAST-containing marks, is currently using those marks, and consumers

4 associate the marks with Monster.  Although BeastUp has represented it is not currently selling

5 the BeastUp energy drink and has stated that it does not plan to use the current can design moving

6 forward, there is no indication that BeastUp has destroyed its remaining inventory of the product,

7 which weighs in favor of granting an injunction.  BeastUp also has indicated it intends to resume

8 sales of another BEASTUP energy drink in the future.  *See* R. Waelty Dep. at 154:17–155:9

9 (Jan. 25, 2018).  It bears noting that BeastUp originally was formed as a company that sold

10 clothing, and Monster is not seeking to enjoin BeastUp's use of its marks on clothing, which

11 minimizes any hardship to BeastUp.  *See* Trial Tr. at 251:14–252:9 (testimony of Robert Welty).

12 The hardships thus weigh in Monster's favor.

13      Fourth, there is no evidence of record to suggest the public would be disserved by an

14 injunction.  Given the evidence of consumer confusion, the public interest rather would be served

15 by an injunction preventing further confusion moving forward.

16 **IV.   CONCLUSION**

17      Based on the foregoing, the court hereby **ORDERS and ADJUDGES** as follows:

18     1.     Final judgment is **entered** in favor of Monster and against BeastUp on Monster's

19         claims:

20          a.     Trademark infringement and false designation of origin under 15 U.S.C.

21             § 1125(a);

22          b.     Trademark infringement under 15 U.S.C. § 1114;

23          c.     Trademark dilution under 15 U.S.C. § 1125(c);

24          d.     Petition for cancelation of BeastUp's U.S. Trademark Registration No.

25             4,584,629 under 15 U.S.C. § 1119;

26          e.     Unfair competition under California Business and Professions Code

27             §§ 17200 et seq.; and

28          f.     Unfair competition under California common law.

2.    BeastUp's U.S. Trademark Registration No. 4,584,629 for the BEASTUP mark is **canceled** and the Director of the United States Patent and Trademark Office (PTO) is ordered to make the appropriate entry upon the records of the PTO that the registration has been canceled.

3.    BeastUp, its agents, servants, employees, attorneys, successors, and assigns, and all other persons in active concert or participation with any of them who receive actual notice of this injunction by personal service or otherwise, are forthwith **permanently enjoined** from:

    a.    Using the BEASTUP mark, the BeastUp Logo, or the BeastUp Scratch Marks, or using any other marks confusingly similar to Monster's Claw Icon mark or Monster's UNLEASH THE BEAST! or other BEAST-containing marks, in connection with the manufacture, sale, offer to sell, promotion of, or distribution of any beverage products;

    b.    Filing any applications for registration of the BEASTUP mark, the BeastUp Logo, or the BeastUp Scratch Marks, or any other marks confusingly similar to Monster's Claw Icon mark or Monster's UNLEASH THE BEAST! or other BEAST-containing marks, in connection with any beverage products;

    c.    Using any marks in connection with any beverage products that are likely to dilute the distinctive qualities of Monster's Claw Icon mark;

    d.    Falsely designating the origin of BeastUp's beverage products;

    e.    Unfairly competing with Monster in any manner whatsoever; and

    f.    Causing a likelihood of confusion or injury to Monster's business reputation.

4.    BeastUp is directed to file with this court and serve on Monster **within thirty days** after the service of this order, a written statement report, under oath, confirming it has complied with the injunction as provided by 15 U.S.C. § 1116.

5.   The parties are ordered to meet and confer and **within thirty days** after service of this order file a joint status report explaining whether BeastUp has delivered to Monster for destruction all materials in BeastUp's possession that the court has found to infringe on Monster's marks, or whether the parties have otherwise agreed to disposition of the infringing materials, consistent with the provisions of 15 U.S.C. § 1118.

6.   The parties shall each bear their own costs and attorneys' fees incurred in this case.

IT IS SO ORDERED.

DATED: November 14, 2022.

CHIEF UNITED STATES DISTRICT JUDGE